# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Kevin P. Hoyland, Special Agent with the FBI, being duly sworn, deposes and states under penalty of perjury that the following is true to the best of my information, knowledge and belief.

1. I am a Special Agent with the FBI and have been since 2012. I have experience investigating a wide variety of federal criminal violations to include white collar crimes, computer crimes, narcotics crimes, violent crimes, crimes against children, and other federal violations to include national security matters. As a Special Agent, I have received training and gained experience in interviewing techniques, arrest procedures, search warrant applications, the execution of search and seizures, financial crimes, computer crimes, child exploitation, and various other criminal laws and procedures. As part of my duties, I investigate individuals who have participated in organized fraud networks, including those targeting the elderly for their own illegal gain.

2. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

3. Your affiant was informed by law enforcement that on 11/02/2018, Estes Park Police Department ("EPPD") was contacted by Key Bank – Estes Park Branch in regards to S.O., date of birth ("DOB") 11/1938, who had recently opened an account and almost immediately attempted to withdraw the entire balance of $138,000. Key Bank was

concerned that given her age, she was being victimized and defrauded by unknown persons.

4. On 11/27/2018, S.O. went to EPPD with her adult son and filed a complaint explaining how she was a victim of a lottery fraud. In early 2018, S.O. received a letter in the mail from "The Mega Lottery Picker 2018" which was dated "Feb/16/2018" indicating that she had won $2,800,000 USD, tax free from a lottery drawing in Spain. The letter provided instructions to contact "Mr. Antonio Morris" and that she would be required to remit 5% of the total amount of the winnings to "Prosegur Securities Madrid" as the promotion company.

5. In March 2018, S.O. began sending tens of thousands of dollars via cashier's checks, Western Union, and packages containing cash to persons unknown to her as directed by an individual she knew as "Frank White." S.O. kept a spreadsheet documenting the roughly 70 payments she made, including who she sent money to, dates she sent it, the destination address, and how much money she sent, which lists her loss at over $1,000,000.00 from March 2018 through November 2018. In subsequent interviews with S.O., she provided bank statements, bank receipts, copies of cashier's checks, and other documentation to support her claims that all of the money she has lost was her own and she was not duped into receiving and then forwarding along money from persons she does not know.

6. Between 03/26/2018 and 04/16/2018, S.O. wired $5,880 via Western Union and over $102,000 in cashier's checks to S.P., DOB 03/1951, on Wimbledon Dr SW, Grandville, MI. Banking records from Huntington National Bank indicate that on two occasions in April 2018, S.P. received funds from S.O. Two days after these funds

were deposited into S.P.'s account she requested cashier's checks made out to an individual named Leonard Luton for nearly the same amount as received. Those checks were subsequently cashed by an account holder at Bank of America. When contacted by Huntington National Bank, S.P. acknowledged that she did not know the people she was receiving the money from, nor sending the money to, but felt that she was helping people and did not benefit monetarily from her actions.

7. On 04/20/2018, Grand River Bank in Grandville, MI contacted the Grandville Police Department ("GPD") to report suspicious activity with a new customer, S.P. Per the GPD police report, S.P. with the same DOB as the aforementioned S.P., opened the account three days prior using a $45,000 cashier's check sent by S.O. and attempted to withdraw $30,000. When police contacted S.P. and asked her the purpose behind the money, she said it was for taxes she needed to pay related to her winning $5,000,000 in the Publisher's Clearing House lottery. S.P. continued to explain that she received money and instructions from "David" at 702-726-2033 on where to send money after receiving it and asked the GPD Investigators if she could call him so he could help explain the situation.

8. GPD reported that upon listening to S.P.'s conversation with David, it was clear he was upset that she had involved law enforcement and wanted her to stop speaking with them, take $30,000 of the $45,000, and go open a new account at a different bank. At one point while on "hold" with David, S.P. began to speak with the GPD Investigator in the room with her. David overheard the conversation and became suspicious. The Investigator identified himself as S.P.'s grandson to continue the ruse. David denied the money was related to a lottery and instead explained the funds

were for a business start-up wherein S.P. was supposed to keep $2,000. David offered to pay the Investigator $500 for "his troubles." Over a two-hour period while S.P. was being interviewed, David attempted to contact S.P. 52 times.

9. Your affiant knows that individuals who orchestrate these types of wire and mail frauds often target older persons who are more likely to believe fact patterns which are illogical. The suspects frequently call and badger the victims in an attempt to get the victims to go along with their scheme and send or receive money. When persons are no longer willing, or able, to send their own money, they are then recruited to serve as a recipient of other victim's money for further routing to the fraudsters in an effort to make the paper trail more difficult to follow. Persons who serve as a conduit for transferring the money are often called money mules.

10. With S.P.'s consent, GPD reviewed her text messages with 702-726-2033 and found numerous references to shipment tracking numbers and other instructions on where S.P. was supposed to send the money she received. On 03/31/2018, S.P. received a text which stated "Account:483065255611 Routine:021000322Leonard Luton." The number under "Routine" corresponds to a routing number for Bank of America. Your affiant believes this is the same Luton listed in the aforementioned Huntington National Bank banking records as referenced in Paragraph 6.

11. On or about 05/17/2018, GPD added a supplement to their report that detailed a conversation they had with S.P.'s adult son who explained that the scammers had mailed S.P. a cell phone in an effort to continue to communicate with her that helps to describe the depth these scammers are willing to go for their own personal greed.

12. As communicated to your Affiant by EPPD Detectives, during EPPD's interviews with S.O. she explained how she began to lose trust in White as he continually promised her a return of her money and other prizes she had "won" which never came true. S.O. communicated with White via telephone and White often used number 702-726-2033; the same number S.P. provided for David. That number resolves back to Bandwidth.com, which provides a variety of telecom solutions, to include Voice Over Internet Protocol ("VoIP"). VoIP allows an individual to make phone calls internationally over the internet at low or no cost to them.

13. Around late April/early May 2018, White told S.O. that S.P. had been arrested and that S.O. had been the victim of a fraud. White went on to allege that he was working with law enforcement in an attempt to get her money back. Eventually, S.O. told White she would no longer send him money because she did not trust him. White asked her if she trusted the FBI, to which she said she did. White then provided her with phone number 347-719-7368 for her to call to confirm for herself that White was working with the FBI to recover and return her money. S.O. stated she called the number and it was answered by an individual stating "Federal Bureau of Investigation" and that they were working with White in effort to get S.O.'s money back. The subscriber of that number has not been identified yet, however it also resolves back to Bandwidth.com.

14. S.O. explained to EPPD that she had been in communication with White regularly in the days prior to 10/02/2018. White told S.O. that he would contact the FBI and they would dispatch an agent and a "Merchant Banker" to her house to pick-up the remaining $65,000 she "owed." Similar to previous payments, S.O. believed this

5

would be the final payment she needed to make to receive all her previous money back and/or prizes White told her she had won.

15. At approximately 11:00pm on 10/02/2018, S.O. received a knock at her residence where she lived alone, to find as she described a large black male standing there. The man told her he was an FBI agent, showed her a badge, and indicated the person S.O. could see sitting in the car was the Merchant Banker White had told her about. S.O. handed the individual a package containing $65,000 in cash and they left.

16. For a two week period in November, your Affiant attempted to consensually record the telephone calls between S.O. and White. Those calls affirm the relationship as described by S.O. wherein White frequently called and harassed S.O. for more money, continually promising a variety of things in an effort to get her to send him more money. White has a distinct accent that sounds Jamaican.

17. On the morning of 01/22/2019, S.O. called EPPD stating that White was planning to send someone to her residence to pick-up $39,600. EPPD officers were dispatched to her house and could hear White telling S.O. on the phone that "agents" were on their way and instructed her to bring the package of money out to them in the car. When the vehicle arrived later that afternoon, EPPD arrested the driver of the vehicle -- Leonard L. Luton, DOB 04/21/1976, address 1307 Pacific St. Apt 6D, Brooklyn, NY and passenger Stacy A. Byfield, DOB 07/13/1990, address 443 Tompkins Ave, #4, Brooklyn, NY -- near S.O.'s front door.

18. White remained in telephonic contact after the arrest, telling S.O. that he cannot get ahold of the agents after she conveyed that no one came to her house. As the night of 01/22/2018 wore on, White allegedly made statements that he was trying to find an

agent in Loveland, CO to come up either that night or the next day to pick up the money. It was presumed by S.O. to be another FBI agent, however no additional persons showed up at her residence. The following day after further promises of more agents showing up, White instructed S.O. to wire the $20,000 to L.W. of Groton, CT and provided her with routing instructions to do so. L.W. is an individual who S.O. had previously sent money to in this scheme and it is unclear if he is a money mule or witting participant.

19. Following the arrests, both Luton and Byfield were separately read their Advice of Rights and provided a hard copy of the document to review themselves by Detective Caleb Robertson of EPPD and your Affiant. Prior to initiating interviews, both Luton and Byfield signed the Advice of Rights waiving their rights and agreed to speak with investigators. The interviews were both audio and video recorded and the individuals were offered water and food at many intervals during the interviews.

20. Byfield stated she was the girlfriend of Luton and did not understand why she was under arrest. Byfield explained they had driven to Colorado from New York, but she had slept most of the trip and did not understand the purpose behind the trip. Byfield also claimed to not know why they stopped at S.O.'s home and that she went to her door at the instruction of Luton without any additional information or context. Byfield did not believe it to be unusual to drive 2,000 miles across the country without knowing an end destination, nor was it unusual to go to an unknown person's front door without any context behind the purpose.

21. Byfield eventually acknowledged that she had traveled with Luton before to pick up unknown packages and has spent nights in hotels during those trips. This would

indicate that these trips took them well outside of New York if it required a stay in a hotel and not just a day trip to places.

22. During the interview, Byfield signed a consent to search form to review her iPhone which was seized from her person during the arrest. Nonetheless, EPPD obtained a search warrant for this iPhone from Larimer County Judge Jouard the following day. Contained on the phone were photos of Western Union receipts, including those sent by a Jamie Smith of New York to multiple different names. When asked about these photos, Byfield explained how she was blocked from sending money to Jamaica by Western Union because they thought her previous transactional activity was fraudulent, so she used her cousin Smith to send money on her behalf. When questioned about why Western Union thought her transactions were fraudulent, Byfield stated that Western Union flagged repetitive transactions as fraudulent. Your affiant knows that repetitive transactions alone does not block a customer from using Western Union's service.

23. Byfield stated that Luton gave her the money to give to her cousin to then send to persons in Jamaica. Byfield then took a photo of the receipt and texted the photo to Luton highlighting the tracking number. Your affiant knows from similar investigations that sending money via Western Union and then providing photos of the receipt and tracking number is often how fraudsters pass money back to the organization operating the scheme, especially when it is located outside the US.

24. Byfield's information was queried through New York and she was found to have no New York license, but did have information on file related to a previous arrest. The address on file in New York listed 443 Tompkins Ave, #4, Brooklyn, NY for Byfield.

Byfield stated her father lived at that address with whom she has a good relationship, but she had not lived there in approximately 10 years and provided a different address in the Brooklyn area for herself. When asked about why S.O. would have sent $15,000 in cash addressed to "Tom White" to that Tompkins Avenue address via UPS on 11/07/2018 and another $20,000 in cash the following day, Byfield did not have an answer. Byfield claimed to not know anything about any packages sent to that address, nor the money inside them.

25. Given the lack of reasonable explanations for driving from New York to Colorado and going up to the door of S.O.'s residence, photos of Western Union receipts with names sending money other than her own, and S.O. sending $35,000 in cash to a Tom White at the Tompkins Avenue address listed for her in New York, your Affiant believes that Byfield is aware of and participated in the scheme to defraud S.O..

26. During Luton's interview with Detective Robertson and your Affiant, he explained that Byfield and he were planning on traveling to Chicago and shortly before leaving, was asked by his friend Rayjay Dobson if he could pick up a package in Colorado. Luton claimed to have never been to Colorado before and did not realize how far away Colorado was from Chicago. Dobson offered to pay Luton $500 for his troubles. Luton alternated between explaining how he was a successful DJ and also worked odd jobs to make money, to being poor and having to sleep in his car.

27. Luton verbally consented to letting your Affiant go through the iPhone seized from his person following his arrest, but refused to sign the consent form. Luton was asked no less than five times at different points during the interview if he consented to your Affiant looking through his phone or taking pictures of items on his screen. At no

point did Luton ever revoke that consent or otherwise indicate he did authorize your Affiant to review data on his phone.

28. Luton acknowledged that he picked up packages on behalf of Dobson and that he gave the packages to Dobson's brother "Greg" who also lived in New York. Luton did not know Greg's last name, but knew Greg to be an alias. Luton did not know what happened to the packages afterwards and claimed to be surprised to learn that the package he was supposed to pick up at S.O.'s house had tens of thousands of dollars in cash. Luton later hypothesized that if there was money in the packages, Greg probably sent the money down to Jamaica or gave the money to persons who were physically traveling to Jamaica.

29. Luton provided phone numbers 876-770-7685 and 876-774-3214 for Dobson, 347-489-1346 for Greg, and showed your Affiant a text message from Greg giving Luton his address of 24 S. 11th Ave, Mount Vernon, NY. Luton explained that he has known Dobson for a while as they grew up in the same area of Jamaica, but does not know Greg as well. Through social media searches, open source database searches, and other FBI databases, "Rayjay Dobson" has successfully been identified as Rajay Dobson, DOB: 11/05/1990, likely living in Jamaica and "Greg" as Jermain Dobson, DOB: 09/19/1983, living at the same Mount Vernon, NY address as provided by "Greg" in a text message to Luton in December of 2018. Jermain Dobson is also from Jamaica and is Rajay Dobson's brother.

30. As the interview continued, Luton was asked about names and addresses where S.O. has sent money, including both "Mark White" and "John Anderson" at 204 Fifth Ave, Toms River, NJ. Luton stated his friend Lincoln "Scabo" Haughton lived at that

10

address and Luton had asked Haughton to accept some packages on Luton's behalf, which Luton subsequently picked up and turned over to "Greg" (Jermain Dobson). Luton stated Haughton did not like having packages sent to his address with fake names, so only 2-3 packages went there. When confronted with at least six separate shipments from S.O. to that address from September 2018 through November 2018 totaling $65,000, Luton claimed he was surprised to hear that.

31. Luton was asked why S.O. was asked to purchase and then send four iPhones to a "John Anderson" on two separate occasions in October 2018. S.O. sent them to 1307 Pacific St. Apt 6D, Brooklyn, NY, the same address Luton provided for himself during the interview. Luton claimed he did not know a John Anderson, nor did he receive any packages containing iPhones, but said it was common for packages to be mislabeled within his building. On 01/23/2019, a search warrant was issued by Larimer County Judge Jouard for Luton's iPhone seized from his person following his arrest. In reviewing the phone, it was determined that the IMEI of Luton's phone was identical to one of the iPhones that S.O. had purchased on 10/29/2018 and sent to "John Anderson" at Luton's address. During the interview, Luton denied that the phone was sent to him by S.O. and instead stated that he bought it from an individual named "Briggs" who drove a Lincoln SUV with Virginia plates. Given the amount of data on the phone which stretches back before October 2018, it is likely that Luton transferred data from his old phone to this new iPhone.

32. A search warrant was signed in Larimer County and served on Apple, Inc on 12/01/2018 in regards to the device identifiers from the iPhones which S.O. had sent to John Anderson and others as part of the fraud. Apple responded to the warrant and

11

listed the accounts for which the devices were registered under. Two of the phones were registered under the name "Rajay Jodson" on 11/14/2018 with fictitious addresses. However, one of the phone numbers used to register the phone was 702-226-2033, the same number used by White to contact S.O. Additionally, the IP address associated with the registration and subsequent iTunes transactions for those devices resolves back to ISP Cable and Wireless Jamaica. Your affiant believes that "Rajay Jodson" is actually Rajay Dobson, who is using the alias Frank White to defraud S.O.

33. On 01/25/2019, Detective Robertson spoke with Lorna Malone of 1307 Pacific St. Apt 6D, Brooklyn, NY. Malone confirmed she is Luton's mother, lives at that address with Luton and explained how previously a package had arrived at her residence addressed to John Anderson which Luton took.

34. While reviewing additional text message conversations between Luton and Dobson, on 09/06/2018 Luton sent Dobson a text stating "204 fifth avenue Toms River New Jersey 08757". Dobson responded with a 12 digit number which was determined to be a FedEx tracking number listing a shipment by S.O. from Estes Park, CO to that address delivered on 09/07/2018. S.O. noted that the package contained $15,000 in cash.

35. On 11/06/2018, Luton sent Dobson a text with the address of 443 Tompkins Ave, Brooklyn, NY 11216 which is the same address associated with Byfield. Dobson responded back "Tom White" and then on 11/07/2018 and 11/08/2018 provided Luton with two different 18 digit numbers which resolve back to UPS tracking numbers for shipments by S.O. sent to the captioned address. S.O. listed those

packages as being addressed to the same "Tom White" and contained a total of $35,000 in cash.

36. Luton's phone also had information on it regarding a Bank of America bank account ending in 5611, which is believed to be the same account used to receive funds from S.P. in April 2018.

37. Lastly, Luton claimed in the 01/22/2019 interview that he had never been to Colorado before. In reviewing the geolocation data on Luton's phone, his phone recorded a GPS coordinate of 40.381481, -105.525291 at 11:31pm on 10/02/2018 which corresponds to S.O.'s residence. This is the same day and approximate time that S.O. said a large black man showed up at her house claiming to be an FBI agent, showed her a badge, and to which she gave him $65,000 in cash wrapped in rubber bands and placed in a manila envelope. Based on text messages on Luton's phone around that time, it is still unclear whether or not he was the individual who went to her door or the person who remained in the car.

38. Ten days later on 10/12/2018, Luton's phone took a photograph of stacks of presumed U.S. currency with rubber bands around them. Also viewable in the photographs was a manila envelope.  Detective Robertson believes the sheer amount of cash shown would be close to the $65,000 which S.O. gave the "FBI agent."

39. Given the totality of the evidenced gathered thus far from Luton's own words, data off of his phone, and connections to addresses of note in the investigation, your Affiant believes that Luton and Byfield are active and willing participants in the scheme to defraud S.O..

I, Kevin P. Hoyland, being duly sworn according to law, depose and say that the facts stated in the foregoing affidavit are true and correct to the best of my knowledge, information and belief.

Dated: January 31, 2019

                                              *s/ Kevin P. Hoyland*
                                              Special Agent
                                              FBI

Submitted, attested to, and acknowledged by reliable electronic means on _____, 2018.

                                              _____
                                              United States Magistrate Judge
                                              United States District Court
                                              District of Colorado

**Affidavit reviewed and submitted by Martha A. Paluch, Assistant United States Attorney.**