IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 19-cr-00098-CMA

UNITED STATES OF AMERICA,

     Plaintiff,

v.

LEONARD LUTON,

     Defendant.

---

## GOVERNMENT'S MEMORANDUM IN SUPPORT OF DETENTION

---

     This matter is scheduled for a detention hearing on Thursday, March 21, 2019, before the Honorable United States Magistrate Judge S. Kato Crews (hereinafter referred to as the Court).  The United States of America (the government) provides this memorandum to set forth the arguments it intends to make at that hearing.  In sum, the government seeks an order of detention pursuant to Title 18, United States Code, Section 3142(f) and (g) for the following reasons:  The defendant poses a serious risk 1) of flight; 2) to the safety of the victim and the community; and 3) that he will obstruct or attempt to obstruct justice through the destruction of evidence.

     Because of these risks, explained in more detail below, the government respectfully requests that this Court issue an order of detention in this case.

## BACKGROUND[1]

The defendant was arrested in Larimer County on January 22, 2019, on charges stemming from the defendant's participation in a mail fraud scheme designed to defraud victim S.O.  S.O. is an 80-year old woman who resides in Estes Park, Colorado.  The Larimer County Judge set the defendant's bond in that case at $450,000 given the serious nature of the charges.

On January 31, 2019, a Criminal Complaint was filed in the United States District Court charging the defendant with Attempt and Conspiracy to Commit Mail Fraud.  Case No. 19-mj-00025-NRN, ECF 1.  A preliminary hearing was held in this case on February 20, 2019, before the Honorable United States Magistrate Judge Nina Y. Wang.  Judge Wang found probable cause to hold the case over.  On March 6, 2019, a federal grand jury returned an Indictment charging the defendant with five counts of aiding and abetting mail fraud.  ECF 20.

This case began in February of 2018.  At that time, the defendant and/or his associates mailed a flyer to S.O. informing S.O. that she had won $2.8 million in a lottery.  In order to collect her winnings, S.O. was told she was required to remit a

---

[1] The detention statute authorizes the Court to present information regarding detention by proffer. *See* 18 U.S.C. § 3142(f) (noting that proceedings may be by proffer); *United States v. Delker*, 757 F.2d 1390, 1395-96 (3d Cir. 1985) (exploring legislative history of Bail Reform Act and concluding that district courts have discretion to conduct detention hearing by proffer); *United States v. Gaviria*, 828 F.2d 667, 670 (11th Cir. 1987) ("We hold that the government as well as the defense may proceed by proffering evidence subject to the discretion of the judicial officer presiding at the detention hearing."). The information in this section is derived from the Indictment returned on March 6, 2019, ECF 20, statements from the victim and case agent and the affidavit supporting the complaint, which is incorporated herein by reference, *See* Complaint, 19-mj-00025-NRN, ECF 1 (D. Colo. Jan. 31, 2019).

portion of the proceeds to a promotional company.  S.O. received numerous telephone calls between March and November of 2018 from individuals to include one who identified himself as Frank White.  White convinced S.O. that she needed to mail cash, cashier's checks, and iPhones to certain addresses so that she could receive her winnings.  As alleged in the Indictment, S.O. mailed 45 such packages totaling approximately $900,000.  She also handed over $65,000 in person to one of the scammers.  ECF 20 at 2.  In addition, as explained in the Complaint Affidavit, she was also directed to wire money to accounts to which the scammers had access.  19-mj-00025-NRN, ECF 1.  All told, S.O. lost over $1 million through this scheme.  The evidence indicates that a good portion of the illegal proceeds was wired to the defendant's associates in Jamaica.

## THE DEFENDANT IS A SERIOUS FLIGHT RISK

Each of the factors contemplated by the detention statute weigh in favor of detention:

(A) the defendant has strong ties to Jamaica;

(B) the weight of the evidence is overwhelming;

(C) the potential penalties are significant enough to provide substantial incentive to flee; and

(D) the defendant has no ties to Colorado, his personal situation, and his legal status in this country substantially raise the risks of flight.

### A.  The defendant's strong ties to Jamaica increase his risk of flight

The defendant was born and raised in Jamaica and he reported to Pretrial Services that his 2-year-old child resides there.  The Pretrial Services report indicates

3

that the defendant last traveled to Jamaica during the week of Christmas, within a month of his arrest in this case. After his arrest, the defendant told Special Agent Kevin Hoyland and Estes Park Police Officer Caleb Robertson that he had never been to Colorado before. He stated that his friend Rayjay Dobson asked him to drive to Colorado to pick up a package. The defendant stated that he grew up with Rayjay in Jamaica. Special Agent Hoyland would testify that the evidence indicates Rayjay currently resides in Jamaica. The defendant stated he had picked up packages before for Rayjay and gave the packages to Rayjay's brother "Greg" who resides in New York. "Greg" has been positively identified as Jermain Dobson, Rayjay's brother. While the defendant claimed surprise that the packages contained money, he went on to surmise that if there was money in the packages "Greg" probably sent the money to Jamaica or gave it to persons who were travelling to Jamaica.

Special Agent Hoyland would testify that the evidence establishes that the defendant directed his associates and friends to wire money to multiple individuals located in Jamaica on numerous occasions.

## B. The Weight of the Evidence is Overwhelming

The defendant's guilt is supported by the testimony of victim S.O., by bank and phone records, and the investigation conducted by Special Agent Hoyland. S.O. will testify that she was instructed to send cash, cashier's checks and iPhones to addresses to which the defendant and his associates had access. S.O. also handed over $65,000 in person and the defendant is tied to this delivery of cash through pictures on his iPhone – an iPhone purchased and mailed by S.O. to the defendant's address – and through GPS data retrieved from that same phone. Specifically, Special Agent Hoyland

would testify as follows:

### Delivery of $65,000 on October 2, 2018

In late summer, early fall of 2018, S.O. told Frank White she was losing trust in him because she had yet to see any of her winnings despite multiple mailings of cash as directed.  White then asked if S.O. trusted the FBI to which she stated she did. White stated he was working with the FBI to retrieve her money, as she had been the victim of a scam.  White provided S.O. with a phone number to call to confirm that he was working with the FBI which she did.  The person answering S.O.'s call confirmed White's association with the FBI.  White then told S.O. that he would dispatch an agent and a merchant banker to retrieve the remaining money that she owed.  At approximately 11:00 p.m. on October 2, 2018, S.O. heard a knock at her door.  A tall black man was standing there and told her he was the FBI agent dispatched by Frank White and he showed S.O. a badge.  The man also stated that the person in the car was the merchant banker White told her about.  S.O. handed over $65,000 in cash. The cash was wrapped in rubber bands and placed in a manila envelope.

After the defendant's arrest, the defendant consented to Agent Hoyland looking through his phone.  A search warrant was obtained the next day from a Larimer County Judge authorizing the search of the defendant's phone.  Contained on this phone was a picture taken 10 days after the October 2, 2018 late night visit to S.O.'s home.  The picture was of a large amount of cash wrapped in rubber bands and a manila envelope could be seen in the background.

In addition, the GPS geolocation data found on the phone in the defendant's possession recorded a GPS coordinate which corresponded to S.O.'s home at 11:31

p.m. on October 2, 2018, the same date and approximate time an individual was at
S.O.'s front door taking the $65,000 from her.  This evidence strongly indicates that the
defendant was at or near S.O.'s residence on October 2, 2018 and therefore, lied to
Special Agent Hoyland when he stated he had never been to Colorado before.

### Delivery of iPhones

S.O. was directed on a number of occasions to mail iPhones to addresses tied to
the defendant.  Specifically, Counts 3 and 4 of the Indictment charge the mailing of two
iPhones each time to a J.A. in Brooklyn, New York.  The address for these mailings was
a Pacific Street address in Brooklyn.  After his arrest, the defendant told the agents that
he resided at that same Pacific Street address, yet claimed no knowledge of packages
of iPhones being mailed to J.A. at that address.  However, the defendant's mother
confirmed to federal agents that she lived at that address with the defendant, that a
package had arrived addressed to J.A., and that the defendant took that package.

In addition, the unique identifiers on the iPhone in the defendant's possession at
the time of his arrest confirmed that his iPhone was one of the iPhones mailed by S.O.
to the Pacific Street address.[2]  The defendant confirmed to Agent Hoyland that he used
the phone in his possession and the defendant showed Agent Hoyland texts and
contacts to indicate the phone was his.

### Cashier's Checks

S.O. would testify that Frank White directed her to mail over $100,000 in

---

[2]  S.O. mailed the iPhones in late October, after the October 2 late night visit to her home.
Special Agent Hoyland testified at the preliminary hearing that this suggested that an individual
took data from a previous phone (one that was physically at the victim's residence) and backed
it up to the new iPhone mailed by S.O. that was later in the defendant's possession upon his
arrest.

cashier's checks to victim S.P. in Grandville, Michigan.  S.P. is a 67 year-old woman.
Once those funds were deposited into S.P.'s bank account, she requested cashier's
checks in the same amount as the funds deposited to be made payable to the
defendant Leonard Luton.  The bank suspected fraud and alerted the police.  When
questioned by the police, S.P. stated she was required to obtain cashier's checks
payable to the defendant in order for her to pay taxes so that she could obtain her
lottery winnings.

### C.  The defendant faces a significant sentence if convicted at trial

S.O. was defrauded out of over $1 million.  The losses to S.P. and other victims
are still being calculated.  Starting with a floor of $1 million, in addition to the applicable
enhancements (substantial financial hardship, substantial part of the fraud committed
outside of the United states, vulnerable victim, and obstruction of justice, discussed
below) the guideline offense level under U.S.S.G. § 2B1.1 is a minimum of 29 and is
likely to be substantially higher once other victims are identified and their losses
tabulated.  Such an offense level calls for 87-108 months in prison.  In addition, if the
ongoing investigation establishes that the defendant's telemarking fraud defrauded over
10 victims over the age of 55 **OR** that the defendant and/or his associates specifically
targeted victims over the age of 55, then the sentence enhancement found at Title 18,
United States Code, Section 2326 would apply.  This provision provides for a
consecutive term of up to 10 years' imprisonment.  Such a significant sentence provides
more than sufficient incentive for this defendant to flee to Jamaica or elsewhere to avoid
prosecution.

**D.  The Defendant's Lack of Ties to Colorado, Personal History, and Legal Status in this Country Provide Further Evidence of his Risk of Flight**

The defendant's only tie to Colorado is the 80-year old victim.  Prior to his incarceration, he resided in Brooklyn, New York with his mother.  He told the Pretrial Services Officer that he has a 2-year old child residing in Jamaica and a 16-year-old daughter residing in Atlanta.  After his arrest, the defendant told Agent Hoyland first that he was a successful DJ and also worked odd jobs to make money, but then told Agent Hoyland he was poor and had to sleep in his car.  The car the defendant drove to Colorado has been impounded and is subject to forfeiture.  He has no verified employment or resources that would allow him to make repeated trips to Colorado for his court appearances.  His lack of stable employment and apparent lack of financially responsible sureties should weigh into this Court's determination of whether to detain this defendant.

Agent Hoyland would testify to the amount of money the defendant's associates on the East Coast have wired to Jamaica at the defendant's direction.  It appears the defendant is working with individuals located in Jamaica to effectuate this scheme.  It is not a stretch to believe his associates in Jamaica have every incentive to arrange for this defendant to flee to Jamaica or elsewhere in an attempt for those associates to avoid being implicated further in the instant offense.

The Pretrial Services Report documents the defendant's use of two aliases.  In addition, Agent Hoyland would testify that through an inventory of the defendant's vehicle, a credit card in someone else's name was located.

Finally, the defendant is in this country as a Legal Permanent Resident.  If convicted of this offense he will lose his LPR status and be deported for this aggravated felony pursuant to Title 8, United States Code, Section 1101(a)(43)(M)(i). This fact provides even further incentive for this defendant to flee.

In *United States v. Ishraiteh,* 59 F. Supp.2d 160 (D. Mass. 1999), the court denied the defendant's request to modify his detention order.  In that case, the defendant was charged with mail and wire fraud and money laundering.  The magistrate judge originally detained the defendant based on four factors:  1) the defendant was facing a substantial sentence; 2) the proceeds of the fraud ($11.5 million) had been transferred to an account in another country and were "beyond the reach of the United States and available to the [D]efendant were he to be released from custody"; 3) the defendant had access to additional assets not disclosed to Pretrial Services, had numerous international contacts, and a minimum of three passports; and 4) the defendant had minimal contacts to Massachusetts (where he was indicted) and California (where he was arrested).  *Id.* at 161.

As to the first factor, the defendant argued he was only facing 33 months in prison.  The second magistrate judge found this fact unpersuasive.  Here, the defendant is facing an advisory guideline range of more than twice that, 87-108 months.  As to the fraud proceeds, in this case the evidence shows that the defendant here directed victim S.P. to obtain cashier's checks made out in his name for over $100,000, and at least two witnesses have stated they wired money to Jamaica at the defendant's direction.  The defendant also has numerous contacts in Jamaica, to include family living there.  Finally, the defendant here has no contacts to Colorado

whatsoever.  As in *Ishraiteh*, the government's case against this defendant is "robust."
And even if this defendant surrenders his passport, he still has the ability to "evade
further appearances before this Court."  *Id.* at 162.

All of these factors establish by a preponderance of the evidence – that it is
more likely than not – that no condition or combination of conditions of release will
reasonably assure the defendant's appearance as required.

## THE DEFENDANT POSES A RISK TO THE SAFETY OF THE VICTIM AND TO THE COMMUNITY

S.O. lives alone.  The defendant was arrested at S.O.'s home the same day
that Frank White told S.O. that agents would arrive at her home to pick up more
money from her.  In addition, the GPS data on the iPhone in the defendant's
possession at the time of his arrest – an iPhone purchased and mailed by S.O. to the
defendant's Brooklyn address – strongly indicates that the defendant was at or near
S.O.'s residence at 11:31 p.m. on October 2, 2018, the night the defendant handed
over $65,000 in cash.  While S.O.'s description of the man at the door that night does
not match the defendant's description, the defendant could have been in the vehicle
or close by such that the GPS data would place him at S.O.'s residence.  If released,
the government believes the defendant poses a risk to this elderly victim.  He could
return to the victim's home or contact her by phone in an attempt to intimidate her.

The evidence of the defendant's manipulating and stealing from an elderly
victim is overwhelming.  The defendant has no known assets.  If released, he could
resort to additional financial crimes thereby victimizing others in the community.

## THERE IS EVIDENCE THAT THE DEFENDANT HAS
## ATTEMPTED TO OBSTRUCT JUSTICE

One of the addresses S.O. was directed to send packages to was located in Toms River, New Jersey.  In fact, Count 2 of the Indictment charges a mailing of $10,000 to this address.  Federal agents interviewed the individual who lives at this address, L.H..  L.H. identified a photograph of the defendant and stated he knew this individual as Bruce Luton.  L.H. stated that he learned from a Ring video doorbell security system installed at his residence that Luton had retrieved packages mailed to L.H.'s address on approximately two occasions.

In a February 1, 2019 interview with law enforcement, L.H. stated that he had received a call from Luton from a detention center.  L.H. stated that Luton was speaking in code because he knew jail phone calls were monitored.  The call was a three-way call between Luton, L.H. and a girl named "D."  L.H. stated that D is one of Luton's girlfriend's.  L.H. also identified another girl he knows as Robin as one of Luton's girlfriends.  L.H. identified a photo of Stacy Byfield as Robin.[3]  During this phone call, Luton asked L.H. to go onto his iCloud account and erase it for him.  Luton told D during the call, "give L.H. the laptop and he will shut it down for me."  L.H. told law enforcement he did not feel comfortable erasing Luton's laptop and told Luton he could not do it.

Title 18, United States Code, Section 3142(f)(2)(B) requires the Court to consider whether there is "a serious risk that such person will obstruct or attempt to obstruct justice . . . ."  The government submits that the evidence obtained from L.H.

---

[3] Stacy Byfield drove with the defendant from Brooklyn to the victim's home in Estes Park and was charged by complaint in 19-cr-00026-NRN.  Her case remains pending.

indicates that the defendant is attempting to do just that; by asking L.H. to erase his iCloud account, the logical inference is that the defendant was attempting to destroy additional evidence of his involvement in this lottery scheme.

### DEFENDANT'S MOTION TO REOPEN DETENTION HEARING

In support of his motion to reopen his detention hearing, the defendant relies heavily on the fact the probation department recommended that the defendant be released on a $25,000 unsecured bond without pretrial supervision.  However, as this Court is aware, that recommendation is based solely on the nature of the offense, meaning the statute with which the defendant is accused of violating, the circumstances surrounding the actual arrest of the defendant, and the defendant's criminal history.  The probation department does not consider the facts as set forth in the affidavit.  The probation department maintains that while the Court is required to consider the nature and circumstances of the offense charged, *see* 18 U.S.C. § 3142(g)(1), the pretrial services officer is not allowed to do so.  Accordingly, almost none of the information recited above factored into the pretrial services officer's recommendation of an unsecured bond.

Defendant also points to his lack of criminal history.  The fact this defendant had never spent a day incarcerated prior to his arrest in Larimer County is even more reason for him to flee rather than face 87-108 months in prison, with the possibility of a consecutive sentence of up to 10 years. Moreover, the lack of criminal history alone does not entitle him to release as the Court is required to consider all of the factors detailed above in making a determination of whether the government has proven by a preponderance of the evidence that no condition or combination of conditions of

12

release will reasonably assure this defendant's appearance as required.

**CONCLUSION**

For all of these reasons, the government will request that the Court issue an

order of detention of the defendant at the March 21, 2019 hearing.

Dated this 20th day of March, 2019.


Respectfully submitted,

JASON R. DUNN
United States Attorney


 /s *Martha A. Paluch*
Martha A. Paluch
Assistant U.S. Attorney
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado 80202
Telephone: (303) 454-0100
E-mail: Martha.paluch@usdoj.gov

**CERTIFICATE OF SERVICE**

I certify that on this 20th day of March, 2019, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system that will send

notification of such filing to all counsel of record in this case.


 /s Martha A. Paluch

Martha A. Paluch
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado 80202
Telephone: (303) 454-0100
E-mail: Martha.paluch@usdoj.gov