1

1             IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO
2
    Case No. 19-cr-00098-CMA-1
3   _____

4   UNITED STATES OF AMERICA,

5        Plaintiff,

6   vs.

7   LEONARD LUTON,

8        Defendant.
    _____
9

10           Proceedings before S. KATO CREWS, United States

11  Magistrate Judge, United States District Court for the

12  District of Colorado, commencing at 2:05 p.m., March 21,

13  2019, in the United States Courthouse, Denver, Colorado.

14  _____

15           WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

16  ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

17  _____

18                         APPEARANCES

19           MARTHA PALUCH, Attorney at Law, appearing for the

20  Plaintiff.

21           LAURA SUELAU, Attorney at Law, appearing

22  for the Defendant.

23  _____

24                      DETENTION HEARING

25

2

```
1                  P R O C E E D I N G S
2              (Whereupon, the within electronically recorded
3     proceedings are herein transcribed, pursuant to order of
4     counsel.)
5              THE COURT:  Thank you.  Please be seated.  Okay,
6     we're on the record in 19-c -- 19-cr-98, United States vs.
7     Luton.  May I have appearances of counsel, please.
8              MS. PALUCH:  Good afternoon, Your Honor.  Martha
9     Paluch appearing on behalf of the United States.
10             THE COURT:  Good afternoon.
11             MS. SUELAU:  Laura Suelau on behalf of Leonard
12     Luton who is seated at counsel table.
13             MR. LUTON:  Good afternoon.
14             THE COURT:  Good afternoon.  All right.  So we're
15     here on the motion to reopen detention hearing.  I've granted
16     that motion insofar as we will conduct a detention hearing.
17     And so I've reviewed the motion.  I did also receive and
18     review the Government's memorandum in support of detention.
19     I've also gone back through and reviewed the pretrial
20     services report from earlier, and so I am prepared to proceed
21     with you all on the detention hearing.
22             So, Ms. Paluch, would you like to go ahead and
23     proceed with your evidence.
24             MS. PALUCH:  Thank you, Your Honor.
25             As I stated in my memorandum, I intend to proceed
```

1  by way of proffer and do not have witnesses to call today.

2  The Court has indicated that you have read my memorandum, so

3  I don't know that it would be a correct use of the Court's

4  time for me to repeat every argument that I have already

5  submitted to the Court.

6        I do have some additional information I would like

7  to provide to the Court.  And then, as long as this approach

8  is agreeable to the Court, I can then allow defense counsel

9  to address what I've put forth in my memo, unless you prefer

10  that I restate my arguments.

11        THE COURT:  Sure, I appreciate that.  You don't

12  need to restate your arguments.  If you have anything

13  additional or different from your memorandum, then why don't

14  you go ahead and put that on now.

15        MS. PALUCH:  Thank you, Your Honor.

16        THE COURT:  And I think I may have a couple of

17  questions, as well, from your memorandum, but if you want to

18  start with any additional information you have.

19        MS. PALUCH:  Certainly.  Thank you, Your Honor.

20  That sounds like the most efficient use of time.

21        I would like to state, and I have provided, just as

22  of today, this information to defense counsel that the agent

23  did look into the defendant's travel to and from Jamaica, or

24  outside of the country when I indicate in my memorandum that

25  the defendant has substantial ties to Jamaica.

4

1          Between 1994 and 2005, there are 15 entries of the

2    defendant into the United States.  The records that old did

3    not indicate to the agent whether or not that was Jamaica.

4    From 2005 to 2015, the defendant resided in Jamaica.  In

5    2015, he entered the United States on a visa, and between

6    2015 and 2018, he made five trips back to Jamaica.

7          On the issue of whether or not the defendant poses

8    a risk to the community, a couple of points on that.  I think

9    the Government's strongest argument is that he presents a

10   serious risk of flight for all of the reasons I've stated in

11   my memo.

12         As to the risk of danger to the community, I would

13   point out that the Ninth Circuit has held that danger to the

14   community may encompass pecuniary or economic harm.  And that

15   cite is United States v Reynolds, 956 F.2d 192.  And this

16   cite is found at 192-3, and that's a 1992 position case out

17   of the Ninth Circuit.

18         That goes to our argument that if this defendant is

19   released, our understanding through pretrial is he has

20   limited financial means.  Information given to the

21   information as cited in our memo, is that at one point he was

22   living in his car, unemployed, was poor.

23         So our position is, if he is released, there could

24   be a danger to the community at large, should he elect to

25   commit any other financial crimes.  He did have a credit card

1    in the name of someone else in that vehicle.

2            And we do believe that it's a legitimate concern

3    for this 80-year-old victim.  We believe the evidence

4    suggests -- well, we know that the defendant was arrested at

5    her home on January 22, and we believe that evidence strongly

6    indicates he was there the evening of October 2,

7    approximately 11:31 p.m., and this 80-year-old lives alone.

8            So, Your Honor, as you know, our burden is to prove

9    to you that there is -- by a preponderance of the evidence,

10   there are -- there are no conditions or combination of

11   conditions that will assure this defendant's appearance at

12   his next court date.  And we believe, as set forth in our

13   memo, we have more than established that burden.

14           As to proving by clear and convincing evidence as

15   to a safety to the community, we do believe the Court can --

16   can make that finding.  I would concede that our argument is

17   stronger on risk of flight.

18           I at this time would answer any of the Court's

19   questions.

20           THE COURT:  And so -- thank you.

21           Your argument about attempt to obstruct justice,

22   that is a preponderance standard, isn't it?

23           MS. PALUCH:  That is correct, Your Honor --

24           THE COURT:  All right.

25           MS. PALUCH:  -- that is.  And we believe, based on

6

1    the statements made by LH and the report that has been

2    provided, we believe indicates that he reached out to law

3    enforcement to state that that was the call that he had

4    received from the defendant in order to -- to erase the

5    information from the iCloud.

6            You know, the only logical inference we can think

7    of that he would direct someone to erase the iCloud is that

8    it's going to contain further evidence of this scheme.  So

9    under 3142(f)(2), I believe it's (2)(b), when it talks about

10   a risk to the community, it's 2 -- (f)(2)(b) also talks about

11   obstruct or attempt to obstruct justice, and we believe that

12   we have proven that.

13           That's why we are proceeding on both prongs because

14   of the vulnerability of the victim in this case, the fact

15   that the defendant was at her home, in addition to directing

16   someone on a jail call to destroy the -- or erase the iCloud.

17           We think that the Court can detain on both prongs.

18           THE COURT:  Okay.  And then in terms of risk of

19   safety, your argument on that is directed at the potential

20   risk to the elderly victim; is that right?

21           MS. PALUCH:  It is, Your Honor.  But also I would

22   indicate that the evidence, as you've seen in the complaint,

23   the arrest warrant complaint, we have two other victims in

24   other states.  SP, which has indicated for the cashier's

25   checks, she's a 67-year-old woman in Michigan, who is told

1   that funds will come into your account.  Our victim in Estes

2   Park mailed over $100,000 to SP.  SP was then directed to

3   request cashier's checks made out to Leonard Luton.  So we

4   believe that the defendant is tied to that elderly victim as

5   well.

6          In the complaint, there is another individual by

7   the initials of LW.  He lives in Connecticut and same:  We

8   had our victim here in Estes Park directed to mail money to

9   that individual's house.

10         So I don't think it's a stretch to say that this

11  defendant could resort to additional financial crimes if he

12  is released.  And what we're seeing here is the preying upon

13  of the elderly in our community, as well as in other parts of

14  the country, tied to this scheme, and we think that is a

15  safety risk to the community.

16         THE COURT:  Okay.  And then in terms of your

17  argument about risk of flight, you -- or I guess this is --

18  because of the additional information you had about his

19  travel, at least in and out of the United States, if I were

20  to order his release and order that he turn over his

21  passport, I take it your arguments on risk of flight are then

22  focused on what you've briefed here in terms of his lack of

23  ties to Colorado, et cetera?

24         MS. PALUCH:  Absolutely, Your Honor.  You know, if

25  he does surrender his passport, which I believe was a

8

1   condition proposed, and I believe the argument would be made

2   that he would be willing to surrender his passport.  You

3   know, he doesn't have to live the country to flee the

4   jurisdiction of Colorado.  He can go back to New York and

5   just simply refuse to come back here for further court

6   appearances.

7          In that event, we would have to dispatch the

8   marshal service to locate him, and in Brooklyn, New York, I'm

9   not sure how easy that would be.

10          And so given the fact that the defendant drove

11   cross country solely for the purpose to receive more money

12   from this elderly victim, I don't believe we can assure that

13   he would be willing to return to Colorado, especially in

14   light of the significant advisory guideline range that has

15   been set forth before the Court.

16          I think the argument you will hear is this is a

17   defendant with no criminal history.  He had not been in

18   prison prior, at least in the United States, prior to this

19   offense.  I would submit that that makes the possible

20   sentencing range that he faces even that more daunting, even

21   that more upsetting to him to cause him to not want to return

22   to Colorado.

23          In addition, he is facing ramifications to his

24   status in this country.  Why come back to Colorado and face

25   being convicted of an aggravated felony and then being faced

9

1   with deportation when, if he can just hide out with friends

2   in Brooklyn and we can't find him, that changes the whole

3   equation.  And then we're left with an 80-year-old victim,

4   who I don't believe will receive justice in this case, if he

5   is not held accountable here in Colorado.

6        Does the Court have any other questions for me?

7        THE COURT:  I may.  Let me see here.

8        MS. PALUCH:  Certainly.

9        THE COURT:  You cited this Fisher v. Massachusetts

10   (ph) case in your memorandum brief, and one of the factors

11   considered by that magistrate judge was that in that case the

12   proceeds of the fraud had been transferred to an account in

13   another country, and, therefore, were beyond the reach of the

14   United States and available to the defendant were he to be

15   released from custody.

16        Is there any evidence thus far in this case that

17   any of the money alleged to be at issue in this case is

18   potentially somehow available to Mr. Luton?

19        MS. PALUCH:  The evidence that we have, Your Honor,

20   is at least two witnesses saying -- and we have text messages

21   close in time to the mailings from this victim where the

22   defendant is texting two women, in particular, and directing

23   them to transfer funds to Jamaica.

24        The timing we believe indicates that these are

25   fraud proceeds that have been wired to Jamaica.  The number

10

1    of wire transfers to Jamaica are numerous, multiple, right

2    around the time of these mailings.  So we believe the

3    inference is there that the fraud proceeds are going to

4    Jamaica, and we believe if the defendant is able to wire

5    those funds to someone in Jamaica, that I'm not certain why

6    that person in Jamaica couldn't wire money back to the

7    defendant.

8          What we know for sure is the victim is out over a

9    million dollars.  What we know for sure is that SP in

10   Michigan made out -- requested at the bank that over $100,000

11   in cashier's check be made payable to this defendant.  So we

12   do believe he has proceeds at his disposal that could assist

13   him.

14         There was one other point I was going to make.

15   That is, Your Honor, Larimer County, who participated in the

16   arrest of this defendant, when he went to court -- first of

17   all, I'll back up, Your Honor, did I answer your question as

18   to the fraud proceeds?

19         THE COURT:  Yeah, you did.

20         MS. PALUCH:  Okay, thank you.

21         When he was arrested in Larimer County and was

22   brought into that court on these theft charges and the DA was

23   able to obtain a bond of $450,000, that they told me was

24   pretty unheard of.  And it was because the --

25         MS. SUELAU:  Your Honor, I object to this.  I think

1   this calls for total speculation and lack of foundation.  I

2   know there is not evidentiary rules in this sentencing

3   hearing, but this is beyond.

4          THE COURT:  And I understand that.  I think it is

5   getting far afield, but I'll allow it and I understand how to

6   appropriately weigh it.

7          MS. PALUCH:  Yeah, I'll keep my commentary, Your

8   Honor, out of it or my discussions with the prosecutors up

9   there.  But I think it is a matter of fact in the record, I

10  believe it could have even been in the pretrial services

11  report, that the bond amount in Larimer County -- and in

12  fact, it's in defense counsel's own motion to open this

13  hearing, she indicated that Larimer County had placed a

14  $450,000 bond on this defendant and he was unable to make the

15  required payment in order to meet that bond.

16         So I'm not saying -- stating anything that's not

17  already in the record in numerous places.  I will -- that's a

18  fair point that I shouldn't say whether that is a standard

19  amount of bond being set.  The Court can draw its own

20  conclusions on that point.

21         But I do believe that all of these are appropriate

22  considerations and we -- decisions on whether to detain

23  someone can't be made in a vacuum of, okay, this is a person

24  with no prior criminal history and has never been in jail

25  before.

12

1          Understandably, that is a valid consideration for

2    this Court, we understand that.  Surrendering of the

3    passport, that is a valid point.  I think it would be

4    difficult for him to fly to Jamaica, if not impossible,

5    without a passport.  That's not our point.

6          Our point is that why would he come back to

7    Colorado?  Why?  There is no employment here, there is no

8    family here, there are no ties here.  There is no reason for

9    him to ever come back into this state again.  And if that

10   happens, then I think that's an injustice right there.

11          So I appreciate the Court's time and I appreciate

12   you reading my brief on short notice.  And thank you.

13          THE COURT:  One more question.

14          MS. PALUCH:  Certainly.

15          THE COURT:  And you said he was arrested at this

16   elderly individual's home?

17          MS. PALUCH:  He was in the car and Ms. Byfield,

18   (ph) his passenger, went to the door to obtain the package

19   from the elderly victim, and when she call the Estes Park

20   police department, they were both arrested -- he was arrested

21   in -- ordered out of the car and she was arrested at the

22   front door.

23          In addition, as you've seen in the memo, we believe

24   the phone on his person places him there the night of October

25   2, when they went to her door at 11:30 p.m.

1          Thank you, Your Honor.

2          THE COURT:  Thank you, Counsel.

3          Ms. Suelau.

4          MS. SUELAU:  Your Honor, the Government kept asking

5     the question:  Why would he come back to New York or come

6     back to Colorado for this case?  And I just want to answer

7     that, because I think there is a few really obvious reasons

8     why he would want to come back and deal with this case.

9          The first is that he is from Jamaica, we don't

10    dispute that, and he waited and worked 15 years with the help

11    of his mother to get a legal permanent resident status card.

12    This year is the first year he can apply for citizenship.

13         He now has a felony case hanging over his head.  He

14    is hardly going to jeopardize his chances of either losing

15    that legal permanent resident status or applying for

16    citizenship by -- I guess, maybe the inference is that he

17    just hide out in Brooklyn until -- and that, you know,

18    Brooklyn is some obscure place where the marshals couldn't

19    find him.

20         So he wants to come back to Colorado to deal with

21    this in order to continue in that immigration process.  He

22    also has an incentive to deal with this case because it's his

23    first ever criminal case.  He has never had a failure to

24    appear, he has never had a single arrest.  It doesn't even

25    appear he has had a single traffic ticket.

14

1        So he wants to confront these charges to deal with

2    them, to resolve them.  And he knows that the only way to do

3    that is to return to Colorado.

4        In terms of this idea that he is facing a lot of

5    time and, therefore, he is less likely to appear, I'm a

6    little -- that would be like the Government could come into

7    any detention hearing, say out loud on the record, This

8    person is facing 20 years, and, therefore, the person hears

9    it and is more likely to flee.

10        I don't -- Mr. Luton and I have not specifically

11    discussed what his guideline range would be.  These charges

12    the Government is, you know, saying we may or may not file

13    down the road, because this case is not fully formed.  We

14    just received discovery late last week, so that conversation

15    between him and I would be premature.

16        And so for the Government to come in now and say,

17    He's facing 87 months, he knows that, and, therefore, he's

18    going to flee, feels a little bit like, you know, they've

19    opened pandora's box and then, therefore, Mr. Luton will be

20    impacted.  It's really putting the cart before the horse in

21    terms of where we're at in this case.

22        He understands he's facing consequences.  What

23    those consequences will be is still coming together.  The

24    Government is providing more discovery to us today.  So I

25    can't conceive that that guideline range is even accurate or

1    that I've told Mr. Luton that that's what he's facing because

2    I truly don't know, nor does he.

3            What he does know is that he has his first ever

4    case that he's being told it is a federal case, that is a big

5    deal that could impact something he has been working for his

6    whole life, his citizenship, and he wants to get it dealt

7    with.

8            The fact that he has been to Jamaica in the last

9    few years, or over the course of his lifetime, is not

10   surprising, given that he's from there and that he has a

11   child there, which would also explain why he may have sent

12   wire transfers to Jamaica.  But that doesn't mean that he is

13   going to flee.

14           In fact, having a child in Jamaica is an additional

15   incentive for him to deal with this case, get it resolved and

16   get it resolved in a way that he can move forward with his

17   citizenship proceedings.  He wants his son to move here.  He

18   wants his son, before he turns 43, like Mr. Luton, to have

19   the future, possible future of being a citizen in the United

20   States.

21           So by fleeing to Jamaica, he is jeopardizing his

22   future and his son's future.

23           More than that, his entire life is in the United

24   States, with the exception of his son.  His mother lives

25   here.  He lives with his mother and has since her husband and

1    his father passed away a few years ago of cancer.  I spoke to

2    his mother on the phone, and I would say that if Your Honor

3    would like to speak to his mother on the phone, she's on

4    standby, but if you would rather me proceed by proffer, we

5    can do that and I can just relay the information she gave me.

6              THE COURT:  I would like to hear proffer from you

7    on that --

8              MS. SUELAU:  Okay.

9              THE COURT:  -- with the potential of calling.

10             MS. SUELAU:  So his mother has lived here for over

11   20 years.  And during that time she has been working because

12   she is a citizen to help Mr. Luton get his citizenship.  He

13   did get his legal permanent resident card in 2015.  Around

14   that same time his father got sick and passed away from

15   cancer and Mr. Luton has been living with his mother and

16   helping her.  She's on Social Security benefits, so he helps

17   her financially in the meantime.

18             His two brothers are also living in the United

19   States.  Mom is very proud to tell me that none of her sons

20   have ever been in handcuffs before this, and she's not about

21   to sit by and let Mr. Luton just flee on what is the first

22   charge -- criminal charge ever to occur in their family.

23             Mom also told me that Mr. Luton's passport is in

24   her fire-retardant safe, and that if she has to walk down to

25   the courthouse in New York today to turn it over, she will do

1    that.  She's also willing to loan Mr. Luton her car to drive

2    out here for court dates and help him get -- with some of her

3    Social Security money to pay for flights to come back out

4    here.  She's willing to do whatever it takes to have

5    Mr. Luton home, support him in this, and also see him resolve

6    this successfully.

7         You know, the -- Mr. Luton is indigent.  He has

8    been deemed as much by this Court.  And I'm a little bit

9    bothered by the fact that I heard a real undertone in the

10   Government's argument today and read in their memorandum this

11   undertone that because he is poor, he should not be released;

12   because he's poor, he is more likely to commit a financial

13   crime; because he is poor, then he can't back out here;

14   because he's poor, he's a danger to the community.  And I

15   think the real danger would happen if we took any of those

16   arguments and detained him.

17        He is not wealthy.  He works as a DJ when he can.

18   He also works as an electrician, and he lives in Brooklyn and

19   he is part of this big Jamaican community, and a lot of his

20   jobs are, you know, helping at the local bodega and fixing a

21   friend's light or fixing a friend's phone and things like

22   that, and getting paid small amounts along the way for that.

23        His only steady work is at a lounge in New York

24   City being a DJ.  His mother says that she has his W-2 and

25   she's willing to send it over right now.  You know, his means

1  are limited, but it doesn't mean that they're dishonest and

2  that he wouldn't be willing to put those means towards

3  getting himself to and from court dates here.

4        I know the Government sort of used it as

5  inconsistency that he said he lives out of his car, but also

6  that he DJs.  In talking to him, what he means by like I live

7  out of my car, is like I'm always driving around, I've got

8  all my stuff in there.  He has his tools in there for his

9  electrician work.  He has his turntables in there for his DJ

10  work, and that, yeah, he lives in his car in that way.

11  That's not inconsistent with his assertion that he is a DJ

12  and he was not misrepresenting that to either probation or

13  the agents that he spoke to when he was arrested.

14        I also -- in addition to this idea that he is poor,

15  therefore, he's a danger to the community or he is a risk of

16  flight, I also heard this, he has no criminal history;

17  therefore, he is more at risk of flight.  And I think that

18  again, if he is detained for that reason, it's sort of like

19  can a criminal defendant win in federal court when criminal

20  history is a huge factor in a detention proceeding when

21  someone does have criminal history.  And in this case, we're

22  saying he doesn't; therefore, he is more of a risk of flight.

23        There was also some discussion about whether or not

24  Mr. Luton can get -- I think the argument may go that could

25  he get money from Jamaica that would then allow him to flee

1    to Jamaica?  I think if Mr. Luton were to get money from

2    Jamaica, he would have gotten it to pay the $450,000 bond in

3    Larimer County.

4           He does not have -- he does not know or have access

5    to anybody in Jamaica who could send him a very large amount

6    of money to allow him to flee to Jamaica.  And as I've added,

7    he has no incentive to flee to Jamaica and every incentive to

8    remain here.

9           As to the danger to the victim in this case,

10   Mr. Luton was outside her home at the time of his arrest, but

11   there is no evidence that he ever directly spoke to or

12   interacted with the victim.

13         The person who was talking to the victim and

14   directly manipulating her to give this money to different

15   people and send it various places and directly responsible

16   for storing the million dollars, a gentleman by the name of

17   Frank White, or using the a/k/a Frank White, called the

18   victim after Mr. Luton was incarcerated.  So it cannot be

19   that Mr. Luton is Frank White, the mastermind of this

20   operation.

21         And I just -- it sort of -- Mr. Luton knows that he

22   has been arrested, that he is not to have contact with the

23   victim.  He is not going to violate the Court's order and go

24   to Estes Park and talk to this victim.  He understands that's

25   going to be under surveillance, presumably the victim's

1  house, because there is people out there who are the

2  masterminds of this are, you know, maybe still in contact

3  with the victim, that she's under surveillance.  Her safety

4  is not in jeopardy due to him, either directly, you know

5  physical safety or in terms of him contacting her for money.

6          As a final thing on the obstruction of justice

7  intimation here, basically without getting too much into

8  Mr. Luton's private matters, his phone is not locked, and he

9  has personal pictures of his girlfriend on his phone.  It is

10  understandable that he would want those pictures erased.  He

11  was not attempting to obstruct justice.  He was attempting to

12  protect his and his girlfriend's privacy.  So I don't think

13  that that is a fair allegation.

14          The Government's memorandum, it says three things:

15  He's a risk of flight, he's a risk of safety to the victim in

16  the community and then he will obstruct justice.  I think I

17  have addressed each of those three things and made clear that

18  Mr. Luton is not a risk of flight, he is not a danger to the

19  community, or this victim specifically, and that he wants to

20  deal with this case.  He wants to show up and tell his truth

21  around this.

22          And there has never been an allegation that he is

23  the mastermind of this.  I think the Government would agree

24  to that.  But he -- he's not -- it's not appropriate to

25  detain him, it's just simply not someone who has no criminal

1   history and has every incentive to appear in court.

2          So for those reasons, I don't believe the

3   Government has met their burden.  If Your Honor has any

4   questions, I'd be happy to answer them.

5          THE COURT:  So my -- and thank you, Counsel.

6          My biggest concern and struggle, as I listened to

7   your arguments and the Government's arguments, is really the

8   lack of ties to Colorado.  And I know it's under the statute,

9   I think, framed in terms of risk of flight, but as part of

10  that, what I have to consider is whether there are any

11  conditions or combination of conditions that would reasonably

12  assure his attendance as required in court.

13         And so I struggle with the fact that Mr. Luton

14  literally has no tie to Colorado whatsoever; and if released,

15  wants to be released to his home in Brooklyn.  His car has

16  been impounded or taken by the Government.

17         I hear you say that his mother has indicated she

18  would loan her vehicle and would utilize any funds available

19  to her if he needed air travel, or what have you, so I get

20  that.  And I hear you -- I hear you say that -- that his

21  motivation for returning to Colorado, as required to deal

22  with this case, includes how he worked for such a long period

23  of time to obtain his citizenship, how that's now in jeopardy

24  with this case; that that is a motivation to come to court to

25  deal with the allegations in an effort to address the

1   potential jeopardy related to his citizenship, and also that

2   this is his first criminal case and with no record and no

3   prior criminal background, that that is a motivation for him

4   to address and deal with this.  So I hear that and I get

5   that.

6           But I guess I'm wondering, I mean, what else, if

7   anything, can you offer to the Court to satisfy the Court

8   that he would show up, as required, for his appearances if

9   he's living in New York?

10          MS. SUELAU:  It's a difficult situation because

11  he's from New York.  His car has been seized as part of this

12  you know, this allegation.  His livelihood is in the car,

13  those things.

14          At the same time, like I said, he has great

15  incentive to return here, and I think that imposing a

16  condition, such as supervision by the probation office in

17  Brooklyn to have him check in regularly and things like that

18  so he's accountable to someone when he's not in Colorado,

19  would alleviate some of that concern.

20          But we are open to -- to any conditions, Your Honor

21  thinks is appropriate, and perhaps probation could help us

22  think of something.

23          What they typically do -- you know, I know that our

24  office has had a number of white collar cases and other cases

25  where defendants have lived out of state and come back for

1    court dates, and so I know that there are procedures for

2    doing that.

3         As a last final resort, if Your Honor thinks that

4    you simply don't believe that he could come back to Colorado

5    otherwise, we would agree to a halfway house if that meant

6    that he could be out of custody.

7         I think that's sort of in some way setting him up

8    for failure, given that he doesn't know a single soul in

9    Colorado.  But I've spoken to him about that possibility, and

10   he is a resourceful guy and would certainly look for work

11   here and figure things out.  And I know the probation office

12   could assist him in getting plugged into resources here in

13   Colorado and things like that.

14        But I do think that supervision in New York would

15   probably be more appropriate if Your Honor is looking for

16   supervision.

17        THE COURT:  Okay.  Anything else?

18        MS. SUELAU:  No, Your Honor.

19        THE COURT:  Okay, thank you.

20        MS. SUELAU:  Thank you.

21        THE COURT:  Ms. Paluch, I'll give you another

22   opportunity.

23        MS. PALUCH:  Thank you, Your Honor, just briefly.

24        I would like as to Ms. Suelau's first argument at

25   that it's unfair for the Government to talk about what the

1    advisory guideline range is, as this Court is aware, that is

2    one of the factors to be considered.  And in fact, the sheet

3    that the Court provides in making these determinations, it's

4    number 2 under the list after weight of evidence, it's

5    subject to a lengthy period of incarceration if convicted.

6          So that's not unfair for the Government to talk to

7    the Court about its calculation of the guideline range,

8    because that is a valid consideration in making your

9    determination.

10          Second, as to counsel's assertion that he should be

11    detained because he's poor, that was certainly not the intent

12    of the Government to make that argument.  I think it's a fair

13    argument to have the Court to consider:  Is this a defendant

14    who has the resources to allow him to return to Colorado on a

15    regular basis to appear at all the necessary proceedings in

16    this case?

17          Third, the issue of defense counsel took exception

18    to the assertion that he could have access to the fraud

19    proceeds in order to flee to Jamaica.  I don't think that was

20    the question the Court posed to me.

21          The question the Court asked of me was:  Is there

22    any evidence that fraud proceeds have been sent out of the

23    country?  Consistent with the case law that I provided you, I

24    answered that question as to the evidence that we have.  And

25    as I pointed out, it's not necessary that the defendant flee

1   to Jamaica.  It's just necessary that he not return to -- to

2   Colorado.  And again, as we have said, our burden on that is

3   only by a preponderance.  That's only more likely than not.

4           Fourth, as to obstruction, you know, Counsel's

5   assertion is that he directed this witness to do that based

6   on personal reasons.  You know, the Government doesn't know

7   that.  You know, jail employees are listening to recorded

8   jail calls.  And when they hear a defendant say, Erase my

9   iCloud account, that's going to catch the attention of law

10  enforcement.

11          As to citizenship, I think that's an argument that

12  can cut either way.  I think that is an argument that cuts in

13  the Government's favor; however, because he has so much to

14  lose through a conviction in this case potentially, that that

15  weighs in favor of the Government's argument for detention.

16          As -- finally, as to counsel's assertion about a

17  halfway house, you know, if this defendant is risk of flight,

18  I don't believe that placing him in a halfway house is going

19  to obviate that risk.  I think you have even more, obviously

20  more freedom in a halfway house and the ability to walk away

21  from a halfway house is something we see on a regular

22  occurrence in this district.

23          We believe that we have clearly met our burden that

24  this defendant poses a risk of flight.  We also believe we've

25  met our burden that he should be detained for the safety of

1   the victim, as well as for the community.

2           And for these reasons, we would ask that the Court

3   issue an order of detention in this case.

4           THE COURT:  Okay, thank you.  Okay.  I would like

5   to take about a 10- to 15-minute recess on this, and I'll

6   come back and I'll issue a ruling.  Thank you.

7           (Break was taken.)

8           THE COURT:  Thank you, please be seated.

9           Okay.  So we're here in 19-cr-98, United States vs.

10  Leonard Luton, on the motion to reopen detention hearing

11  filed by Mr. Luton at ECF Number 26.

12          The Court has granted that motion insofar as the

13  Court has reopened the detention hearing and convened a

14  detention hearing today at which counsel from both sides

15  proceeded by way of proffer and proffered evidence related to

16  the motion to reopen the detention hearing.

17          The Government also filed Government's memorandum

18  in support of detention, which the Court has reviewed, in

19  addition to the arguments of counsel received today.

20          In the motion to reopen detention hearing, Counsel

21  for Mr. Luton argues that information not known to Mr. Luton

22  at the time of his detention hearing exists and that

23  information is material on the issue of whether there are

24  conditions of release that will reasonably assure his

25  appearance and safety of the community.  Those conditions

1   being, namely, that Mr. Luton at the time of the original

2   detention hearing was before the Court on a writ out of --

3   let's see, was it Larimer County, Counsel?

4           MS. PALUCH:  Yes.  Yes, Your Honor.

5           THE COURT:  -- Larimer County and is no longer

6   subject to those conditions with Larimer County.  The Bail

7   Reform Act provides that the judicial officer may at any time

8   amend the order to impose additional or different conditions

9   of release, and I should add that the Court previously

10  entered an order of detention at ECF Number 17, noting that

11  the defendant consented to detention and, thus, waived his

12  right to a detention hearing and agreed to voluntary

13  detention at that time.  And that order was dated February 13

14  of 2019.

15          The Bail Reform Act provides that the judicial

16  officer may at any time amend the order to impose additional

17  or different conditions of release.  That's at 18 U.S.C.

18  Section 3142(2)(c)(3).

19          Upon consideration of a defendant's motion to amend

20  an order of detention and to release the defendant upon

21  conditions pending trial, the Court may consider relevant

22  changes of circumstances.  The Court may also consider

23  proffers of additional evidence, as the Court has done today.

24          So today the Government has sought Mr. Luton's

25  detention.  In considering the Government's request, I'm

1   guided by several general principles.

2           First, at all times the defendant is entitled to

3   the presumption of innocence.  Nothing that takes place or

4   took place in the hearing or that is set forth in my findings

5   is intended or should be construed to affect that

6   presumption.  Rather, the purpose of the hearing I'm

7   conducting is to determine whether, notwithstanding that

8   presumption of innocence, the defendant should be detained

9   pending trial.

10          Second, under the Bail Reform Act, pretrial

11  detention is understood to be an exceptional step.

12          Under the Act, a defendant must be released prior

13  to trial, unless a judicial officer finds that no conditions

14  or combination of conditions exist which will reasonably

15  assure the appearance of the defendant or reasonably assure

16  the safety of any other person or the community.

17          Third, the Act requires that the least restrictive

18  conditions be imposed that are necessary to provide those

19  reasonable assurances.  If I cannot find any conditions that

20  will reasonably assure the appearance of the defendant, as

21  required, or the safety of persons or the community, then I

22  am required by the Act to order the defendant detained.

23          In this case, the Government seeks to detain the

24  defendant under Section 3142(f)(1) and 3142(f)(2).  The

25  Government argues that the defendant should be detained

1    because the defendant presents a risk of flight and a risk of

2    obstruction or attempt to obstruct justice.

3              In those instances, the Government must show by a

4    preponderance of the evidence that no conditions or

5    combination of conditions will reasonably assure the

6    defendant's presence as required.

7              The Government also argues that the defendant

8    should be detained because the defendant presents a danger to

9    another or the community.  And in that instance, the

10   Government has a higher burden and must show by clear and

11   convincing evidence that no conditions or combinations of

12   conditions will reasonably assure the safety of the

13   community.

14             The Court also is required to consider four

15   specific factors under the Bail Reform Act, which include the

16   nature and circumstances of the alleged offense, the weight

17   of the evidence against the defendant, the history and

18   characteristics of the defendants, and the nature and

19   serious -- the nature and seriousness of danger to others or

20   the community.

21             I've considered all of the evidence and these

22   factors and I've also given consideration to the

23   recommendation of the pretrial services -- or of pretrial

24   services, which in this case their recommendation is a

25   release on various conditions.

1          With respect to the Government's position that the

2     defendant should be detained because he poses a risk of

3     safety to any other person or the community, I find the

4     Government has not met its burden of showing by clear and

5     convincing evidence that that is the case.

6          On the issue of whether the defendant should be

7     detained because he poses a risk of obstruction of justice or

8     attempt to obstruct justice, I find that the Government has

9     not met its burden on that particular issue.  However, I do

10    find that the Government has met its burden to show by

11    preponderance of the evidence that there are no combination

12    of conditions which would reasonably assure the defendant's

13    attendance.

14         I find that the defendant has little, really no

15    ties to Colorado.  Defendant has resided in Brooklyn, New

16    York, for the past at least four and a half years where his

17    mother resides.  He has a two-year-old child that resides in

18    Jamaica and a 16-year-old child that resides in Atlanta.  The

19    defendant's car has been seized by the Government.

20         The Court does note that, based on the proffer of

21    evidence from Mr. Luton's counsel, that Mr. Luton's mother

22    has offered to loan her car and money from her Social

23    Security benefits to assist with travel; but notwithstanding

24    those factors and Mr. Luton's mother's willingness to assist,

25    the Court is not convinced and remains concerned that, due to

1       the defendant's literal lack of ties to this state, that

2       there are any conditions that the Court may reasonably impose

3       to assure his attendance as required.

4               The Court further finds that the weight of the

5       evidence against the defendant appears to be strong, but he

6       is subject to a lengthy period of incarceration if he is

7       convicted.

8               For what it's worth, the Court did struggle with

9       this decision noting that Mr. Luton has no criminal

10      background whatsoever, does appear to have a loving mother,

11      who, along with him, would like to fight for a successful

12      resolution to this -- this case.  But again, given the

13      literal lack of ties to this jurisdiction, the Court has

14      found that the Government has met its burden.

15              The Court further finds that, although Mr. Luton

16      has worked in self-employment as a DJ, and another form of

17      self-employment, that he lacks stable employment, were the

18      Court to order his release, and lacks a stable residence, at

19      least a residence -- stable residence located in this

20      jurisdiction.

21              Therefore, I find that there is -- there are no or

22      is no condition or combination of conditions that the Court

23      can impose to reasonably assure Mr. Luton's appearance, as

24      required, and, therefore, I will order Mr. Luton to be

25      detained.  And I direct that he be kept separately from

1   persons convicted and serving sentences to the extent

2   possible; that he be given reasonable opportunity for private

3   consultation with his attorney; that the U.S. Marshals

4   deliver him for court proceedings on request of the Court or

5   Government; and that he be temporarily -- or that he be

6   remanded to the custody of the U.S. Marshals pending

7   additional proceedings.

8            Counsel, are there any questions about my order?

9            MS. PALUCH:  No, Your Honor.  Thank you.

10           MS. SUELAU:  No, Your Honor.

11           THE COURT:  Okay, all right.  Thank you, I

12   appreciate your time.  Court will adjourn.

13           (Whereupon, the within hearing was then in

14   conclusion at 3:09 p.m.)

15

16

17

18

19

20

21

22

23

24

25

33

```
 1                    CERTIFICATE OF TRANSCRIBER

 2    I certify that the foregoing is a correct transcript to the

 3    best of my ability to hear and understand the audio recording

 4    and based on the quality of the audio recording from the

 5    above-entitled matter.

 6

 7    /s/ Dyann Labo                      April 4, 2019

 8    Signature of Transcriber             Date

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com