IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No.  19-cr-00098-CMA

UNITED STATES OF AMERICA,

        Plaintiff,

v.

LEONARD LUTON,

        Defendant.

---

**UNOPPOSED MOTION FOR PRETRIAL RULING REGARDING THE
GOVERNMENT'S PROPOSED EXPERT TESTIMONY PURSUANT
TO FED. R. EVID. 702**

---

The United States of America, by Jason R. Dunn, United States Attorney, and through Martha A. Paluch and Sarah H. Weiss, Assistant United States Attorneys, pursuant to this Court's Criminal Practice Standard 12(j) and Fed. R. Crim. P. 16(a)(1)(G), hereby files this unopposed motion for a pretrial ruling regarding the government's proposed expert testimony under Fed. R. Evid. 702. The government reserves the right to supplement this Motion with additional reports and information should they become available.[1]

The United States and defendant's counsel Mr. Mark Scabavea have conferred regarding this motion.  Mr. Scabavea advised that the defendant does not object to this motion.

---

[1] The United States also requests written notice, pursuant to Rule 16(b)(1)(C) of the Federal Rules of Criminal Procedure, of any expert witness Defendant Luton plans to call at trial.  (*See also* ECF 24 at ¶ 9 (Discovery Conf. Memo.))

1

### I.     The Government's Cellular Records Analysis Expert:  FBI Special Agent Kevin Hoyland

#### A.  Qualifications, Experience and Training

Federal Bureau of Investigations (FBI) Special Agent (SA) Kevin Hoyland has been employed as a special agent with the FBI since 2012.  SA Hoyland is currently employed as a FBI C.A.S.T. (Cellular Analysis Survey Team) National Asset.  SA Hoyland's curriculum vitae, which outlines his training, experience, and qualifications, was produced in discovery,[2] is incorporated by reference, and is attached hereto as Attachment 1.  As set forth in SA Hoyland's CV, National Assets are FBI Special Agents whose primary role is to provide cellular records analysis and technological assistance to Local, State, and Federal Law Enforcement, including mapping, analytical reports, tracking of cellular devices, and presenting expert testimony in court.  Presently, there are approximately 15 individuals in a National Asset role in the United States.  Prior to his designation as a National Asset, SA Hoyland served as a C.A.S.T. Field Asset and Principal Relief Supervisory Special Agent from 2016 to 2019.  SA Hoyland has been qualified as an expert and provided expert testimony in the field of cellular records analysis in the following counties in the State of Colorado:  Adams, Arapahoe, Boulder, Broomfield, El Paso, Teller, and Weld.  SA Hoyland has also testified as an expert in state court in Omaha, Nebraska, and Casper, Wyoming.

#### B.  Nature of SA Hoyland's Testimony

During its case-in-chief, the government expects to introduce evidence and testimony regarding the cellphone seized from the defendant's person incident to his arrest.  This cellphone was imaged pursuant to a Larimer County state search warrant

---

[2] INV_00001313-1314, INV_00002682-2683.

that was produced in discovery.[3]  The data extraction from this cellphone was produced to the defense on March 12, 2019.[4]

Cellphone companies maintain databases that capture and store information related to the usage of each customer's cellular phone.  These databases generate call detail records (CDRs).  The CDRs document the network interactions to and from the cellphone, to include the date, time, duration, number called, and calling numbers.  The CDRs also capture the cell tower and cell sector ("cell site") which the cellphone utilized when it initiated contact with the network.

A federal search warrant was executed on the defendant's service provider, T-Mobile, on April 20, 2018, requesting the CDRs pertaining to the defendant's cellphone.  These records were produced to the defense in discovery.[5]

SA Hoyland will testify to the methodology used in his cellular analysis of these CDRs.  Specifically, SA Hoyland identified the cell sites used during voice calls and text messages to show the general location of the defendant's cellphone around key events in this case.  This information is also referred to as geolocation data.

In this case, cell towers provided the general location of the defendant's cellphone during two trips from Brooklyn, New York, to Estes Park, Colorado.  One such trip involved a visit to S.O.'s home in the early morning hours of October 3, 2018, and the second trip related to the defendant travelling to and being arrested outside of S.O.'s home on January 22, 2019.  SA Hoyland will also testify to text messages, video, and images recovered from the defendant's cellphone that pertain to his analysis of the

---

[3] INV_00002089-2095.
[4] Thumb drive #T17186; Data was also provided to defendant's new counsel on September 24, 2019 (thumb drive #0000469).
[5] SW_00000175-186, INV_00001971-1981.

geolocation of the defendant's cellphone during these two trips to Colorado.[6]  Some of the data retrieved from the defendant's cellphone predated S.O.'s mailing of cellphones to the defendant's address in October of 2018.  SA Hoyland will opine that this data was transferred from a previous device to the cellphone mailed by S.O. found in the defendant's possession on January 22, 2019.

In addition, SA Hoyland will testify about the defendant's cellphone being in the vicinity of addresses where certain packages were mailed by S.O. at the direction of "Frank White" using next-day delivery by either UPS or FedEx.  Specifically, SA Hoyland will testify as to the geolocation of the defendant's cellphone in relation to the delivery addresses of the packages listed in certain counts of the Superseding Indictment, as well as other deliveries that occurred during the course of the scheme.

SA Hoyland's anticipated testimony regarding his methodology and specific findings are contained in his Historical Cellular Analysis Report, dated December 16, 2019.  This report was produced in discovery[7] and is attached hereto as Attachment 2.

---

[6] The government maintains that testimony pertaining to text messages, video, and images recovered from the defendant's cellphone do not constitute expert testimony. *See United States v. Marsh,* 568 F. App'x 15, 17 (2d Cir. 2014) (special agent's testimony as "to the contents of the messages retrieved from the phone," was not expert testimony in that it did not "turn on or require a technical understanding of the programming or internal mechanics of the technology"); *Securities and Exchange Commission v. Sabrdaran,* No. 14-cv-04825-JSC, 2016 WL 7826653, at *1 (N.D. Cal. Oct. 20, 2016) (witness's testimony was not expert where the witness testified 1) that he used Cellebrite to extract data from Sabrdaran's Blackberry phone, 2) to "the amount and types of data extracted," and 3) his comparison of an extracted audio file and a converted version of this file).  The government will call one of its case agents, SA Amy Howard, to testify to this nonexpert evidence at trial.  However, to the extent this information relates to and supports SA Hoyland's testimony regarding the geolocation data at issue, the government submits it is proper for SA Hoyland to incorporate these corresponding text messages, video, and images recovered from the defendant's cellphone into his proposed expert testimony.
[7] EXP_00000493-524.

In this report, SA Hoyland details 1) the Investigative Information pertaining to his examination, 2) the Basic Principles Utilized in Call Detail Record Analysis, 3) the conclusions derived from his analysis, and 4) maps and other demonstratives which further explain his analysis.  SA Hoyland's report was successfully peer reviewed by another C.A.S.T. member.  This C.A.S.T. member reviewed the records and the conclusions contained within SA Hoyland's report to ensure the accuracy of the report.

As to his examination of this evidence, SA Hoyland will explain how he used the C.A.S.T. tools and the policies and procedures established by that FBI Unit to conduct his examination reliably.  SA Hoyland's testimony will be based on his education, experience, training, certifications, and his application of each of those to the evidence in this case.

## II.     The Government's Lottery Fraud Expert:  Dr. Doug Shadel

### A.  Qualifications, Experience and Training

The government submits, without objection, that Dr. Doug Shadel is qualified to provide testimony as an expert, pursuant to Federal Rule of Evidence 702, on the basis of his knowledge, skill, experience, training, and education.  Dr. Shadel' s curriculum vitae, which outlines his training, experience, and qualifications, was produced in discovery,[8] is incorporated by reference, and is attached hereto as Attachment 3. Presentations previously given by Dr. Shadel on the topic of lottery scams were also provided to the defense in discovery.[9]

In *United States v. Lavrick Willocks, et al.,* Case No. 4:12-CR-175, in the United States District Court for the District of North Dakota, the government noticed to the

---

[8] EXP_00000372-375.
[9] EXP_00000376-394.

5

defense that it intended to call Dr. Shadel to testify as an expert pertaining to lottery frauds originating from Jamaica. In a pretrial hearing, the court ruled that Dr. Shadel would be allowed to testify at trial in accordance with the expert disclosure of his testimony made by the government. However, given the fact similar testimony was provided by a Jamaican official, in addition to the wealth of evidence against the defendant, the prosecution elected to present Dr. Shadel's testimony at sentencing.[10]

Dr. Shadel has spent the last 35 years studying, and working to prevent, consumer fraud, including lottery fraud perpetrated by Jamaican nationals. Since 1993, Dr. Shadel has worked for AARP[11] as the Consumer Affairs Director, Associate Regional Director, and currently sits as the State Director for AARP Washington. He also serves as AARP's national spokesperson for The Fraud Watch Network, the organization's nationwide helpline and resource aimed at fighting fraud targeted at older Americans. His primary focus during his tenure at AARP has been the design and implementation of fraud prevention programs. Prior to that, Dr. Shandel was a fraud investigator for the Washington State Attorney General's Office from 1979 to 1989. From 1989 to 1993 Dr. Shadel was a Special Assistant to the Attorney General for the State of Washington, where he ran the fraud prevention programs.

Dr. Shadel obtained his Ph.D. in 2007. His dissertation was entitled, *The Psychology of Consumer Fraud*. He has written and/or co-authored a number of articles and books on fraud, scammers, victim profiles and demographics, and risk

---

[10] A copy of Dr. Shadel's testimony was provided to the defense. EXP-00000395-492.
[11] The mission statement of AARP (formerly the American Association of Retired Persons) is: "AARP's mission is to enhance quality of life for all as we age. We lead positive social change and deliver value to members through information, advocacy and service."

factors, including: Doug Shadel & Anthony Pratkanis, *Weapons of Fraud: A Source Book for Fraud Fighters* (2005); Doug Shadel, *Outsmarting the Scam Artists: How to Protect Yourself from the Most Clever Cons* (2012); Doug Shadel & John T., *Schemes & Scams: A Practical Guide for Outwitting Today's Con Artist* (1994); *The Science of Identity Theft*; and Doug Shadel, *Confessions of a Con Man*, AARP The Magazine, Nov. 2012.

Dr. Shadel has also conducted research and various studies relating to fraud victim characteristics, the tactics used by scammers, and the susceptibility of vulnerable consumers. Those studies include: Doug Shadel, *Caught in the Scammer's Web: Risk Factors That May Lead To Internet Fraud* (Feb. 2014); Susanne Scheibe, Doug Shadel, et al., *Forewarning Reduces Fraud Susceptibility in Vulnerable Consumers*, Basic Appl. Soc. Psych. 272, 272–279 (2014); *National Fraud Victim Profiling Study* (2011); *Stanford/AARP Call Center Study* (2010); *Mental Status of Lottery Victims Pilot Study* (2009) (research co-led by Dr. Shadel); *The Psychology of Consumer Fraud* (2007) (research co-led by Dr. Shadel); and *Off the Hook: Reducing Participation in Telemarketing Fraud* (2003) (US DOJ study co-led by Dr. Shadel).

Dr. Shadel has also testified before the U.S. Senate Special Committee on Aging about lottery fraud. He serves on the Advisory Board of the Stanford University Financial Fraud Research Center and has been a frequent advisor and contributor to the FINRA (Financial Industry Regulatory Authority) Investor Education Foundation.

### B. Nature of Dr. Shadel's Testimony

Dr. Shadel will testify about the scope and effects of the lottery fraud operated by Jamaican nationals in the United States. Dr. Shadel will also testify about the

persuasion techniques and tactics used by scammers to entice their victims (e.g. "phantom riches," "scarcity," and "source credibility"), the demographic and behavorial factors of the targeted victims, and the susceptibility of vulnerable elderly consumers to such frauds.

To date, Dr. Shadel has reviewed 1) the Superseding Indictment (ECF 45); 2) the Criminal Complaint and Affidavit filed in this case, 19-mj-00025-NRN; 3) reports of interviews of S.O. and L.W.; 4) the videotaped interview of S.O; and 5) has listened to recorded calls between S.O. and "Frank White," and recorded calls between S.P. and "David."

Based upon his financial fraud research, and extensive academic and statistical studies involving random samples of the general public and samples of known lottery fraud victims, Dr. Shadel will opine that lottery fraud victims are more likely to be over the age of 70, female, living alone, less educated, less financially literate, and less financially stable.  The persons in this demographic are more likely to listen to sales pitches from unknown callers, more likely to read direct mail solicitations, more likely to express an interest in persuasion tactics used by con men, less likely to be signed up for the Do Not Call list, and less likely to check out the background of a purported business before giving the business money.

Based upon academic and statistical studies, Dr. Shadel will testify that the older (over 55) general population tends, as a coping mechanism, to focus on positive experiences rather than negative experiences.  This adaptive behavior suggests that when bad things happen (e.g. poor health, friends passing) older persons are more

vulnerable to fraud because they tend to downplay the negative aspect of an offer (risk) and focus primarily on the positive aspect (gain).

Dr. Shadel has personally interviewed over a dozen convicted swindlers and co-led a team of researchers who analyzed hundreds of undercover audiotapes of con men calling elderly victims. These tapes were transcribed and coded to determine the types of persuasion tactics used in lottery scams. Based upon these interviews and research, Dr. Shadel will testify that the central strategy of the scammer for defrauding victims is to "get them under the ether," which is to say getting the victim in a heightened emotional state that keeps the victim off balance and not thinking rationally. The con man will engage the victim in a subject that will get them excited – like winning the lottery – and once the victim is in this heightened emotional state, the victim finds it difficult to engage the logical reasoning part of their brain and is therefore prone to making an impulsive or emotional decision. The three most common tactics for this are phantom riches, scarcity and source credibility, all of which are deployed in the service of getting the victim into a heightened emotional state.

1. Phantom riches – the "phantom" is something that a victim wants but does not have – like a million-dollar prize. The con man will dangle this phantom in front of the victim to get them excited and willing to do whatever it takes to get it.

2. Scarcity – There are three variations to this tactic: time scarcity, product scarcity, and winner scarcity. All three prey on the idea we have in our head that if something is scarce, then it must be valuable and therefore we must act quickly to avoiding losing the valuable offer.

3. Source credibility – This tactic preys on the idea of linking the product or prize to credible sources to make the offer more believable. In the case of lotteries, it is not hard to do since victims are familiar with legal state and national lotteries.

9

It is Dr. Shadel's opinion that the scams originating from Jamaica pitching the lottery fraud operate on the same basic set of principles as other lottery scams in that they target, among others, lower income, less educated, older women, and they employ persuasion techniques to obtain money from victims.  This lottery fraud differs from other telemarketing scams, however, in that perpetrators are frequently extremely persistent with victims - continuing to call a victim and make additional demands once the victim sends initial monies - and sometimes use bullying and aggressive behaviors to advance the fraud.

### III. The Parties Submit No Evidentiary Hearing is Necessary

Given that the defendant does not object to this motion, the parties submit that an evidentiary hearing is not necessary.

### IV. Conclusion

The parties stipulate that the appropriate foundation exists under Fed. R. Evid. 702 for the proposed expert testimony as outlined above.  Therefore, the government requests a pretrial ruling from the Court permitting SA Hoyland and Dr. Shadel to render expert opinions and testimony during the trial in this case consistent with their expected testimony as outlined in this motion.

Respectfully submitted this 8th day of January, 2020.

        JASON R. DUNN
        United States Attorney


        s/ *Martha A. Paluch*
        MARTHA A. PALUCH
        SARAH H. WEISS
        Assistant U.S. Attorneys
        1801 California Street, Suite 1600
        Denver, CO 80202
        Telephone 303-454-0100
        Facsimile 303-454-0402
        Email: martha.paluch@usdoj.gov
        Sarah.weiss@usdoj.gov

11

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of January, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record.

*s/Martha A. Paluch*
Martha A. Paluch
Assistant U.S. Attorney
United States Attorney's Office
1801 California Street, Suite 1600
Denver, CO  80202
(303) 454-0100
Martha.paluch@usdoj.gov