IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 19-cr-00098-CMA-1

UNITED STATES OF AMERICA,

  Plaintiff,

v.

LEONARD LUTON,

  Defendant.

---

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF ITS *JAMES* PROFFER**

---

  The United States of America (the government), by Martha A. Paluch, and Sarah H. Weiss, Assistant United States Attorneys, submits this memorandum in support of its *James* proffer. This proffer demonstrates the existence of the charged conspiracy to commit mail fraud, the duration of this conspiracy, and its participants.

  The government has concurrently filed a preliminary *James* proffer log, which lists those out of court statements made during the course of the conspiracy and in furtherance of the conspiracy that the government intends to offer at trial.

  Through this motion, the government respectfully requests that the Court rule, prior to trial, that the statements identified in the government's log are admissible pursuant to Fed. R. Evid. 801(d)(2)(E).

  The United States and defendant's counsel Mr. Mark Scabavea have conferred regarding this Memorandum. Mr. Scabavea advised that the defendant does not oppose the government's request for a pretrial ruling regarding the admissibility of these

statements. The parties propose that the defendant be given until the motions response date of January 22, 2020, to provide his position on the admissibility of each of the proffered statements. The government will then file with the Court a final *James* proffer log that includes the defendant's position on each statement.

After review of these pleadings, the government respectfully requests that the Court find that a hearing on the government's *James* motion "is not necessary to resolve the provisional admissibility of the Government's proposed co-conspirator statements in this case." *United States v. Yurek,* No. 15-cr-394-WJM, 2017 WL 2834544, at *1 (D. Colo. June 30, 2017) (unpublished); *United States v. Urena*, 27 F.3d 1487, 1491 (10th Cir. 1994) (noting that a *James* hearing might have been unnecessary based on previously presented evidence establishing the existence of a conspiracy; the important factor is not that the trial court hold a hearing *per se*, but that the trial court make its relevant factual determinations prior to the introduction of co-conspirator statements to the jury); *United States v. Hernandez*, 829 F.2d 988, 994 (10th Cir. 1987) (it is clear that defendants have no distinct right to a pre-trial hearing with respect to the conspiracy determination).

The government notes that it may attempt to offer at trial additional statements, not currently in the government's possession or of which the government is not currently aware, which may be discovered in the course of trial preparation. If such statements are discovered pre-trial, the government will request leave to file a supplemental list of additional out-of-court statements it intends to offer at trial.

**I.     THE LAW CONCERNING RULE 801(d)(2)(E)**

    1.    According to the Federal Rules of Evidence, "[a] statement is not hearsay if [it] is offered against a party and is . . . a statement by a coconspirator of a party during the course of and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). Statements are admissible pursuant to Rule 801(d)(2)(E) if a court finds, by a preponderance of the evidence, three things: that (1) a conspiracy existed; (2) the declarant and the defendant were both members of the conspiracy; and (3) the statements were made in the course of and in furtherance of the conspiracy. *United States v. Alcorta,* 853 F.3d 1123, 1137 (10th Cir. 2017); *Bourjaily v. United States*, 483 U.S. 171, 181 (1987). The government must prove these preliminary facts by a preponderance of the evidence. *Alcorta,* 853 F.3d at 1137; *United States v. Perez,* 989 F.2d 1574, 1577 (10th Cir. 1993) (en banc). At trial, at the conclusion of its case, the government will move that the Court find that the government has proven the three elements listed above. *United States v. Pilling,* 721 F.2d 286, 294 (10th Cir. 1983) (citation omitted).

    2.    In making these determinations, a court "is not bound by evidence rules, except those on privilege." *See* Fed. R. Evid. 104(a), 1101(d)(1); *Bourjaily*, 483 U.S. at 178-79; *United States v. Owens*, 70 F.3d 1118, 1124 (10th Cir. 1995) (quoting *Bourjaily*). The court "may consider both independent evidence and the statements themselves when making" the Rule 801(d)(2)(E) findings. *United States v. Rutland,* 705 F.3d 1238, 1248 (10th Cir. 2013); *Bourjaily*, 483 U.S. at 180 ("[T]here is little doubt that a co-conspirator's statements could themselves be probative of the existence of a conspiracy and the participation of both the defendant and the declarant in the

conspiracy."); *Owens*, 70 F.3d at 1124 (same).

3. To determine whether a conspiracy existed, the government is not required to show that a formal or explicit agreement existed. *United States v. Arutunoff*, 1 F.3d 1112, 1116 (10th Cir. 1993). But it must provide evidence of four things: (1) an agreement between two or more people to break the law; (2) knowledge by those people of the essential objectives of the conspiracy; (3) knowing and voluntary participation in the conspiracy; and (4) interdependence among the conspirators. *United States v. Sells*, 477 F.3d 1226, 1235 (10th Cir. 2007); *see also United States v. Hill*, 786 F.3d 1254, 1266 (10th Cir. 2015) (quoting *Sells*).

4. To determine the second factor, the connection of the declarant and the defendant to the conspiracy, at most there must be "some independent evidence linking the defendant to the conspiracy." *Alcorta*, 853 F.3d at 1142. However, the independent evidence "need not be 'substantial.'" *Id.* A court "may presume a defendant is a knowing participant [in a conspiracy] when he acts in furtherance of the conspiracy's objectives." *United States v. Rogers,* 556 F.3d 1130, 1138 (10th Cir. 2009).

5. As to the defendant's knowledge of the essential objectives of the conspiracy, the government is not required to prove that a conspirator knows all other conspirators, or all the details of the conspiracy. *United States v. Small,* 423 F.3d 1164, 1182 (10th Cir. 2005). Nor must the government prove that a conspirator knew of or participated in every aspect of the conspiracy, *United States v. Eads*, 191 F.3d 1206, 1210 (10th Cir. 1999). A coconspirator statement is also admissible even if the declarant is uncharged. *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1081 n.5 (10th Cir. 2006).

6. In determining the third factor, that the statement was made during the course of and in furtherance of the conspiracy, several rules apply. First, the focus is on whether the declarant's intent in making the statement was to advance the conspiracy, not whether the statement actually advanced the conspiracy. *Perez*, 989 F.2d at 1578. To determine this, the court must examine the nature of the statement and its context. *Id.* at 1579. Second, there is no requirement that the statement be made by one conspirator to another. *United States v. Williamson*, 53 F.3d 1500, 1519 (10th Cir. 1995); *United States v. Figueroa-Rivera*, 2017 WL 4481125, at *4 (D.N.M. Mar. 10 2017) (unpublished) (quoting *Williamson*).

7. Examples of statements made in furtherance of a conspiracy include but are not limited to:

    a. Statements that in any way promote the objective(s) of a conspiracy. *Rutland,* 705 F.3d at 1252; *United States v. Townley*, 472 F.3d 1267, 1273 (10th Cir. 2007) (citation omitted).

    b. Statements that reveal the existence of a conspiracy. *United States v. Garcia*, 994 F.2d 1499, 1505 (10th Cir. 1993);

    c. Statements that are intended to recruit potential coconspirators or otherwise to induce others to assist in carrying out the objectives of the conspiracy. *Perez*, 989 F.2d at 1578;

    d. Statements that identify a conspirator or the role of a conspirator. *Rutland*, 705 F.3d at 1252; *Townley*, 472 F.3d at 1273;

    e. Statements that explain important events in the conspiracy. *Rutland*, 705 F.3d at 1252; *Townley*, 472 F.3d at 1273;

   f. Statements of future intent that set transaction integral to the conspiracy in motion and maintain the flow of information among the co-conspirators. *United States v. Morgan*, 748 F.3d 1024, 1037 n.16 (10th Cir. 2014); *United States v. Roberts*, 14 F.3d 502, 514-15 (10th Cir. 1993) (same).

   g. Statements that are designed to advise co-conspirators of the progress of the conspiracy and keep them abreast of activities associated with the conspiracy. *Townley*, 472 F.3d at 1273; *Perez*, 989 F.2d at 1578;

   h. Statements which are intended to assure the listener of a conspirator's ability to consummate a particular transaction. *Rutland*, 705 F.3d at 1252;

   i. Statements that are designed to gain the trust of other conspirators or potential conspirators, to reassure trustworthiness, or to allay suspicions or fears. *Townley*, 472 F.3d at 1273; *Rutland*, 705 F.3d at 1252.

   j. Statements which are intended to control damage to the conspiracy that are made during the course of the conspiracy. *Cf. Alcorta,* 853 F.3d at 1139; *United States v. Griggs*, No. 08-cr-00365-MSK, 2012 WL 628595, at *5 (D. Colo. Feb. 27, 2012) (unpublished);

   k. Statements that prompt the listener to respond in a way that facilitates carrying out the activities of the conspiracy. *Perez*, 989 F.2d at 1578;

   l. Statements that conceal the objective of the conspiracy. *Rutland*, 705 F.3d at 1252-53.

 Although not all of these examples may have relevance to this case, the size of this list is illustrative of the broad interpretation given to statements in furtherance of a conspiracy.

## II.     PROFFERED EVIDENCE CONCERNING THE CONSPIRACY

8.     The evidence described below will demonstrate that the conspiracy charged in Count 1 of the Superseding Indictment began in or around February 2018 and continued through January 22, 2019, and that Defendant Leonard Luton and his co-defendant Rajay Dobson[1] were members of the conspiracy.

9.     The sources of information relied upon for this proffer include 1) the defendant's post-arrest interview; 2) text messages between the defendant and Dobson, and the defendant and others; 3) call detail records (CDRs) that establish a) communications between the defendant and Dobson during the conspiracy; b) the location of the defendant's cellphone during key events in this case; and c) video, pictures, and other data contained in the Cellebrite extraction report for the defendant's cellphone related to the scheme. Although this proffer describes the majority of the significant aspects of and acts associated with the conspiracy, it does not purport to describe every aspect of the conspiracy or every act taken in furtherance of it.

### A.     Overview of the Attempt and Conspiracy to Commit Mail Fraud

10.    The defendant and Dobson, as members of the conspiracy, worked together and assisted each other during the course of the conspiracy in order to convince victim S.O. that she had won a lottery and needed to send cash, cashier's checks, and cellphones to addresses to which the defendant had access between February 2018 and January 22, 2019.  This conspiracy was carried out in the following manner:

---

1 Rajay Dobson is charged in the Superseding Indictment, but is not listed in the caption of this pleading as he has not yet appeared in this case.

      a. The defendant and Dobson contacted S.O. by mailing her a flyer falsely stating that she won $2,800,000 from a lottery drawing in Spain. The flyer informed S.O. that she was required to remit 5% of the total amount of the winnings to a promotional company in order to receive her winnings.

      b. S.O. was contacted by telephone. One of the individuals who called S.O. identified himself as "Frank White."

      c. White directed S.O. to make the payments in various ways, to include mailing via private and commercial interstate carriers, such as the United Parcel Service (UPS) and Federal Express (FedEx), cashier's checks and packages containing cash to addresses to which the defendant had access.

      d. White also directed S.O. to purchase and mail iPhones to addresses to which the defendant had access.

      e. Specifically, White directed S.O. to mail some of the cashier's checks to a woman with the initials S.P. who lived in Grandville, Michigan. White also directed S.O. to wire funds to S.P., which S.O. did. In total, S.O. sent over $150,000 to S.P. as directed by White. Bank and Western Union records confirmed amounts sent by S.O. to S.P. as directed by Frank White.

      f. S.P. had been told she had won a $5 million lottery and that in order to receive her winnings, she needed to receive money from others and send it on. She received instructions from a man calling himself "David." David told S.P. that once she deposited funds received from S.O., S.P. was to obtain cashier's checks made payable to the defendant. S.P. also received a text message from David providing her with Defendant Leonard Luton's name, bank account, and routing information. These

cashier's checks obtained by S.P. were deposited into the same account listed in the text message, which account was in the name of Leonard Luton and for which he was the only signatory.

      g. White also directed S.O. to mail two cashier's checks each in the amount of $15,000 to a man with the initials L.W. who lived in Connecticut. Similar to S.P., L.W. was told he had won a lottery and needed to receive funds from others in order to receive his winnings. S.O.'s bank records confirmed the issuance of the two cashier's checks made payable to L.W. as directed by White.

      h. The defendant, Dobson, and others communicated with each other via text messages and other messaging services about the addresses where particular packages S.O. mailed would arrive and the tracking numbers associated with those mailings.

      i. White directed S.O. to hand over $65,000 in cash to persons who came to her home in Colorado, which S.O. did.

      j. White also directed S.O. to hand over approximately $39,000 in cash to persons who came to her home in Colorado on January 22, 2019. This incident resulted in the arrest of the defendant and his companion Stacy Byfield[2] at S.O.'s home.

      k. Through this lottery scheme, the defendant and Dobson defrauded S.O. out of over $700,000.

      l. During the scheme, the defendant directed others to wire funds to persons in Jamaica.

    11. As to the defendant's participation in this conspiracy, the Supreme

---

[2] Ms. Byfield pled guilty to misprison of a felony in Case No. 19-cr-00207-RBJ.

Court in *Bourjaily* held that "there is little doubt that a co-conspirator's statements could themselves be probative of the existence of a conspiracy and the participation of both the defendant and the declarant in the conspiracy." 483 U.S. at 180. The independent evidence linking the defendant to the conspiracy "need not be 'substantial.'" *Alcorta,* 853 F.3d at 1142.

    12. Evidence of the defendant's active, knowing, participation in the conspiracy includes, but is not limited to, the following:

        a. During his post-arrest interview on January 22, 2019, the defendant stated his friend Rajay Dobson asked him to drive to S.O.'s residence to pick up a package and that the defendant was to give the package to Rajay's brother, Greg. The defendant stated Dobson was to pay him $500 for picking up the package, and the defendant claimed he did not know what was in the package. The defendant also stated that Dobson texted him S.O.'s address. During the interview, the defendant consented to SA Hoyland and Detective Robertson looking through his phone. The defendant identified two phone numbers associated with Dobson at that time. Dobson used one of these phones numbers to text tracking numbers to the defendant. S.O. gave these numbers to Frank White after mailing packages at White's direction.

        b. Records from Apple confirmed that the International Mobile Equipment Identity (IMEI) identifier on the cellphone seized from the defendant's person at the time of his arrest at S.O.'s residence was the same IMEI for the cellphone purchased by S.O. as directed by White. S.O. mailed this cellphone to an address given to her by White, at which address the defendant lived with his mother. The package containing this

cellphone was addressed to "John Anderson." The defendant's mother confirmed the defendant's receipt of a package in this name.

    c. The call detail records (CDRs) for the cellphone seized from the defendant's person at the time of his arrest confirmed that this cellphone traveled from the defendant's residence in Brooklyn, New York, to Estes Park, Colorado, to S.O.'s residence on two occasions: 1) during the early morning hours of October 3, 2018, when S.O. handed over $65,000 in cash to a person who identified himself as an FBI agent (which visit White told her to expect); and 2) on January 22, 2019, when the defendant was arrested outside of S.O.'s residence – a date when Frank White told S.O. agents would be arriving at her home to retrieve the remaining approximately $39,000 S.O. allegedly owed.

    d. The CDRs confirmed communication between the defendant and Dobson during these trips to Colorado and throughout the conspiracy. Specifically, Dobson texted to the defendant S.O.'s address on August 20, 2018, and on October 2, 2018.

    e. The Cellebrite extraction report of the defendant's phone contained videos, text messages, and images documenting travel to Colorado during the two visits to S.O.'s residence.

    f. The report of the Cellebrite extraction performed on the cellphone seized from the defendant's person at the time of his arrest contained a picture of a large amount of cash bundled in rubber bands with a manila envelope in the background approximately one week after S.O. handed over $65,000 in cash, bundled in rubber bands and placed in a manila envelope.

    g. The CDRs for the cellphone on the defendant's person at the

11

time of his arrest placed the defendant's cellphone near addresses where packages were mailed by S.O. as directed by Frank White using next day delivery services. The defendant's cellphone was near those addresses on the day the packages were scheduled for delivery.

### B. Description of Statements in Furtherance of the Conspiracy

13. The chart attached to this proffer, entitled *James* Log, summarizes coconspirator statements made in furtherance of the conspiracy charged in Count 1 of the Superseding Indictment and described in this proffer. The letters following the 801(d)(2)(E) entries in the "Bases for Admission" column refer to the subparagraphs of paragraph 7 above, which identify purposes for which the coconspirator statements may be offered.

14. Statements in the log the government intends to admit pursuant to Rule 801(d)(2)(e) are made by Dobson to the defendant. To provide context for many of these statements, government counsel included in the log statements made by the defendant to Dobson, or by the defendant in response to Dobson's statements. These statements made by the defendant are not hearsay when offered against him, Fed. R. Evid. 801(d)(2)(A), and will be offered at trial pursuant to this rule. Other hearsay exceptions may also apply to the listed statements. *See* Fed. R. Evid. 803.

15. The government may offer some of these statements, or at least some portion of the statements, as verbal acts or directions rather than as assertions of fact. As such, these statements would not be covered by the hearsay rules. *See* Fed. R. Evid. 801(a); *United States v. Jackson*, 88 F.3d 845, 847-48 (10th Cir. 1996). Questions are also generally not hearsay because they are not intended as assertions. *Id.* at 848.

Finally, portions of some of the statements will be offered simply to prove that the statements were made, not to prove the truth of the matters asserted. *See* Fed. R. Evid. 801(c); *see generally* John W. Strong, *McCormick on Evidence* § 249 (5th Ed., 2003 Supp).

### C. Recorded Telephone Calls

16. The government will also seek to admit against the defendant statements made by Dobson in recorded calls between 1) Dobson (representing himself as Frank White) and S.O. and 2) Dobson (representing himself as David) and S.P. These recordings occurred during the course of the conspiracy and the statements were made in furtherance of the conspiracy. As for S.O., the FBI installed recording equipment on S.O.'s telephone and recorded calls between S.O. and Frank White. The government will seek to play eight such calls at trial (which range in length from 3 to 8 minutes).[3]

17. As for S.P., she deposited a $45,000 cashier's check received from S.O. upon opening an account at Grand River National Bank. When she returned a few days later to withdraw $30,000 of that amount, the bank called the police. The police contacted S.P. while she was still at the bank. The police were able to record 1) conversations between Dobson (calling himself David) and S.P. and 2) calls between Dobson (calling himself David) and a police detective, Andrew Measell, who was posing

---

[3] The government will seek to admit these recorded calls at trial through the testimony of its first witness, S.O. The "order of proof is within the sound discretion of the trial judge. Evidence of the acts and statements of other participants in the fraudulent enterprise or their agents may be admitted prior to demonstrating participation in the scheme by the objecting defendant, so long as the foundation is subsequently laid." *United States v. Krohn,* 573 F.2d 1382, 1387 (10th Cir. 1978).

as S.P.'s grandson. Dobson called S.P. using the same **702-xxx-2033** phone number he used to call S.O. The government will seek to play three such calls at trial (which range in length from 2 to 36 minutes) during the testimony of Grandville, Michigan Police Detective Andrew Measell.

18. The statements made in these recordings are admissible as nonhearsay on a number of grounds: 1) they are not offered for the truth of the matter inserted therein; 2) they are verbal acts – offered to prove that the words were spoken, *United States v. Faulkner*, 439 F.3d 1221, 1227 (10th Cir. 2006); and 3) they are admissible against the defendant to establish the conspiracy between the defendant and Dobson. *Id.; United States v. Lopez-Gutierrez,* 83 F.3d 1235, 1242 and n. 8 (10th Cir. 1996) (recorded calls between co-defendant Avila and confidential information properly admitted against defendant Lopez-Gutierrez at trial as calls were not hearsay; "they were not offered for the truth of what was in them, but rather to show the existence of a conspiracy between Avila and Lopez-Gutierrez"); *United States v. Busch,* 758 F.2d 1394, 1397 (10th Cir. 1985) ("utterances and acts of one conspirator are admissible against a co-conspirator, even though the latter was not present at the time of the act or utterance, *if* there be evidence, independent of the utterances or acts themselves, which shows the existence of a conspiracy") (emphasis in original); *United States v. Feldman,* 825 F.2d 124, 127 (7th Cir. 1987) (denying defendant's hearsay objection where "investors' testimony was offered to prove the *existence* of a scheme; the statements were not offered for their truthfulness") (emphasis in original).

19. Also retrieved from the defendant's cell phone were eight voicemail

messages[4] from numbers associated with Dobson. These messages were left in English Caribbean Creole. The government hired a linguist who transcribed these messages into English.

20.     The government will seek to admit the transcripts of these eight voicemail messages so that the jury can compare the voice in these messages left on the defendant's phone from a number associated with Dobson to the voice in the recorded calls between S.O. and Frank White and the voice in the recorded calls between S.P. and David. S.O. will identify the voice of Frank White based on her hundreds of calls with him, and Officer Andrew Measell will identify the voice of "David" through his conversations with him. After listening to the calls made to S.O., S.P. and the messages left for the defendant from numbers associated with Dobson, the jury will have "had sufficient familiarity with [Dobson's] voice to determine on its own whether it was [Dobson] on the other end of the transmissions." *United States v. Hull,* 74 F. App'x 615, 621 (7th Cir. 2003) (citing *United States v. Khorrami*, 895 F.2d 1186, 1195) (7th Cir. 1990)); *see also* Fed. R. Evid. 901(b)(5) (the requirement of authentication of a voice can be satisfied through an "opinion identifying a person's voice – whether heard firsthand or through mechanical or electronic transmission or recording – based on hearing the voice *at any time* under circumstances that connect it with the alleged speaker") (emphasis added); *Brown v. City of Hialeah,* 30 F.3d 1433, 1437 (11th Cir. 1994) ("[o]nce a witness establishes familiarity with an identified voice, it is up to the jury to determine the weight to place on the witness's voice identification"); *United States v.*

---

4 The messages were in fact audio clips sent via a messaging application. For ease of reference in this pleading, the government refers to these audio clips as voicemail messages.

*Degaglia,* 913 F.2d 372, 376 (7th Cir. 1990) ("[m]inimal familiarity is sufficient for admissibility purposes"); *United States v. Pool,* 660 F.2d 547, 560 (5th Cir. 1982) (circumstantial evidence may be used for the admission of voice identification testimony).[5]

21. In *DeBenedictis v. Wainwright,* 517 F. Supp. 1033 (S.D. Fla. 1981), the defendants objected to the admission of recorded calls of solicitors who called targets of fraudulent telephone solicitations. The defendants claimed the calls were inadmissible as "none of the witnesses were able to testify as to the true identity of the callers or as to where the calls came from." *Id.* at 1037. The court noted that the "identity of the person with whom the conversation is alleged to have been had may be established by circumstantial evidence." *Id.* Given that 1) the witnesses wrote checks in response to the telephone solicitations, 2) the money was turned over to the defendants, and 3) went into accounts they opened and on which they were the only signators, the court held that the necessary link between the unknown callers and the defendants was established. *Id.*

This evidence establishes that the defendant and Dobson worked interdependently to carry out this conspiracy.

D. **Phone Numbers Used in the Scheme**

22. In addition to the evidence detailed above, the evidence the government will present to establish Dobson's identity and the defendant's participation in this

---

[5] To the extent the defendant raises a confrontation clause argument based on his inability to cross-examine Dobson (posing as Frank White or David), such claim fails. "[N]either a hearsay nor confrontation question arises when testimony is used to prove merely that the statement had been made." *DeBenedictis v. Wainwright,* 517 F. Supp. 1033, 1038 (S.D. Fla. 1981 (citing *Dutton v. Evans,* 400 U.S. 74, 88 (1970)).

16

conspiracy with Dobson includes, but is not limited to, the following evidence related to phone numbers used in the scheme:

    a.  Phone records revealed that the **702-xxx-2033** phone number used to call both S.O. and S.P. was registered with Magic Jack, which is a program that allows voice over IP phone calls. Minutes after its creation, the defendant texted this phone number and its password to a number listed in the defendant's phone for Dobson with an area code for Jamaica, **876, ending in 7953**. Specifically, the defendant's contact/username for this number is R-J-A-Y-7-3-3.

    b.  The defendant saved in his phone the password for the email account used to register the 702 phone number used to call S.O. and S.P.

    c.  The **876-xxx-7953** number sent the defendant a text message with S.O.'s address on August 20, 2018.

    d.  The **876-xxx-6329** number sent the defendant a text message with S.O.'s address on October 2, 2018.

    e.  The defendant confirmed in his post-arrest interview that he was on the phone with Dobson when police arrived to arrest him at S.O.'s residence on January 22, 2019.  Call detail records confirmed that the defendant was in communication with Dobson on January 22, 2019, using a **876-xxx-7685** number.  The defendant had identified this number as being associated with Dobson during his post-arrest interview.

    f.  During the early morning hours of October 3, 2018, the night two individuals arrived at S.O.'s residence in Estes Park, S.O. was on the phone with Frank White (using the **702 number**) for approximately 30 minutes around 1:30 a.m.

    g.  Also during this 1:30 a.m. time frame, the **876-xxx-7953** number called

the defendant's cell number, **347-xxx-8544**, multiple times. The defendant confirmed that this **347-xxx-8544** number was his cell number during his post-arrest interview.

      h.  Throughout the conspiracy, the defendant and Dobson, using multiple phone numbers previously identified texted to each other names, addresses, and tracking numbers for shipments S.O. mailed at Frank White's direction.

      i.  In his post-arrest interview, the defendant told SA Hoyland and Detective Robertson that Rajay Dobson's nickname is Bird. When the defendant's friend C.H. texted the defendant asking for Bird's number, the defendant responded, **+1 (876) xxx-6329**. This number was associated with the registration of one of the cellphones S.O. shipped to the defendant's address in Brooklyn, NY. The individual listed in the registration was "Rajay Jodson." Also associated with that cellphone registration was the **702-xxx-2033** number White and David used to communicate with S.O. and S.P.

      j.  The government maintains that the defendant's statements, recorded calls, voice messages from Dobson to the defendant, texts, call detail records, and other evidence the government will submit at trial, establish that Dobson is the individual utilizing the 702 number used to call S.O. and S.P. and the numbers used to communicate with the defendant. This evidence is further proof of the defendant's knowing participation with Dobson in this conspiracy.

Respectfully submitted this 8th day of January, 2020.

JASON R. DUNN
United States Attorney

s/ Martha A. Paluch
MARTHA A. PALUCH
SARAH H. WEISS
Assistant U.S. Attorneys
1801 California Street, Suite 1600
Denver, CO 80202
Telephone 303-454-0100
Facsimile 303-454-0402
Martha.paluch@usdoj.gov
Sarah.weiss@usdoj.gov

## **CERTIFICATE OF SERVICE**

  I hereby certify that on this 8th day of January, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system that will send notification of such filing to counsel of record in this case.

             s/ Martha A. Paluch
             MARTHA A. PALUCH
             Assistant U.S. Attorney
             1801 California Street, Suite 1600
             Denver, CO 80202
             Telephone 303-454-0100
             Facsimile 303-454-0402
             Martha.paluch@usdoj.gov