**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Case No. 19-cr-00098-CMA

UNITED STATES OF AMERICA,

      Plaintiff,

v.

LEONARD LUTON,

      Defendant.

---

**GOVERNMENT'S SENTENCING STATEMENT**

---

On February 13, 2020, a jury found the defendant guilty of nine of ten counts of the Superseding Indictment, specifically Count One, which charged Conspiracy to Commit Mail Fraud, and Counts Two, Three, and Five through Ten, which charged Aiding and Abetting Mail Fraud. The jury acquitted on Count Four, which pertained to S.O.'s mailing of a $45,000 cashier's check to S.P. As explained at trial, that particular check was intercepted by law enforcement and returned to S.O. before the funds could be sent along to the defendant in this case. The defendant is scheduled to be sentenced on May 12, 2020, at 2:00 p.m.

As set forth in this Sentencing Statement, the United States Sentencing Guidelines ("U.S.S.G." or "guidelines") recommend that the defendant be imprisoned for between **87 and 108 months**. Through this filing and at the sentencing hearing, the government will argue, under a preponderance of the evidence standard, that the appropriate sentence is **108 months incarceration**, to be followed by **three years of supervised release**, a restitution judgment in the amount of **$994,793.75**, and a forfeiture money judgment in the amount of fraud proceeds

1

that are directly attributable to this defendant. A sentence at the high-end of the guidelines is sufficient, but not greater than necessary, to advance the sentencing objectives set forth in 18 U.S.C. § 3553(a).

## THE SENTENCE RECOMMENDED BY THE ADVISORY SENTENCING GUIDELINES

The base offense level is **7** because the defendant was convicted of mail fraud, which carries a maximum sentence of twenty years imprisonment, U.S.S.G. § 2B1.1(a)(1); plus **14** levels as a result of the defendant conspiring to cause losses of more than $550,000 but less than $1.5 million, U.S.S.G. § 2B1.1(b)(1)(H); plus **2** levels because this offense caused substantial financial hardship to S.O., U.S.S.G. §2B1.1(b)(2)(A)(iii); plus **2** more levels because a substantial part of the scheme was committed from outside the United States, U.S.S.G. § 2B1.1(b)(10)(B); plus **2** more levels because S.O. was a vulnerable victim, and the defendant knew, or should have known this fact, given the facts established at trial, U.S.S.G § 3A1.1(b)(1); and **2** more levels because the defendant tried to obstruct justice by lying to law enforcement during his post arrest interview, committing perjury at trial, and directing others to erase his iCloud account after his arrest. U.S.S.G. § 3C1.1. The defendant has not accepted responsibility for this offense and should receive no related decrease. The total offense level is therefore **29.**

Based on the government's information at this time, the defendant's criminal history will likely place him into **Category I**. Coupled with an offense level of 29, the guidelines recommend that the defendant be imprisoned for between **87 and 108** months.

## ANALYSIS OF THE 18 U.S.C. § 3553(A) FACTORS
## SUPPORT A SENTENCE AT THE HIGH-END OF THE GUIDELINES

A sentence of 108 months is fully supported by each of the factors set forth in 18 U.S.C. § 3553(a). A sentence at the high-end of the guidelines also appropriately reflects the defendant's obstructive conduct (both during the investigation of this matter and at trial), which was significant.

**I.   Nature & Circumstances of the Offenses**

**A.  The conspiracy to defraud S.O.**

The Court heard extensive evidence of this criminal conspiracy at trial. In short, the harm inflicted by the defendant was substantial, and it fully supports the sentence recommended by the government.

The evidence at trial established that between February 2018 and January 22, 2019, the defendant's co-conspirator, Rajay Dobson, calling himself "Frank White," convinced the victim, S.O. from Estes Park, Colorado, that she had won a $2.8 million dollar lottery and a Mercedes Benz. White told S.O. she needed to mail cash, cashier's checks, and cellphones via UPS and FedEx to pay the "fees" required in order to receive her prizes. White directed S.O. to mail these payments to the defendant's mailing address and to the addresses of his friends and associates.

In addition, White directed S.O. to mail some of the cashier's checks to a woman with the initials S.P. who lived in Grandville, Michigan. White also directed S.O. to wire funds to S.P., which S.O. did. In total, S.O. sent over $150,000 to S.P. at White's direction. Bank and Western Union records confirm this amount.

An interstate investigation by federal and local law enforcement confirmed that S.P. was used in this scheme as a money mule. S.P. also had been told that she had

won a lottery, in her case a prize of $5 million dollars, and that in order to receive her winnings, she needed to receive money from others and send it on. She received instructions from a man calling himself "David." David told S.P. that once she deposited funds received from S.O., S.P. was to obtain cashier's checks made payable to the defendant. Specifically, screenshots from S.P.'s phone confirmed that she received a text message from David providing her with the defendant Leonard Luton's name, his bank account, and routing information. The cashier's checks written by S.O. were cashed out by S.P. and then deposited by S.P. into the same account listed in the text message she received from David. The defendant's bank account records confirmed that these amounts were deposited into a Bank of America account in the defendant's name, and for which he was the only signatory.

White also directed S.O. to hand over cash in person on two separate occasions. The first instance occurred in October 2018, when White directed S.O. to hand over $65,000 in cash to persons who came to her home in Estes Park at approximately 1:30 a.m. on October 3. At that time, a man knocked on S.O.'s door, identified himself as an FBI agent, showed S.O. what appeared to her to be a real FBI badge, and directed her to hand over the cash. S.O. walked down her sidewalk to talk to a man in the car in front of her house who represented himself to be the "merchant banker" White told her would come to her home. This "banker" instructed S.O. to hand over the cash to the man who had come to her door, and S.O. did so.

White also directed S.O. to hand over approximately $39,000 in cash to persons who came to her home in Colorado on January 22, 2019. Law enforcement was involved

4

in this case by that time, and they had set up a covert operation to apprehend whoever arrived at S.O.'s home to pick up the funds. When the defendant and his girlfriend Stacy Byfield[1] arrived at S.O.'s home, they were both arrested. In his post-arrest interview, the defendant explained to the agents that he was at S.O.'s home at the direction of his friend Rajay Dobson, who asked the defendant to travel from the defendant's home in Brooklyn, New York, to S.O.'s residence in Estes Park to pick up a package. At that time, he denied being part of the October hand-to-hand transaction, and indeed, he denied ever having been to Colorado before.

The Cellebrite extraction of the defendant's cellphone provided multiple phone numbers for Dobson, and the defendant confirmed two of those numbers during his post-arrest interview. The defendant, Dobson, and others communicated with each other via text messages and other messaging services about the addresses where particular packages S.O. mailed would arrive and the tracking numbers associated with those mailings. Call detail records of the defendant's phone confirmed his presence at the address where a particular package was scheduled to arrive, around the time of the expected delivery. The government presented, through the expert testimony of Special Agent Kevin Hoyland, 19 instances where this occurred with respect to packages mailed by S.O. as directed by White. Voicemail messages left by Dobson and retrieved from the defendant's phone indicated the two discussed the distribution of funds between themselves and others.

---

[1]      Ms. Byfield pled guilty to misprison of a felony in Case No. 19-cr-00207-RBJ. She is scheduled to be sentenced on March 24, at 8:30 a.m.

At trial, the government presented certified bank records that established the withdrawals of funds from S.O.'s bank accounts, and the deposits into, and withdrawals of cash from, the defendant's bank accounts. Many of these deposits occurred at or near the dates of deliveries of cash from S.O. The government also presented evidence of the defendant directing others to wire funds to Jamaica on multiple occasions, and of him paying his friends hundreds of dollars around the times of deliveries of S.O. packages to their addresses.

The government proved, through the testimony of FBI Forensic Accountant Matt Morgan, that through this lottery scheme, the defendant and Dobson defrauded S.O. out of over $700,000 as alleged in the Superseding Indictment. However, at sentencing, the government will prove by a preponderance of the evidence, through the testimony of Mr. Morgan, that the total amount of loss to S.O. was **$994,793.75.**

### B. Obstruction enhancement pursuant to U.S.S.G. § 3C1.1.

Section 3C1.1 provides for a two-level enhancement if the "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction . . . ."

The government submits that this enhancement applies due to 1) the lies the defendant told to the agents during his post-arrest interview, 2) the perjury he committed at trial, and 3) the directions he gave others to erase his iCloud account after his arrest.

### 1. Legal standards for the defendant's lies during his post-arrest interview and for his perjury at trial.

Application Note 4.(G) to § 3C1.1 provides that a two-level obstruction enhancement is warranted if a defendant provides "a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense."

Application Note 4.(B) to § 3C1.1 provides for a two-level obstruction enhancement when a defendant commits perjury "if such perjury pertains to the conduct that forms the basis of the offense of conviction." To use perjury as a basis for an obstruction enhancement, the Court must determine 1) that the defendant gave false testimony under oath, 2) concerning a material matter, 3) and did so willfully "rather than as a result of confusion, mistake or faulty memory." *United States V. Dunnigan,* 507 U.S. 87, 94 (1993); *United States v. Hawthorne,* 316 F.3d 1140, 1145 (10th Cir. 2003). The district court is required to set forth the false statements it considered in imposing the enhancement. *Hawthorne,* 316 F.3d at 1146. While the district court need not cite the alleged perjury verbatim, it should "generally identify the testimony at issue" so that the appellate court can evaluate the findings without needing to speculate. *Id.*

"Material," as used in § 3C1.1 means "evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination." § 3C1.1, App. N. 6. It is not necessary "that a defendant's falsehood actually obstruct justice; an attempt to obstruct, even if thwarted, is sufficient." *United States v. Magana-Guerrero,* 80 F.3d 398, 400 (9th Cir. 1996) (citation omitted). Indeed, the threshold for materiality under § 3C1.1 is "conspicuously low." *United States v. Dedeker,* 961 F.2d 164, 167 (11th Cir.

7

1992).

The government submits that the following lies told by the defendant during his post-arrest interview and at trial support this enhancement.

### 2. Examples of the defendant's numerous lies during his post-arrest interview and his perjury at trial.

#### a. The defendant lied in his post-arrest interview about the October 2018 trip to S.O.'s house to pick up $65,000 in cash.

During his post-arrest interview, the agents asked the defendant if he had ever been to Colorado before. This was important to the investigation, because law enforcement knew that in the early morning hours of October 3, 2018, individuals arrived at S.O.'s home and she handed over $65,000 in cash. The agents wanted to determine if the defendant was one of those individuals. The defendant at least twice told the agents he had never been to Colorado before, and in fact, "had never been to this side of the world before, never." Govt. Ex. 21 (at 28:55 and 56).

At trial, the defendant admitted—for the first time—that *he had been* in Colorado in October of 2018. Attachment 1 at 15-16 (defendant's testimony on direct: "Q: Did you make a road trip to Colorado in October of 2018? A: Yes. I was part of a road trip here.") Then later, he stated on direct that he didn't remember being in Colorado because he "was fast asleep." *Id.* at 17-18. In response to a question from his counsel of whether he remembered being in Estes Park, the defendant offered the nonsensical explanation of "[n]o, I am sure my body was there, but not in awareness." *Id.* During cross-examination, the defendant was more definitive in his response as to whether he had been in Estes Park in October of 2018: "A: I know I was in Estes Park, because I told you that we

8

stopped. I know we were in Loveland." *Id.* at 85. Later, the defendant was asked, "Q: So, you lied to the agents in January when you said, I have never been here before?" A: "I told you why I said that, about that lie." *Id.*

This lie significantly obstructed the investigation and prosecution of this case because the FBI and the government spent a considerable amount of time proving at trial that call detail records, text messages, and video taken from the defendant's cellphone showed that he in fact traveled to Colorado in early October and was at S.O.'s residence during the time when she handed over $65K in cash. *See* Govt. Ex. 126C (Composite Exhibit of SA Hoyland's Expert Report, Slides 8-11).

The defendant tried to minimize his lie at trial, claiming he "cleared up" the issue when he testified. For example, on cross-examination, when pressed, he said: "Q: [y]ou didn't clear it up in that interview, sir," the defendant responded, "[b]ut I testified under oath that I am now." *Id.* at 87. The government presented the jury with irrefutable evidence that the defendant was in Colorado in the early morning hours of October 3, 2018. Only then did the defendant decide to admit that in fact he was in Estes Park at that time. This recantation has no effect on the Court's analysis of whether this material, false statement warrants an obstruction enhancement in this case. *Cf. United States v. Thomas,* 11 F.3d 1392, 1401 (7th Cir. 1993) (in the context of lies to a pretrial services officer, defendant's subsequent recantation of false statements had no effect on the issue because "3C1.1 applies to *attempts* to obstruct justice as well as actual obstruction") (emphasis in original).

>       **b.      The defendant lied during both his post-arrest interview
>       and at trial about how he came into possession of his cellphone,
>       which was mailed to his address by S.O.**

Records from Apple confirmed that the International Mobile Equipment Identity
(IMEI) identifier on the cellphone seized from the defendant's person at the time of his
arrest at S.O.'s residence was the same IMEI for a cellphone purchased by S.O. as
directed by White. S.O. mailed this cellphone to an address given to her by White,
specifically an address in Brooklyn, NY, where the defendant lived with his mother. The
package containing this cellphone was addressed to a fictitious "John Anderson," and the
defendant's mother confirmed to law enforcement that the defendant took possession of
the package upon delivery. However, when confronted with this evidence during his
post-arrest interview, the defendant claimed that he bought this exact phone out of the
trunk of his friend's car. He stated that the phones mailed to his address by S.O. "didn't
come to [his] hands," and that he "never physically received those phones. Never. I'm
willing to do whatever tests you guys have to prove that. 100% sure. 100% sure." Govt.
Ex. 21 at 1:10.

The defendant repeated this lie at trial. On direct examination, he testified that he
bought the phone out of his friend's car and paid him $800. Attachment 1 at 56. On
cross-examination, he admitted that 1) the evidence showed the IMEI for his phone was
the same IMEI as a phone purchased by S.O.; 2) the phone was mailed to his address;
and 3) his mom confirmed receipt of the "John Anderson" package. The government
proved through a FedEx receipt that the package of the other set of iPhones mailed to
the defendant's address by S.O. had been signed for, and provided evidence for the jury

10

to compare the signature on that form to one of the defendant's bank signatory forms. Govt. Exs. 46 and 138. The defendant's explanation for how he came into possession of the most damning piece of evidence in this case defies credulity. The victim's phone being found on the defendant's person was such a crucial piece of evidence because it proved that the defendant knew what was in this package mailed by S.O., a lie that formed the central tenet of his defense at trial. The defendant's knowledge was an essential element of the crime and the jury's verdict establishes that the government proved this element. *See United States v. Michael,* 411 F. App'x 167, 173 (10th Cir. 2011) (defendant was convicted of possession with intent to distribute marijuana and testified that he "lacked knowledge the crates in the trailer contained marijuana." The jury's verdict convicting him of this offense "necessarily indicated the jury did not find Michael's testimony as to his knowledge truthful, since knowledge is an element of the offense for which Michael was convicted").

The defendant's lies about never being in Colorado before and about how he obtained S.O.'s cellphone are both material and deserving of the obstruction enhancement.

### c.    The defendant lied about the number of times he picked up packages for Dobson.

The defendant's primary defense at trial was a lack of knowledge; specifically, that he did not know what was inside S.O's packages that were delivered to his home and to the homes of his friends and associates. To support his purported lack of knowledge, the defendant testified at length at trial regarding an "off-the-books delivery business" that he supposedly ran for numerous friends inside and outside of Jamaica.

That was not the story he told investigators. In his post-arrest interview, the defendant stated his friend, Rajay Dobson, asked him to drive to S.O.'s residence to pick up a package and that the defendant was to give the package to Rajay's brother, Greg. The defendant stated Dobson was to pay him $500 for picking up the package. He denied knowledge of what was in the package. When asked how many times Dobson had asked him to pick up packages for him, the defendant replied, "This is the first time." Govt. Ex. 21 at 0:28. Later in the interview, he stated he had been picking up packages for Dobson for the past year—coincidentally, the entire time period of the conspiracy. *Id.* at 1:28. The defendant's initial statement that this was the first time he picked up a package for Dobson was a blatant lie.

The defendant also never mentioned performing any "delivery services" for anyone else besides Dobson. Had the defendant told the agents of his supposed package pickup and delivery "business," law enforcement would have proactively checked that claim as a material aspect of their investigation.

At trial, when the clips from his videotaped interview were played, the defendant did not dispute changing his answer from picking up for the first time for Dobson versus picking up for the past year. Attachment 1 at 80-84. When pressed about this lie, he claimed that he was "literally sleeping" during his interview. *Id.* at 84.

In total contradiction to his post-arrest interview, the defendant embroidered an elaborate lie at trial. He claimed that he did not know what was in S.O.'s packages, because he received so many packages in connection with his "delivery business" that he could not remember individual deliveries, and that, in any event, he never opened any

12

of his "customers'" packages. These statements, too, made under oath and upon pains and penalties of perjury, were false. Given that they formed the central basis for his defense and would have been a material component of the investigation, these lies appropriately merit an obstruction of justice enhancement

### d. The defendant lied about not knowing Byfield's father's address.

Finally, while the government cannot establish that the following statement significantly obstructed or impeded the investigation or prosecution of this case, the government maintains that the Court can take into consideration this additional lie as an example of the defendant's obstruction and in fashioning an appropriate sentence.

In the post-arrest interview, the agents asked the defendant about packages mailed by S.O. to 443 Tompkins Avenue in Brooklyn, New York. They asked if the defendant knew who lived at that address. The defendant stated, "No." When told by the agents that Stacy's dad lived there, the defendant responded, "She told me that. I never asked for her dad's address." Govt. Ex. 21 at 1:23.

In the government's case-in-chief, it disproved the defendant's statements during his post-arrest interview, presenting evidence of the defendant sending this address to Dobson multiple times, and in fact, stating "use this." Govt. Ex. 96. The defendant had been in a relationship with Byfield for three years, and she and her father lived close to the defendant. To claim to investigators that he did not know his girlfriend's father's address was yet another blatant lie, told in an effort to evade his culpability for these crimes.

The defendant conceded as much at trial on cross-examination: Attachment 1 at

112 ("Q: [y]ou lied in your interview, when they [the agents] said, who lives at the Tompkins Avenue address, and you said that you didn't know? A: Yeah. Q: That was a lie? A: I guess, ma'am. I don't remember.").

### 3. Legal standards for the defendant's obstruction by ordering the destruction of evidence.

Application Note 4.(D) to § 3C1.1 provides that the defendant's "directing or procuring another person to destroy or conceal evidence that is material to an official investigation" also qualifies as obstruction meriting a two-level enhancement. *See also United States v. Curtis,* 573 F. App'x 712, 728 (10th Cir. 2014) (affirming the district court's application of the obstruction enhancement where defendant directed a client to delete all emails to or from the defendant, and rejecting the defendant's argument that this "act of obstruction didn't amount to a material hindrance to the investigation because law enforcement recovered almost all of the client's emails anyway"; court noted that the "material-hindrance requirement only applies when the obstruction is *contemporaneous* with arrest") (emphasis in original).

### 4. The defendant directed others to delete his iCloud account shortly after he was arrested.

As part of the government's investigation, law enforcement interviewed individuals who lived at many of the addresses where S.O. had sent packages. One such address was located in Toms River, New Jersey, and was the address of one of the defendant's friends, L.H.[2] During his interview, L.H. identified a photograph of the

---

[2]    Count Two of the Superseding Indictment , for which the defendant was convicted by the jury, charges a mailing of $10,000 to this address.

defendant and stated he knew this individual as Bruce Luton. L.H. stated that he learned from a Ring video doorbell security system installed at his residence that Luton had retrieved packages mailed to L.H.'s address on approximately two occasions.

In a February 1, 2019 interview with law enforcement, L.H. stated that he had received a call from Luton from a detention center. L.H. stated that the defendant was speaking in code because he knew jail phone calls were monitored. The call was a three-way call between the defendant, L.H. and a girl named "D." L.H. stated that D was one of Luton's girlfriends.[3] During this phone call, the defendant asked L.H. to go onto his iCloud account and erase it for him. According to L.H., the defendant told D during the call, "give L.H. the laptop and he will shut it down for me." L.H. told law enforcement he did not feel comfortable erasing the defendant's laptop and he told the defendant that he would not do it.

On May 31, 2019, Special Agent Amy Howard executed a search warrant on Apple Inc. for the Apple iCloud account associated with the defendant's email address, fass2rass@gmail.com (19-sw-05599-MEH). On June 19, 2019, Apple Inc. responded to the search warrant, stating that the defendant's account was "active," but there were no iCloud logs or IDS Query Logs with any associated activity, supporting the government's argument that the defendant directed another to delete his iCloud account.

L.H. was interviewed again on August 6, 2019, and confirmed that he participated in the three-way call described above, and reiterated that he did nothing

---

[3]      L.H. also identified another girl he knows as "Robin" as one of Luton's girlfriends. L.H. identified a photo of Stacy Byfield as Robin.

with Luton's Apple account. Whether this deletion was performed by L.H. or someone else, the evidence is clear that the defendant's direction that the iCloud account be deleted was accomplished.

Finally, at the defendant's detention hearing, the defendant admitted, through his counsel, that he directed another person to erase his iCloud account. His counsel stated, "It is understandable that [Luton] would want those pictures [private images of his girlfriend that were of a sexual nature] erased. He was not attempting to obstruct justice. He was attempting to protect his and his girlfriend's privacy." Attachment 2, March 21, 2019 detention hearing, Page 20.

This post-hoc explanation made no sense. The defendant freely showed the agents the many pictures of naked women on his iPhone during his post-arrest interview and the defendant knew the agents seized his iPhone for the purpose of downloading all of the contents of that phone – which included over 100,000 photos. It makes no sense that the defendant would need to have his friends erase his iCloud account to protect the privacy of these women when the government already had the photos. The fact that the defendant went through the chicaneries of a three-way call from the detention center and speaking in code further supports the conclusion that he knew his directions were illegal. Given that the bulk of the evidence against this defendant was derived from his phone, the more logical explanation is that the defendant was attempting to destroy evidence related to the lottery scheme by deleting historical evidence that would have been backed up in his iCloud account.

In its Order Denying Motion for Revocation of Detention Order, ECF 40, this

16

Court agreed, finding the defendant's explanation for erasing the iCloud account unpersuasive. The Court noted "the low probability that some individual would gain access to the iCloud account. Furthermore, there is likely more information available on an iCloud account than is contained on Mr. Lutons iPhone, including information from multiple devices that are registered to the same iCloud account." *Id.* at 15. The Court found the government proved by a preponderance of the evidence that if released, the defendant posed "a serious risk that he will obstruct or attempt to obstruct justice." *Id.*

For these same reasons, the government submits it has met its burden of proving by a preponderance of the evidence that the § 3C1.1 enhancement applies due to the defendant's "directing or procuring another person to destroy or conceal evidence that is material to an official investigation." § 3C1.1 App. N. 4(D);

The Court could find that one or all of the defendant's obstructive behaviors justify the obstruction enhancement. *See United States v. Brown,* 288 F. App'x 518, 525-526 (10th Cir. 2008) (finding the defendant obstructed justice "in every possible way" by destroying evidence, lying to police officers, and committing perjury).

## II.   **The defendant's history and characteristics justify a 108-month sentence**.

The defendant immigrated to this country,[4] supposedly to pursue the American dream pursued by so many before him. Rather than pursue legal employment and a legitimate life, The

---

[4]      The parties dispute whether the defendant immigrated to this country legally.   At trial, the government provided documents from the defendant's immigration records which showed that he lied on his green card application about being denied entry at the border of this country under suspicious circumstances. When confronted on cross-examination about

defendant used his status in this country to facilitate a fraud against a vulnerable American victims for the financial benefit of himself and for his friend and co-conspirator back in Jamaica.

For almost a year, this defendant was involved in picking up numerous packages of cash, cashier's checks, and cellphones mailed by S.O. At any point, the defendant could have refused to pick up these packages. He could have refused to deposit the cash into his bank accounts; he could have declined to direct that money back to Jamaica. He could have told Dobson to find someone else to participate in this conspiracy, and he could have informed law enforcement.

He did not. The money was too good. His actions did not trouble his conscience whatsoever. Instead he documented the trophies of his greed. Specifically, he had multiple photos of large quantities of cash on his phone, most notably a photo of the $65,000 in cash that S.O. handed over in October of 2018. He admitted that this photo was taken from his phone. Attachment 1 at 93-94 (discussing the photo of the $65K handed over by S.O.: "Q: [s]ir, this photo was retrieved from your phone, that was in your possession upon your arrest?" A: [y]eah."). On cross-examination, he did not dispute that he was holding cash in certain photos; but, he incredibly claimed he was holding "fake money." *Id.* at 126-27.

Not once has this defendant accepted any responsibility or expressed any remorse for his actions. Instead, he lied repeatedly to the agents during his post-arrest interview, and he continued to lie to this Court and to the jury from the witness stand.

Most importantly, this is a defendant who agreed to participate in a scheme to defraud an elderly victim; a woman who lived alone, had recently lost her husband, and was lonely. The

---

this lie to immigration authorities, defendant claimed this was "a mistake" on the part of "the Customs Office." *Id.* at 136-37.

defendant's actions (and Dobson's) in this regard are despicable and speak volumes about the characteristics of this defendant. Especially given that he callously refuses to acknowledge the damage his choices have caused, he deserves a significant sentence.

### III.   A sentence of at least 108 months is necessary to promote respect for the law and represents a just punishment for the defendant's offenses.

A significant sentence is necessary to make clear—both to this defendant and to others—that when scammers prey upon the most vulnerable members of our society, the consequences will be severe. The 108-month sentence sought by the government will prove that crimes of this nature are taken seriously by this country's criminal justice system and that those who choose to commit such crimes will pay dearly, thereby promoting respect for the law.

The government's recommended sentence is a just one, especially given that this case involves the victimization of an elderly woman who was defrauded out of most of her life's savings. The defendant knew of,[5] and indeed this scheme depended upon, the exploitation of a vulnerable, lonely, naïve, and elderly widow. *See generally* Expert Testimony of Dr. Doug Shadel. As reflected in the guidelines, the defendant's punishment should be a substantial one that takes into account the fact that the defendant targeted a vulnerable victim.

As S.O. will explain in her victim impact statement, the harm she suffered through the defendant's and Dobson's actions was significant. She suffered substantial financial harm and her ability to provide for her future living and medical expenses is in question. In the months

---

[5]     The defendant admitted, for the first time at trial, that he took part in the October trip to the victim's home in October, where $65,000 was retrieved.   Although the defendant contended that he was conveniently asleep when the money was picked up, that explanation is not credible.

leading up to the trial, she suffered extreme emotional and physical distress. She suffered from a number of physical ailments and was required to postpone medical treatments so that she could testify on February 10, 2020. She is still recovering from the ordeal of this crime and the related court proceedings.

A 108-month sentence will address the harm the defendant caused to S.O., the multiple ways the defendant obstructed and attempted to obstruct justice, and his refusal to accept any responsibility for his actions.

## IV.   Specific and general deterrence require the sentence recommended by the government.

The need to deter the defendant from further crimes also weighs heavily in favor of the recommended sentence. The defendant made the deliberate choice to engage in this criminal activity over and over again for almost a year, weighing the potential rewards of success against the likelihood of being caught and the consequences that would follow if he was. A significant sentence for this defendant will also send a clear message to other scammers that they can plan on spending a significant time in prison if they defraud others. *See United States v. Musgrave,* 761 F.3d 602, 609 (6th Cir. 2014) ("[b]ecause economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence"); *United States v. Morgan,* 635 F. App'x 423, 457 (10th Cir. 2015) (noting that deterrence "is particularly important in the area of white collar crime"); *United States v. Courtney*, 76 F.Supp. 3d 1267, 1307 n.13 (D.N.M. 2014) ("the Court must still consider specific deterrence when sentencing, because Congress demands it").

20

**V.**     <u>**The need to protect the public from further crimes**</u>.

This defendant, who refuses to acknowledge the wrongfulness of his actions, presents a continuing threat to society. There is no question that had defendant not been incarcerated for the year prior to his trial, he would have continued working with Dobson to defraud other elderly lottery victims across the country. A substantial sentence in this case will protect the public from other crimes committed by this defendant during his incarceration and hopefully will disrupt Dobson's and his other co-conspirators' efforts to defraud additional victims in this community and elsewhere.

<u>**CONCLUSION**</u>

The government intends to present testimony from FBI Forensic Accountant Matt Morgan to prove the loss and forfeiture amounts at the sentencing hearing. Therefore, it respectfully requests that the Court allow two hours for the hearing. At that time, the Government will request that the Court impose a sentence of 108 months in prison, three years supervised release, and the restitution and forfeiture amounts consistent with Mr. Morgan's testimony.

Dated this 16th day of March, 2020.

Respectfully submitted,

JASON R. DUNN
United States Attorney

*s/ Martha A. Paluch*
MARTHA A. PALUCH
SARAH H. WEISS
Assistant U.S. Attorneys
1801 California Street, Suite 1600
Denver, Colorado 80202
(303) 454-0100
FAX: (303) 454-0402
Email: Martha.paluch@usdoj.gov
Sarah.weiss@usdoj.gov
Attorneys for the government

**CERTIFICATE OF SERVICE**

I certify that on this 16th day of March, 2020, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system that will send notification of

such filing to all counsel of record in this case.

s/ *Martha A. Paluch*
MARTHA A. PALUCH
Assistant United States Attorney
1801 California Street, Suite 1600
Denver, CO 80202
Telephone 303-454-0100
Facsimile 303-454-0402
martha.paluch@usdoj.gov