**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 19-cr-00098-CMA-1

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**LEONARD LUTON,**

**Defendant.**

_____

**REPORTER'S PARTIAL TRANSCRIPT**
**(Jury Trial Day 2 -- Testimony of Special Agent A. Howard)**
_____

        Proceedings before the HONORABLE CHRISTINE M.
ARGUELLO, Judge, United States District Court, for the
District of Colorado, commencing at 10:20 a.m. on the 11th
day of February, 2020, Alfred A. Arraj United States
Courthouse, Denver, Colorado.

**A P P E A R A N C E S**

**FOR THE PLAINTIFF:**
MARTHA A. PALUCH and SARAH H. WEISS, U.S. Attorney's
Office, 1801 California St., Suite 1600, Denver, CO 80202

**FOR THE DEFENDANT:**
MARK EDWARD SCABAVEA, Attorney at Law, 301 Sheridan Blvd.,

Lakewood, CO 80226

<u>I N D E X</u>

**WITNESSES:**                                                      <u>PAGE</u>

**SPECIAL AGENT AMY HOWARD**
DIRECT EXAMINATION BY MS. WEISS                          4
CROSS-EXAMINATION BY MR. SCABAVEA                       95
REDIRECT EXAMINATION BY MS. WEISS                      103

<u>E X H I B I T S</u>

**NO.**                                                    <u>ADMITTED</u>

    26-119    .........................................       4

1                          **FEBRUARY 11, 2020**

2            (Requested proceedings.)

3            THE COURT:  You may be seated.

4            All right.  The Government may call its next

5   witness.

6            MS. WEISS:  Your Honor, the Government calls

7   Special Agent Amy Howard.

8            COURTROOM DEPUTY:  May I have everyone's attention,

9   please?

10                     **SPECIAL AGENT AMY HOWARD**

11  having been first duly sworn, testified as follows:

12           THE WITNESS:  I do.

13           COURTROOM DEPUTY:  Please be seated.

14           Please state your name, and spell your first and

15  last names for the record.

16           THE WITNESS:  My name is Amy Howard.  A-M-Y

17  H-O-W-A-R-D.

18           THE COURT:  You may proceed.

19           MS. WEISS:  Your Honor, the Government does intend

20  to introduce a large number of exhibits with this witness,

21  specifically Exhibits 26 through 119.  All of those

22  exhibits have been stipulated as to their authenticity.

23           THE COURT:  You are going to use them all?

24           MS. WEISS:  Correct.

25           THE COURT:  I will admit 26 through 119.  Let me

1    make sure they are all stipulated.  And they are, so 26

2    through 119 are admitted.

3              (Exhibit Nos. 26-119 are admitted.)

4              MS. WEISS:  Thank you, Your Honor.

5              THE COURT:  You may publish as you proceed, without

6    asking permission.

7              MS. WEISS:  Thank you.

8                         **DIRECT EXAMINATION**

9    **BY MS. WEISS:**

10   Q.    Where do you work, Agent Howard?

11   A.    For the FBI, ma'am.

12   Q.    And what is your title?

13   A.    I am a special agent.

14   Q.    And are you assigned to a particular field division?

15   A.    Yes.  I am assigned to the Denver Field Division, and

16   I work out of the Fort Collins Regional Office.

17   Q.    How long have you been an FBI special agent?

18   A.    For 5 years now.

19   Q.    What is your education?

20   A.    I have a bachelor's degree in business.

21   Q.    And can you describe briefly your job

22   responsibilities as an FBI special agent?

23   A.    Yes.  So, in the regional office I handle all

24   criminal matters that come in.  So, I work a variety of

25   matters, including white collar crime, crimes against

1    children, public corruption, drugs, various violations.

2    Q.    And what offices and assignments have you had with

3    the FBI?

4    A.    I previously worked at the Los Angeles Field Office,

5    where I worked national security matters.

6    Q.    Can you explain what training you've received to

7    become an FBI special agent?

8    A.    Yes.  So, we all go through a 20-week course at

9    Quantico, Virginia, where we receive all of the training

10   that we need to be a special agent.  And then once we are

11   in the field we receive various trainings on whatever

12   matters that we are working.

13   Q.    At some point in 2018, did the defendant, Mr. Leonard

14   Luton, come to the attention of the Fort Collins FBI Field

15   Office?

16   A.    Yes.

17   Q.    And how did that come about?

18   A.    So, we were contacted by the Estes Park Police

19   Department regarding an elder fraud investigation they

20   were working on.

21   Q.    And did the FBI and the Estes Park Police Department

22   at that point begin to collaborate and work a joint

23   investigation?

24   A.    Correct.

25   Q.    In brief overview, did the FBI collect evidence in

1    the course of its investigation?

2    A.   Yes.  So, the FBI was provided a spreadsheet from

3    Ms. Olson, and so we were able to, from that point,

4    collect certified banking records, shipping records during

5    that time period.  We also reviewed Google and Apple

6    subscriber information that was collected, call detail

7    records from the victim's cellphone, the defendant's

8    cellphone, and Frank White's phone.  And we also did a

9    forensic download of the defendant's cellular telephone.

10   Q.   Did you also review the records from the victim's

11   home telephone, as well?

12   A.   Yes.

13   Q.   Agent Howard, the jury has heard Ms. Olson testify

14   about making a number of mailings at the direction of a

15   person calling himself Frank White.  Were you able to tie

16   any of those mailings of packages to that individual?

17   A.   Yes.

18   Q.   And what was she mailing in those packages?

19   A.   She was mailing cash, cashier's checks, and iPhones.

20   Q.   And did Ms. Olson send money by any other means that

21   you were able to determine?

22   A.   She also did Western Union wires.

23   Q.   Agent Howard, we are going to go through a lot of

24   that evidence here today, and I want to start now with

25   those Apple records that were obtained by the Estes Park

1    Police Department.  Was the FBI able to obtain any

2    additional leads off those records?

3    A.   Yes.  We were able to see what -- from those records,

4    who the phones were registered to and how they were being

5    used.

6         MS. WEISS:  And if we can please publish Exhibit

7    25, which has already been admitted.

8    Q.   (BY MS. WEISS)  Are these the records that were

9    received by Apple?

10   A.   Yes.

11   Q.   And were these provided in a spreadsheet format?

12   A.   Yes, as it is seen here.

13   Q.   Looking at pages 1 to 10 of this exhibit -- and this

14   may be one that is easier to have in the binder in front

15   of you, Agent Howard -- do the first 10 pages of this

16   exhibit, do they all have that word "registration" on the

17   top?

18   A.   Yes.

19   Q.   And does that correspond with essentially a tab of

20   that spreadsheet; these are all of those registration

21   lines throughout that spreadsheet?

22   A.   Yes.

23   Q.   Okay.  And looking at this first page, the rows that

24   are marked 17 to 18, is this 17 a serial number that we

25   just reviewed of the defendant's cellphone?

1    A.    Yes, it is.

2    Q.    And what is exhibit -- or, I am sorry, row 18?

3    A.    It is the other serial number of the other phone.

4    Q.    And who is that phone registered to?

5    A.    A Rajay Jodson.

6    Q.    And can we look at the second page of this tab?  And

7    does this show the type of phone?

8    A.    Yes, it does.

9    Q.    As for the defendant's phone, that was the XS Max

10   Gold?

11   A.    Correct.

12   Q.    Or the 10S Max Gold?

13   A.    Yes.

14   Q.    And what was the size of that phone?

15   A.    It was 90 gigabytes.

16   Q.    And is that a lot of data?

17   A.    Yes, that is a large amount of data.

18   Q.    And turning to page 3 of this same document, is this

19   where with see those names that you mentioned were

20   registered to the phone?

21   A.    Yes, it is.

22   Q.    And what are those names?

23   A.    Leonard Luton, on line 17, and Rajay Jodson, on line

24   18.

25   Q.    And was Rajay Jodson significant to the FBI's

1  investigation in any way?

2  A.  Yes, it was very similar to the name Rajay Dobson,

3  that the defendant gave in his post-arrest interview as

4  the person that instructed him to pick up a package.

5  Q.  Okay.  Could you now turn to pages 11 through 15 of

6  this same exhibit.

7      MS. WEISS:  And if we could display page 18,

8  please -- I am sorry 11.

9  Q.  (BY MS. WEISS)  And do these pages all have "iTunes

10  subscriber" at the top?

11  A.  Yes.

12  Q.  So does that correspond to another tab of the

13  spreadsheet provided by Apple?

14  A.  Correct.

15  Q.  So what are the records shown on these pages, the

16  "iTunes subscriber"?

17  A.  The records show the iTunes transactions; so the

18  iTunes activities on the devices.

19  Q.  Okay.  Turning to the next page, page 12, what do we

20  see of significance on this page?

21  A.  So, we see the email address, fass2rass@gmail.com,

22  with the name Leonard Luton at 1307 Pacific Street.  We

23  also see the email up top 666666@iCloud.com, with the name

24  Rajay Jodson.

25  Q.  Turning to the next page, page 13, do we see any

1    cities of relevance on this page?

2    A.   Yes, Brooklyn, New York, and Kingston, Jamaica.

3    Q.   Okay.  Moving on to the next page, page 14, do we see

4    any information of significance here?

5    A.   Yes, the phone numbers.

6    Q.   And can you explain why those phone numbers are

7    significant?

8    A.   The number corresponding to Leonard Luton's

9    information; (347) 633-8544 is the number that the

10   defendant gave as his personal cellphone number.

11   Q.   Okay.  And we see a couple numbers with an 876 area

12   code.  What does that correspond to?

13   A.   The area code of the Jamaican phone number.

14   Q.   Finally, the final number on this page, what are we

15   seeing here?

16   A.   The number (702) 726-2033.

17   Q.   And what phone number is that, ma'am?

18   A.   That is the number that was being used to contact

19   Ms. Olson by a person claiming to be Frank White.

20   Q.   So does this indicate that one of his cellphones

21   Ms. Olson mailed was associated to that phone number that

22   Frank White was calling from?

23   A.   Yes, it does.

24        MS. WEISS:  Can we now turn to pages 16 through 25

25   of this same exhibit.  And if we can please display page

1    17.  And if you can blow up the last four lines of this

2    sheet.

3    Q.   (By Ms. Weiss)  Agent Howard, are we seeing the same

4    sort of information related to the iTunes activity for

5    these two phones?

6    A.   Yes.

7    Q.   Looking at lines 29 and 30, what email address is

8    shown there, ma'am?

9    A.   Fass2rass@gmail.com.

10   Q.   Is that similar to the fass2rass Hotmail address that

11   we have seen before?

12   A.   Yes.

13   Q.   And what did the FBI do with this fass2rass@gmail

14   address?

15   A.   The FBI obtained subscriber information for this

16   particular email.

17   Q.   Okay.  Could we please turn to Exhibit 112.  And it

18   is on your screen if that is easier, Agent Howard.  Okay.

19   Do you recognize this document?

20   A.   Yes.  These are the subscriber records for

21   fass2rass@gmail.com.

22   Q.   Is there a name that was associated with this email

23   address?

24   A.   Yes, DJ Bruce.

25   Q.   And turning to the next-to-last line, it starts

1    "sms."  Was there a phone number associated with this

2    Gmail address?

3    A.    Yes.  It is (347) 633-8544.

4    Q.    And whose phone number is that?

5    A.    Leonard Luton's.

6    Q.    If we can now turn to page 3 of this same exhibit.

7    What are we seeing here, Agent Howard?

8    A.    These are other emails associated with the

9    fass2rass@gmail.com address.

10   Q.    And is there an email listed here that was of

11   significance to the FBI's investigation?

12   A.    Yes, DixonReggie1296@gmail.com.

13   Q.    Why was this email address significant?

14   A.    This email address was found in the contents of the

15   defendant's cellphone.

16   Q.    Okay.  And was it associated with anything else?

17   A.    It was also associated with the 702 phone number that

18   Frank White used to contact Ms. Olson.

19   Q.    I want to focus in on that number now, Agent Howard.

20   The jury has heard testimony that Ms. Olson was receiving

21   calls from a 702 area code number.  That was Frank White;

22   correct?

23   A.    Yes.

24   Q.    And did you do anything to review Ms. Olson's call

25   records, for instances, of that number?

1    A.   Yes.  We reviewed the CenturyLink records of

2    Ms. Olson's phone.

3    Q.   Okay.  And can you please just briefly review

4    Exhibits 63 through 74 yourself.  What are those exhibits,

5    Agent Howard?

6    A.   These are the CenturyLink records for Ms. Olson's

7    home telephone numbers.

8         MS. WEISS:  And if we can please publish Exhibit

9    63.

10   Q.   (BY MS. WEISS)  And is this the document that shows

11   that these are Ms. Olson's call records?

12   A.   Yes, it does.

13        MS. WEISS:  And if we can turn to Exhibit 3 of the

14   same -- or, I am sorry, page 3 of the same exhibit.  And

15   if you can blow up that top column so we can familiarize

16   ourselves with these records.

17   Q.   (BY MS. WEISS)  Agent Howard, can you walk us through

18   how you read these call records?

19   A.   So, the date is a little funny to read.  But if you

20   look under the column for "date," it says "8-02-01."  The

21   "8" stands for 2018.  "02" is February.  And "01" is the

22   first of February.

23   Q.   And what do the two first columns represent?

24   A.   It shows who was calling Ms. Olson to that phone

25   number, the date and time, and how long the phone call

1    lasted.

2    Q.    Okay.  And we are not going to look at all of these

3    records, but we are going to look at a couple examples.

4    Can you please turn to Exhibit 67.  Agent Howard, are

5    these more call records of Ms. Olson?

6    A.    Yes.

7    Q.    And approximately what dates do these pages pertain

8    to?

9    A.    Approximately July 24, 2018, going to August 1st of

10   2018.

11   Q.    If we can turn to the next page, page 2, is that more

12   of the same?

13   A.    Yes.

14   Q.    Did you approximate about how many times Frank

15   White -- that Frank White number called Ms. Olson on or

16   around these dates?

17   A.    We have -- I calculated from an amount in January.

18   But, no, I would have to go back and actually count them.

19   If you would like me to, I can.

20   Q.    You don't need to do that.

21   A.    I would say multiple times.

22        MS. WEISS:  If we can just blow up the left-most

23   column.

24   Q.    (BY MS. WEISS)  Are we seeing numerous instances of

25   that 702 number?

1    A.    Yes, we are.

2    Q.    And one more example, Exhibit 74, please.  Agent

3    Howard, what time period do these records show?

4    A.    This shows the time period of January 18, 2019, and

5    it is ending in January 29, 2019.

6    Q.    And did any significant events in this case happen

7    within these time frames?

8    A.    Yes.  The Frank White number contacted Ms. Olson

9    approximately 87 times.

10   Q.    And was there any other event that happened in

11   between that week of January 18th of 2019?

12   A.    Yes.  The defendant, Leonard Luton, was arrested on

13   January 22, 2019, outside of Ms. Olson's home.

14   Q.    So Frank White had called Ms. Olson 87 times around

15   the period of the defendant's arrest?

16   A.    That is correct.

17   Q.    Okay.  And if we can turn to the next-to-last page,

18   which is page 3.  And, Agent Howard, what days does this

19   page cover?

20   A.    Page 3 covers January 24, 2019, through January 25,

21   2019.

22   Q.    Had the defendant been arrested by that date?

23   A.    Yes.

24   Q.    Was he in custody?

25   A.    Yes, he was.

```
 1   Q.   And what are we seeing happening during that time
 2   frame as pertains to Frank White?
 3   A.   We are seeing multiple phone calls from Frank White.
 4   Q.   And is he continuing to contact Ms. Olson even after
 5   the defendant's arrest?
 6   A.   Yes, he is.
 7   Q.   And what, if any, investigative significance do you
 8   draw from that information?
 9   A.   This tells us that there are two people that were
10   involved in a conspiracy together.
11   Q.   Did the FBI determine which phone company provided
12   services for this 702 number?
13   A.   Yes.
14   Q.   And what was that?
15   A.   MagicJack.
16   Q.   What type of phone services does MagicJack offer?
17   A.   MagicJack is a service that allows users to make
18   telephone calls over the internet.
19   Q.   And based on your understanding, what is the appeal
20   of a voice-over-internet provider?
21   A.   It is a cheaper way for users to make long-distance
22   and international phone calls.
23   Q.   And did the FBI also obtain call detail records for
24   that MagicJack 702 number?
25   A.   Yes, we did.
```

1    Q.   And what do those records show?

2    A.   Multiple calls from the 702 MagicJack number to

3    Ms. Olson during the time frame of the scheme.

4    Q.   Okay.  Did the FBI also obtain subscriber information

5    for that 702 number?

6    A.   Yes, we did.

7    Q.   And can you turn to Exhibit 75.

8         MS. WEISS:  If we can publish that please.

9    Q.   (BY MS. WEISS)  What are these records that we are

10   seeing here?

11   A.   These are the subscriber records for the MagicJack

12   number of (702) 726-2033.

13   Q.   Is that what we see at the top of the page here?

14   A.   Yes, ma'am.

15   Q.   And if you can please pull up the account ID.  What

16   information was provided as the account member name and

17   address for this?

18   A.   Reggie Dixon, at 1296 Pacific, Brooklyn, New York.

19   Q.   And is Reggie Dixon similar to that email address we

20   saw in the defendant's gmail records?

21   A.   Yes.

22   Q.   Was the FBI able to determine whether there was any

23   connection between this defendant and that 1296 Pacific

24   address?

25   A.   Yes.

1    Q.   And what was that connection?

2    A.   This address -- or, I am sorry, this information was

3    found in the defendant's cellphone.

4    Q.   Okay.  Setting aside the cellphone, what connection

5    was there to the defendant?

6    A.   This address was also very close to the defendant's

7    residence or to the defendant's mailing address.

8    Q.   Were you able to determine who lived at that

9    residence?

10   A.   A woman named Dee, who is also an associate of

11   Mr. Luton's.

12   Q.   Looking towards the bottom of this page, does this

13   document indicate when this MagicJack account was created?

14   A.   Yes, February 28th of 2018.

15   Q.   And is that the writing in red we are seeing here?

16   A.   Yes, ma'am.

17   Q.   And at what time was this account created?

18   A.   At 9:02.

19   Q.   And turning to page 3 of this same exhibit, Agent

20   Howard, if you can focus your attention on the last chunk

21   of this page, the email address details, what are we

22   seeing here?

23   A.   The email address of DixonReggie1296@gmail.com.

24   Q.   And is there a password associated with this account?

25   A.   Yes.  It is Dixon1296.

1    Q.    Had the FBI seen this DixonReggie email address and

2    this password appear anywhere else?

3    A.    Yes, in the defendant's cellphone.

4    Q.    We are going to look at that now.  Can you turn to

5    Exhibit 101.

6    A.    Okay.

7    Q.    This is the first time we have seen a document like

8    this, I believe, so could you please explain what we are

9    seeing here?

10   A.    This is an extraction report.  So, this is -- the

11   defendant's cellphone has a very large amount of data.  So

12   this is just a small piece of this that we were able to

13   show.

14   Q.    Is that why it says "extraction report" on the top of

15   this?

16   A.    Correct.

17   Q.    Okay.  And then what particular section of the

18   defendant's phone are we looking at right now?

19   A.    This is located in the "password" section of the

20   defendant's phone.

21   Q.    So are these passwords that were saved on the

22   defendant's phone?

23   A.    Correct.

24   Q.    And what password and account was saved here that we

25   are looking at?

1   A.   So, if you are looking under the section of data,

2   that is the password that was stored, which is

3   1296Pacific.   The account is DixonReggie1296, and the

4   service is a Google email account.

5   Q.   And that is the same information from that MagicJack

6   line?

7   A.   Correct.

8   Q.   Let's turn to Exhibit 79 now.   And, again, Agent

9   Howard, is this another piece of the extraction of the

10  defendant's cellphone?

11  A.   Correct.

12  Q.   And this is, again, the first time the jury has seen

13  something like this --

14        MS. WEISS:   So, can we blow up the participants at

15  the top?

16  Q.   (BY MS. WEISS)   -- so if you could explain what we

17  are seeing.

18  A.   So, we are reviewing a WhatsApp message between a

19  phone number ending in 7953 with the name Budman, and the

20  phone ending 8544, which we know to be Leonard Luton's,

21  with the name "newrules," and it says "owner" next to it,

22  which shows that he is the owner of the device.

23  Q.   Okay.   Let's look at the contents of this exchange,

24  itself.   And, actually, before we do that, what is

25  WhatsApp?

1    A.    WhatsApp is an encrypted text message service that

2    allows users to send texts all over the world.

3    Q.    Okay.  Now, looking at this exchange, was the FBI

4    able to connect anyone to this Budman contact?

5    A.    Yes.

6    Q.    Who was that person?

7    A.    Rajay Dobson.

8    Q.    So, is this a WhatsApp exchange between the defendant

9    and Rajay Dobson?

10   A.    Yes.

11   Q.    Are we going to see many of these types of exchanges?

12   A.    Yes, ma'am.

13   Q.    And can you walk us through their conversation now?

14   A.    So, the user "newrules," which we know to be Leonard

15   Luton, is sending a message to Rajay Dobson that says

16   "DixonReggie1296Pacific."  He follows that up with "Jacks

17   phone number is (702) 726-2033," in which Rajay Dobson

18   responds, "chop."

19   Q.    So, can you relate that to the information that the

20   jury has just heard?

21   A.    Yes.  So, this is the same contact information for

22   that MagicJack number that was set up with the login and

23   password information.

24   Q.    And this was sent by the defendant?

25   A.    It was, yes.

1    Q.   To Rajay Dobson?

2    A.   Correct.

3    Q.   Looking at the timing of these messages and comparing

4    that to when this MagicJack account was created, how do

5    they relate?

6    A.   Well, given that this time that we are seeing is UTC

7    time, we have to account for about a 7-hour approximate

8    time difference.  So, if we coordinate that with the setup

9    of the MagicJack number, it is approximately minutes after

10   the MagicJack account is created.

11   Q.   So the defendant sent that information to Rajay

12   Dobson minutes after creating that account?

13   A.   Yes.

14        MS. WEISS:  Can you please blow back up the

15   participants of this conversation?

16   Q.   (BY MS. WEISS)  Looking at the Budman7953 contact,

17   Agent Howard, you said the FBI linked this number to Rajay

18   Dobson?

19   A.   Yes.

20   Q.   And how was the FBI able to do that?

21   A.   The FBI was able to link this number to Rajay Dobson,

22   as it was a number that the defendant provided in his

23   interview with investigators.

24   Q.   Okay.  Was this one of those numbers, Agent Howard,

25   or was this one that the FBI had to find?

1  A.   The FBI also had to find that in the contents of the

2  cellphone, as well.

3  Q.   Okay.  Can we look at Exhibit 77, please.  And just

4  flipping through the pages of this exhibit, Agent Howard,

5  what are we seeing here?

6  A.   We are seeing an extraction report showing the

7  contacts section of the defendant's cellphone.

8  Q.   And are these all of the contacts on the defendant's

9  cellphone or just a few of them?

10  A.   Just a few.

11  Q.   And which few, ones pertinent to this investigation?

12  A.   Yes.

13  Q.   If we can look at pages 6 and 7 in particular.

14        MS. WEISS:  And can you blow this up so we can read

15  it a little better?  Thank you.

16  Q.   (BY MS. WEISS)  Is this the contact information

17  associated with that 7953 number we were just looking at?

18  A.   Yes.

19  Q.   And what is the name associated with that?

20  A.   Budman.

21  Q.   And was this number also associated with any other

22  type of cellphone application?

23  A.   Yes, with a Snapchat user name of RJAY733.

24  Q.   And is that part of how the FBI was able to link this

25  contact to Rajay Dobson?

```
 1   A.   Yes.

 2   Q.   Turning to the next page, was there an image

 3   associated with this contact?

 4   A.   Yes.

 5   Q.   And is this that image?

 6   A.   Yes.

 7   Q.   Did the FBI associate any other numbers to Rajay

 8   Dobson during the course of this investigation?

 9   A.   Yes.

10   Q.   And how many additional numbers?

11   A.   So, four in total.

12        MS. WEISS:   Okay.   If we can publish Exhibit 78,

13   please.

14   Q.   (BY MS. WEISS)   Agent Howard, what are we seeing on

15   the screen now?

16   A.   These are all of the numbers that we have associated

17   with Rajay Dobson.

18   Q.   Okay.   And if you could -- is this third number down

19   the one we were just looking at?

20   A.   Yes, ma'am.

21   Q.   Okay.   And can you walk us through this first number?

22   A.   So, the first number is area code (876) 770-7685,

23   which was provided by the defendant and also found in the

24   defendant's cellphone under the name "Max Bird."

25   Q.   And was Max Bird a nickname that the defendant
```

1   provided for Rajay Dobson?

2   A.   Yes.

3   Q.   And turning to the next number.

4   A.   It is (876) 774-3214, which was also provided by the

5   defendant and found in his cellphone under the name "Bird

6   Lime."

7   Q.   And was there another nickname associated with that

8   number, as well?

9   A.   Also "Fry."

10  Q.   And was Bird Lime another variation of the nicknames

11  that the defendant gave for Rajay Dobson?

12  A.   Yes.

13  Q.   And the third number, 7953, that was the one we just

14  looked at, was this number provided by the defendant in

15  his interview?

16  A.   No, sorry about that, it is just in the defendant's

17  cellphone.

18  Q.   Okay.  And, finally, this last number ending in 6329?

19  A.   So, the number (876) 308-6329 was saved in the

20  defendant's cellphone as "X-Budman."

21  Q.   And was there any other information linking this 6329

22  number to Dobson?

23  A.   It was also found in a corresponding text message, as

24  well.

25  Q.   Okay.  We will look at that text message now, Agent

1    Howard, which is Exhibit 81.  This is a text exchange;

2    correct?

3    A.   It is, yes.

4    Q.   Okay.  I want to walk through just the bottom-most

5    two messages.  These start the oldest at the very bottom,

6    so we can start with that one.

7    A.   So, it is a message from a Miss Carlene, with a

8    number ending 8163, to Leonard Luton, in which

9    Miss Carlene is asking "What is Bird number?"  And Leonard

10   Luton replies with (876) 308-6329.

11   Q.   And is that the number that we just reviewed on the

12   previous exhibit?

13   A.   Yes, it is.

14   Q.   Who is Miss Carlene?

15   A.   She was identified as Carlene Hosang.

16   Q.   And what is the relationship between the defendant

17   and Carlene Hosang?

18   A.   She is an associate of Mr. Luton's.

19   Q.   And did she have any role in the events that we have

20   been talking about over the past couple of days?

21   A.   Yes, she did.

22   Q.   And what was that role?

23   A.   She would send Western Union wires on behalf of

24   Mr. Luton.

25   Q.   And did she also accept deliveries at her address of

1    Ms. Olson's packages?

2    A.    She did, yes.

3    Q.    And who is the "Bird" that is mentioned here?

4    A.    Rajay Dobson.

5    Q.    And how do you know that again?

6    A.    That was one of the aliases that the defendant gave

7    in his post-arrest interview for Rajay Dobson.

8    Q.    So, correct to say the defendant gave this number for

9    Rajay Dobson to Miss Carlene but not to investigators?

10   A.    Yes.

11   Q.    Agent Howard, at any point in time, did the defendant

12   ever tell investigators that that MagicJack 702 number was

13   associated with Rajay Dobson?

14   A.    No.

15   Q.    Did he ever tell investigators that he set up that

16   number?

17   A.    No.

18   Q.    Can we turn back to Exhibit 77 now, please?  And we

19   will be focusing on pages 2 and 3.

20        MS. WEISS:  If we can please blow this up.

21   Q.    (BY MS. WEISS)  Is this that 6329 number again?

22   A.    Yes, it is.

23   Q.    And was there a picture associated with this contact?

24   A.    Yes.

25   Q.    And who are the individuals pictured here, or at

1    least the individual pictured here, Agent Howard?

2    A.   So, it is a small child and a man with a cigarette

3    hanging out of his mouth.

4    Q.   Who is the man with the cigarette?

5    A.   Rajay Dobson.

6    Q.   Agent Howard, did the FBI find any other photographs

7    of Rajay Dobson during its investigation?

8    A.   Yes, through immigration records.

9    Q.   Can we look at Exhibit 118?  And we will be turning

10   to the last page of this exhibit.

11        MS. WEISS:  If we can blow up the picture there.

12   Q.   (BY MS. WEISS)  Who is this individual?

13   A.   This is Rajay Dobson.

14   Q.   And, again, what is the source of this picture?

15   A.   These are his immigration records.

16   Q.   Did Mr. Dobson's immigration records indicate the

17   last time he has been in the United States?

18   A.   Yes, 2017.

19   Q.   And does the FBI have any indication of where

20   Mr. Dobson is presently located?

21   A.   He is presently located in Jamaica.

22   Q.   And why is he still in Jamaica?

23   A.   Despite our best efforts, we have been unable to

24   extradite him at this time.

25   Q.   And before I move on, Agent Howard, just looking at

1    this page 3 of the same exhibit, does this indicate around

2    when this photograph was taken that we were just viewing?

3    A.    In July of 2015.

4    Q.    Okay.  Agent Howard, over the course of the FBI's

5    investigation, did you review any voicemail recordings?

6    A.    Yes, we did.

7    Q.    Where were those voicemail recordings saved?

8    A.    On the defendant's cellphone.

9    Q.    And can you please turn to what has been marked

10   Government's Exhibit 103 in your binder.  And what is this

11   document?

12   A.    This shows the audio voicemail files that were saved.

13   It is a small portion of what was saved on the defendant's

14   cellphone.

15        MS. WEISS:  Okay.  Can you blow up the Item 6 -- I

16   am sorry, Item 8?

17   Q.    (BY MS. WEISS)  Starting with the right-most column

18   of this item, Agent Howard, what information do we see

19   here?

20   A.    So, we see that it was -- the creation date was

21   February 18th of 2018.  The source was WhatsApp.

22   Q.    Okay.  Then looking at the right-side column, what do

23   we see?

24   A.    If you are looking under "path," the second line down

25   right after "media," it shows the phone number of the

```
 1   source of the voicemail, which is (876) 308-6329.
 2   Q.   And does that file path then indicate the phone
 3   number that was used to leave this voicemail?
 4   A.   Yes.
 5   Q.   Is this one of the phone numbers associated with
 6   Rajay Dobson that we have been discussing?
 7   A.   It is.
 8   Q.   Are all of the voicemails listed in this exhibit left
 9   by numbers associated with Dobson?
10   A.   Yes.
11   Q.   Agent Howard, what language were these voicemails
12   left in?
13   A.   English Caribbean Creole.
14   Q.   And where is that language spoken?
15   A.   Jamaica.
16   Q.   And did the FBI do anything to determine what was
17   being said on those voicemails?
18   A.   Yes.  So, these messages were translated by a
19   linguist at the FBI who specializes in English Caribbean
20   Creole.
21   Q.   And can you turn to Exhibit 105, please.  Are these
22   those certified translations, ma'am?
23   A.   Yes.
24   Q.   Looking at Exhibit 104, is that a CD?
25   A.   Yes, it is.
```

1    Q.   And is this the CD containing those voicemail

2    messages?

3    A.   It is.

4    Q.   Are these true and accurate copies of those

5    recordings?

6    A.   Yes.

7    Q.   Along with the visual of those certified

8    translations?

9    A.   Yes.

10   Q.   If we can keep Exhibit 103 in front of you, we will

11   listen to those voicemails now.

12        MS. WEISS:  Can we cue up Exhibit 106?

13   Q.   (BY MS. WEISS)  And, Agent Howard, this pertains to

14   Item 8 on that list that you have in front of you.

15        (Audiotape played in open court.)

16   Q.   (BY MS. WEISS)  Agent Howard, in your training and

17   experience, is Dobson speaking in any sort of way that is

18   familiar to you as a member of law enforcement?

19        MR. SCABAVEA:  Objection, Your Honor, speculation.

20        THE COURT:  Sustained.  Lay more foundation.

21   Q.   (BY MS. WEISS)  Agent Howard, do you have any

22   training and experience with how criminals tend to talk to

23   one another?

24   A.   Yes, ma'am.

25   Q.   Can you describe what -- the way they talk to one

1   another?

2   A.   Sometimes subjects will speak in code, so they are

3   not -- so they can be more -- they can cover kind of what

4   type of activity they are discussing.

5   Q.   Okay.  Agent Howard, when was this voicemail from

6   Mr. Dobson left on the defendant's cellphone?

7   A.   February 18, 2018.

8   Q.   And how does that relate to the events of this case?

9   A.   This is shortly after Ms. Olson received the flyer in

10   the mail indicating that she had won a lottery.

11        MS. WEISS:  Okay.  Can we now play Exhibit 107,

12   which corresponds to item 7 on your sheet?

13        (Audiotape played in open court.)

14   Q.   (BY MS. WEISS)  Agent Howard, the jury heard some

15   discussion of maxing out card and closing and ordering

16   more.  Does that discussion relate to anything you found

17   out about lottery frauds in the course of your

18   investigation?

19   A.   Yes.  Sometimes victims are encouraged to purchase

20   gift cards as part of a lottery scheme.

21   Q.   Okay.  And are those gift cards also sent on to the

22   fraudsters?

23   A.   Correct.

24        MS. WEISS:  And can we play Exhibit 108?

25        (Audiotape played in open court.)

1    Q.    (BY MS. WEISS)  Agent Howard, when was this voicemail

2    left, Item 6?

3    A.    July 24, 2018.

4    Q.    Does that date relate to any other events in this

5    case?

6    A.    Yes.  Ms. Olson had just mailed two packages of cash.

7            MS. WEISS:  And can we just play 109 and 110

8    together?  They are quite short.

9            (Audiotape played in open court.)

10   Q.    (BY MS. WEISS)  Agent Howard, when were these

11   voicemails left from Rajay Dobson to the defendant's

12   cellphone?

13   A.    Can you just give me the corresponding number?

14   Q.    Yes, Items 3 and 4?

15   A.    3 and 4.  So Item 3 was left on October 4th of 2018.

16   Item 4 was left October 2, 2018.

17   Q.    So, to be clear for the record, the voicemail that

18   mentions "Nebraska" was left on October 2nd?

19   A.    Yes.

20   Q.    And the other voicemail was left on October 4th?

21   A.    Correct.

22   Q.    And how does that relate to other events in this

23   case?

24   A.    This was the timeframe when two individuals came to

25   Ms. Olson's home to pick up $65,000 in cash.

1    Q.   And we're going to discuss this later on in your

2    testimony, but did you discover any other references to

3    "Nebraska" in the defendant's cellphone around this time?

4    A.   Yes, we did.

5    Q.   And what was that?

6    A.   In the contents of the defendant's text messages.

7    Q.   And what exactly did you see?

8    A.   We discovered a picture of a "Welcome to Nebraska"

9    sign, along with images of maps showing a trip.

10   Q.   Okay.  And the Nebraska road sign, that was actually

11   taken from video on the defendant's cellphone?

12   A.   Correct.

13        MS. WEISS:  If we can play Exhibit 111, which

14   corresponds with item 2.

15        (Audiotape played in open court.)

16   Q.   (BY MS. WEISS)  Agent Howard, when was this voicemail

17   left on the defendant's cellphone from Mr. Dobson?

18   A.   January 14th of 2019.

19   Q.   And how does that relate to the defendant's arrest in

20   this case?

21   A.   This was shortly before the defendant's arrest.

22   Q.   Agent Howard, I would like to switch gears now and

23   discuss the evidence with respect to the specific mail

24   fraud aiding and abetting counts that are in the

25   Indictment.

1           The jury has heard testimony that Ms. Olson

2    prepared a spreadsheet and gave that to law enforcement;

3    correct?

4    A.    Correct.

5    Q.    And what did the FBI do with her spreadsheet?

6    A.    The FBI was able to collect and review certified

7    banking records and shipping records related to the

8    packages referenced on Ms. Olson's spreadsheet.

9    Q.    Okay.  And can you please just briefly page through

10   Exhibits 26, 30, 34, and 39.  And what were those

11   exhibits?

12   A.    Those were member account agreements for the banks

13   that Ms. Olson had accounts.

14   Q.    And so do those exhibits show that all of the records

15   we are about to look at are Ms. Olson's bank accounts?

16   A.    Yes, ma'am.

17   Q.    I want to focus your attention on the time period

18   that forms the basis of Count 2 of the Indictment, which

19   is March 29, 2018.  Did the FBI find any evidence of any

20   account activity in Ms. Olson's bank accounts around that

21   date?

22   A.    Yes, ma'am.

23   Q.    Can we look at Exhibit 31?  What is on the screen

24   right now?

25   A.    So, we are looking at an account summary for the date

1    of March 29, 2018, to April 25, 2018, for Ms. Sandra

2    Olson, at the Bank of Estes Park.

3    Q.   Okay.  We are going to flip to the second page of

4    this exhibit, Agent Howard, and we are going to take these

5    items somewhat out of order, starting with the one in the

6    middle.

7    A.   So, the one in the middle shows a cash-in ticket for

8    $9,000.75 on March 29, 2018.

9    Q.   Does this indicate that Ms. Olson brought in

10   $9,000.75 to the Bank of Estes Park on that date?

11   A.   Yes.

12   Q.   And then looking at the next item down from that.

13   A.   So, this is a receipt for a withdrawal of $95, signed

14   by Sandra Olson, on March 29, 2018.

15   Q.   And turning to the top-most item of this same page.

16   A.   So, this is a copy of a certified check in the amount

17   of -- I am sorry, I can't read it very well.  $9,095.75,

18   on March 29, 2019 -- 2018, made by Sandra Olson to Sandra

19   Pipcher.

20   Q.   And is that spelled "Pipcher" in this instance?

21   A.   Yes, P-I-P-C-H-E-R.

22   Q.   And sort of putting those transactions we just looked

23   at together, what happened on this day?

24   A.   It appears that Ms. Olson withdrew $95 and then also

25   cashed in $9,000.75, so that she would have the amount of

1   money combined; $9,095.75, to generate a cashier's check.

2   Q.   And if we can turn to the last page of this document

3   now.  And what are we looking at?

4   A.   So, we are looking at a copy of the cashier's check

5   from Ms. Olson to Ms. Pipcher on March 29, 2018.

6   Q.   And what is the amount of that check?

7   A.   $9,095.75.

8   Q.   Agent Howard, what is the purpose of using a

9   certified check like this one rather than just a regular

10  check out of a bank account?

11  A.   It means that the bank will guarantee the funds and

12  that the check will not bounce.

13  Q.   Okay.  I want to turn now to Count 3 of the

14  Indictment, which is on or around April 3, 2018.  Did the

15  FBI also uncover banking activity in Ms. Olson's account

16  pertinent to that date?

17  A.   Yes.

18  Q.   Can we look at Exhibit 35?  And what is this

19  document?

20  A.   This is an account summary from Premier Members

21  Credit Union for Sandra Olson's account for April of 2018.

22  Q.   Okay.  And can we turn to the third page of this same

23  exhibit.  And what does this document show, Agent Howard?

24  A.   This is a receipt for $9,095.75, plus a $2 service

25  fee, signed by Ms. Sandra Olson.

1   Q.   Does this document indicate who that check was made

2   out to?

3   A.   Yes, to a Sandra Pitcher.

4   Q.   And does this document indicate on what date?

5   A.   The date is April 3, 2018.

6   Q.   And was the FBI able to determine who cashed that

7   check?

8   A.   Yes.

9   Q.   Who was that?

10  A.   Ms. Sandra Pitcher.

11  Q.   Where does Ms. Pitcher live?

12  A.   Grandville, Michigan.

13  Q.   Turning to Count 4 of the Indictment, which is around

14  April 16, 2018, did the FBI find similar evidence in

15  Ms. Olson's bank accounts around that date?

16  A.   Yes.

17  Q.   Can we look at Exhibit 32?  And looking where it says

18  "withdrawals and other debits," do we see any pertinent

19  banking activity there?

20  A.   Yes.  On April 16th of 2018, there was a withdrawal

21  of $45,006.

22  Q.   And was that $6 a banking fee?

23  A.   Yes.

24  Q.   And if we can turn to the second page of the same

25  exhibit, and turn your attention to the second and third

1    item shown here.

2    A.   So, the second item shows a copy of a cashier's check

3    for $45,000 to Sandra Pitcher on April 16th of 2018.  And

4    you also said the third item?

5    Q.   Yes.  What is that?

6    A.   It is a receipt for $45,006, which is the amount,

7    plus a fee, signed by Sandra Olson.

8    Q.   Agent Howard, that is now three checks that we have

9    seen where Ms. Olson wrote out funds to Sandra Pitcher.

10   In the review of the records, did you also discover

11   whether Ms. Olson wired money to Ms. Pitcher?

12   A.   Yes.

13   Q.   And can you look at Exhibit 62 briefly.  Do you

14   recognize this document?

15   A.   Yes.  62, you said?

16   Q.   Yes.  And what do we find in Exhibit 62?

17   A.   These are wires associated with the email

18   fass2rass@gmail.com.

19   Q.   I am sorry, the entirety of 62.  What are we seeing

20   here?

21   A.   A summary of Western Union wires.

22   Q.   Okay.  And did the FBI look up Western Union wires

23   pertaining to notable individuals in this investigation?

24   A.   Yes.

25   Q.   And then also when it saw wire numbers?

1    A.    Correct.

2    Q.    Okay.  And is that where you saw the wires between

3    Ms. Olson and Ms. Pitcher?

4    A.    Yes.

5    Q.    Agent Howard, who is Sandra Pitcher?

6    A.    Sandra Pitcher is a resident of Grandville, Michigan.

7    Q.    And what is her -- did she have any relationship to

8    this case?

9    A.    She was also another victim in this scheme.

10   Q.    Did the FBI obtain Ms. Pitcher's bank records, as

11   well?

12   A.    Yes.

13   Q.    In summary, what did Ms. Pitcher's bank records show?

14   A.    Ms. Pitcher's bank records showed a large number of

15   withdrawals.

16   Q.    And what happened with those -- I am sorry, a large

17   number of withdrawals or deposits?

18   A.    I am sorry, a large number of deposits.

19   Q.    Okay.  What happened after she would deposit funds?

20   A.    That money was then sent out to individuals.

21   Q.    Okay.  And any individual in particular?

22   A.    Yes, Leonard Luton.

23   Q.    If you could briefly look at Exhibits 49, 51, 133,

24   and 135.  And what are those exhibits?

25   A.    These are account agreements for Ms. Pitcher's bank

1    accounts.

2    Q.    And do those exhibits show that the records we are

3    about to look at are Ms. Pitcher's bank records?

4    A.    Yes.

5    Q.    Did Ms. Pitcher have all of these bank accounts at

6    the time she started receiving checks from Ms. Olson?

7    A.    No.  She opened up at least three additional bank

8    accounts in order to send and receive funds.

9    Q.    And funds from whom?

10   A.    That she was getting from Ms. Sandra Olson.

11   Q.    So she was opening accounts for the purpose of

12   cashing Ms. Olson's checks; is that right?

13   A.    Yes.

14   Q.    And do those documents that you just looked, do those

15   contain examples of that; the opening and closing of

16   accounts?

17   A.    Yes.

18   Q.    Agent Howard, we are going to look now at what

19   happened to Ms. Olson's checks after they were cashed by

20   Ms. Pitcher.

21   A.    Okay.

22   Q.    We are going to look back to Count 2, and start back

23   at the start with March 29, 2018.  Can you look at Exhibit

24   50, please?

25              MS. WEISS:  If we can just briefly display page 3.

1   Q.   (BY MS. WEISS)  What does this exhibit contain?

2   A.   This is an account summary for Ms. Sandra Pitcher at

3   Huntington Bank from March 16, 2018, to April 10, 2018.

4   Q.   Okay.  Let's turn back to the first page of this

5   exhibit, and we are going to look at the third item

6   down -- I am sorry, the fourth item down.  My apologies.

7        Is this the same certified check we saw from

8   Ms. Olson's bank, the Estes Park account?

9   A.   Yes.

10  Q.   Why does it appear in Ms. Pitcher's records?

11  A.   Because she endorsed it.

12  Q.   And does that mean it was cashed?

13  A.   Yes.

14  Q.   And where do you see the endorsement?

15  A.   To the right.

16  Q.   And is that in the form of Ms. Pitcher's signature?

17  A.   Yes.

18  Q.   So this means that check was cashed by her?

19  A.   Correct.

20  Q.   Okay.  Was the FBI able to determine whether

21  Ms. Pitcher kept this money, this $9,095?

22  A.   She did not.

23  Q.   What happened to it?

24  A.   She sent it to Leonard Luton.

25  Q.   Okay.  Can we look at Exhibits 55, 58, and 61

 1   briefly?  What are those documents, Agent Howard?

 2   A.   These are account agreements for the bank accounts of

 3   Leonard Luton.

 4   Q.   Okay.  So all of the bank records we are about to

 5   look at are Leonard Luton's bank records?

 6   A.   Correct.

 7   Q.   Turn to Exhibit 56.  So, I will ask you to turn to

 8   the pages that are -- I am sorry, is this his -- is this

 9   an account statement for Mr. Luton's bank account?

10   A.   Correct.

11   Q.   And then turning to pages 4 and 5.

12        MS. WEISS:  And if we can blow up the check,

13   itself, the front of the check.

14   Q.   (BY MS. WEISS)  What is this document, Agent Howard?

15   A.   This is a cashier's check from April 3, 2018.  The

16   remitter is Sandra Pitcher.  The amount is $9,000, and it

17   is paid to the order of Leonard Luton.

18   Q.   And how does the date of April 3rd relate to the date

19   of Ms. Olson's check?

20   A.   It corresponds to Ms. Olson's banking statements.

21   Q.   I am sorry?

22   A.   I am sorry, Ms. Pitcher's banking statement.

23   Q.   When does Ms. Olson send her checks for $9,095?

24   A.   She sent it on March 29, 2018.

25   Q.   Okay.  And Ms. Pitcher cashed it shortly thereafter?

1    A.    Correct.

2    Q.    And then on April 3rd, this check was written to the

3    defendant?

4    A.    Correct.

5    Q.    If we can turn to the next page, page 5.  Agent

6    Howard, does it appear this check was signed?

7    A.    No, it does not.

8    Q.    In your training and experience, Agent Howard, is it

9    possible to cash a check without it being signed?

10   A.    It is possible for a cash [sic] to be deposited in

11   someone's account if that person that is depositing it had

12   the other individual's account and routing number.

13   Q.    And was there information in this investigation that

14   Ms. Pitcher had Mr. Luton's account and routing number?

15   A.    Yes.  Ms. Pitcher had a text message containing the

16   defendant's name and account and routing number.

17   Q.    And what number had sent her that text message with

18   the defendant's name, account, and routing number?

19   A.    The number 702 that Frank White used.

20   Q.    I will move to Count 3, which again was alleged to

21   have occurred April 3, 2018.  We are looking at Exhibit

22   50.  If we can turn to the second page of this exhibit.

23   Are these more of Ms. Pitcher's Huntington National Bank

24   records?

25   A.    Yes.

1    Q.   And what are we seeing on this page?

2    A.   A cashier's check from Premier Credit Union --

3    Members Credit Union, which is Ms. Olson's bank, on April

4    3, 2018, in the amount of $9,095.75, made out to Sandra

5    Pitcher.

6    Q.   And did Ms. Pitcher sign for this check, as well?

7    A.   She did, yes.

8    Q.   And does this indicate that it was cashed into her

9    Huntington National Bank account?

10   A.   It does, yes.

11   Q.   Was the FBI able to determine whether Ms. Pitcher

12   kept these funds?

13   A.   Yes.

14   Q.   And did she keep those funds?

15   A.   She did not.

16   Q.   Okay.  Can we turn to Exhibit 57?  Again, what is the

17   first page of this document?

18   A.   This is the bank account statement for Leonard Luton.

19   Q.   And is it from around the month of April, 2018?

20   A.   It is from April 1, 2018, to April 30, 2018.

21   Q.   And if we can now turn to page 4 of this exhibit.

22   And what is this document, Agent Howard?

23   A.   This is a copy of a cashier's check dated April 6,

24   2018, from Sandra Pitcher to Leonard Luton, in the amount

25   of $9,000.

1    Q.   And, again, is this a couple days after Ms. Pitcher

2    cashed Ms. Olson's check?

3    A.   Yes.

4    Q.   Looking at the next page, page 5, was this check

5    signed for?

6    A.   No, it was not.

7    Q.   Was it deposited directly into the defendant's bank

8    account?

9    A.   It was, yeah.

10   Q.   And is it your understanding that was done similarly

11   because Ms. Pitcher had the defendant's accounting and

12   routing number?

13   A.   Yes.

14   Q.   Finally, let's look at Count 4, which is the next

15   count up, April 16, I believe.  This was an account

16   pertaining to $45,000, Agent Howard.

17        MS. WEISS:  If we can blow up Exhibit 52, or

18   display Exhibit 52, please.

19   Q.   (BY MS. WEISS)  And what are we looking at here?

20   A.   So, this is a bank statement from Grand National

21   Bank, which was one of Ms. Pitcher's banks in the month of

22   April, 2018.

23   Q.   And does this indicate a deposit of $45,000?

24   A.   Yes, on April 17th of 2018.

25   Q.   And turning to the next page, is this a receipt from

1    that same deposit?

2    A.   Yes, it is.

3    Q.   And then if we can turn to the last page, please,

4    Agent Howard.

5         MS. WEISS:  If we can blow this up a little bigger,

6    please.

7    Q.   (BY MS. WEISS)  And what are we looking at now?

8    A.   This is a cashier's check dated April 16, 2018, in

9    the amount of $45,000, from -- the remitter is Sandra

10   Olson to Sandra Pitcher.

11   Q.   And did Ms. Pitcher sign for this check?

12   A.   Yes, she did.

13   Q.   And was this check, indeed, deposited in

14   Ms. Pitcher's bank account?

15   A.   It was deposited, yes.

16   Q.   What happened with the funds after Ms. Pitcher

17   deposited them?

18   A.   So, at that point, the bank had contacted the police,

19   and the police became involved and stopped the process.

20   Q.   Okay.  And by "the police" you mean the local police

21   in Grandville, Michigan?

22   A.   Yes.

23   Q.   So, did Ms. Pitcher ultimately keep these funds?

24   A.   No, she did not.

25   Q.   Were these funds ultimately returned to Ms. Olson at

1    the direction of law enforcement?

2    A.   Yes, they were.

3    Q.   And was that money returned because it was believed

4    to be part of a lottery scam?

5    A.   Yes.

6    Q.   Agent Howard, did the FBI find other instances,

7    besides the ones we have just reviewed, where Ms. Pitcher

8    deposited checks into Mr. Luton's bank account?

9    A.   Yes.

10   Q.   And did the FBI obtain any evidence that Ms. Pitcher

11   also mailed packages at the direction of whoever was

12   defrauding her?

13   A.   Yes.

14   Q.   And were some of those packages mailed to the

15   defendant, Mr. Luton?

16   A.   Yes.

17   Q.   Can we look at Exhibit 54.  What are we looking at

18   here, Agent Howard?

19   A.   This is a UPS tracking receipt.

20       MS. WEISS:  And if we can just blow up that top

21   box.

22   Q.   (BY MS. WEISS)  Does this indicate from where this

23   package was sent?

24   A.   Just in Michigan.

25   Q.   Is this a package mailed by Ms. Pitcher?

1    A.   It was, yes.

2    Q.   Where was it mailed to?

3    A.   Brooklyn, New York.

4    Q.   Looking to the middle part of the same page, where it

5    says "designation address information."

6    A.   It is 1307 Pacific Street, Apartment 6D, Brooklyn,

7    New York.

8    Q.   And is that the defendant's mailing address?

9    A.   It is, yes.

10   Q.   Can we turn to Exhibit 53 now.  And what is this

11   document, Agent Howard?

12   A.   This is a Priority Mail Express receipt from the U.S.

13   Postal Service.

14   Q.   And who was the person that mailed this package?

15   A.   Sandra Pitcher.

16   Q.   And who was the intended recipient of this package?

17   A.   Bruce Luton at 1307 Pacific Street, Apartment 6D,

18   Brooklyn, New York.

19   Q.   Agent Howard, are you aware if Ms. Pitcher ever was

20   criminally charged for cashing Ms. Olson's check?

21   A.   She was not.

22   Q.   Why was that?

23   A.   She was determined to be a victim in the scheme.

24   Q.   And is there a term for a victim who acts as the sort

25   of the middleman between one victim and the ultimate

1    fraudster?

2    A.    Yes, a money mule.

3    Q.    Can you explain to the jury what a money mule is?

4    A.    A money mule is a person that is used to facilitate

5    the transfer of money and it is often unknowingly.

6    Q.    And in this investigation, did the FBI determine

7    whether Ms. Pitcher did this knowingly or unknowingly?

8    A.    It was unknowingly.

9    Q.    So what really was Ms. Pitcher's role in this scheme?

10   A.    A victim.

11   Q.    Agent Howard, we are now going to discuss Counts 5

12   through 7 of the Indictment, which pertain to the mailing

13   of cash by Ms. Olson.  If we could turn to Exhibit 33.

14   And what are we looking at now?

15   A.    We are looking at Ms. Olson's Bank of Estes Park

16   account summary from July 27, 2018, to August 22, 2018.

17   Q.    And looking at this statement period activity, do we

18   see any transactions on or around July 27?

19   A.    Yes, a withdrawal in the amount of $20,000.

20          MS. WEISS:  And if we can turn to the second page

21   of this same exhibit.  And if we can blow up the top

22   portion of that.

23   Q.    (BY MS. WEISS)  And what are we looking at?

24   A.    This is a receipt reflecting the same transaction,

25   signed by Ms. Olson.

1    Q.   And did Ms. Olson's spreadsheet indicate what she did

2    with this cash after she withdrew it?

3    A.   Yes, she mailed it.

4    Q.   And did she provide a receipt for a tracking number

5    associated with this package?

6    A.   Yes, she did.

7    Q.   Were you able to confirm that mailing with the mail

8    carrier?

9    A.   Yes.

10   Q.   Can we look at Exhibit 48.  And this is very small

11   writing, Agent Howard, I apologize for that.  What are

12   these records?

13   A.   UPS shipping records.

14   Q.   Were these records that the FBI received in relation

15   to this investigation?

16   A.   Yes.

17   Q.   Okay.  First of all, is UPS a commercial interstate

18   mail carrier?

19   A.   It is, yes.

20   Q.   Can you walk us through what we are seeing on this

21   line of the document?

22   A.   So, the first portion shows the tracking number and

23   it also references the date.  And then the right part

24   shows the address of where the package was sent.

25   Q.   And what was the date that this package was sent?

1   A.   July 28th of 2018.

2   Q.   And where was this sent to?

3   A.   17243 Brocher Road, Valley Stream, New York.

4   Q.   And were you able to determine who lives at that

5   Brocher Road address?

6   A.   Yes, Carlene Hosang.

7   Q.   Is that the Miss Carlene we saw earlier who asked for

8   Bird's number?

9   A.   Yes.

10   Q.   And, again, who is Carlene?

11   A.   She is an associate of Leonard Luton's.

12   Q.   Did the FBI find any text messages in the defendant's

13   cellphone pertaining to this mailing?

14   A.   We did, yes.

15   Q.   And can you look at Exhibit 80.  What is this

16   document, Agent Howard, once you got into it?

17   A.   This is an extraction report showing a message

18   between Rajay Dobson and Leonard Luton.

19        MS. WEISS:  And can you blow up the message that

20   begins "1Z," then the one after it.

21   Q.   (BY MS. WEISS)  All right.  What is the first message

22   we are looking at here?

23   A.   On July 27th of 2018, Rajay Dobson sends a message

24   with a tracking number ending 7523 to Leonard Luton, in

25   which Leonard Luton responds "up top."

1    Q.   And 7523, is that the tracking number that we just

2    looked at?

3    A.   It is, yes.

4    Q.   And what does "up top" mean here?

5    A.   From what it appears, it means "up top," like high

6    five.

7    Q.   Move on to Count 6, Agent Howard.  This is a count

8    that the Government alleges took place on or around

9    September 6, 2018, and pertains to $15,000 in cash that

10   Ms. Olson said that she shipped.

11        Can you please look at Exhibit 36.  And, in

12   particular, we are going to look at the second page, about

13   halfway down.  Does this page indicate any banking

14   activity by Ms. Olson on or around September 6th?

15   A.   Yes, on September 6th it shows a withdrawal of

16   $10,000.

17   Q.   Okay.  Was there any other -- I am sorry, can you

18   turn to the third page of this exhibit.  And what are we

19   seeing here?

20   A.   This is a receipt for the same transaction on

21   September 6, 2018, for the amount of $10,000.

22   Q.   And is that essentially the third transaction down on

23   this receipt, the withdrawal from the money market

24   account?

25   A.   Correct.

54

1   Q.   And does it indicate how this cash was disbursed to

2   Ms. Olson?

3   A.   In hundreds.

4   Q.   Did the FBI find any evidence of other withdrawals by

5   Ms. Olson around this same time period?

6   A.   Yes.

7   Q.   Can we look at Exhibit 28.  And we will turn to page

8   2 of this exhibit.  And what do we see here, Agent Howard?

9   A.   This is a receipt for withdraw of cash in the amount

10   of $9,500, made on September 6th of 2018, by Ms. Sandra

11   Olson.

12   Q.   So, did Ms. Olson withdrawal from two separate bank

13   accounts on the same day?

14   A.   Yes, she did.

15   Q.   What was the total amount she withdrew?

16   A.   $19,500.

17   Q.   And how much has the Government charged in relation

18   to this count?

19   A.   Only $15,000.

20   Q.   Why is that?

21   A.   That was the amount that Ms. Olson wrote down on her

22   receipt, shipping receipt.

23   Q.   So there was a shipping receipt for this count, as

24   well?

25   A.   Correct.

1   Q.   And if we can look at Exhibit 44 next.  And what are

2   we looking at now?

3   A.   A FedEx shipping receipt showing a tracking number

4   ending 7114, on September 6th of 2018, by Sandra Olson to

5   the recipient of Mark White, 204 5th Avenue, Toms River,

6   New Jersey.

7   Q.   And is FedEx also a commerce interstate carrier?

8   A.   It is, yes.

9   Q.   Okay.  And who lives at 204 5th Avenue in Toms River,

10   New Jersey?

11   A.   Lincoln Haughton.

12   Q.   And we heard his name before, but can you remind us

13   all who Lincoln Haughton is?

14   A.   He is also an associate of Mr. Luton's.

15   Q.   Is there any indication in the defendant's cellphone

16   that he was aware of this package?

17   A.   Yes.

18   Q.   And can we please turn to Exhibit 85.  And we will be

19   looking at the three text messages in the middle.

20        Agent Howard, can you please walk us through this

21   exchange.

22   A.   So, this is a message between Leonard Luton and Rajay

23   Dobson in which Leonard Luton, on September 6, 2018, sends

24   to Rajay Dobson the address 204 5th Avenue, Toms River,

25   New Jersey, 08757, in which Rajay Dobson responds with a

1    tracking number ending 7114, and Leonard Luton responds,

2    "up top."

3    Q.   And so is this first message the defendant provided

4    that Toms River New Jersey address to Dobson?

5    A.   Correct.

6    Q.   And Dobson in return provided the 7114 tracking

7    number?

8    A.   Yes.

9    Q.   And that is the tracking number of Ms. Olson's

10   package we just looked at?

11   A.   Correct.

12   Q.   I am going to turn to Count 7 of the Indictment now,

13   Agent Howard, and we will be starting with Exhibit 29.

14   And Count 7 pertains to mailing of cash by Ms. Olson on or

15   around September 25, 2018.  What are we seeing in Exhibit

16   29, Agent Howard?

17   A.   We are seeing two withdrawals, one on September 20th

18   of $20,000, and one on September 26th of $19,000.

19   Q.   Turning to the second page, in particular, and the

20   third item down.

21   A.   So, on September 20th of 2018, this is a receipt for

22   a withdrawal of $20,000 cash made by Ms. Sandra Olson.

23   Q.   And was the FBI able to find any information about

24   what Ms. Olson did with this cash after she withdrew it?

25   A.   Yes, she mailed it.

1    Q.   And how are you able to confirm that?

2    A.   Through shipping records.

3    Q.   Can we turn to Exhibit 45 next.   And what are we

4    seeing now, Agent Howard?

5    A.   We are seeing a shipping report from FedEx services

6    showing tracking number ending in 7140 on September 25,

7    2018, by Sandra Olson to the name John Anderson at 204 5th

8    Avenue, Toms River, New Jersey.

9    Q.   And we just saw that Toms River, New Jersey, address

10   in the last count.   Was the same name used in relation to

11   the last package as this one?

12   A.   No, it is a different name.

13   Q.   Is any evidence related to this tracking number found

14   on the defendant's cellphone?

15   A.   It is, yes.

16   Q.   And can we look at Exhibit 86.   And can you walk us

17   through this document?

18   A.   So, this is a message between Rajay Dobson and

19   Leonard Luton in which Rajay Dobson, on September 25,

20   2018, sends Leonard Luton a tracking number ending in

21   7140.

22   Q.   And is that the same tracking number for the FedEx

23   receipt we just looked at?

24   A.   Yes.

25   Q.   Did the FBI review the defendant's bank account

1    records from around September 25, 26?

2    A.    Yes.

3    Q.    And can we look at Exhibit 59.  What are we looking

4    at here, Agent Howard?

5    A.    We are looking at the defendant's Chase account

6    summary from September 14, 2018, to October 5, 2018.

7    Q.    And do we see any transactions that are significant

8    to this investigation around the 25th or 26th of that

9    month?

10   A.    An ATM cash deposit on September 26, 2018, in the

11   amount of $2,000.

12   Q.    Does this indicate where that deposit was made?

13   A.    Toms River, New Jersey.

14   Q.    So the same town that the package was sent to?

15   A.    Correct.

16   Q.    Does Mr. Luton live in Toms River, New Jersey?

17   A.    He lives in Brooklyn, New York, but it is very close,

18   it is within blocks.

19   Q.    Toms River, New Jersey and Brooklyn, New York?

20   A.    Oh, no, I am so sorry.  No, the defendant lives in

21   Brooklyn, New York.

22   Q.    Okay.  Toms River, New Jersey, is not close?

23   A.    No, sorry, wrong addresses.

24   Q.    And does this indicate that the defendant then made

25   another transaction after depositing that $2,000?

1   A.   Yes.  He made a quick payment on September 26th to

2   Carlene.

3   Q.   Is Carlene believed to Carlene Hosang?

4   A.   Correct.

5   Q.   And is a quick payment just a transfer between bank

6   accounts?

7   A.   Yes.

8   Q.   Okay.  And then additionally on September 25th, is

9   there another transaction that is significant here?

10  A.   On September 25th, there was also another quick

11  payment to a "Scabo" in the amount of $320.

12  Q.   And does Lincoln Haughton have a nickname?

13  A.   Yes.  He is known to go by the name Scabo.

14  Q.   Okay.  Agent Howard, we are going to move to Counts 8

15  and 9, which the Government alleges took place on or

16  around September 22 and 30, 2018.  Those are the ones

17  concerning the mailing of the cellphones.

18       Did the FBI receive any information from Ms. Olson

19  related to her purchasing cellphones?

20  A.   Yes.  The receipts that she had of the purchase of

21  those cellphones from the Apple Store.

22  Q.   Did the FBI then go out and contact Apple and obtain

23  certified copies of those receipts?

24  A.   Yes, we did.

25       MS. WEISS:  And could we turn to Exhibit 42 next.

1    And if we can blow up the date on the top of this

2    document.

3    Q.   (BY MS. WEISS)  And what are we seeing here, Agent

4    Howard?

5    A.   This is the receipt from the Apple Store from October

6    19, 2018.

7         MS. WEISS:  And if we can blow up the products that

8    we are seeing here.

9    Q.   (BY MS. WEISS)  And what does this receipt indicate

10   was purchased?

11   A.   Two iPhone XS Max phones were purchased.

12   Q.   And this receipt also provides serial numbers and

13   IMEI numbers?

14   A.   Correct.

15   Q.   And what was the total amount that was purchased that

16   day, including tax?

17   A.   $2,718.94.

18   Q.   This was a receipt from the Apple Store in Boulder;

19   correct?

20   A.   Correct.

21   Q.   Was the FBI able to find any evidence in Ms. Olson's

22   banking record to confirm that she made this purchase?

23   A.   Yes, in her credit card statement.

24   Q.   Okay.  Can we look at Exhibit 40 next.  What are we

25   looking at here?

1    A.    We are looking at Ms. Olson's Discover Card account

2    summary.

3    Q.    And is this a credit card account statement?

4    A.    Yes, it is.

5    Q.    Turning to the second page, what do we see?

6    A.    We see the transactions from October through November

7    of 2018.  And on October 19th, there is a purchase at the

8    Apple Store in Boulder, Colorado, for $2,718.94.

9    Q.    Did the FBI find any information about what Ms. Olson

10   did with those phones after she bought them?

11   A.    Yes, she mailed them.

12   Q.    And can we look at Exhibit 46.  And what is this

13   document?

14   A.    This is a FedEx shipping report.

15   Q.    And what is the tracking number?

16   A.    It ends in 6132.

17   Q.    And does this indicate when the package was shipped?

18   A.    Yes.  On October 22, 2018, by Sandra Olson.

19   Q.    And who was it shipped to?

20   A.    To a John Anderson, at 1307 Pacific Street, Apartment

21   6D, Brooklyn, New York, 11216.

22   Q.    And is that the defendant's mailing address?

23   A.    It is, yes.

24   Q.    And does this document indicate that the package was

25   delivered at that address?

1   A.   It was.

2   Q.   And what does it say?

3   A.   On October 23, 2018.

4   Q.   And was this package signed for, in fact?

5   A.   Yes.

6   Q.   Was there any other information in the defendant's

7   cellphone regarding that package that we just looked at?

8   A.   Yes, there was.

9        MS. WEISS:   Turning to Exhibit 92.   And we will be

10   blowing up those three messages.   Thank you.

11   Q.   (BY MS. WEISS)   Agent Howard, can you please walk us

12   through this conversation.

13   A.   So, this is a conversation between Rajay Dobson and

14   Leonard Luton which takes place on October 22nd of 2018,

15   in which Rajay Dobson sends Leonard Luton a tracking

16   number ending in 6132, in which --

17   Q.   Can I pause you?   Is that the same tracking number we

18   just looked at?

19   A.   It is, yes.

20   Q.   What was Mr. Luton's response to receiving the

21   tracking number?

22   A.   "Xmax dat."

23   Q.   What type of iPhones did Ms. Olson purchase?

24   A.   XS Max.

25   Q.   Turn to Count 9, Agent Howard.   That also concerns

1    the mailing of two cellphones.  And can we look at Exhibit

2    43 together?  Is this another certified receipt from

3    Apple?

4    A.    It is, yes.

5    Q.    And does this indicate a purchase of iPhones at the

6    Apple Store in Boulder, Colorado?

7    A.    Yes.

8    Q.    What was the date of purchase?

9    A.    October 29, 2018.

10         MS. WEISS:  Can we blow up the products that were

11   purchased?

12   Q.    (BY MS. WEISS)  And what products were purchased?

13   A.    IPhone XS Max.

14   Q.    And looking, in particular, at the second phone

15   listed on this receipt, what is significant about this

16   phone, in particular?

17   A.    The serial number ending KPHJ was the same serial

18   number of the defendant's cellphone he had on him at the

19   time of his arrest.

20   Q.    And how much money was -- how much money was spent in

21   purchasing these two iPhones, in total?

22   A.    $2,718.94.

23   Q.    Did you find evidence in Ms. Olson's banking records

24   that she was the person that made this purchase?

25   A.    Yes, through credit card records.

```
 1   Q.   Can we look at Exhibit 41.  And what are we looking

 2   at now?

 3   A.   Ms. Olson's Fidelity credit card statement.

 4   Q.   Turning to the second page, what do we see?

 5   A.   We see a transaction on October 29, 2018, at the

 6   Apple Store in Boulder in the amount of $2,718.94.

 7   Q.   And what did Ms. Olson say she did with those phones?

 8   A.   She mailed the phones.

 9   Q.   And was the FBI able to obtain shipping records?

10   A.   Yes.

11   Q.   Can we look at Exhibit 47.  And what are we seeing

12   now?

13   A.   This is a FedEx report for the tracking number ending

14   1612, and it was -- the date was October 29, 2018, by

15   Sandra Olson, to the recipient of John Anderson, at 1307

16   Pacific Street, Apartment 6D, Brooklyn, New York.

17   Q.   And, again, this may be getting repetitive, but whose

18   address is that?

19   A.   Leonard Luton's.

20   Q.   Does this indicate that this package was delivered?

21   A.   It does, yes, on October 30, 2018.

22   Q.   And does it indicate what time, even, this package

23   was delivered?

24   A.   Yes.  At -- so that would have been 3:53.

25   Q.   Okay.  Can we pull back up real quickly Exhibit 25,
```

1   and look at page 1.  When was the defendant's cellphone

2   registered with Apple?

3   A.   October 31, 2018.

4   Q.   What time?

5   A.   At 2113 military time, which if we give UTC time,

6   shortly after this cellphone was received.

7   Q.   So the cellphone was received on October 30th at 3

8   p.m.-ish and registered within a day --

9   A.   Yes.

10  Q.   -- to the defendant's name --

11  A.   Correct.

12  Q.   -- and his address?

13  A.   Correct.

14  Q.   Was there any discussion of this package on the

15  defendant's cellphone?

16  A.   Yes, there was.

17       MS. WEISS:  Can we look at Exhibit 93.  And if we

18  can blow up those two texts.

19  Q.   (BY MS. WEISS)  This another conversation between the

20  defendant and Rajay Dobson, Agent Howard?

21  A.   Yes.

22  Q.   Can you walk us through what was said?

23  A.   So, on October 30th of 2018, Rajay Dobson sends

24  Leonard Luton a tracking number ending in 1612.

25  Q.   And is that the same tracking number that we just

1    looked at?

2    A.   It is, yes.

3    Q.   How does the defendant respond?

4    A.   "Maddddddd."

5    Q.   We have one more count to go, Agent Howard.  If we

6    can turn to the final count, Count 10, which concerns the

7    time period on or around November 7, 2018.  Can you please

8    look at Exhibit 38.  And what are we looking at here?

9    A.   So, we are looking at Ms. Olson's Premier Members

10   Credit Union balance statement for October of 2018.

11   Q.   Can we turn to the second page.  Do we see any

12   withdrawals of cash by Ms. Olson in the days and week

13   leading up to November 7th?

14   A.   Yes.  So, there is a withdrawal on October 26th in

15   the amount of $10,000, and also a withdrawal on the same

16   day, October 26th, in the amount of $34,144.

17   Q.   Was there also a withdrawal on the 19th?

18   A.   Yes, in the amount of $25,000.

19   Q.   Okay.  You heard Ms. Olson testify that she would

20   take out money and keep it on hand?

21   A.   Correct.

22   Q.   Can we look at the final two pages of this exhibit.

23   Are these just receipts confirming those same withdrawals

24   we just talked about?

25   A.   Yes.

1    Q.    Does it indicate Ms. Olson again was getting a large

2    amount of cash, mostly in hundreds?

3    A.    Yes.

4    Q.    Did the FBI find proof that Ms. Olson shipped any of

5    this money in the days and weeks after --

6    A.    Yes.

7    Q.    -- this money was taken out?

8          Can we look at Exhibit 48.  We have seen this

9    document before, I believe, but what are we looking at?

10   A.    So, we are looking at UPS shipping records.

11   Q.    And is there a shipment that was made on or around

12   November 7th?

13   A.    Yes, the shipment ending No. 8192, made on November

14   8, 2018.

15   Q.    And where was that package mailed to?

16   A.    To 443 Tompkins Avenue, Brooklyn, New York.

17   Q.    And whose house is that on Tompkins Avenue?

18   A.    Stacy Byfield's father's address.

19   Q.    And did the defendant initially deny knowing that

20   address in his interview?

21   A.    Yes.

22   Q.    And, again, was Stacy Byfield the defendant's

23   girlfriend, who was with him on the day he was arrested?

24   A.    Correct.

25   Q.    Was the FBI able to find any other evidence in the

1    defendant's cellphone regarding this shipment?

2    A.    Yes.

3           MS. WEISS:  Can we look at Exhibit 95?  If we can

4    blow up from "maddddd."

5    Q.    (BY MS. WEISS)  And what is happening here?

6    A.    So, this is a message between Rajay Dobson and

7    Leonard Luton, in which Leonard Luton, on November 6,

8    2018, sends Rajay Dobson the address 443 Tompkins Avenue,

9    Brooklyn, New York, 11216.  Dobson responds with the name

10   "Tom White."  Luton responds "ok."  And then Rajay Dobson

11   responds on November 7, 2018, with a tracking number

12   ending 8192, in which Luton responds "madddd."

13   Q.    Is that the same tracking number we just looked at?

14   A.    Yes.

15   Q.    And, again, are we seeing the defendant providing an

16   address where a package can be shipped?

17   A.    Yes.

18   Q.    And Dobson provides the name and the tracking number?

19   A.    Correct.

20   Q.    Is there any bank activity in Mr. Luton's bank

21   accounts around the date of this shipment?

22   A.    Yes.

23   Q.    Can we look at Exhibit 60.  What are we looking at,

24   Agent Howard?

25   A.    We are looking at the defendant's Chase account

1    summary from October to November of 2018.

2    Q.   And turning to the second page of this exhibit, were

3    there any deposits in Leonard Luton's account after that

4    package was mailed on November 8th?

5    A.   Yes.  On November 9, 2018, there would be a deposit

6    of $1,200.

7    Q.   And does this indicate where that deposit was made?

8    A.   Yes.  Fulton Street, in Brooklyn New York.

9    Q.   And, Agent Howard, have you looked up the distance

10   between this Fulton Street ATM and the Tompkins Avenue

11   address where the package was mailed to?

12   A.   Yes.

13   Q.   How far away are they?

14   A.   That address is blocks away.

15   Q.   Agent Howard, did the FBI recover evidence that

16   Ms. Olson mailed cashier's checks to anyone else besides

17   Sandra Pitcher?

18   A.   Yes.

19   Q.   And who?

20   A.   To a Lloyd Wessam.

21   Q.   And where does Mr. Wessam live?

22   A.   Mr. Wessam lives in Connecticut.

23   Q.   And can you review Exhibit 27, and then also 114

24   through 117.  And what is contained in those exhibits?

25   A.   Banking information related to Lloyd Wessam.

1   Q.   Did the FBI also pull Mr. Wessam's bank accounts?

2   A.   Yes.

3   Q.   Does that indicate that Mr. Wessam had indeed cashed

4   Ms. Olson's checks?

5   A.   Yes.

6   Q.   And does the FBI -- has the FBI determined whether

7   Mr. Wessam was like Ms. Pitcher; a money mule, or somehow

8   involved in this scheme?

9   A.   We haven't made a final determination at this point.

10          MS. WEISS:  Your Honor, it is 11:56, and I am at a

11   good stopping point, even though I am a little ahead of

12   schedule here.  Could we take a break now and pick back up

13   with Agent Howard after lunch?

14          THE COURT:  That would be perfect, I think.  So we

15   will take a half an hour recess.  We will reconvene at

16   approximately 12:30.  Remember, do not discuss this case

17   among yourselves or with anyone else, and do not conduct

18   any research.

19          Court will be in recess until 12:30.

20          (Lunch is taken from 11:57 a.m. to 12:31 p.m.)

21          THE COURT:  All right.  Ms. West, would you please

22   bring in the jury.

23          (In the presence of the jury.)

24          THE COURT:  All right.  You may be seated.

25          Ms. Weiss, you may proceed.

1          MS. WEISS:  Thank you, Your Honor.

2     Q.   (BY MS. WEISS)  Agent Howard, when we took our lunch

3     break, we had just finished going through the nine counts

4     of aiding and abetting mail fraud.  Now we are going to

5     switch gears again.

6          Somewhat apart from those nine mail fraud counts,

7     did the FBI discover additional communication between the

8     defendant and Rajay Dobson pertaining to packages that

9     Ms. Olson had shipped?

10    A.   Yes.

11         MS. WEISS:  Can we start with Exhibit 83, please?

12    If we can publish 83, as well.

13    Q.   (BY MS. WEISS)  Agent Howard, is this another one of

14    these conversations between the defendant and Rajay

15    Dobson?

16    A.   Yes.

17    Q.   And if we can start with the two text messages that

18    follow the message with the image.

19    A.   On August 22, 2018, Rajay Dobson sends Leonard Luton

20    a tracking number ending in 7628, in which Luton responds

21    "chop."

22    Q.   And is that tracking number 7628 one that the FBI was

23    able to match up with a shipment from Ms. Olson's

24    spreadsheet?

25    A.   Yes.

1   Q.   Again, what does "chop" mean?

2   A.   Along the lines of remember or understanding of some

3   sort.

4   Q.   Can we look at the second page of this exhibit, which

5   is a continuation of that conversation?  Do we see here

6   another exchange between the defendant and Dobson?

7   A.   Yes.  On August 29, 2018, Rajay Dobson sends Leonard

8   Luton a tracking number ending in 1581, in which Leonard

9   Luton responds "kool."

10   Q.   And was that tracking number 1581 one the FBI was

11   able to match up with a shipment made by Ms. Olson?

12   A.   Yes.

13   Q.   Can we turn to Exhibit 84.  And we are going to look

14   at the text messages in the middle.  Can you walk us

15   through this text message exchange, as well?

16   A.   Yes.  On September 4, 2018, Rajay Dobson sends

17   Leonard Luton a tracking number ending in 7498, in which

18   Leonard Luton replies "mad rass," and Rajay replies "ahh."

19   Q.   And, again, is this a tracking number that the FBI

20   was able to match with one of Ms. Olson's shipments?

21   A.   Yes.

22   Q.   And turning to Exhibit 94 next.  And can you please

23   walk us through this exchange, as well, Agent Howard?

24   A.   Yes, on November 5th of 2018, Rajay Dobson sends

25   Leonard Luton a tracking number ending in 9671, in which

1    Luton responds "fed?"  And Dobson responds "U."

2    Q.   And, again, is this a tracking number that the FBI

3    was able to match to one of Ms. Olson's packages?

4    A.   Yes.

5    Q.   And then can you please explain the next two

6    messages?

7    A.   Of the ones I just --

8    Q.   Yes.  What is happening here?  I am sorry, the

9    "fed" and "U."

10   A.   It appears that Leonard Luton is asking whether that

11   package, with the tracking number end 9671, will be coming

12   via FedEx, in which Dobson replies "U," which implies UPS.

13   Q.   Okay.  We saw some examples earlier where the

14   defendant, Mr. Luton, provided addresses where packages

15   could be mailed.  Did you find additional instances of

16   that related to Ms. Olson's packages?

17   A.   Yes.

18   Q.   And can we look at Exhibit 96.  And what is this

19   document?

20   A.   These are text messages between Leonard Luton and

21   Rajay Dobson.  And so it shows Leonard Luton sending Rajay

22   Dobson the address 172-42 Brocher Road, Jamaica Queens,

23   approximately five times.  And then he also sends the

24   address 443 Tompkins Avenue, Brooklyn, New York,

25   approximately four times to Rajay Dobson.

1   Q.   And who lives at that Brocher Road address, again?

2   A.   Carlene Hosang.

3   Q.   Is Carlene Hosang an associate of the defendant's?

4   A.   Yes.

5   Q.   And who lives at that Tompkins Avenue address?

6   A.   Stacy Byfield's father.

7   Q.   And who is Stacy Byfield?

8   A.   The defendant's girlfriend.

9   Q.   Agent Howard, did you ever see any text messages

10  where the defendant and Rajay Dobson discuss packages in

11  anything other than just these limited tracking number,

12  name, address type way?

13  A.   No.

14  Q.   Did you ever see them discuss, hey, I bought

15  something on Amazon, can you pick it up for me?

16  A.   No.

17  Q.   Did you ever see anything like, hey, I picked up your

18  package, man, I am going to drop it off to your brother

19  Greg?

20  A.   No, I did not.

21  Q.   Or, I picked up your package, I am going to send it

22  on to Jamaica for you?

23  A.   No.

24  Q.   All of these text messages were in this very limited

25  format; is that correct?

1    A.    Correct.

2    Q.    Do you consider that to be the type of code language

3    that we talked about earlier?

4    A.    I would, yes.

5    Q.    Agent Howard, we have seen a number of names,

6    including Tom White, John Anderson, Mark White, that were

7    the listed recipients of these packages on the shipping

8    information.  Did the FBI investigate those names?

9    A.    Yes.

10   Q.    And what was the result of that investigation?

11   A.    Based on our investigation, we did not find those

12   particular names associated with those addresses.

13   Q.    Do you believe they are not real people?

14   A.    Yes, we believe they are fictitious.

15   Q.    Did you find any evidence of any packages addressed

16   to Rajay Dobson's real name, at all?

17   A.    No.

18   Q.    And apart from the one package we saw from

19   Ms. Pitcher, did you see any packages addressed to Bruce

20   or Leonard Luton's name, at all?

21   A.    No.

22   Q.    Or to the true resident of the names of -- the true

23   residents of those addresses we have been discussing?

24   A.    No.

25   Q.    We discussed briefly earlier, Agent Howard, did the

1   FBI find evidence in the defendant's cellphone pertaining

2   to money wires?

3   A.   Yes.

4        MS. WEISS:  And we are going to look at a couple

5   examples of that.  Can we turn to Exhibit 82?  Can we

6   below up those first two messages with the pictures?

7   Okay.

8   Q.   (BY MS. WEISS)  Once you have had a chance, Agent

9   Howard, to get us there, can you please explain who the

10  participants of this conversation are and what is

11  happening at the beginning of this?

12  A.   So, Rajay Dobson and Leonard Luton are the

13  participants.  And on August 20, 2018, Leonard Luton sends

14  a picture -- two pictures of copies of wire receipts.

15  Q.   Okay.  And can we flip to the next page of this

16  exhibit.  Are these blown up pictures of those pictures

17  that were sent in this message?

18  A.   They are, yes.

19  Q.   Okay.  And this can be a little bit difficult to see.

20  Did this picture indicate when this money wire was sent?

21  A.   August 20, 2018.  It shows under "date of

22  transaction."

23  Q.   Okay.  And below that, does it indicate the sender?

24  A.   Yes, Carlene Hosang.

25  Q.   And is that the Brocher Road address that we have

 1    been discussing?

 2    A.    Yes.

 3    Q.    And turning to the next page, does this part of the

 4    receipt indicate how much money was wired?

 5    A.    $930 U.S.

 6    Q.    Okay.  And does anything on this receipt indicate

 7    whether this money wire went out of the country of the

 8    United States?

 9    A.    Yes, to Jamaica.

10    Q.    If we can turn back to the first page of this

11    exhibit.  After those two pictures are sent by the

12    defendant, does Rajay Dobson respond?

13    A.    Yes, he responds with Ms. Olson's home address, which

14    is 450 -- he spelled it "Chaplin Lane" but it's Chapin

15    Lane, Estes Park, Colorado.

16    Q.    So the defendant had Ms. Olson's address as early as

17    August 20, 2018?

18    A.    Correct.

19    Q.    And he received that address from Rajay Dobson?

20    A.    Yes.

21    Q.    And how does he respond when he received that

22    address?

23    A.    Luton says "call me."

24    Q.    The following day is there another tracking number

25    that we see here?

```
 1   A.   Yes, on August 21, 2018, there is a tracking number
 2   ending in 9797.
 3   Q.   Thank you.  Is it correct the FBI tracked this
 4   trucking number to one of Ms. Olson's packages, as well?
 5   A.   Yes.
 6        MS. WEISS:  Can we turn to Exhibit 98 next?  Can we
 7   blow up the participants first of this one?
 8   Q.   (BY MS. WEISS)  Who are the participants of this
 9   conversation, Agent Howard?
10   A.   Leonard Luton and Stacy Byfield.
11   Q.   Okay.  And can we move down to where we see the two
12   names in the text message conversation.  Are these names
13   that the defendant, Leonard Luton, sent to his girlfriend,
14   Stacy Byfield?
15   A.   Yes.
16   Q.   And what does he say after that -- or, I am sorry,
17   what does she say after that?
18   A.   "Both Jamaica WI."
19   Q.   And how does the defendant respond?
20   A.   "Yep."
21   Q.   And does he say anything else?
22   A.   "950 each."
23   Q.   And then turning to the last two messages of this
24   conversation, how does Ms. Byfield respond?
25   A.   She responds "ok luv," then sends a picture of a copy
```

1   of a Western Union receipt.

2   Q.   Okay.  Then turning to the next page, do we have a

3   thumbnail of another receipt here?

4   A.   Yes.

5   Q.   Okay.  And then can we turn to the next two pages of

6   this exhibit.  And what is this?

7   A.   This is a Western Union receipt from December 6,

8   2018, to the receiver of Kimari Bently, in Jamaica, for

9   $950 plus a transfer fee.

10  Q.   Okay.  And is this the blown up version of that image

11  we just saw, or at least one of them?

12  A.   It is, yes.

13  Q.   And is Kimari Bently one of those names the defendant

14  sent to his girlfriend, Stacy Byfield?

15  A.   It is, yes.

16  Q.   And then what did Stacy Byfield then go out and do?

17  A.   Had the money wired in that name on that date.

18  Q.   Okay.  Is Stacy Byfield the name of the sender that

19  is listed on this receipt?

20  A.   No, it is Jamie Smith.

21  Q.   Turning to the next page, is this much the same

22  thing, Agent Howard?

23  A.   Yes.

24  Q.   Who is the intended receiver of this Western Union

25  wire?

```
 1   A.    Omar Thelwell.

 2   Q.    And, again, is that a name that was provided by the

 3   defendant?

 4   A.    Yes.

 5   Q.    This one does not indicate how much was sent;

 6   correct?

 7   A.    No.

 8   Q.    But was it also $950, did you confirm that with

 9   Western Union?

10   A.    Yes.

11   Q.    And what is the name of the supposed sender of this

12   money wire?

13   A.    Tracey Reeves.

14   Q.    Not Stacy Byfield, either?

15   A.    No.

16   Q.    Agent Howard, can you look at Exhibits 97, 99, and

17   100.

18         MS. WEISS:  And if we can publish 97.

19   Q.    (BY MS. WEISS)  Have you had a chance to look at

20   those exhibits?

21   A.    Yes.

22   Q.    What are those three exhibits?

23   A.    They are all of the similar fashion of the former

24   exhibit; the discussion of names that are sent by Leonard

25   Luton and copies of receipts for Western Union wires from
```

1    Stacy Byfield.

2    Q.   And, again, are any of these Western Union receipts

3    sent in Stacy Byfield's actual name?

4    A.   No.

5    Q.   Did the FBI go to Western Union and obtain records

6    related to these tracking numbers?

7    A.   Yes.

8    Q.   And did the FBI also request records on Western Union

9    activity for Mr. Luton?

10   A.   Yes.

11   Q.   All of his activity?

12   A.   Yes.

13   Q.   And did you do the same thing with several of

14   Mr. Luton's associates in this case?

15   A.   Yes.

16   Q.   And can we look at Exhibit 62.  Are these those

17   Western Union records, Agent Howard?

18   A.   Yes.

19   Q.   And, like the Apple records, were these also provided

20   in a spreadsheet format?

21   A.   Yes.

22   Q.   So they require a little bit of flipping back and

23   forth in order to line up the rows; right?

24   A.   Yes.

25   Q.   Okay.  If we can turn to -- I apologize, why don't

1    you, while I am turning, in summary, what did the record

2    show about the defendant's Western Union activity?

3    A.   We saw some wires in the defendant's name, but they

4    were minimal amounts, low amounts.

5    Q.   Okay.  And can you turn to page 4.

6         MS. WEISS:  If we can publish that, please.

7    Q.   (BY MS. WEISS)  Is this the entirety of Mr. Luton's

8    Western Union activity under his real name during the

9    period of the charged conspiracy?

10   A.   Yes.

11   Q.   Looks like the largest one is $200 or $220?

12   A.   There is a few in the amount of 300, but, yes.

13   Q.   Okay.  Did the FBI request from Western Union all of

14   Stacy Byfield's Western Union activity?

15   A.   Yes.

16   Q.   Did you find any Western Union activity under Stacy

17   Byfield's real name?

18   A.   No, we did not.

19   Q.   Did you request Western Union activity for Carlene

20   Hosang?

21   A.   Yes.

22   Q.   If you would turn to page 12.  Is this one page of

23   Carlene Hosang's Western Union activity?

24   A.   Yes.

25   Q.   And are we seeing larger amounts, over a thousand

1    dollars, on here, as well?

2    A.   Yes.

3    Q.   Again, it is a little difficult because we are

4    flipping, but can you turn to page 14 next?  Does this

5    page list the individuals who received money from Carlene

6    Hosang sent by Western Union?

7    A.   Yes.

8    Q.   Are there any notable names on this list?

9    A.   A few with the last name of Luton.

10   Q.   And, for the record, can you read out those names?

11   A.   Sure, Leighton Luton, Jermaine Luton.

12   Q.   And did the FBI know who those individuals are?

13   A.   They are possibly relatives of the defendant.

14   Q.   So Carlene Hosang was wiring money to Jamaica;

15   correct?

16   A.   Correct.

17   Q.   She was wiring money to relatives of the defendant?

18   A.   Correct.

19   Q.   Can we turn to Exhibit 119 next.

20        MS. WEISS:  If we can turn and publish the last

21   page -- the next to last page, I apologize.

22   Q.   (BY MS. WEISS)  Agent Howard, what is this exhibit?

23   A.   This is Leonard Luton's immigration documentation.

24   Q.   Just his travel records; is that correct?

25   A.   Yes.

1    Q.   Entries and exits into the United States?

2    A.   Yes.

3    Q.   Between the dates of the charged conspiracy, February

4    2018, to January 2019, did the defendant make any trips

5    back home to Jamaica?

6    A.   Yes.

7    Q.   And how many?

8    A.   Two.

9    Q.   And when were those?

10   A.   In June of 2018 and December of 2018.

11   Q.   In your training and experience, Agent Howard, would

12   it be possible for a person to bring large amounts of U.S.

13   currency across to another country by flying commercially?

14   A.   Yes.

15   Q.   Agent Howard, I want to return now to that incident

16   we heard so much about that occurred at Ms. Olson's home

17   on the very late night of October 2, 2018, going into the

18   early morning hours of October 3, 2018.

19        Can you please turn to Exhibit 76, and we will look

20   at page 29.  And what are these records, Agent Howard?

21   A.   They are the MagicJack call detail records for the

22   702 number that Frank White was utilizing.

23   Q.   It looks like this page is from about October 1,

24   2018, to October 3rd; right?

25   A.   Correct.

1    Q.   We are seeing a number of calls from that 702 number

2    to Ms. Olson's 970 number?

3    A.   Yes.

4    Q.   And if we can look at Row 1153, in particular.  Is

5    this a phone call that was made from that 702 MagicJack

6    number to Ms. Olson on October 3rd?

7    A.   Yes, it was.

8    Q.   And what time was that call made that is shown here?

9    A.   These records are in Eastern Time, so in Mountain

10   Time it would be 1:35 a.m.

11   Q.   How long did Frank White speak to Ms. Olson at 1:30

12   in the morning on October 3rd?

13   A.   For approximately 30 minutes.

14   Q.   Is that what we see in the three lines?

15   A.   Yes.  30.0.35.

16   Q.   Agent Howard, did the FBI review the contents of

17   Mr. Luton's phone to determine whether there was any

18   pertinent evidence around this October 3rd trip?

19   A.   Yes.

20   Q.   Can we look at Exhibit 89 next.

21         MS. WEISS:   If we can blow up the three in the

22   middle.

23   Q.   (BY MS. WEISS)  Can you please walk us through this

24   document?

25   A.   So, Rajay Dobson is sending a message to Leonard

1    Luton with the address 450 Chapin Lane, Estes Park,

2    Colorado 80517, and follows up that message with "yow."

3    Q.   And can I pause you quickly?

4    A.   Sure.

5    Q.   What day did Mr. Dobson sent Mr. Luton Ms. Olson's

6    address in Estes Park?

7    A.   October 13, 2018.

8    Q.   And does Mr. Luton respond to that?

9    A.   Yes, he responds "chop."

10   Q.   Can we turn to Exhibit 90 next?  Who are the

11   participants of this conversation?

12   A.   Leonard Luton and an individual Geo, ending No. 8243.

13   Q.   And did the FBI know who Geo is?

14   A.   Yes, this is Giovanni Hosang.

15   Q.   And who is Giovanni Hosang?

16   A.   The brother of Carlene Hosang.

17   Q.   Okay.  And what happens on October 2nd in this

18   conversation between Mr. Luton and Giovanni Hosang?

19   A.   Leonard Luton, on October 22nd, sends Geo Ms. Olson's

20   address; 450 Chapin Lane, Estes Park, Colorado.

21   Q.   So, on October 2, 2018, Mr. Luton is sending someone

22   else Ms. Olson's address?

23   A.   Correct.

24   Q.   This was shortly after he received that address from

25   Rajay Dobson?

1    A.   It was, yes.

2    Q.   If we can look at Exhibit 88 next.

3         MS. WEISS:  And I just want to blow up the last two

4    messages, please.

5    Q.   (BY MS. WEISS)  And what is happening in this

6    document, please, Agent Howard?

7    A.   This is a message between Leonard Luton and an

8    individual Dee, ending No. 1484.

9    Q.   And what does Mr. Luton send to Dee on the

10   bottom-most message on October 2nd?

11   A.   He sends her an image of a map, and then follows up

12   that message to say "current location."

13   Q.   Okay.  And can we turn to the next page of this

14   exhibit.  This the map that Mr. Luton sent to Dee?

15   A.   Yes.

16   Q.   What generally does this map show?

17   A.   It shows a trip of 14 hours and 56 minutes, starting

18   approximately somewhere near Chicago and ending at a point

19   in Colorado.

20   Q.   And can we turn to Exhibit 87 next.  We are going to

21   look at this whole conversation, message by message, Agent

22   Howard, but who are the participants of this conversation?

23   A.   Rajay Dobson and Leonard Luton.

24   Q.   Can we start with the second message in?

25   A.   Yes, so it is a picture of a map showing "current

1    travel."

2    Q.   And who sent this message?

3    A.   Leonard Luton.

4    Q.   And he sent it to Rajay Dobson?

5    A.   He did, yes.

6    Q.   Can we flip to the -- I apologize, page 5 of this

7    same exhibit.  Is this the image that was sent by

8    Mr. Luton to Dobson?

9    A.   Yes.

10   Q.   And what does it show?

11   A.   It shows a trip on Route 80 West, which runs across

12   the country.

13   Q.   Okay.  And can we go back to the first page?  And

14   what is this text message?

15   A.   Leonard Luton sends Rajay Dobson another picture of a

16   map.

17   Q.   And what date was this?

18   A.   October 2nd of 2018.

19   Q.   And can we flip to page 4 of this exhibit?  Is this

20   the image that Mr. Luton sent to Mr. Dobson?

21   A.   Yes.

22   Q.   Was Mr. Luton updating Mr. Dobson about his progress

23   on this trip?

24   A.   Yes.

25   Q.   And turning back to the first page again, do we see

1   Mr. Dobson acknowledge those updates?

2   A.   Yes.  He responds "yow."

3   Q.   And does the defendant then respond?

4   A.   He responds "yo."

5   Q.   And then what happens next?

6   A.   Rajay Dobson sends Leonard Luton an address of 1225

7   West Eisenhower Boulevard.

8   Q.   And what is that address, what does that pertain to?

9   A.   Correlates to the Village Inn restaurant in Loveland,

10   Colorado.

11   Q.   And how far is Loveland from Estes Park, Colorado?

12   A.   Approximately 45 minutes.

13   Q.   Can we turn to page 2 of this exhibit?  Do we see

14   some missed voicecalls?

15   A.   Yes.

16   Q.   So those would have been missed calls from Dobson to

17   the defendant?

18   A.   Correct.

19   Q.   Can we move to the next one?  And the one after that,

20   too.  How does the defendant respond next?

21   A.   He responds to Dobson with "Motel 6 North Platte,

22   1520 Jeffers Street, North Platte, Nebraska, 69101."  And

23   then follows that up with a message that says "3 hours for

24   her."

25   Q.   What is your understanding of who the "her" is in

1    this conversation?

2    A.    That it was misspelled and should have said "here."

3    Q.    Could it pertain to Ms. Olson?

4    A.    Oh, sure.

5    Q.    Can we move down to the next picture and the little

6    capture under that, too.  The screen shot here, Agent

7    Howard, is that a snippet of a video that was sent from --

8    or sent to Dobson?

9    A.    Yes.

10   Q.    And have we blown up what that snippet picture looks

11   like?

12   A.    Yes.

13   Q.    Can we look at page 3 of this exhibit?  And what do

14   we see in this photograph?

15   A.    It shows a Nebraska "Welcome" sign.

16   Q.    And is that near any landmarks in Nebraska, in

17   particular?

18   A.    The airport.

19        MS. WEISS:  And then if we can turn back to that

20   next page and blow up the snippet with the icon.

21   Q.    (BY MS. WEISS)  Is this a message from Dobson to

22   Luton?

23   A.    Yes.

24   Q.    And is there a voice message attached?

25   A.    Yes.

1    Q.   And is that one of the voice messages from Rajay

2    Dobson that we listened to earlier today?

3    A.   Yes.

4    Q.   Is that the one where Dobson talks about Nebraska?

5    A.   Correct.

6    Q.   And we can set that exhibit aside.

7         Can we look at Exhibit 91 next.  Agent Howard, what

8    is listed here?

9    A.   So, this is a text message exchange between Rajay

10   Dobson and Leonard Luton.

11   Q.   And what is the date?

12   A.   The date is October 3, 2018.

13   Q.   And did this exhibit just show efforts of the two

14   individuals trying to contact each other during October

15   3rd?

16   A.   Yes.

17   Q.   But there is no actual substance to their

18   conversation?

19   A.   No.

20   Q.   And, I am sorry, can we look at the times of these

21   messages, if we still have them up?  Do these list

22   messages in the early morning hours of -- I am sorry, in

23   the morning hours of October 3rd?

24   A.   Yes, given UTC time, the message corresponding with

25   the call drop would have occurred around 1 o'clock in the

1    morning.

2    Q.    Okay.   Was that around the time the evidence suggests

3    that individuals came to Ms. Olson's home to pick up that

4    $65,000?

5    A.    Yes.

6    Q.    Now, Agent Howard, you previously testified that the

7    defendant's phone was purchased by Ms. Olson in late

8    October and registered by the defendant a day later, also

9    in late October.   How was it possible that there is

10   evidence on the defendant's cellphone that predates late

11   October 2018?

12   A.    If the defendant had a SIM card from a prior phone he

13   could take that SIM card and put it into a new device.

14   Q.    Is it also possible to update devices on the cloud

15   these days?

16   A.    Correct.

17   Q.    Agent Howard, we have now seen at least two texts

18   where Dobson sent Ms. Olson's address to Leonard Luton;

19   one in August and one in October of 2018.   Did we see any

20   similar message of that nature in January 2018?

21   A.    No, we did not.

22   Q.    Is that because the defendant already had her

23   address?

24   A.    Correct.

25   Q.    We are almost done here, Agent Howard, just a couple

1   more.

2           MS. WEISS:  Can we look at Exhibit 2, please, and

3   display the second page?

4   Q.   (BY MS. WEISS)  And what photo are we looking at

5   here?

6   A.   This is a photo of cash.

7   Q.   And is that cash packaged in any particular manner?

8   A.   It is bundled by rubber bands, on a manilla envelope.

9   Q.   And is this the cash that Ms. Olson testified looks

10  similar to what she bundled up and gave to those

11  individuals; the merchant banker and the FBI agent on the

12  night of October 3rd?

13  A.   Yes.

14  Q.   And can we look to the first page?  Does this page

15  indicate file information regarding this photo?

16  A.   Yes.  The metadata shows it was created on October

17  12th of 2018.

18  Q.   So, less than -- or, I am sorry, about a week after

19  Ms. Olson handed over that money?

20  A.   Correct.

21  Q.   And does this indicate whether or not this is a photo

22  that was taken with the defendant's phone versus one that

23  perhaps he received via text message or something of that

24  nature?

25  A.   No, it was taken with the defendant's phone.

1    Q.   Is that the only photo of large quantities of cash

2    that you found on the defendant's cellphone?

3    A.   No.

4    Q.   Can we look at Exhibit 102 next?  And what do we see,

5    just flipping through the pages of this document?

6    A.   On 102, the first page, we see a picture of a hand

7    holding a large amount of cash.

8    Q.   And when was this picture taken?

9    A.   February 6th of 2018.

10   Q.   And can we turn to the next page?  Is this the larger

11   version of that photo?

12   A.   Yes.

13   Q.   And turning to the page after that, is this another

14   file information on a picture?

15   A.   Correct.

16   Q.   And when was this picture taken?

17   A.   December 3rd of 2018.

18   Q.   And can we turn to the picture, itself?  Agent

19   Howard, was Mr. Luton asked during his interview how he

20   was doing financially?

21   A.   Yes.

22   Q.   And what did he say?

23   A.   He said he was broke, in more or less words.

24        MS. WEISS:  No further questions at this time.

25        THE COURT:  Mr. Scabavea?

1          MR. SCABAVEA:  Thank you, Your Honor.

2                     **CROSS-EXAMINATION**

3    **BY MR. SCABAVEA:**

4    Q.   Good afternoon, Ms. Howard.

5    A.   Good afternoon, sir.

6    Q.   How are you doing today, ma'am?

7    A.   I am doing well, thank you.

8    Q.   You are the lead agent for this case; is that

9    correct?

10   A.   Correct.

11   Q.   What does it mean to be a lead agent?

12   A.   It means that you are in charge of handling all of

13   the evidence, collecting evidence, processing it,

14   reviewing it, assisting the U.S. Attorney's Office in the

15   investigation.

16   Q.   How long have you been investigating this case?

17   A.   This case was brought to the FBI in late of 2018.

18   Q.   The amount of information seized and reviewed from

19   Mr. Luton is around 10 terabytes; is that correct?

20   A.   About 90 gigabytes.

21   Q.   So about 9 terabytes, then?

22   A.   I am not sure the translation.

23   Q.   Is it fair to say the amount of information involved

24   in this case is very massive?

25   A.   I would say so.

1    Q.   Is it also fair to say that you conducted quite an

2    extensive investigation of Mr. Luton?

3    A.   I would say so, yes.

4    Q.   Mr. Luton sent/received a lot of packages; is that

5    correct?

6         MS. WEISS:  Pardon me, sorry, Agent Howard.

7    Objection, assumes facts not in evidence.

8         THE COURT:  Overruled.

9    Q.   (BY MR. SCABAVEA)  I will ask it again.

10   A.   Yes, can you repeat that?

11   Q.   I will rephrase.

12        Mr. Luton received a lot of packages; is that

13   correct?

14   A.   Our investigation focused on the packages that were

15   known to us via Ms. Olson.

16   Q.   Would you be surprised if he sent and received about

17   700 packages in about a 2-year time frame?

18        MS. WEISS:  Objection, assumes facts not in

19   evidence?

20        THE COURT:  Sustained.

21   Q.   (BY MR. SCABAVEA)  Would Mr. Luton receive a small

22   payment for the packages he received?

23   A.   Can you state that again, I didn't understand?

24   Q.   Would Mr. Luton receive a small payment for the

25   packages he sent?

1          MS. WEISS:  Objection, calls for speculation.

2          THE COURT:  She can answer if she knows.

3          THE WITNESS:  I am not sure if that -- can you give

4   me more information about that?

5   Q.   (BY MR. SCABAVEA)  Sure.  So, when he would send

6   packages, were you able to ascertain whether or not he

7   received money from doing so, at all?

8          MS. WEISS:  Objection, assumes facts not in

9   evidence.  We don't have any evidence about the defendant

10  sending packages versus receiving them.

11         THE COURT:  Sustained.

12         MR. SCABAVEA:  I'll correct, I mean received

13  packages.  My correction, Your Honor.

14         THE COURT:  Well, restate it.

15         MR. SCABAVEA:  Thank you, Your Honor.

16  Q.   (BY MR. SCABAVEA)  Were you aware of any money or

17  small amounts of money that Mr. Luton would receive by

18  receiving packages?

19  A.   Not that our investigation showed.

20  Q.   But you did investigate him extensively; is that

21  correct?

22  A.   Correct.

23  Q.   Regarding the numerous packages that he received, is

24  there any evidence that he actually opened the packages?

25  A.   I'm not aware of whether or not he did.  I was not

1    there at the time of the package receipt.

2    Q.   I understand, but do you have any evidence that he

3    opened the packages, at all?  Did you recover any evidence

4    that says -- that would show that he opened these

5    packages?

6    A.   No.  No, sir.

7    Q.   Any video of him opening packages?

8    A.   No, sir.

9    Q.   Sandra Pitcher was a subject of your investigation as

10   well; is that correct?

11   A.   She was a person in our investigation.  I wouldn't

12   call her a subject of our investigation, no.

13   Q.   Is it fair to say she was somebody you investigated?

14   A.   She is somebody that we looked into, of course.

15   Q.   Did you believe she was involved in the lottery

16   scheme, at all?

17   A.   We did not know at the time of the receipt of

18   information whether or not she was involved, which is why

19   we did further investigation.

20   Q.   But you assert that Ms. Pitcher did pay Mr. Luton

21   some money during the scheme; is that correct?

22   A.   That is correct, yes.

23          MR. SCABAVEA:  Your Honor, permission to publish

24   Government's Exhibit No. 56.

25          THE COURT:  You may.

1          MR. SCABAVEA:  Thank you.

2     Q.   (BY MR. SCABAVEA)  I am now publishing Government's

3     Exhibit 56.  Can you see that okay, Ms. Howard?

4     A.   Yes, I can.

5     Q.   What is that?

6     A.   That is a cashier's check from Sandra Pitcher on

7     April 3, 2018, in the amount of $9,000 to the order of

8     Leonard Luton, from Huntington National Bank.

9     Q.   If we turn to page 5 of that exhibit.  Can you tell

10    me what this is?

11    A.   That is the back of the check.

12    Q.   And what do you see on the back of the check?

13    A.   Well, that writing is very small.  I see the date of

14    April 3, 2018.

15    Q.   Did Mr. Luton actually endorse this check?

16    A.   He did not, no.  It was not signed.

17    Q.   So was it deposited into his account without his

18    knowledge?

19    A.   Yes.  Well --

20          MS. WEISS:  Objection, calls for speculation.

21          THE COURT:  Sustained.

22          MR. SCABAVEA:  Your Honor, I will ask it another

23    way, if that is okay.

24          THE COURT:  You may try.

25    Q.   (BY MR. SCABAVEA)  Would this be evidence that

```
 1   Mr. Luton did not --

 2           MS. WEISS:  Objection, calls for speculation.

 3           THE COURT:  Sustained.

 4           MR. SCABAVEA:  Your Honor, permission to publish

 5   Government's Exhibit No. 57.

 6           THE COURT:  You may.

 7   Q.   (BY MR. SCABAVEA)  I am now showing you page 4 of

 8   Government's Exhibit No. 57.  What is that?

 9   A.   It is like the one before; a cashier's check on April

10   6, 2018, from Sandra Pitcher, in the amount of $9,000,

11   paid to the order of Leonard Luton.

12   Q.   Now, turning to page 5 of Government's Exhibit 57,

13   what do you see here?

14   A.   This is the back of the check, sir.

15   Q.   And do you see an endorsement on the back of the

16   check?

17   A.   I do not see a signature, no.

18   Q.   What do you see on the back where the endorsement

19   would be?

20   A.   It says, "credited to the account of the within named

21   payee.  Endorsement guaranteed.  Bank of America NA."

22   Q.   Do you know what that means?

23   A.   That the -- I am assuming that the check was

24   automatically credited.

25           MR. SCABAVEA:  Your Honor, permission to publish
```

1    Government Exhibit 105.

2         THE COURT:  You may.

3         MR. SCABAVEA:  Thank you.

4    Q.  (BY MR. SCABAVEA)  I will start with page 1 of this

5    exhibit -- I will back it up a little bit here.  Can you

6    see it okay?

7    A.  Yes.

8    Q.  So what is this?

9    A.  This is the certified transcription of the voicemails

10   left by Rajay Dobson on Leonard Luton's phone.

11   Q.  What language is this translated from?

12   A.  English Caribbean Creole.

13   Q.  What language do people in Jamaica speak?

14   A.  I know English Caribbean Creole.

15   Q.  Would you be surprised to know that Mr. Luton does

16   not speak English Caribbean Creole?

17        MS. WEISS:  Objection, assumes facts not in

18   evidence.

19        THE COURT:  Sustained.

20   Q.  (BY MR. SCABAVEA)  Do you know if there is another

21   language they speak called Patois?

22   A.  I am not overly familiar with that.

23   Q.  Was this exhibit translated into Patois, to your

24   knowledge?

25   A.  No, not to my knowledge.

1   Q.   I am going to show you page No. 2 of Exhibit No. 105.

2   This was shown to the jury previously; correct?

3   A.   Correct.

4   Q.   Would you agree that by reading this, this doesn't

5   make a whole lot of sense?

6   A.   As I stated earlier, it appears to be some sort of

7   code.

8   Q.   Are you an expert in this kind of code?

9   A.   No, I am not, sir.

10  Q.   I am going to go to the next page, page 3 of Exhibit

11  105.  You read this for the jury, as well.  So, would you

12  also agree that this doesn't make a whole lot of sense?

13  A.   I would restate that it appears that it could be some

14  sort of code that they are using.

15  Q.   Could it also be not code?

16  A.   It could also be, too.

17         MR. SCABAVEA:  Your Honor, may I have a moment,

18  please?

19         THE COURT:  You may.

20         MR. SCABAVEA:  Nothing further, Your Honor.

21         THE COURT:  All right.  Thank you.

22         May this witness -- I am sorry, you may step down.

23         MS. PALUCH:  I had a few questions for redirect.

24         THE COURT:  I am sorry.  I am sorry, Ms. Weiss,

25  redirect?  I apologize.

1                      **REDIRECT EXAMINATION**

2      **BY MS. WEISS:**

3      Q.   Agent Howard, you were asked a question about 10

4      terabytes of data in this case, and you responded 90

5      gigabytes.  Was the 90 gigabytes just what was on the

6      defendant's phone?

7      A.   Correct.

8      Q.   Not the entirety of the case?

9      A.   Correct.

10             MS. WEISS:  Can we please pull up Exhibit 2, page

11     2.

12     Q.   (BY MS. WEISS)  Agent Howard, you were asked a

13     question about whether or not there is any evidence that

14     Mr. Luton was aware of what was in the packages; correct?

15     A.   Correct.

16     Q.   Is this photo of cash, cash that Ms. Olson had

17     delivered?

18     A.   Yes.

19     Q.   And it was found on the defendant's phone?

20     A.   Correct.

21     Q.   Not someone else's phone?

22     A.   No.

23     Q.   Taken by his phone; correct?

24     A.   Correct.

25             MS. WEISS:  If we could move to Exhibit 92.  And if

1    we can blow up the tracking number and the response.

2    Q.   (BY MS. WEISS)  Agent Howard, is this a tracking

3    number that pertained to Ms. Olson mailing an iPhone?

4    A.   Yes.

5    Q.   And how does the defendant respond to that tracking

6    number?

7    A.   "Xmax dat."

8    Q.   And X Max is the type of phone mailed, is it not?

9    A.   Correct.

10   Q.   This is a text message that predates that package

11   arriving at this defendant's address; right?

12   A.   Correct.

13   Q.   Do you consider that to be evidence that the

14   defendant knew what was in those phones --

15   A.   I would.

16   Q.   -- or in those packages, I apologize.

17        Agent Howard, you heard testimony from Caleb

18   Robertson about the interview conducted by him and another

19   FBI agent?

20   A.   Yes.

21   Q.   And they confronted the defendant and said that his

22   girlfriend also had and iPhone X; correct?

23   A.   Yes.

24   Q.   And how did he respond to that?

25   A.   That it was not an iPhone 10.

1   Q.   And had anyone told the defendant that Ms. Olson had

2   mailed iPhone 10s?

3   A.   No.

4   Q.   Was the defendant asked in his interview if he would

5   be angry if what happened to Ms. Olson happened to his

6   grandma?

7   A.   Yes.

8   Q.   How did he respond to that?

9   A.   That he would.

10  Q.   Did anyone tell him what had happened to Ms. Olson?

11  A.   No.

12  Q.   Can we look at Exhibit 56 now, please, and page 6.

13  Page 6, Agent Howard, you were shown a couple of the

14  checks written by Ms. Pitcher to Mr. Luton's account and

15  then deposited into Mr. Luton's account; correct?

16  A.   Uh-huh.

17  Q.   And I believe on your direct testimony you testified

18  that those were deposited because Ms. Pitcher had this

19  defendant's account and routing number; correct?

20  A.   Correct.

21  Q.   Do you ever dispute that those checks were not

22  signed?

23  A.   No.

24  Q.   In fact, those checks were deposited at the counter;

25  right?

1    A.   Correct.

2    Q.   Is that what I am seeing on this document?

3    A.   Yes.

4    Q.   Can you pull up Exhibit 105.  Are these those

5    certified translations, Agent Howard, that the FBI

6    requested?

7    A.   Yes.

8    Q.   Did it take awhile to find an expert to do these

9    translations?

10   A.   Yes.

11   Q.   And, in fact, did we originally request those

12   translations in Jamaica Patois?

13   A.   Yes.

14   Q.   And were we told that Jamaica Patois is actually

15   called English Caribbean Creole for translation purposes?

16   A.   Correct.

17   Q.   Agent Howard, you were asked some questions about --

18   that implied that Mr. Luton doesn't speak this language;

19   right?

20   A.   Yes.

21   Q.   Did the FBI at certain points in time collect jail

22   calls of the defendant?

23   A.   Yes, we did.

24   Q.   And was the defendant speaking in English in those

25   jail calls?

1    A.    No, he was not.

2    Q.    What language was he speaking in those jail calls?

3    A.    English Caribbean Creole.

4    Q.    And did those jail calls have to be translated in

5    order for the FBI to review them, in fact?

6    A.    Yes.

7          MS. WEISS:  One moment, Your Honor.

8          Nothing further from the Government, Your Honor.

9          THE COURT:  All right.  You may step down.

10          THE WITNESS:  Thank you.

11          (Further proceedings had but not transcribed per

12    request of ordering counsel.)

13          **R E P O R T E R ' S   C E R T I F I C A T E**

14

15          I, Darlene M. Martinez, Official Certified

16    Shorthand Reporter for the United States District Court,

17    District of Colorado, do hereby certify that the foregoing

18    is a true and accurate transcript of the proceedings had

19    as taken stenographically by me at the time and place

20    aforementioned.

21          Dated this 16th day of December, 2020.

22

23          _____

24          s/Darlene M. Martinez

25          RMR, CRR