IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 19-cr-00098-CMA-01

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. LEONARD LUTON,

    Defendant.

---

**GOVERNMENT'S POSITION STATEMENT RE LOSS,
RESTITUTION AND FORFEITURE**

---

The United States of America, by Matthew T. Kirsch, Acting United States Attorney for the District of Colorado, through Martha A. Paluch and Sarah H. Weiss, Assistant United States Attorneys, respectfully submits this position statement in advance of the defendant's August 5, 2021 sentencing hearing. In this filing, the government sets forth its argument pertaining to 1) the loss amount to be attributed to the defendant pursuant to U.S.S.G. §§ 1B1.3 and 2B1.1; 2) the amount of restitution the defendant should be ordered to pay to victims S.O. and S.P.; and 3) the amount of the forfeiture money judgment it will request that the Court impose.

    **I.**    **Burden of Proof**

At the sentencing hearing, the government bears the burden of proving all three amounts at issue by a preponderance of the evidence. *See United States v. Wright,* 848 F.3d 1274, 1284 (10th Cir. 2017) (loss amount); *United States v. Anthony,* 942 F.3d 955, 964 (10th Cir. 2019) (as to restitution, the government must prove the amount of

loss sustained by a victim as a result of the offense of conviction, by a preponderance of the evidence) (citing 18 U.S.C. § 3664)); *United States v. Bader,* 678 F.3d 858, 893 (10th Cir. 2012) ("[a] forfeiture judgment must be supported by a preponderance of the evidence") (citations omitted)).

The preponderance of the evidence standard requires the government to "show it is more likely than not that the factual matters on which it bears the burden are true." *United States v. Riesterer,* 224 F.Supp.3d 1156, 1167 (D. Colo. 2016) (citing *United States v. Craig,* 808 F.3d 1249, 1257 n.7 (10th Cir. 2015)). The government will meet its burden of proving all three amounts at the sentencing hearing through the testimony of FBI Forensic Accountant Matt Morgan.

II.     **The loss amount is over $550,000 but less than $1.5 million for a 14-level increase in the base offense level pursuant to U.S.S.G. § 2B1.1(b)(1)(H)**

The defendant was convicted at trial of conspiring with his co-defendant Rajay Dobson to defraud S.O., an elderly Estes Park woman, by convincing her she needed to pay "fees" in order to receive her alleged lottery winnings. The defendant was also convicted of eight of the nine mail fraud counts. The government proved at trial through the testimony of Mr. Morgan that S.O. lost more than the $700,000 as alleged in the Superseding Indictment. ECF 45. The summary chart prepared by Mr. Morgan, Gov't Ex. 128, admitted at trial, detailed payments made and mailing fees incurred by S.O. The total as reflected in this summary chart is **$776,725.58**. This exhibit is attached to this pleading for ease of reference as Attachment A. Mr. Morgan testified this was a conservative estimate as he only included in this chart mailings and fees for which the government was able to obtain a certified record from 1) the bank from which S.O.

withdrew the funds, 2) Western Union, and/or 3) the shipping company she used. He did not include in Gov't Ex. 128 additional mailings made by S.O. These additional mailings are proved by a preponderance of the evidence by the testimony of S.O., and further bolstered by non-certified receipts S.O. saved and placed in an envelope directly after mailing each package. As S.O. described at trial, after her family discovered that she was being scammed, she prepared a spreadsheet with the help of her family, using the saved receipts, along with her bank statements and other evidence. A copy of S.O.'s spreadsheet is attached hereto as Attachment B.

Government's Sentencing Exhibit 1, entitled Summary of Loss Attributed to Leonard Luton, attached hereto as Attachment C, is a summary chart prepared by Mr. Morgan. Mr. Morgan will testify at sentencing that he took Gov't Trial Ex. 128 (Attachment A) and added the additional mailings/fees listed on S.O.'s spreadsheet for which S.O. had receipts, and for the majority of which the bank statements/shipping records and/or other trial evidence corroborated the mailing, into that chart. The entries for these additional payments are designated on the chart in blue. As set forth in this exhibit, Mr. Morgan will testify that the loss in this case is **$971,455.41.**

In addition, S.P. of Grandville, Michigan submitted a victim impact statement to the Probation Office stating that she lost **$3500** as a result of this lottery scheme, and she attached supporting credit card statements. As set forth in her statement, S.P. had also been told she won a sweepstakes. S.P. was told she needed to pay taxes in order to receive her winnings and was told to use her credit cards for cash advances and to buy gift cards. ECF 109-2 at Pages 4-9. Substantial evidence was submitted at trial regarding S.P.'s depositing of S.O. funds into the defendant's account and in fact S.P.'s

phone contained the defendant's name and bank account number.

The government submits that the entire amount of the loss -- **$971,455.41** for S.O. and **$3500** for S.P., for a total of **$974,955.41** -- is attributable to the defendant pursuant to the Relevant Conduct provisions set forth at U.S.S.G. § 1B1.3.

### a. Legal Framework

Commentary Note 3(A) to § 1B1.3 provides that with respect to jointly undertaken criminal activity, such as a scheme to defraud, the defendant is accountable for the acts and omissions of others that were: "(i) within the scope of the jointly undertaken criminal activity; (ii) in furtherance of that criminal activity; and (iii) reasonably foreseeable in connection with that criminal activity"; *see also United States v. Gordon,* 710 F.3d 1124, 1165 (10th Cir. 2013) ("reasonably foreseeable gains attributable to co-conspirators' acts are properly tabulated in § 2B1.1(b)(1)'s offense-conduct computations") (citations omitted).

The defendant was convicted of conspiring with Rajay Dobson to defraud S.O. To determine a particular defendant's accountability for the conduct of others, the Court "must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake." *United States v. Patton,* 927 F.3d 1087, 1094 (10th Cir. 2019); *United States v. Godinez-Perez,* 864 F.3d 1060, 1063 (10th Cir. 2016) (citing § 1B1.3 cmt. n.3(B)); *United States v. Green,* 175 F.3d 822, 837 (10th Cir. 1999) ("the district court must make particularized findings tying the defendant to the relevant conduct used to increase the base offense level") (citation omitted).

### b. The scope of the criminal activity the defendant agreed to jointly undertaken

Factors relevant to determining the scope of jointly undertaken criminal activity

4

include 1) "the existence of a single scheme"; 2) "similarities in modus operandi"; 3) "coordination of activities among schemers"; 4) "pooling of resources or profits"; 5) "knowledge of the scope of the scheme"; and 6) the "length and degree of the defendant's participation in the scheme." *United States v. Salem,* 657 F.3d 560, 564 (7th Cir. 2011) (citations omitted).

The evidence of the conspiracy as established at trial clearly satisfies each of these factors. A summary of the facts proved at trial is set forth in the Government's Sentencing Statement, ECF 108 at 3-5. For purposes of this pleading, the government highlights those aspects of the evidence that satisfy each of the foregoing elements.

1. **The existence of a single scheme**

The jury found beyond a reasonable doubt that the defendant conspired with Rajay Dobson to commit a single scheme: to defraud S.O. by convincing her she had won a lottery and had to mail packages of cash and iPhones in order to receive her winnings. The objective of this single scheme was for the defendant and Rajay Dobson to take as much money from S.O. as they could.

2. **Similarities in modus operandi**

As for the wiring of funds, "Frank White" directed S.O. to wire funds to S.P. The trial evidence established that S.P. was directed to deposit those funds in the defendant's bank account. As for the mailings, each one followed the same pattern: the defendant would provide Dobson with the address of one of his friends where the defendant knew he would be able to retrieve the mailing. Dobson, acting as "Frank White," would provide that address and a false name to S.O. S.O. would then mail packages of cash and/or iPhones to the names and addresses provided by White. S.O.

testified she would call "Frank White" and read to him the long FedEx or UPS tracking number for each mailing. Dobson would then text that exact same tracking number to the defendant, as established at trial by the text messages retrieved from the defendant's phone.

The defendant confirmed this evidence at trial: he testified that he texted addresses for receipt of packages to Dobson and that Dobson texted to him names and the tracking numbers for the packages so he would know when and where to go and what to pick up. The defendant also testified that he and Dobson texted regarding whether the package was being sent via UPS or FedEx. Attachment D (copy of the defendant's trial testimony) at 66, 71-72, 129-132, 142. The defendant's retrieval of these packages was proven through Special Agent Hoyland's Expert Report, Gov't Ex. 126C, which documented the presence of the defendant's phone at the addresses where 19 packages were sent by S.O. on the day they arrived. In addition, one of the cell phones S.O. purchased was mailed to the defendant's address and found on his person at the time of his arrest on January 22, 2019.

### 3. Coordination of activities among schemers

The previous paragraph establishes the coordination between the defendant and Dobson to successfully effectuate the scheme. Without persistent, smooth-talking, and manipulative Dobson repeatedly calling S.O., she does not send the mailings. *Cf. United States v. Parkinson,* 657 F. Appx. 853, 856 (11th Cir. 2016) (in "fraud cases, the repeated targeting of a victim, a practice called 'reloading,' constitutes evidence that the defendant knew the victim was particularly vulnerable to the fraud scheme"). Without the defendant's address and those of his friends in the United States, there is nowhere

for Dobson to tell S.O. to mail the packages. The defendant is reliant on Dobson to defraud S.O. while Dobson is reliant on the defendant to retrieve the packages in the United States and wire money to Jamaica.

### 4. Pooling of resources or profits

During the conspiracy, Stacy Byfield repeatedly wired money to Jamaica as requested by the defendant. The text messages proved that soon after S.O. handed over $65,000 in person and mailed packages of cash, the defendant sent Byfield text messages directing her to wire funds via Western Union to Jamaica. Through her plea agreement, Byfield explained that on this and other occasions when the defendant asked her to wire funds, she asked others, and paid them a small fee, to wire the money for her, because she was blocked from sending money by Western Union. She utilized multiple senders on the same day to avoid detection by Western Union and so that any one individual would not expect being paid too often for wiring the funds. Byfield received the money and the names of persons to receive the wired funds from the defendant. Byfield took photos of the receipts, and she texted the photos to the defendant highlighting the tracking number. In addition to having others wire money for him, Byfield admitted that she and others picked up money wired in her and their names via Western Union and gave the money to the defendant. Byfield explained the defendant did this so that he would not have to use his name for receipt of the funds. *See* Byfield Plea Agreement, 19-cr-00207-RBJ, ECF 39 at 8-12 (Attachment E). The defendant confirmed Byfield's statements at trial: he testified that he had several people wire money to Jamaica for him so that any one person wouldn't be blocked by Western Union for making too many transfers. He explained if the amount was over

$300, he had someone else wire it for him. Attachment D at 142-143, 158.

Trial evidence established that Dobson resides in Jamaica and has not returned to this country since 2017. Given the overwhelming evidence of the defendant's collaboration with Dobson to defraud S.O. and the multiple wire transfers of money the defendant directed others to make to Jamaica soon after picking up S.O.'s money, this Court can find, by a preponderance of the evidence, that the defendant and Dobson shared in the profits from this scheme.

### 5. Knowledge of the scope of the scheme

The prior paragraphs set forth the evidence that establishes the defendant's knowledge of the scope of the lottery scheme and his willing participation in it. Further trial testimony from the defendant that supports this conclusion is as follows:

- The defendant testified that he and Rajay Dobson both previously lived in Trelawny, Jamaica, and that he talked to Dobson up to five times a day. Attachment D at 29, 60-61.

- The defendant testified that he set up and registered the MagicJack 702-xxx-2033 number. The defendant testified that after he registered that number, he texted that number to Dobson. This is the exact number Dobson, a/k/a "Frank White," used to call S.O. throughout the lottery scheme. *Id.* at 85, 122-123, 133.

- The defendant testified that he lived at 1307 Pacific Street, Apartment 6D, Brooklyn, New York. This is the same address where Frank White directed S.O. to mail cell phones. Upon his arrest at S.O.'s home in January 2019, the defendant was found to be in possession of one of the cell phones

    S.O. had purchased and mailed to the defendant's address. This fact was proved at trial by the unique identifying number of the cell phone taken from the defendant's person; it was the same as that for the cell phone S.O. purchased as proven by the certified receipt. *Id.* at 33, 112-113.

- The defendant testified that Dobson paid him $1,000 to drive from the defendant's home in Brooklyn, New York to Estes Park, Colorado to pick up a package from someone at S.O.'s address. The defendant admitted that Dobson texted him S.O.'s address on numerous occasions. He admitted that he had been in Estes Park, Colorado in early October 2018 when S.O. handed over $65,000 in cash. The defendant admitted that a photograph of this cash – bundled in rubber bands with a manila envelope in the background – was retrieved from his phone. The defendant's admission that he had been in Estes Park in October of 2018 directly contradicted his post-arrest statement to law enforcement that he had never been to Colorado before his January 2019 trip. *Id.* at 40-44, 49-50, 109-112, 118-119, 121-122, 125-126.

- The defendant testified that he had at least four phone numbers for Dobson saved in his phone. He testified that Dobson's numbers were saved in the defendant's phone under variations of Dobson's nickname of "Bird" as well as other nicknames (including, "Budman," "Bird Lime," "Ex-Budman," and "Fry"). Two of these numbers were used to text tracking numbers to the defendant. A photograph of Dobson was associated with one of these contacts for Dobson retrieved from the defendant's phone. At

trial, the defendant identified Dobson as the man in that photograph. The photograph depicts Dobson with a cigarette in his mouth, along with his son. Attachment D at 63, 122-124. This photograph of Dobson matches the photograph of Dobson contained in the certified travel records admitted at trial. Gov't Ex. 118.

- At trial, the government presented certified bank records that established the withdrawals of funds from S.O.'s bank accounts, and the deposits into, and withdrawals of cash from, the defendant's bank accounts. Many of these deposits into the defendant's bank accounts occurred at or near the dates of deliveries of cash from S.O. to addresses under the defendant's control. Bank records also established that the defendant paid his friends hundreds of dollars around the time of deliveries of S.O.'s packages to their addresses.

### 6. Length and degree of the defendant's participation in the scheme

The defendant's involvement throughout the duration of this conspiracy was established at trial. The defendant testified that he had been picking up packages for Dobson for the past year prior to his arrest in January 2019, which was approximately the same period of time Frank White had been directing S.O. to mail packages related to this lottery fraud. Attachment D at 108. In addition, the first name recorded by S.O. in her spreadsheet (Attachment B) is that of S.P., and the defendant's connection to S.P. was clearly established at trial. The last event to occur in this conspiracy was the defendant's arrest at S.O.'s home.

### c. The conspirators' conduct was in furtherance of the jointly undertaken criminal activity

The defendant and his conspirator Dobson acted in ways to further the objectives of the jointly undertaken criminal activity – defrauding S.O. out of as much money as possible. The paragraphs above detail how the defendant and Dobson were able to achieve this goal through their joint efforts. Each conspirator contributed to the conspiracy and worked "together in [the] jointly undertaken criminal activity, as opposed to working independently and autonomously." *Salem,* 657 F.3d at 564-65. This conspiracy was successful because the defendant and Dobson were in constant contact with each other throughout the scheme, each performed his respective role, and they relied on each other to do so.

### d. The conspirator's conduct was reasonably foreseeable in connection with the criminal activity

Dobson's conduct in connection with the scheme was *known and encouraged by* this defendant, not just reasonably foreseeable to him. For example, the defendant texted Dobson C.H.'s and Byfield's addresses multiple times and with respect to Byfield's address, told Dobson, "use this," for the mailing of packages. Attachment D at 135-138. The defendant also admitted he set up and texted to Dobson the phone number used in the scheme. *Id.* at 85 and 133.

In any event, the test "is reasonable foreseeability, not actual knowledge." *United States v. Snow,* 468 F. App'x 830, 837 (10th Cir. 2012); *United States v. Aslan,* 644 F.3d 526, 537 (7th Cir. 2011) ([f[oreseeability is not equivalent to actual knowledge") (citation omitted). Indeed, a defendant "need not know of a co-schemer's actions for those actions reasonably to be foreseeable to the defendant." *Aslan,* 644

F.3d at 537. Nor does the inquiry require "that a defendant interact with, or even know of, [his] fellow coconspirators, provided of course that the involvement of the others and their actions in furtherance of the conspiracy were reasonably foreseeable." *United States v. Sykes,* 774 F.3d 1145, 1151 (7th Cir. 2014) (citing *United States v. Wang*, 707 F.3d 911, 916 (7th Cir. 2013), for the proposition that "a defendant could reasonably foresee the loss caused by forty-one other coconspirators even though he only knew of three others that were involved in the conspiracy"). The Court can base its reasonable foreseeability determination "on whether [the defendant] demonstrated a substantial degree of commitment to the conspiracy's objectives, either through his words or his conduct." *Wang*, 707 F.3d at 916 (citations omitted). And a defendant's enhancement under the loss table "holds him responsible for losses caused by the reasonably foreseeable acts of his co-conspirators, with no consideration given to the degree of his culpability." *United States v. Gallant,* 537 F.3d 1202, 1240 (10th Cir. 2008) (reversing district court's loss calculation because it did not include "losses attributable to the reasonably foreseeable acts of the defendant's co-conspirators" and instead, "used gain as a proxy for each defendant's culpability").

Without the defendant providing the addresses for the mailings and picking up the packages here in the United States, this scheme does not work. For these reasons, the government submits the defendant is just as culpable, if not more so, than Dobson. However, even if this Court finds the defendant played a lesser role in this conspiracy than Dobson, he is still accountable for the acts of Dobson as they were reasonably foreseeable to him. *Cf. United States v. Singh*, 291 F.3d 756, 761-62 (11th Cir. 2002) ("the well- established principle that an act may be imputed from one co-conspirator to

another" applies to enhance sentence for a substantial part of the fraud taking place outside of the United States; the defendant need not personally take action from outside the United States, it is sufficient if his co-conspirator did and those actions were reasonably foreseeable to the defendant).

### III.  The defendant should be ordered to pay $881,447.41 in restitution to S.O. and $3500 to S.P.

The Mandatory Victims Restitution Act of 1996 made restitution mandatory in certain cases, "particularly crimes of violence and theft crimes with identifiable victims who 'suffered a physical injury or pecuniary loss.'" *United States v. Serawop,* 505 F.3d 1112, 1117 (10th Cir. 2007) (citing 18 U.S.C. § 3663A(c)(1)); *United States v. Burks,* 678 F.3d 1190, 1198 (10th Cir. 2012) (same). At sentencing, Mr. Morgan will testify that S.O. is due **$881,447.41** in restitution.  *See* Gov't Sentencing Exhibit 2, entitled, Restitution For S.O. (Attachment F). Mr. Morgan will testify that he deducted from the loss amount (Gov't Sentencing Exhibit 1) any amounts which were returned to S.O. during the scheme, from, for example, UPS or a bank. In addition, S.P. submitted evidence supporting her claim that she lost **$3500** in this scheme, and the defendant's connection to S.P. was clearly proven at trial. Accordingly, at sentencing, the government will request that the Court order that the defendant pay these amounts to these two victims, for a total amount of restitution of **$884,947.41.** The government recommends that this amount be ordered jointly and severally with Rajay Dobson in the event Rajay Dobson is convicted of this conspiracy later.

### IV. Forfeiture

#### a. Procedural Background

On June 8, 2020, the Court entered a Preliminary Order of Forfeiture for a Personal Money Judgment Against Defendant Leonard Luton (the "Preliminary Order") pursuant to 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c), and Fed. R. Crim. P. 32.2. ECF 128. The Preliminary Order was for an as yet undetermined amount and subject to amendment at the sentencing hearing after the Court determines the amount of proceeds obtained by the defendant.

#### b. Legal Framework

Criminal forfeiture is mandatory in this case pursuant to 18 U.S.C. § 981(a)(1)(C) as incorporated by 28 U.S.C. § 2461.[1] *See United States v. Vampire Nation*, 451 F.3d 189, 198-201 (3d. Cir. 2006) (28 U.S.C. § 2461(c) authorizes a money judgment for proceeds obtained as a result of mail fraud); *United States v. Brummer*, 598 F.3d 1248, 1250-1251 (11th Cir. 2010) (determining that forfeiture is not discretionary pursuant to Section 2461(c), stating; "[t]he word 'shall' does not convey discretion. It is not a leeway word.") (citation omitted).

#### c. Determination of Amount of Proceeds Generally

The government's burden is to establish the amount of the criminal forfeiture money judgment by a preponderance of the evidence. *United States v. Bader*, 678 F.3d 858, 893 (10th Cir. 2012). The Court may rely on evidence "already in the record," such as evidence introduced at trial, and "any additional evidence or information submitted by

---

[1] The procedures of 21 U.S.C. § 853 also apply to all criminal forfeiture cases pursuant to 28 U.S.C. § 2461(c).

the parties and accepted by the court as relevant and reliable." Fed. R. Crim. P. 32.2(b)(1)(B).

In order to determine the amount of a forfeiture money judgment, the Court must determine the amount of proceeds the defendant obtained as a result of the offense for which he was convicted. The term "'[p]roceeds' means property of any kind obtained *directly or indirectly*, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto." Title 18, United States Code, Section 981(a)(2)(A) (emphasis added). "In other words, '[p]roceeds are property that a person would not have but for the criminal offense . . ..'" *United States v. Yass*, 636 F.Supp. 2d 1177, 1184 (D. Kan. July 14, 2009) (citation omitted).

### d.  Proceeds from a Fraud Scheme

Forfeiture of the total amount of proceeds the defendant obtained through a scheme to defraud should be ordered forfeited. As stated by the Supreme Court, the purpose of forfeiture is to disgorge the "fruits of illegal conduct." *United States v. Ursery*, 518 U.S. 267, 284 (1996). As a result, forfeiture is not necessarily based on loss, but on the proceeds the defendant obtained from his criminal conduct. *See United States v. Webber,* 536 F.3d 584, 603 (7th Cir. 2008); *United States v. Kalish*, No. 06 CR 656, 2009 WL 130215, at *4 (S.D.N.Y. Jan. 13, 2009) (amount of proceeds can exceed the victims' losses and a forfeiture of $8.4 million in proceeds was appropriate even though the loss to identified victims was only $1.2 million).

Therefore, although criminal forfeiture requires a conviction on a criminal count for which forfeiture is authorized, when that count of conviction is a scheme, the fruits are all the "proceeds generated under a fraud scheme." *Yass*, 636 F. Supp. 2d at 1186

(ordering forfeiture of all funds obtained through the fraud scheme stating that "[c]ourts have ordered forfeiture of property derived from uncharged and acquitted conduct that is part of the same scheme or enterprise as convicted conduct"), *partially replaced by United States v. Blechman,* No. 08-40008, 2010 WL 235035 (D. Kan. Jan. 8, 2010) (defendants could deduct costs); *see United States v. Venturella*, 585 F.3d 1013, 1017 (7th Cir. 2009) ("forfeiture is not limited solely to the amounts alleged in the count(s) of conviction."). Forfeiting all the proceeds of a scheme makes sense, because the government does not need to establish each instance of mail fraud to establish beyond a reasonable doubt a fraudulent scheme exists. Instead, "the mailings need only be incident to an essential part of the scheme or a step in [the] plot." *Venturella*, 585 F.3d at 1017 (citation and quotation marks omitted, modification in original). Indeed, a conviction related to a particular mail fraud count, often by themselves, do "not adequately account for the proceeds obtained from [defendant's] crime[s] of conviction." *Id*.

Here, the defendant was convicted of a mail fraud scheme. The case law supports, and the government requests, that the criminal forfeiture amount in this case include all of the proceeds the defendant obtained directly or indirectly as a result of the mail fraud scheme, including the proceeds from Count Four of which he was acquitted.

Government's Sentencing Exhibit 3, entitled Forfeiture Amount Attributed to Leonard Luton, attached hereto as Attachment G, is a conservative calculation of the gain directly attributable to this defendant. Specifically, the government will request at sentencing that the Court issue a final order of forfeiture in the amount of **$484,123.16**.[2]

---

2 The government did not include in this calculation the $3500 lost by S.P. when she

The government will prove this amount through the testimony of Mr. Morgan at sentencing by a preponderance of the evidence. In sum, the government attributed to the defendant amounts/items that were mailed to 1) S.P., 2) the defendant's address, 3) the addresses of his friends; and 3) the addresses where Special Agent Hoyland's report placed the defendant's cellphone on the date of delivery.

### Sentencing Hearing

The government advises the Court that S.O. and her son M.O. will attend the August 5, 2021 sentencing hearing and wish to address the Court.

Respectfully submitted this 22nd day of July, 2021.

                MATTHEW T. KIRSCH
                Acting United States Attorney
                District of Colorado

By:   s/ *Martha A. Paluch*
       MARTHA A. PALUCH
       SARAH H. WEISS
       Assistant United States Attorneys
       1801 California Street, Suite 1600
       Denver, CO 80202
       Telephone 303-454-0100
       Facsimile 303-454-0402
       Martha.Paluch@usdoj.gov
       Sarah.weiss@usdoj.gov

---

purchased gift cards as directed by "David" as those purchases were not part of the charged scheme.

## CERTIFICATE OF SERVICE

I certify that on this 22nd day of July, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system that will send notification of such filing to all counsel of record in this case.

                                                    s/ *Martha A. Paluch*
                                                    MARTHA A. PALUCH
                                                    SARAH H. WEISS
                                                    Assistant United States Attorneys
                                                    1801 California Street, Suite 1600
                                                    Denver, CO 80202
                                                    Telephone 303-454-0100
                                                    Facsimile 303-454-0402
                                                    martha.paluch@usdoj.gov
                                                    Sarah.weiss@usdoj.gov