**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 19-cr-00098-CMA-1

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**LEONARD LUTON,**

**Defendant.**

_____

**REPORTER'S PARTIAL TRANSCRIPT**
**(Jury Trial Day 3 -- Testimony of**
**Dr. D. Shadel and L. Luton)**

_____

        Proceedings before the HONORABLE CHRISTINE M.
ARGUELLO, Judge, United States District Court, for the
District of Colorado, commencing at 8:50 a.m. on the 12th
day of February, 2020, Alfred A. Arraj United States
Courthouse, Denver, Colorado.

                **A P P E A R A N C E S**

**FOR THE PLAINTIFF:**
MARTHA A. PALUCH and SARAH H. WEISS, U.S. Attorney's
Office, 1801 California St., Suite 1600, Denver, CO 80202

**FOR THE DEFENDANT:**
MARK EDWARD SCABAVEA, Attorney at Law, 301 Sheridan Blvd.,
Lakewood, CO 80226

**ATTACHMENT D**

1          (A break is taken from 9:20 a.m. to 9:34 a.m.)

2          THE COURT:  All right.  Are we ready to bring the

3    jury in?

4          MR. SCABAVEA:  Yes, Your Honor.

5          THE COURT:  All right.  Ms. West, would you please

6    bring in the jury.

7          (In the presence of the jury.)

8          THE COURT:  All right.  You may be seated.

9          Mr. Scabavea, the defense may proceed.

10          MR. SCABAVEA:  Thank you, Your Honor.  The Defense

11    calls the Defendant, Leonard Luton.

12          THE COURT:  Mr. Luton, if you would step up here.

13          THE DEFENDANT:  Thank you.

14          COURTROOM DEPUTY:  May I have everyone's attention,

15    please?

16          Raise your right hand.

17                         **LEONARD LUTON**

18    having been first duly sworn, testified as follows:

19          THE WITNESS:  I do.

20          COURTROOM DEPUTY:  Please be seated, sir.  Please

21    state your first and last names for the record, and spell

22    it.  Speak into the microphone.

23          THE WITNESS:  Thank you.  Good afternoon.  My first

24    name is L-E-O-N-A-R-D.  Last name L-U-T-O-N.

25          THE COURT:  You may proceed.

**ATTACHMENT D**

```
 1                      DIRECT EXAMINATION

 2   BY MR. SCABAVEA:

 3   Q.   Mr. Luton, where were you born?

 4   A.   I was born in Jamaica.

 5   Q.   Do you have any brothers or sisters?

 6   A.   Yeah.  I have nine brothers.

 7   Q.   What are their names?

 8   A.   I have Leighton, Rajive, Andre, Orville, Peter,

 9   Damion, Lon.

10   Q.   Where do they live?

11   A.   I have three in Florida, one in Jersey, one in Miami,

12   and the rest in Jamaica.

13   Q.   How is your relationship with them?

14   A.   I am the middle child, so it goes both ways.

15   Q.   Understand.  Where did you go to school?

16   A.   I went to Wolmers Boys High School -- Wolmers Boys

17   High School.  And then I went to the University of West

18   Indies, undergraduate degree in sociology.

19   Q.   Where did you live in Jamaica?

20   A.   Well, I lived originally in Spanish Town.  Then I

21   moved to Clark's Town, Trelawny.

22   Q.   What were your hobbies?

23   A.   Hobbies, mostly music.

24   Q.   Did you play any sports?

25   A.   A little bit of soccer.  That's it.
```

**ATTACHMENT D**

1    Q.    Do you have any children?

2    A.    Yes, I have three kids.

3    Q.    What are their names?

4    A.    Well, I have Kal Luton.  Then I have Leonard Luton.

5    Then I have Zaine Luton.

6    Q.    Where do they live?

7    A.    Well, my daughter lives in Atlanta.  My other two

8    kids are in Jamaica.

9    Q.    How often do you communicate with them?

10   A.    As often as I can, probably like six, seven times a

11   day.

12   Q.    Who is their mother?

13   A.    My eldest, this is my daughter, her mom lives with

14   her, and she is Kadrian Palme.  And my Zaine, her mother

15   with my other son, is Biggie -- that is her nickname, but

16   her real name is Annique Clarke.  They live in Jamaica.

17   Q.    Do you get along with them?

18   A.    Yeah.

19   Q.    How often do you talk with them?

20   A.    Probably three, four times a day.

21   Q.    What is living in Jamaica like?

22   A.    Like, overall, or, like, living conditions?

23   Q.    Yes.

24   A.    We are a Third World country, as you know, so certain

25   opportunities we don't have.  Like, every household is not

**ATTACHMENT D**

1    equipped with running water or lights.  So it is kind of

2    extreme.

3    Q.   Did you work in Jamaica?

4    A.   Yeah.

5    Q.   What did you do?

6    A.   I used to work for the customs firm, where I would

7    drive a truck for the customs firm.

8    Q.   When you lived in Jamaica, did you have a credit

9    card?

10   A.   No, not really.  It is kind of hard to have a credit

11   card in Jamaica.

12   Q.   Why is that?

13   A.   We don't have a lot of banks.  We have the Bank of

14   Jamaica, that is one, and we have an outside bank called

15   Scotiabank, which is from Canada.  So, we don't have --

16   you do have people with cards, but it is not accessible

17   for the average person.

18   Q.   Do any of your family or friends have credit cards?

19   A.   I would figure so, some of them.

20   Q.   Are people in Jamaica able to order from Amazon.Com?

21   A.   You can order, but you will never get it.  How are

22   you going to get it?  Your credit card cannot order

23   anything.  And I intend to explain that later on.  You

24   cannot buy -- say, for instance, you see something online

25   and you would like to purchase it, you would have to have

**ATTACHMENT D**

1   a third-party person to purchase it for you.

2        There is no way -- your credit card, nothing

3   outside of America, is not valid on, like, e-Bay, Amazon,

4   none of those entities.  None.  So it is very almost

5   impossible without a third party.

6   Q.   When did you first come to the United States?

7   A.   The very first time was sometime in the '90s.  I

8   don't remember the exact time.

9   Q.   When did your mother come to the United States?

10  A.   About 30-some years ago; probably like 33, 34 years

11  ago.

12  Q.   Why did you come to the United States?

13  A.   To try to make better life.  Schooling, for one, and

14  my education.

15  Q.   What is your current citizenship status?

16  A.   I am a permanent resident.

17  Q.   How did you become a permanent resident of the United

18  States?

19  A.   It's a 10-year procedure.  It took 10 years to

20  actually become a permanent resident.  Meaning, for

21  instance, you have, like, three to four interviews you do

22  every year, including police record and medical record,

23  where they do the last Friday of the second month

24  continuously.  So you do it for, like, 6 years in

25  continuance.  Every year they do interview, background

**ATTACHMENT D**

1    check, police report.  But it is a tedious procedure, and

2    it takes a lot of money.

3    Q.   How long did it take you to become a permanent

4    resident?

5    A.   Ten years.

6    Q.   Before all of the events that led you to be in the

7    courtroom today, where did you live?

8    A.   Brooklyn, New York.

9    Q.   To be clear, is New York State divided into boroughs?

10   A.   Yes, sir.

11   Q.   And Brooklyn is one of those boroughs?

12   A.   Yes, sir.

13   Q.   Why did you decide to live in Brooklyn?

14   A.   That is where my mom lives.  I live with my mom.

15   Q.   Do you have any other family that lives in Brooklyn?

16   A.   I have an uncle that lives, like, two blocks, as we

17   say, from the family.

18   Q.   Where do you live in Brooklyn?

19   A.   1307 Pacific Street, Apartment 6D.

20   Q.   Do you live with anybody?

21   A.   My mom and my little brother.  One more brother.

22   Q.   What do you do for a living?

23   A.   Well, I am a DJ, but most of all -- a DJ at night,

24   three nights a week in different clubs, whichever you get

25   a call.  But, most of all, I do computer repairs,

**ATTACHMENT D**

1    cellphone repairs.  But I have a little online business

2    that I started like 2-and-a-half years ago.

3    Q.   Let's talk about being a DJ.  First, how did you

4    become a DJ?

5    A.   I have been doing it through high school, after high

6    school, many, many years.  It is a passion for me.

7    Q.   Who taught you to become a DJ?

8    A.   My father, I guess.  He was a DJ also.

9    Q.   How much money do you make as a DJ?

10   A.   It varies, because as -- what you have to understand

11   is we, like, freelance in New York.  So he would throw me

12   a gig, so he would pay me cash, while he gets a check.  So

13   probably I make like sometimes 34-, 3,500 a month.  It

14   depends.

15   Q.   How are you paid?

16   A.   Cash mostly.

17   Q.   You said you also do computer repairs?

18   A.   Yes, I do.

19   Q.   How long have you done that for?

20   A.   Probably like 15, 20 years.

21   Q.   Why did you get started in that?

22   A.   A passion.  I fix things.  I am a gadget guy.

23   Q.   What else do you do for a living?

24   A.   Apart from that, like, I do mechanic work.  Like, my

25   car that is here, I have six stacks of tools in it.  I

**ATTACHMENT D**

1    have a whole lot of -- yeah.

2    Q.   How long have you been doing that for?

3    A.   Many years, too.

4    Q.   I want to talk to you about packages.

5    A.   Uh-huh.  No problem.

6    Q.   Do you receive packages from people?

7    A.   Yeah, many.

8    Q.   Why do you receive packages?

9    A.   That is what I was trying to explain earlier.  What I

10   do is I have an online business, where people in Jamaica

11   aren't able to buy stuff online.  So what my little thing

12   does is I provide them with the means of getting the stuff

13   online without having to go through a third-party

14   business.

15        So, what they will do is select the item they want

16   online, send me the item number, then I purchase those

17   items online.  That is how it is.  If not, and you don't

18   trust me to buy the right items, because say a woman she

19   is buying a wig, I might not know what type of wig she

20   wants, so she would often buy it, and then -- you know

21   what I mean, I provide her with an address, and she mails

22   it to me.

23   Q.   Who do you receive packages from?

24   A.   Just about every -- all of the persons that I buy

25   anything for.

**ATTACHMENT D**

1   Q.   I know we briefly discussed this, but who orders

2   these packages?

3   A.   Sometimes the customer, sometimes me.

4   Q.   Where do these packages get delivered?

5   A.   I live in an apartment building.  I don't know if you

6   understand or know what it is like, but it is a little

7   two-bedroom apartment building.  So, for me to receive

8   multiple packages, it could never fit in the little

9   apartment building; right.  So, then what I did eventually

10  was get a UPS account later.  But friends I have who have

11  houses with a garage, that is where I get them.

12  Q.   Where in this apartment complex do the packages come,

13  then?

14  A.   Like, what we do is in the apartment building, there

15  is a table in front, because it is like the projects, kind

16  of.  So the packages are on a table.  When the delivery

17  comes, it is on a table.  When you come in, you look for

18  your name.  If you see anything there for you, you take it

19  up to the apartment building.

20  Q.   So, on first floor?

21  A.   Yeah, in the lobby.

22  Q.   That is where everybody in the apartment gets them?

23  A.   Yeah.  If you don't collect in the lobby, it goes to

24  the basement, to the super's apartment.

25  Q.   You say friends and acquaintances received packages?

**ATTACHMENT D**

1    A.    Yeah, a lot of times, many times.

2    Q.    Who receives them?

3    A.    Like, they get delivered to their house, so they

4    would naturally receive them.

5    Q.    Can you name any of your friends or acquaintances

6    that receive packages?

7    A.    A lot.  From Marlon, Mark, Carlene, Lincoln, Damion,

8    Devon.  A lot.

9    Q.    Can we just go through their full names, each one of

10   those, for the jury?

11   A.    Oh, I am sorry.  Devon Neugent.  Lincoln Haughton.

12         THE COURT:  Hold on.  How do you spell Devon

13   Neugent?

14         THE WITNESS:  D-E-V-O-N N-E-U-G-E-N-T.  Lincoln

15   Haughton.  Carlene Hosang.  Michael Moore.  DeShan

16   Garricks.

17         THE COURT:  How do you spell her name?

18         THE WITNESS:  I am sorry?

19         THE COURT:  How do you spell that name?

20         THE WITNESS:  D-E-S-H-A-N G-A-R-R-I-C-K-S.  Who

21   else?  Pete -- what is his last name -- Salmon,

22   S-A-L-M-O-N.  Pete Salmon.  And plenty of people.

23   Q.    (BY MR. SCABAVEA)  You are good.  Where do these

24   people live?  Do they all live in Brooklyn?

25   A.    They live all over.  All over.  Because most of those

ATTACHMENT D

```
 1   people, if they ordered themselves and it comes to their

 2   address, I still collect it and ship it off for them,

 3   so --

 4   Q.   When you receive the packages, what do you do with

 5   them?

 6   A.   Wait until the time is ready for me to ship all

 7   packages.  I don't want to ship one, I wait until I have,

 8   like 25 or 30, so I can make a skid, then I ship it off.

 9   Q.   Do you ever open these packages?

10   A.   That is a federal crime.  No.

11   Q.   So the answer is no?

12   A.   No.

13   Q.   Never?

14   A.   Never.  It states that on the package.

15   Q.   When you receive these packages, is there any money

16   in it for you?

17   A.   Yeah, they pay me.

18   Q.   To be clear, not money in the packages, but money in

19   the process?

20   A.   Well, yeah.  For me to go pick it up, that is part of

21   how I get paid.  You have to pay me to get a package.  I

22   will not just get up and drive and go get it.  You have to

23   pay me.

24   Q.   So that is how you make some of your money?

25   A.   Of course.
```

**ATTACHMENT D**

1   Q.   About how much money do you make on average per

2   package?

3   A.   It depends on the destination I have to go.

4   Q.   How far do you have to drive?

5   A.   Two blocks around the corner, 20 or $30.  If I have

6   to go to Colorado, 500 to 5,000.

7   Q.   So it depends on distance?

8   A.   Gas money, toll money, stuff like that.

9   Q.   Is Western Union used in any part of this process?

10  A.   Well, like, if you order a package off of Facebook

11  and you don't want to meet me in face, you ask me to pay

12  you by Western Union.

13  Q.   Over about the past 2 years, just approximately how

14  many packages have you received and been involved with?

15  A.   For 2 years, that would be like 2017?

16  Q.   2017, 2018.

17  A.   Probably 300, 400, probably more.

18  Q.   300, 400.  So, fair to say you receive a lot of

19  packages?

20  A.   What?  Yeah.  My bad, yeah.

21  Q.   You are good.  It's good.

22       I want to talk about your road trips --

23  A.   Uh-huh.

24  Q.   -- because you just briefly mentioned about going out

25  to different places, charging certain amounts for going to

**ATTACHMENT D**

1    different places.

2    A.    Uh-huh.

3    Q.    So, do you go on road trips?

4    A.    A lot.

5    Q.    Do you like going on road trips?

6    A.    Yeah.  I am a driver.

7    Q.    Why do you go on road trips?

8    A.    Most time, business.  Some of the times, I love being

9    on the road.

10   Q.    So sometimes business, sometimes because you just

11   like driving, seeing the United States?

12   A.    Yeah.

13   Q.    What are some of the places you went to for these

14   road trips?  If you can tell the jury a few you have been

15   to.

16   A.    Florida.  Virginia.  Austin.  I have been all over.

17   Q.    Does anybody usually accompany you on these road

18   trips?

19   A.    Most time, yes.

20   Q.    Who usually accompanies you?

21   A.    Most time, my girlfriend.

22   Q.    I want to talk to you about a road trip you made to

23   Colorado in October of 2018.

24   A.    Uh-huh.

25   Q.    Did you make a road trip to Colorado in October of

**ATTACHMENT D**

1    2018?

2    A.   Yes.  I was part of a road trip here.

3    Q.   Who did you go with?

4    A.   I went with Briggs and one other person.  I think it

5    was Damion.  I am not sure.

6    Q.   Who is Briggs?

7    A.   He is the one that hired me to drive with him.

8    Q.   Is Briggs a friend or an acquaintance?

9    A.   Yeah.  He is that guy that pops up on the block.  He

10   sells stuff like clothing, gadgets, shit -- stuff like

11   that.  Sorry, my bad.

12   Q.   And so Briggs -- do you know his full name, or do you

13   just know him by his name Briggs?

14   A.   "On the Block," that is what he is called.

15   Q.   And who else did you go with?

16   A.   I think Damion went with us, too.

17   Q.   Whose idea was it to go to Colorado?

18   A.   I was hired for the job to drive.

19   Q.   You were hired just to drive?

20   A.   Yeah.  To share in the driving.

21   Q.   So you go on road trips -- they hire you not just to

22   pick up packages, but to drive people?

23   A.   Yeah.  I do that a lot.

24   Q.   So what was the purpose of going to Colorado for this

25   particular trip, or did you know the purpose?

**ATTACHMENT D**

1   A.   I didn't know the purpose, but I gave the detectives

2   an idea what I thought it was.

3   Q.   So you were just hired to drive?

4   A.   Yeah.

5   Q.   Whose car did you take?

6   A.   His car, Briggs'.

7   Q.   You took Briggs' car?

8   A.   Yeah.

9   Q.   Who did the driving?

10  A.   Me mostly.  I drove most of the way to Nebraska.

11  Q.   So you drove all of the way to Nebraska?

12  A.   Yeah.

13  Q.   How many hours was that?

14  A.   That's too much.

15  Q.   Too much hours.  Okay.  Did somebody else eventually

16  take over the driving?

17  A.   Yeah.  I went to sleep.  I know one of them -- think

18  it was him personally who started driving.

19  Q.   (BY MR. SCABAVEA)  So you drove to Nebraska, then

20  Briggs eventually took over driving?

21  A.   Yes.

22  Q.   Were you awake when you actually got to Colorado?

23  A.   I don't remember being in Colorado.  That is why I

24  told them, I don't know if I have been here before, but I

25  have.

**ATTACHMENT D**

1    Q.    How far did Briggs drive when he took over from you?

2    A.    Probably like the next 9 or 10 hours.

3    Q.    So he drives a long time?

4    A.    Yeah.  I drove most of the way, though.

5    Q.    When Briggs was driving the car, what were you doing

6    in the car?

7    A.    I was sleeping.  I was fast asleep.

8    Q.    Did you wake up, at all?

9    A.    Yeah, a couple times.  Yeah.

10   Q.    Do you remember where you woke up at all?

11   A.    I woke up at a gas station one time, used the

12   bathroom, got something to drink.  I think I got up in

13   Loveland.  That is when they were telling me that is

14   Loveland.

15   Q.    And did you end up going to Estes Park?

16   A.    Judging by the investigation, yes.  I cannot say no.

17   Q.    But, I mean, when you were there, do you remember

18   being in Estes Park, or you learned afterwards?

19   A.    No, but I am sure my body was there, but not in

20   awareness.

21   Q.    So, no contesting -- understand.

22          All right.  Do you have any idea where in Estes

23   Park you went then?

24   A.    No.

25   Q.    So you don't remember anything about your time in

**ATTACHMENT D**

1    Colorado --

2            THE COURT:  You need to wait until he finishes

3    asking a question before you respond.

4            THE WITNESS:  Oh, my bad.

5            MR. SCABAVEA:  No, I am sorry, my bad, I was too

6    quick.

7            THE WITNESS:  He speaks fast.

8            THE COURT:  Well, both of you need to slow down,

9    and you need to enunciate more clearly.

10           THE WITNESS:  I am sorry.

11           THE COURT:  That's all right.

12   Q.   (BY MR. SCABAVEA)  So, you don't remember anything

13   about your time in Colorado during that first trip?

14   A.   Not saying I don't remember anything, but little

15   aspects of it, you know.  As I said, I drove all of the

16   way to Nebraska.

17   Q.   When you were in Colorado, did you ever get out of

18   the car?

19   A.   Never.

20   Q.   Do you ever remember being at Ms. Olson's residence?

21   A.   Just second time around, yes.  Not the first time.

22   Q.   Now we are just talking about the first time, in

23   October --

24   A.   No.

25   Q.   -- 2018.  You don't remember being at Ms. Olson's

**ATTACHMENT D**

1   residence --

2   A.   No.

3   Q.   -- at that time?

4        THE COURT:  You have to wait until he finishes

5   asking the question.

6   Q.   (BY MR. SCABAVEA)  So, during that trip, did you ever

7   approach her house?

8   A.   No, sir.

9   Q.   Did you ever show her a badge?

10  A.   No, sir.

11  Q.   Did you ever talk with her?

12  A.   No, sir.

13  Q.   Did you ever pick up something from her?

14  A.   No, sir.

15  Q.   Did you ever leave the car?

16  A.   No, sir.

17  Q.   Were you just sitting in the car?

18  A.   I was fast asleep, sir.

19  Q.   I want to talk to you now about your road trip to

20  Colorado in January of 2019.

21  A.   Yes, sir.

22  Q.   Did you make a road trip to Colorado in January --

23  A.   Yes, sir.

24  Q.   -- of 2019?

25  A.   Yes, sir.

**ATTACHMENT D**

```
 1              THE COURT:  Wait until he finishes his question.
 2    He has to totally finish before you answer.
 3    Q.   (BY MR. SCABAVEA)   Who did you go with on that trip?
 4    A.   I came on the trip with Stacy Byfield.
 5    Q.   Who is Stacy Byfield?
 6    A.   Stacy Byfield is former female friend.
 7    Q.   Whose idea was it to go to Colorado?
 8    A.   Well, it was my idea, as in I got hired for the job.
 9    Q.   Did anybody else go with you?
10    A.   No.
11    Q.   So it was just you and Stacy Byfield on that trip?
12    A.   Yes, sir.
13    Q.   What was the purpose of going to Colorado on that
14    trip?
15    A.   Well, I was hired to pick a package up.
16    Q.   So somebody hired you to pick up a package?
17    A.   Yes, sir.
18    Q.   You decided to make a road trip out of it?
19    A.   Yes, sir.
20    Q.   Whose car did you take?
21    A.   My personal car, sir.
22    Q.   Who did the driving?
23    A.   I did the driving.
24    Q.   Were you going to pick up a package?
25    A.   Actually, no.  We were actually going to Chicago.
```

**ATTACHMENT D**

1    Q.   But, on the way there, were you going there to pick

2    up anything?

3    A.   Well, we were going to get -- sorry, we were going to

4    get married in Chicago.

5    Q.   And before you went to Chicago, were you going to

6    stop in Colorado?

7    A.   I waited until we diverted to Chicago.

8    Q.   Did you ever talk on the phone on your trip?

9    A.   Yes, many times.

10   Q.   What did you talk about?

11   A.   Well, I spoke to many people about many different

12   things.

13   Q.   Do you remember anybody specifically that you talked

14   to on the way to Colorado on your cellphone?

15   A.   Well, I spoke to Carlene.  I spoke to my mom.  I

16   spoke to my daughter.  I spoke to my son.  I spoke to

17   Rajay.  I spoke to Christopher.  I spoke to a lot of

18   people.

19   Q.   When you say you spoke to Rajay, you mean Rajay

20   Dobson?

21   A.   Yes, sir, Rajay Dobson.

22   Q.   So you eventually made it to Colorado; is that

23   correct?

24   A.   Yes, sir.

25   Q.   And what were you going to do there?

**ATTACHMENT D**

1    A.   Well, as I said before, when I came to Colorado was

2    to pick up a package.

3    Q.   And what was the purpose of picking up that package?

4    A.   I was paid to do it, so.

5    Q.   Do you remember how much you were paid to do that?

6    A.   Yes.  He said he would give me a thousand dollars.

7    Q.   So you were there to pick up a package, for the

8    consideration of driving there and picking up a thousand

9    dollars?

10   A.   Yes, sir.

11   Q.   And after -- and your plan, I should say -- I will

12   rephrase.

13        What was your plan after picking up that package in

14   Colorado, where were you going to go next?

15   A.   Chicago.

16   Q.   What was the purpose of going to Chicago?

17   A.   To get married.

18   Q.   And who were you going to get married to?

19   A.   My girlfriend, Stacy Byfield.

20   Q.   The one in the car with you?

21   A.   Yes, sir.

22   Q.   Did you have any idea what was in that package?

23   A.   No, I didn't.

24   Q.   But you never got to pick up that package, did you?

25   A.   No, I didn't.

**ATTACHMENT D**

1    Q.    Why not?

2    A.    I was arrested before I picked the package up.

3    Q.    Tell us how that happened.

4    A.    First of all, we pulled up at the house.  We were

5    there, and I was honking my horn.  Nobody -- I saw the

6    neighbors on the driveway.  So I went up to the neighbor's

7    house and asked them if there is anybody at home or

8    anybody over there.  They didn't answer me, they turn and

9    walk inside.  So then I backed up.  I am on the road.  So

10   I ask my girl, could you go and ring the doorbell to see

11   if anybody is home.  And when she rang the doorbell, she

12   said nobody is inside, and I said, let's go.

13   Q.    What happened next?

14   A.    While she was walking back to the car, the police

15   came and arrested us.

16   Q.    How did the police come and arrest you?  What did

17   they do?

18   A.    I mean, I was in the car.  They pulled up in front of

19   my car, they came from the back and in front, like

20   SWAT-looking type police.

21   Q.    What was your reaction when the police all of a

22   sudden came out?

23   A.    Well, this is the first time I have ever been

24   incarcerated, so that was probably one of the things

25   that --

**ATTACHMENT D**

1   Q.   Were you surprised?

2   A.   Extremely.

3   Q.   Were you completely shocked?

4   A.   Extremely.

5   Q.   What did they do to Stacy Byfield?

6   A.   They had her on the floor, like knees in her back,

7   stuff like that.

8   Q.   After they arrested you, where did the police take

9   you?

10  A.   I was brought to a police station, I think it was the

11  Estes Park Police Station.

12  Q.   When you arrived at the police station, what

13  happened?

14  A.   I was in a holding cell for, like, 2 hours, 4 hours,

15  not spoken to by anyone.

16  Q.   After those 2 hours came to pass, then what happened?

17  A.   They had interviewed me.  They brought me into a room

18  to interview me.

19  Q.   How many people interviewed you?

20  A.   One, two persons.

21  Q.   How did you feel at that point?

22  A.   Well, I'm lost.  I don't know where I am.  Don't know

23  why I am here.  I am lost.  So, thoughts start coming to

24  my head.  Right then and there I am thinking, probably

25  this package is, you know, narcotics or something like

**ATTACHMENT D**

1   this.

2   Q.   You thought the package may contain narcotics?

3   A.   Obviously.  Why would police be on me like that?

4   Q.   So you were nervous about that?

5   A.   Yes, extremely.

6   Q.   When you started your interview in front of the

7   police, did they read you what they called your Miranda

8   rights; your right to remain silent, the stuff you hear on

9   TV?

10   A.   I am going to go based off what they said they did.

11   Can I tell you exactly what happened?  I don't really

12   remember at that point in time.

13   Q.   Were you just in shock, is that why you don't

14   remember?

15   A.   Basically.  So I don't know.

16   Q.   Did you agree to talk to law enforcement?

17   A.   Of course.  Why wouldn't I?

18   Q.   And why did you agree to talk with them?

19   A.   Why wouldn't I agree to talk to law enforcement?  You

20   want to know what you did wrong, so, of course.

21   Q.   Did you have anything to hide?

22   A.   No.  Why would I?

23   Q.   What did you tell them?

24   A.   Whatever they asked me.  Every question they asked

25   me, I answered it.  I told them what I know.

**ATTACHMENT D**

1   Q.   Did you tell them about your practice of receiving

2   packages?

3   A.   Yes, I did.

4   Q.   What did you tell them about that?

5   A.   They asked me everything about -- basically, almost

6   the same as what I am telling you now.  Like, I do this

7   for a living.

8   Q.   Were you cooperative with them?

9   A.   In every single way I possibly could.

10  Q.   Did you answer every question they asked you?

11  A.   Every single question that was asked.

12  Q.   Were you nervous during this questioning?

13  A.   I was, but you know.

14  Q.   I know I may have asked this in a different way, but

15  why were you nervous during this questioning?

16  A.   It is the first time I have ever been incarcerated.

17  I mean, police, you have to understand, I am not racist,

18  but I am black.

19  Q.   Do you know Carlene Hosang?

20  A.   Yes, I do, sir.

21  Q.   How do you know her?

22  A.   Extremely good friend of mine.

23  Q.   When did you first meet her?

24  A.   Years ago.  I used to date one of her daughters back

25  in the day.

**ATTACHMENT D**

1    Q.   Where does she live?

2    A.   She lives in Jamaica Queens, New York.

3    Q.   And just to be clear for the jury, when you say

4    Jamaica Queens, New York, you mean actually in New York

5    City, a borough of Queens?  It doesn't mean in Jamaica;

6    right?

7    A.   No, the borough.

8    Q.   What is your relationship with her like?

9    A.   She is a very good friend of mine.  What happens

10   is -- because I am under oath -- I always fall asleep.  So

11   she is type of person that calls me, that keeps me up

12   while I am driving.  I am, like, at her house probably

13   like five days a week.

14   Q.   You say you dated her daughter?

15   A.   Yes, I did.

16   Q.   Does she have any other children?

17   A.   A boy.  One more girl and one more boy -- two more

18   boys, actually.

19   Q.   Do you get along very well with them?

20   A.   Every one of them.

21   Q.   Even the ex-girlfriend?

22   A.   If I have any?

23   Q.   No.  You said you used to date her --

24   A.   Yes.

25   Q.   -- daughter.  Do you get along with her still?

**ATTACHMENT D**

1   A.   Yes, I do.

2   Q.   Sorry.  I was a little fast with that one.

3   A.   Yes, sir.

4   Q.   How often do you go to her house?

5   A.   Every single day or every other day.

6   Q.   And when you go over to her house, what do you do?

7   A.   Sleep most of the time.  Eat.  Watch TV.  Chill.

8   Q.   Do you ever make dinner, or does she make dinner for

9   you?

10  A.   Most every day.

11  Q.   Do you have packages mailed to her house?

12  A.   Yes, we do.

13  Q.   Why do you have packages mailed to her house?

14  A.   Because it is a house, not an apartment.  So she has

15  also a garage that we put packages in and whatever.

16  Q.   And is Carlene Hosang in any way part of a fake

17  lottery scheme that you know of?

18  A.   If she is, it would be something she hid from me very

19  well.  I believe not.

20  Q.   You previously stated you know Stacy Byfield?

21  A.   Yes, sir.

22  Q.   When did you first meet her?

23  A.   About 3, 3-and-a-half years ago.

24  Q.   What is your relationship with her like?

25  A.   Now or then?

**ATTACHMENT D**

1   Q.   Back then.

2   A.   We were pretty cool.  She used to do my hair, when I

3   had hair.  Sorry.

4   Q.   You say you used to have hair.  What kind of hair?

5   A.   I had long dreads.  I've cut it off since I have been

6   incarcerated.

7   Q.   So you used to have long dreads?

8   A.   Yes, sir.

9   Q.   That is pretty distinctive, isn't it?

10  A.   Yes, sir.

11  Q.   How serious was your relationship with her?  I know

12  you alluded to this.

13  A.   Very.

14  Q.   You said you were planning to get married in

15  Chicago -- on your trip from Colorado to Chicago; is that

16  correct?

17  A.   Yes, sir.

18  Q.   Who does she live with?

19  A.   She lives with her cousins and an aunt.

20  Q.   How often do you go over there?

21  A.   As often as I go to Carlene's.  That is one of my

22  everyday stops.

23  Q.   And what do you do when you go over to her house?

24  A.   Excuse me?  Like I do at most houses, like my

25  girlfriend's; chill out and stuff.  I can say I watch TV.

**ATTACHMENT D**

1    Q.   What else do you do with her?

2    A.   Everything else.  She comes to work with me some of

3    the times.

4    Q.   When you say "work," is that your work as a DJ?

5    A.   That, too.

6    Q.   When you work with her, when she comes to work with

7    you when you work as a DJ, what does she do?

8    A.   She helps me to bring my speaker boxes.

9    Q.   Does she accompany you on your road trips?

10   A.   Yes, sir.

11   Q.   What kind of road trips does she go on with you?

12   A.   Well, most of them.

13   Q.   How many places have you been with her on those road

14   trips, that you can remember?

15   A.   A lot.

16   Q.   What is the purpose of going on these road trips with

17   her?

18   A.   My company.

19   Q.   Your company, being the DJ company?

20   A.   You mean with her?

21   Q.   Yes.

22   A.   She is my accompany [sic].  She comes along with me.

23   Q.   To your knowledge, is she part of any kind of fake

24   lottery scheme?

25   A.   No.

**ATTACHMENT D**

1    Q.   Are you still in a relationship with her now?

2    A.   No.

3    Q.   Why not?

4    A.   Well, as you've probably seen in the discovery, they

5    told her I had another son I never told her about.  So she

6    found out I have another kid.  So, I was planning to tell

7    her on the way here.  The trip to Chicago, I was going to

8    say I have -- I was going to break it to her.

9    Q.   But the police beat you to it?

10   A.   They beat me to it.

11   Q.   So, do you know somebody named Nickashi Manning?

12   A.   Yes.

13   Q.   How do you know her?

14   A.   Another good friend of mine.  We go way back.

15   Q.   When did you first meet her?

16   A.   About 15 to 20 years ago.  I used to take care of one

17   of her kids back in Jamaica.

18   Q.   What is your relationship with her like?

19   A.   She is pretty cool.

20   Q.   You said this before, but how many children does she

21   have?

22   A.   Which one, Nickashi?

23   Q.   Yes.

24   A.   One, two, three, four kids.

25   Q.   Do you remember all their names?

**ATTACHMENT D**

1    A.    No.

2    Q.    I wouldn't expect you to at this point.  But you

3    would remember them normally?

4    A.    Just the one I used to take care of.

5    Q.    How well do you get along with her kids?

6    A.    We talk very good.

7    Q.    How often do you talk to Nickashi?

8    A.    As of late, not a lot of time.  But I speak to her a

9    lot.

10   Q.    Do you know someone named Lincoln Haughton?

11   A.    Yes, I do.

12   Q.    How do you know him?

13   A.    I have known him way back also.

14   Q.    When did you first meet him?

15   A.    As a DJ, I met him probably like 9, 10 -- no, more

16   than that.  Probably like 14 years ago.

17   Q.    Where does he live?

18   A.    He currently lives in New Jersey.

19   Q.    What is your relationship with him like?

20   A.    Very good friend of mine.

21   Q.    How often do you talk with him?

22   A.    Every single day.

23   Q.    How often do you go over to his house?

24   A.    Probably like every weekend.  Every weekend.

25   Probably once in the week.

**ATTACHMENT D**

1   Q.   Have you ever sent him money?

2   A.   All of the time.

3   Q.   Why would you send him money?

4   A.   He is a friend of mine, and he is kind of struggling.

5   So whenever I make a little extra, I give it to him.  He

6   comes with me also on some of my gigs I do.  If I am

7   playing within Jersey, I often call him up and he comes

8   with me.

9   Q.   How often do you go over to his house?

10  A.   Most weekends, and probably once or twice during the

11  week.

12  Q.   What do you do there when you are at his house?

13  A.   Regular guy stuff; drink some beers, talk a little

14  bit.  Most times I have worked on his car.  He has a

15  little project car.

16  Q.   Do you ever have packages mailed to his house?

17  A.   Yes, I do.

18  Q.   And why do you have packages mailed to his house?

19  A.   He has a house, garage space.

20  Q.   And is Lincoln, to your knowledge, part of any fake

21  lottery scheme?

22  A.   Not to my knowledge.

23  Q.   I know I've this asked this kind of before, but do

24  you know Andre Luton?

25  A.   Yes.  That is my little brother.

**ATTACHMENT D**

1    Q.    Where does he live?

2    A.    In lives in Miami -- sorry, Florida.

3    Q.    Miami, Florida?

4    A.    Yes, sir.

5    Q.    What is your relationship with him like?

6    A.    He is my brother.  I love him.

7    Q.    How often do you talk with him?

8    A.    Probably like every day or every other day.

9    Q.    Do you know somebody named Rajay Dobson?

10   A.    Yes, Sir.

11   Q.    How do you know him?

12   A.    Known him from Jamaica also.

13   Q.    How long have you known him?

14   A.    For 7, 8 years.

15   Q.    Where does he live?

16   A.    He lives in Trelawny.  That is the town I told you I

17   moved to after living in Kingston.

18   Q.    So he lives in Jamaica?

19   A.    Yes, sorry.  Jamaica.  My bad.

20   Q.    What is your relationship with him like?

21   A.    On and off, business like.  He, like, in that

22   particular community of Trelawny where he lives, where I

23   live now currently with my son, is, like, more in the

24   depths of Jamaica.  So, it is in the -- I don't want to

25   say bushes, but it is more in the bushes.  So, it is

**ATTACHMENT D**

1   less -- not city like.  So, it is not developed fully.

2   You get what I am saying?  So people there who need stuff

3   online, that is most of my clientele base is right there.

4   Q.   How often do you talk with him?

5   A.   Probably like three, four times a day, or five.

6   Q.   How do you talk to him; by phone, by email, text

7   messages?

8   A.   Phones.  Mostly phones.

9   Q.   How well does he know you?

10   A.   He would probably have to answer that.

11        MR. SCABAVEA:  Your Honor, permission to publish

12   what is marked as Government Exhibit 56.

13        THE COURT:  Yes.  It has been admitted.  You may

14   publish.

15   Q.   (BY MR. SCABAVEA)  Is this your bank account?

16   A.   Yes, sir.

17   Q.   Bank of America?

18   A.   Yes, sir.

19   Q.   Can you please go to the next page.  One more,

20   please.  One more.  On the top there you see a check from

21   Sandra Pitcher to you?

22   A.   Yes, sir.

23   Q.   Have you ever seen that check before?

24   A.   Never.

25   Q.   Ever in your life?

**ATTACHMENT D**

1   A.   Never.

2   Q.   Please go to the next page.  Don't really see much of

3   an endorsement, and we have been talking about that during

4   the whole trial.  Did you ever endorse that check?

5   A.   Never.

6        MR. SCABAVEA:  Your Honor, permission to publish

7   what is marked as Government Exhibit 57.

8        THE COURT:  You may.

9   Q.   (By MR. SCABAVEA)  Is this also your bank?

10  A.   Yes, sir.

11  Q.   Same account?

12  A.   Yes, sir.

13  Q.   Please go to page 3.  I am sorry, one more page, page

14  4.  Once again, this is a cashier's check from Sandra

15  Pitcher to you for $9,000.  Have you ever seen this check

16  before in your life?

17  A.   No, sir, never.

18  Q.   Go to the next page.  You will see an endorsement

19  section.  Did you endorse that in any way?

20  A.   Never.  Never had it, so I couldn't endorse it.

21       MR. SCABAVEA:  Your Honor, permission to publish

22  what is marked as Government Exhibit 77, which is a

23  12-page document.

24       THE COURT:  You may.

25       MR. SCABAVEA:  Thank you.

**ATTACHMENT D**

1   Q.   (By MR. SCABAVEA)  Can you see that okay?

2   A.   Yes, I can.

3   Q.   Do you know what is going on here on this first page?

4   A.   I have no idea.

5   Q.   Let's go to the second page.  Do you see what is

6   going on there?

7   A.   No.  I don't know what is going on there.

8   Q.   Let's go to the third page.

9   A.   Uh-huh.

10  Q.   Who is that?

11  A.   That is presumably Rajay Dobson.

12  Q.   Who is that with him?

13  A.   That is his son.

14  Q.   Next page, please.  You see in the notes there what

15  says, "About:  Hey there!  I am using WhatsApp"?

16  A.   Yes, sir.

17  Q.   Do you know who is saying that?

18  A.   That's, I guess, the status of the person's profile,

19  I think.  I think that is the status of their profile at

20  the top of the screen.

21  Q.   Okay.  Next page, please.  Who is that?

22  A.   That is Miss Hosang.

23  Q.   Carlene Hosang?

24  A.   Yes, sir.

25  Q.   Next page, please.  Next page, please.  Do you have

ATTACHMENT D

1    any idea what that is?

2    A.   I don't know what it is an image of.  A reaper or

3    something like it says on it.  I don't know, an image

4    downloaded.

5    Q.   Does that mean anything to you?

6    A.   I don't know the image.  Well, the people look at, I

7    guess, what it says.

8    Q.   It doesn't have a hidden meaning to you or any other

9    meanings to you, at all?

10   A.   They're holding a dog.

11   Q.   Fair, enough.  Next page.  Next page.  Who is that?

12   A.   Looks like the same son of Rajay.

13   Q.   Next page, please.  Next page.  Does that mean

14   anything to you?

15   A.   It seems like a prayer.  I would assume it is a

16   prayer.

17   Q.   And please go to the last page.  Anything there have

18   meaning to you?

19   A.   It looks like Dee, which is an ex-girlfriend of mine.

20   Q.   What is Dee's full name?

21   A.   DeShan Garricks.  It is the name I mentioned earlier.

22   Q.   Okay.

23        MR. SCABAVEA:  Your Honor, permission to publish

24   what is marked as Government Exhibit 81.

25        THE COURT:  You may.

**ATTACHMENT D**

1    Q.   (BY MR. SCABAVEA)  You see some messages here going

2    back and forth?

3    A.   Yes, sir.

4    Q.   Do they have any meaning to you?  If we can go

5    through them one by one.

6    A.   It's hard to tell what is the meaning, but I guess it

7    is a conversation.  It is a conversation.  But I would

8    have to see before to know what direction the conversation

9    is coming, so I could tell you what it means.

10   Q.   I believe on the left, if you go to the left, number

11   one says, "Party.  To Bruce Luton from Miss Carlene"?

12   A.   I guess that is saying probably a message to me from

13   her.

14   Q.   Does it sound like a message from her to you?

15   A.   I guess.  But I would have to know what was before it

16   to decipher what that is.

17   Q.   Just looking down these messages, back and forth, do

18   these have any meaning to you, at all?

19   A.   As you can see, these are just blips of messages.

20   Just bits and pieces.  I would have to see the

21   conversation to literally tell you what it is about.  It

22   is just pieces.

23        MR. SCABAVEA:  Your Honor, permission to publish

24   what is marked as Government Exhibit 82.

25        THE COURT:  You may.

**ATTACHMENT D**

1    Q.    (BY MR. SCABAVEA)  It is hard to see, but do these

2    messages have any meanings to you?

3    A.    Yeah.  This is showing me sending a Western Union

4    slip twice to 567 Budman.  And there is an address sent to

5    me, yeah.  And it says -- then I replied "Call me."

6    Because I guess I want to know why I am being sent the

7    address.  So I guess that is why.  I am figuring that is

8    why I would say "Call me."  Then there is a number

9    underneath it.  That may be a tracking number.  It is too

10   much to be a phone number.  It might be a tracking number.

11   Q.    Does this have any meaning to you, at all?

12   A.    Well, as I was saying, if you were to put it

13   together, probably.  It's probably a package that he wants

14   me to pick up.  But, I said "Call me."  So I guess he

15   would probably tell me in the phone conversation.

16   Q.    Is this a typical conversation you would have?

17   A.    Yeah.  This is not even a conversation.

18   Q.    Or a typical message back and forth you would have?

19   A.    Yeah.  Yeah.

20   Q.    Why is that a typical text message back and forth for

21   you?

22   A.    It is just typical.

23          MR. SCABAVEA:  Your Honor, permission to publish

24   what is marked as Government Exhibit 83.

25          THE COURT:  You may.

**ATTACHMENT D**

```
 1    Q.   (BY MR. SCABAVEA)  Do you see more back-and-forth
 2    text messages here?
 3    A.   Yes, sir.
 4    Q.   If you can take a look at those for a few seconds.
 5    A.   Uh-huh.  Yes.
 6    Q.   Can you tell us what is going on there?
 7    A.   From what I can see, it looks like an image of
 8    something I probably bought or was bought, and I sent -- I
 9    don't know if that is the image of what was bought, but I
10    guess whatever it is, the tracking number was sent to
11    match.
12    Q.   Do you see the word "Chop" below that?
13    A.   Yes.
14    Q.   What does that mean to you?
15    A.   It could mean many things.  We use it variably.
16    Like, say for instance, in Jamaican terms, because, you
17    know, we speak Patois.
18    Q.   Yes.
19    A.   Creole is Haitian, not Jamaican.  We speak Patois.
20    So our terms go along as according to the type of music
21    and the culture --
22    Q.   Okay.
23    A.   -- it is not based off the language.  So if there is
24    a song that is popular -- that is the name of a song,
25    actually, done by a guy called Rygin King.  So the term
```

**ATTACHMENT D**

1    "Chop" is a term he uses in that song all of the time.  So

2    we just add that to the slang and say it.  So it is

3    variable.  It doesn't definitely mean brown, black, red,

4    or white.

5    Q.   So it has multiple meanings?

6    A.   Like a slang.

7    Q.   And can you tell us what it means in those

8    conversations?

9    A.   It could be saying good morning.  It could be saying

10   good night.

11   Q.   So lots of different meaning?

12   A.   Yeah, it is a slang.  It is how I determine that

13   makes it -- the meaning relevant.  Because if you say it

14   to me early in the morning, I probably think you are

15   saying what's up or, hi, morning.  If I reply "Chop," then

16   obviously that is what I am saying.  But as you can see, I

17   reply, so it has no bearing.

18   Q.   Thank you.

19        MR. SCABAVEA:  Your Honor, permission to publish

20   what has been marked as Government Exhibit 84.

21        THE COURT:  You may.

22   Q.   (BY MR. SCABAVEA)  What do you see here, more text

23   messages?

24   A.   Yes, sir.

25   Q.   Do you see the message that says "Mad rass"?  What

**ATTACHMENT D**

1    does that mean to you?

2    A.   That is the second line of same artist, Rygin King.

3    That is second line of one of his songs.

4    Q.   So, the second line of his song?

5    A.   I am telling you, it is a slang that we use.  It has

6    no subliminal meaning.  It doesn't say, "okay."  If you

7    notice, some of the texts there shown before, I have said

8    "okay" in the texts.  This is not like I am short for

9    words or nothing.  But it is just a slang.  It is like

10   millenniums, as opposed to '90s babies, they speak

11   differently.  If you don't speak the language, then your

12   communications seem like -- you have kids, you are

13   supposed to know.  It is like talking to your teenager.

14   Like, what are you talking about?  Stuff like that.

15   Q.   Makes sense.

16   A.   Yeah.

17        MR. SCABAVEA:  Your Honor, permission to publish

18   what has been marked as Government Exhibit 87.

19        THE COURT:  You may.

20   Q.   (BY MR. SCABAVEA)  Again, I know this is kind of

21   trivial, but does the word "Yow" mean anything to you?

22   A.   "Yow."

23   Q.   I understand.

24        MR. SCABAVEA:  Your Honor, permission to publish

25   what is marked as Government Exhibit 90.

**ATTACHMENT D**

1          THE COURT:  You may.

2    Q.   (BY MR. SCABAVEA)  You see the first text message

3    there?

4    A.   Yes, sir.

5    Q.   What does that mean?

6    A.   I actually remember what that means.  It is a

7    motorcycle that we have, both of us.

8    Q.   Thank you.

9    A.   Yeah.

10         MR. SCABAVEA:  Your Honor, permission to publish

11   what has been marked as Government Exhibit 91.

12         THE COURT:  You may.

13   Q.   (BY MR. SCABAVEA)  You can see this is also a

14   back-and-forth text message?

15   A.   Yes, sir.

16   Q.   Seems like you are using the same kind of lingo?

17   A.   Yeah, but there is no meaning right here.  It is

18   regular conversation.  "Call me."  "Yo."  That is like

19   trying to get the attention of somebody, like, "yo."

20         MR. SCABAVEA:  Your Honor, permission to publish

21   what is marked as Government Exhibit 92.

22         THE COURT:  You may.

23   Q.   (BY MR. SCABAVEA)  You will see -- down on the third

24   line, do you see the words there?

25   A.   Yes, sir.

**ATTACHMENT D**

1   Q.   What is that?  Say what the words are.

2   A.   Pardon me?

3   Q.   What are the words right there?

4   A.   "Xmax dat."

5   Q.   And what does that mean?

6   A.   X marks that.

7   Q.   X marks that?

8   A.   Yes, sir.

9   Q.   Like an "X"?

10  A.   A big point.

11  Q.   Is that anything to do with a cellphone?

12  A.   No.  I am pinpointing what he said.  He sent me a

13  tracking number, so X marks that.  But in Patois, "Xmax

14  dat."  That is how you say it in Patois.

15       MR. SCABAVEA:  Your Honor, permission to publish

16  what is marked as Government Exhibit 93.

17       THE COURT:  You may.

18  Q.   (BY MR. SCABAVEA)  You notice the third line down

19  there?

20  A.   "Maddddddddd."

21  Q.   Does that have any meaning to you?

22  A.   Same as you asked me, I am just using it how it is

23  being used.  You said if I notice anything.  I said

24  "Maddddddddd."  So I am using it exactly how we use it.

25  Q.   No code word for anything?

**ATTACHMENT D**

1    A.    Huh-uh.

2          MR. SCABAVEA:  Your Honor, permission to publish

3    what is marked as Government Exhibit 94.

4          THE COURT:  You may.

5    Q.   (BY MR. SCABAVEA)  Do you understand the meanings of

6    these text messages?

7    A.    Yes, sir.

8    Q.    Can you explain them to us?

9    A.    First one, as the Government said, is FedEx or UPS.

10   Q.    So "Fed" means --

11   A.    Yes.

12   Q.    -- FedEx?

13   A.    I am asking.

14   Q.    So how would you characterize this conversation;

15   talking about how to ship something?

16   A.    Yeah, he actually sends me the tracking number of

17   something, so I am asking.

18   Q.    How to send it?

19   A.    No, no.  What is it coming, as FedEx or UPS?

20   Q.    How the tracking is coming.  Which company,

21   basically?

22   A.    Yes, sir.

23   Q.    Understand.

24         MR. SCABAVEA:  Your Honor, permission to publish

25   what has been marked as Government Exhibit 95.

**ATTACHMENT D**

1           THE COURT:  You may.

2    Q.   (BY MR. SCABAVEA)  As you previously stated, it looks

3    like a lot of tracking numbers here?

4    A.   Yes, sir.

5    Q.   You see the words "Tom White"?

6    A.   Yes, sir.

7    Q.   Any idea what that means?

8    A.   I guess it is the name, the packages.

9    Q.   Thank you.

10           MR. SCABAVEA:  Your Honor, permission to publish

11   what is marked as Government Exhibit 96.

12           THE COURT:  You may.

13   Q.   (BY MR. SCABAVEA)  Do these mean anything to you?

14   A.   No.

15   Q.   If you look at the last one, you see a name there?

16   A.   Yes.

17   Q.   Do you know who that name is?

18   A.   Kimisha Bently, no.  Probably the recipient of a

19   package.

20   Q.   Okay.

21           MR. SCABAVEA:  Your Honor, permission to publish

22   what is marked as Government Exhibit 97.

23           THE COURT:  I am sorry, you may.

24           MR. SCABAVEA:  Thank you, Your Honor.

25   Q.   (BY MR. SCABAVEA)  Do you know who this was a

**ATTACHMENT D**

1   conversation between?

2   A.   It says me and Stacy.

3   Q.   What are you talking about there?

4   A.   I guess the name that was supposed to send the money

5   and "Kimari Bently."  She sent me the -- that looks like a

6   receipt.

7   Q.   Why would you have this conversation with her?

8   A.   To send money.

9        MR. SCABAVEA:  Your Honor, permission to publish

10  what has been marked as Government Exhibit 98.

11       THE COURT:  You may.

12  Q.   (BY MR. SCABAVEA)  Who is this a conversation

13  between?

14  A.   Me and Stacy.  Actually, the same conversation, just

15  an extension.

16  Q.   It is an extension.  So talking about the same thing?

17  A.   Yeah.

18       MR. SCABAVEA:  Your Honor, permission to publish

19  what has been marked as Government Exhibit 99.

20       THE COURT:  You may.

21  Q.   (BY MR. SCABAVEA)  Is this still between you and

22  Stacy?

23  A.   It says -- yes, it says that.

24  Q.   Is this a continuation of the conversation?

25  A.   Uh-huh.  Sorry, yes.

**ATTACHMENT D**

1    Q.   Now, what do you talk about there?

2    A.   Basically, the same thing.  "Iam [sic] downstairs."

3    I think I am probably at her house, probably.  We probably

4    are about to go to Western Union.

5    Q.   Could you repeat that again?

6    A.   I think we are probably about to go, since I am

7    saying that I am downstairs.

8    Q.   Okay.  Yes, thank you.

9    A.   So probably.

10        MR. SCABAVEA:  Your Honor, permission to publish

11   what has been marked as Government Exhibit 100.

12        THE COURT:  You may.

13   Q.   (BY MR. SCABAVEA)  And who is this a conversation

14   between?

15   A.   Me and Stacy.

16   Q.   Is this a continuation of the conversation?

17   A.   No.  This looks like a whole new conversation.

18   Q.   What is this about?

19   A.   A receipt.  A receipt.  But it looks like I am at her

20   house also, because she says, "komin dwn n 5 mins."

21   Q.   Coming down from upstairs?

22   A.   Yes.

23        MR. SCABAVEA:  Your Honor, permission to publish

24   what has been marked as Government Exhibit 102.

25        THE COURT:  You may.

**ATTACHMENT D**

1   Q.   (BY MR. SCABAVEA)  Do you know what this is?

2   A.   It looks like a display picture, and --

3   Q.   Is there another page of this?  Do you recognize that

4   photograph?

5   A.   Maybe.  Probably, yeah.

6   Q.   What does it look like to you?

7   A.   It looks like a hand holding some money inside of a

8   car.  I can see the windows, the mat.

9   Q.   Why would you have this kind of a photo?

10  A.   Who doesn't?  I mean -- sorry, like I live in New

11  York City, so.

12  Q.   Is this kind of the thing they do in New York City?

13  A.   Kind of.  It is a part of the culture of a DJ.

14  Probably just got paid that night, you know what I mean?

15  Q.   So, money for just being paid for being a DJ?

16  A.   Yeah, or something else.

17  Q.   Kind of like showing off?

18  A.   In a sense, yeah.

19       MR. SCABAVEA:  Your Honor, permission to publish

20  what is marked as Government Exhibit 105.

21       THE COURT:  You may.

22  Q.   (BY MR. SCABAVEA)  Now, you may remember this exhibit

23  from earlier in the trial.  It is --

24  A.   Yes, sir.

25  Q.   -- a cover sheet.  And we were talking about

**ATTACHMENT D**

1    Patois -- How do you say that?  Between English Caribbean

2    Creole and Patois.  So, this exhibit is -- has been

3    determined to be translated from English Caribbean Creole.

4    Do you know English Caribbean Creole?

5    A.   No.  That is partially French.  Patois is partially

6    African.

7    Q.   So there is a difference?

8    A.   Totally different.

9    Q.   Do they sound the same, at all?

10   A.   No.  French is more bourgeois-type French.

11   Q.   Which one do you speak?

12   A.   Patois, African.

13   Q.   Go to the next page, please.

14   A.   Pardon?

15   Q.   Now, we have some conversations that were recorded

16   from Dobson onto your phone.

17   A.   Yes, sir.

18   Q.   And, if you look through those, and we will start

19   with the first one.  Does that make any sense to you?  And

20   just read it slowly.  You have plenty of time.  Does that

21   make any sense to you at all?

22   A.   No.  I mean, I would have to literally see the entire

23   conversation.  But, if that is a translation, it doesn't

24   make sense at all.

25   Q.   What about the second line down, or the second

**ATTACHMENT D**

1    paragraph, I should say.

2    A.   It doesn't add up to a conversation, if you get what

3    I am saying.  It doesn't make sense.  If I was to read it

4    back aloud, it would not make any sense, if you get what I

5    am saying.

6    Q.   That message, if you received a message like that,

7    you would not be able to understand what was going on?

8    A.   I could not.  Because if you just read it, it doesn't

9    make sense.  It doesn't.

10   Q.   The third paragraph, which is just one line,

11   basically, down there, does that make some sense?

12   A.   No.  You are "doing the road"?  That -- obviously the

13   translation -- how are you "doing the road"?

14   Q.   How about the fourth paragraph down?

15   A.   It's quite obvious that the problem is just the

16   translation barrier.  That's it.  I mean, if you try to

17   make sense out of it, it says, "I could make her get some

18   bills."  How do you make somebody "get some bills," if you

19   get what I am saying?

20   Q.   Yes.

21   A.   It doesn't make sense.  The translation is totally --

22   I would have translated for them if they just gave it to

23   me, willingly.

24   Q.   Can you go to the next page, please.  We have one

25   bigger paragraph.  If you can read through that and tell

**ATTACHMENT D**

1    us if it makes any sense to you.

2    A.   The first five lines, it doesn't even make sense to

3    continue, because I am thrown off.  Show me the entirety

4    of the conversation, I guess I could tell you exactly what

5    it is.

6    Q.   Does it mean anything to you?

7    A.   I can't understand it.  I understand the words, but

8    pulling them together in that sentence just does not make

9    any sense.

10   Q.   Is it any kind of code speak that you know of?

11   A.   No.  I use slang, I don't speak in code.  I use

12   slang.  We don't speak in code.  I am not a spy, so I

13   don't speak in code.  Sorry.

14   Q.   Then we have the last one there.  Does that make any

15   sense to you?

16   A.   I would have to see the before conversation to know

17   what they were talking about, or even the after.  You show

18   me a piece of something that 90 percent is missing, I

19   don't know what day, what year, what month.  I have no

20   idea how to determine that.  That could be anything.

21   Q.   So, as you testified, all five of these conversations

22   don't make sense?

23   A.   It doesn't add up.

24   Q.   Were they probably translated incorrectly?

25   A.   Probably.  But, I mean, just like a book, one line

**ATTACHMENT D**

1    can't tell you what the book says.  So I would have to,

2    like, see the passage before and after, get what I am

3    saying, to determine what is actually being said.

4         MR. SCABAVEA:  All right.  Thank you.  You can take

5    that one off.  Thanks.

6    Q.   (BY MR. SCABAVEA)  Did you ever receive a package

7    containing cellphones from Ms. Olson?

8    A.   No.

9    Q.   Did you ever receive a package containing a cellphone

10   from anybody?

11   A.   No.

12   Q.   Is that because you don't open packages?

13   A.   Exactly.  I could never tell you that.

14   Q.   When we previously talked about your first trip to

15   Colorado back in 2018, October --

16   A.   Yes, sir.

17   Q.   -- what kind of cellphone did you have with you then?

18   A.   iPhone 10 and iPhone 7.

19   Q.   Where did you get those cellphones?

20   A.   Bought them off eBay

21   Q.   How much do they cost, or do you remember?

22   A.   One -- I bought one refurbished for, like 650.  One,

23   for, like 9-something refurbished.

24   Q.   A few months later, when you made the trip from -- to

25   Colorado, in January of 2019, were those the same two

**ATTACHMENT D**

1    cellphones that you had?

2    A.    Yes, sir.  January '19, no.

3    Q.    What were the cellphones you had then?

4    A.    '19, I had the newer version that Briggs sold me.

5    Q.    And you say "Briggs."  Who is Briggs?

6    A.    Same person I mentioned earlier.

7    Q.    What is his full name, just for the jury?

8    A.    He lives on the block.  That is what we call him.

9    Q.    You said that.  I apologize.

10        Where did you buy that cellphone?

11   A.    From him.

12   Q.    For how much?

13   A.    He paid, what, $800, I think.

14   Q.    You paid him $800?

15   A.    Yeah.

16   Q.    Where did you buy it from him at?

17   A.    Pardon me?

18   Q.    Where did you buy it from him at?

19   A.    Right there, out of the car.

20   Q.    So he sold it to you out of the car?

21   A.    He has laptops, cellphones, clothing items.  That is

22   kind of how it is in New York.

23   Q.    So people in New York sell a lot of things out of the

24   back of the car?

25   A.    Mostly.

**ATTACHMENT D**

1   Q.   That is where you bought it?

2   A.   Yeah.  As a Jamaican, that is how we buy most of our

3   stuff.

4   Q.   Do you know what a MagicJack is?

5   A.   Yeah.

6   Q.   What is MagicJack?

7   A.   MagicJack is a calling app system where you actually

8   buy a physical MagicJack in a store, in Wal-Mart, so that

9   you can make international calls.

10  Q.   When you buy it, how does it come?  How is it

11  packaged?

12  A.   In, actually, in a box with a modem-looking device

13  that you actually stick in, plug it in.

14  Q.   Is it an account?

15  A.   Yes.

16  Q.   And how do you set up this account?

17  A.   To set the account up, you have to have an email

18  address and you have to have a credit card.

19  Q.   So, how does MagicJack work?

20  A.   What happens is MagicJack allows you to make voice

21  over IP calls.  So basically you could make a phone call

22  over Wi-Fi without having a landline.

23  Q.   How does one access through a MagicJack account?

24  A.   Anybody can access a MagicJack account.

25  Q.   What do you need?

**ATTACHMENT D**

1    A.   The user name.

2    Q.   Do you need anything else besides a user name?

3    A.   No.

4    Q.   So, all you need to access one MagicJack account is

5    their user name?

6    A.   Yeah.  It is not a secure device.  They probably

7    didn't -- MagicJack is something that is "hot" by anybody.

8    Even my little son can access that.  "Hot" meaning if you

9    just put the person's name that is on the account in, you

10   go straight to voicemail, then you go to setup, and you

11   change it.

12        MagicJack is often used in the Caribbean.  Like,

13   every island uses a MagicJack, because we don't have the

14   long-distance calling like you people here in America.  So

15   we have to use a calling card, that is called a Digicel

16   card or KeyCard.

17   Q.   So once one has this information, they can make calls

18   using that MagicJack?

19   A.   Anybody, yeah.

20   Q.   And can --

21   A.   Twenty persons can use the same MagicJack.  A hundred

22   persons use the same MagicJack.

23   Q.   If someone were to receive a call from a MagicJack

24   account --

25   A.   Yes, sir.

**ATTACHMENT D**

```
 1    Q.    -- would it have a certain number?

 2    A.    The person who sets the MagicJack up, the number

 3    attached to that is the number that comes up.

 4    Q.    So the number comes with the MagicJack account?

 5    A.    Yeah.

 6    Q.    So you go ahead and buy a MagicJack, you go ahead and

 7    use it to call somebody, and you see a number?

 8    A.    Yes.

 9    Q.    That comes from that specific MagicJack --

10    A.    Yes.

11    Q.    -- that anybody can use if they have your password?

12    A.    Of course.  You don't need a password.

13    Q.    Not a password, I should say account --

14    A.    Right.

15    Q.    -- log in?

16    A.    Right.

17    Q.    Did you set up a MagicJack account?

18    A.    I set up probably 45 or 50 MagicJack accounts.

19    Q.    Why do you do that?

20    A.    Because that is how my family and anybody else

21    communicate here.  That is how anybody in the Caribbean

22    calls anywhere outside of the Caribbean.

23          MR. SCABAVEA:  Your Honor, permission to publish

24    Government Exhibit 125.

25          THE COURT:  You may.
```

**ATTACHMENT D**

1   Q.   (BY MR. SCABAVEA)  Do you recognize any of those

2   numbers?

3   A.   Yeah.  The 2033 number, in the discovery, I read

4   that.  That is the number that I set the MagicJack up on.

5   Q.   Is that one of the MagicJack --

6   A.   That is the one I set up, yes.

7   Q.   -- numbers?  So you set up that number?

8   A.   Yes, sir.

9   Q.   Why did you set up that number, same reason?

10  A.   Same reason.

11  Q.   Now, this exhibit, of course, is a picture of Sandra

12  Pitcher's cellphone?

13  A.   Right.

14  Q.   Do you have any idea how that MagicJack number that

15  you set up got onto her cellphone?

16  A.   I have no idea.  It has never called my number,

17  though, so I wouldn't know it like that.

18  Q.   You see, once again, this is a picture of Sandra

19  Pitcher's cellphone?

20  A.   Yes, sir.

21  Q.   You see your name probably halfway through the

22  screen?

23  A.   Yes, sir.

24  Q.   You see an account number up there?

25  A.   Yes, sir.

**ATTACHMENT D**

1  Q.   Is that your account number?

2  A.   I guess it is.  Excuse me, yes, it is.

3  Q.   Do you have any idea how your account number --

4  A.   No, I don't.

5  Q.   -- made it up on that screen?

6  A.   No, I don't.

7        MR. SCABAVEA:  You can go ahead and take it off.

8  Thank you.

9  Q.   (BY MR. SCABAVEA)  These MagicJack numbers that you

10  have, these accounts you set up, do you give them to other

11  people?

12  A.   Yeah.  To family members, yeah.

13  Q.   How many people can you estimate you give your

14  MagicJack number to?

15  A.   My MagicJack number?

16  Q.   Yes.

17  A.   I set them up on behalf of people, not for my

18  personal use.  Because you cannot use a Jamaican credit

19  card to set up a MagicJack.  So, you get what I am saying?

20  So, if you want a MagicJack, you just ask me to buy it,

21  and I will set it up.  And then you have to pay me, also.

22  Q.   That MagicJack number you just saw --

23  A.   Yes, sir.

24  Q.   -- did you give that account number to anybody?

25  A.   Yeah.  Probably like two or three persons.  But,

**ATTACHMENT D**

1    yeah.

2    Q.   I want to talk about the identity of the victims of

3    this lottery scheme with you.

4    A.   No problem.

5    Q.   Do you know the victim in this case, Ms. Olson?

6    A.   No.

7    Q.   Have you ever met her before?

8    A.   Nope.

9    Q.   Have you ever talked to her before?

10   A.   No, sir.

11   Q.   Before this trial, have you ever seen her before?

12   A.   No, sir.

13   Q.   During this trial, you have seen that this MagicJack

14   number that we just talked about, ended up on the call

15   registry of Ms. Olson?

16   A.   Yes, sir, I have seen that.

17   Q.   Did you ever call Ms. Olson --

18   A.   Never.

19   Q.   -- using that MagicJack number?

20   A.   Never.

21   Q.   Did you ever call Ms. Olson pretending you were

22   somebody named Frank White?

23   A.   I have never called Ms. Olson, none of these people.

24   I don't know none of them.

25   Q.   Have you ever knowingly received a package from

**ATTACHMENT D**

1   Ms. Olson?

2   A.   No, sir.

3   Q.   Have you ever knowingly received money from her?

4   A.   No, sir.

5   Q.   Do you know Sandra Pitcher?

6   A.   No, sir.

7   Q.   Before this case, before this trial, did you have any

8   idea who Ms. Pitcher was?

9   A.   No, sir.  None of the above.

10   Q.   Have you ever talked to her before?

11   A.   No, sir.  None of them.

12   Q.   Did you ever call Ms. Pitcher using this MagicJack

13   number?

14   A.   I never called any of them.  Never spoken to any of

15   them.  Don't know none of them.

16   Q.   Did you ever call Ms. Pitcher or somebody pretending

17   to be David?

18   A.   No, sir.

19   Q.   So you never called Ms. Pitcher any time in your

20   life?

21   A.   I have never spoken to any of these people.  Never

22   have.

23   Q.   Have you ever knowingly received a package from

24   Ms. Pitcher?

25   A.   No, sir.

**ATTACHMENT D**

```
 1   Q.   Have you ever knowingly received money from
 2   Ms. Pitcher?
 3   A.   No, sir.
 4   Q.   Let's change subjects.  Is money deposited into your
 5   account from other people?
 6   A.   Of course.  A lot.  That is why it is a business
 7   account.
 8   Q.   How many different people deposit money in your
 9   account?
10   A.   Depends what you want me to buy or size of what you
11   want me to buy.  It is a lot of people.
12   Q.   In your estimation, about how many different people
13   have deposited money in your account over the past year
14   and a half?
15   A.   Probably a hundred, 150, or probably more.
16   Q.   I know you briefly touched on this.  Why do people
17   deposit money in your account?
18   A.   So, I buy whatever you want me to buy online.
19   Q.   Do people also deposit money to your account for your
20   work as a DJ?
21   A.   Yeah.  And I do have records of Gaslight having sent
22   checks to my account also.  The name Gaslight.  That is a
23   company I work for as a DJ.  It is on my record, too.  And
24   a Spanish restaurant also on my account that -- checks
25   they deposit straight to my account.
```

**ATTACHMENT D**

1    Q.   Is money ever deposited into your accounts for

2    receiving packages?

3    A.   Of course.

4    Q.   How often does that happen?

5    A.   Whenever I receive a package.

6    Q.   And in the past year and a half, how many times would

7    you estimate that has happened?

8    A.   A lot.

9    Q.   Do you know what Zelle is?

10   A.   Zelle, yes.

11   Q.   Can you tell us what Zelle is?

12   A.   Quick pay.  For me what -- I am not a founder of the

13   company, so they would probably have a better explanation.

14   But, for me, quick pay is, like, as a DJ and millenniums,

15   most people use quick pay or a cash app.  For instance,

16   you hit me up, just like Carlene on a regular basis,

17   running out of gas, four or five times, could you send me

18   $20?  Could you send me $50.  I quick pay it to you.  That

19   is how it is.

20        Say I wanted to -- Mark, you are my attorney, I

21   need to pay you, I quick pay you the money.  That is how

22   it is.

23   Q.   Makes sense.

24   A.   That is what it is for me, at least.

25   Q.   You said you receive a lot of money into your

**ATTACHMENT D**

1    accounts.  You received a lot of money into your account?

2    A.   Yeah.  In my business account, yes.

3    Q.   Correct.  Can you remember any high amounts that you

4    received?

5    A.   Once I bought a Caterpillar.

6    Q.   A Caterpillar?

7    A.   The actual.

8    Q.   Like a machine?

9    A.   Yes.

10   Q.   A Caterpillar machine?

11   A.   Yeah.

12        MR. SCABAVEA:  Your Honor, permission to publish

13   what has been marked as Government Exhibit 145.

14        THE COURT:  You may.

15   Q.   (BY MR. SCABAVEA)  If we can go to the next page,

16   please.  So about halfway down you can see on June 7, '18,

17   withdraws and debits under that?

18   A.   Yeah.

19   Q.   You see a negative amount of 14,600?

20   A.   Yeah.

21   Q.   Is that correct?

22   A.   Yes, sir.

23   Q.   Can you tell us what that is?

24   A.   That was a payment that I'd withdrawn from that

25   account.  Then I had realized it because we did not get

**ATTACHMENT D**

```
 1    the machine.  That was for a farm family, for a company in
 2    Jamaica.  That is where I actually bought it.  That is the
 3    first time I had ever paid that much money.
 4    Q.   That is a lot of money; isn't it?
 5    A.   Hell yeah.  Yes.
 6    Q.   You said it was for Caterpillar parts?
 7    A.   Yes.  The name is right there.
 8    Q.   Is it normal for your account to receive this amount
 9    of a deposit?
10    A.   No.  14,000?  No.
11    Q.   But it is normal for your account to receive lots of
12    different deposits --
13    A.   Yeah.
14    Q.   -- for various amounts of money?
15    A.   Yeah.  Depends on what they ask me to buy.  Yeah.
16    Q.   Do you pay attention to all of the money that is
17    deposited into your accounts?
18    A.   Oh, I pay attention to the -- no, sir.  I pay
19    attention to the messages that come in.  Say, for
20    instance, you put $50 in my account, I might not even
21    notice it.  But if you call me and said, hey, did you get
22    the $50 I send you to buy the pair of stockings, I will be
23    like, ahhh, yes.
24    Q.   So, is it fair to say you receive a lot of money into
25    your accounts and don't even know about it?
```

**ATTACHMENT D**

1   A.   Yes.

2   Q.   Are you a wealthy person?

3   A.   No.

4   Q.   Is it fair to say that you roughly live paycheck to

5   paycheck?

6   A.   Job to job.  Job to job.  Depends on how much is

7   being paid.

8   Q.   Are you a hard worker?

9   A.   Extremely.

10  Q.   Are you the one that tries to get fast and easy

11  money?

12  A.   Never have.

13  Q.   Do you send money to Jamaica?

14  A.   A lot.

15  Q.   Why do you send money to Jamaica?

16  A.   I have a lot of brothers.  And I have kids, and my

17  father and my mother -- my stepmother.  Yeah.

18  Q.   So let's parse that out.  Who do you send money to in

19  Jamaica?

20  A.   To one of my brothers.  Two of my brothers.  One of

21  my nephews.  Cousin.  Father.  My mom, which is my

22  step-mom.

23  Q.   How often do you send money to these people?

24  A.   Every single week.

25  Q.   Why do you do that?

**ATTACHMENT D**

1   A.   Well, my father is on a dialysis machine, which we

2   don't have health care in Jamaica.  So, my step-mom is

3   blind in one eye.  My little brother has an arm missing.

4   I basically take care of that side of the family.

5   Q.   Now, during this trial -- which you have been sitting

6   through this entire time --

7   A.   Yes, sir.

8   Q.   -- you've heard a lot about Jamaican lottery schemes;

9   is that correct?

10   A.   Yes, sir, I definitely did.

11   Q.   Do you know anything about this lottery scheme?

12   A.   Of course.  I know about Jamaican lottery schemes.  I

13   have seen it a lot on TV.  In Jamaica, it is publicized on

14   TV a lot.

15   Q.   So it is common?

16   A.   YouTube, all over.  Yeah, I know about it.

17   Q.   Well, were you aware of any parts about this lottery

18   scheme that we've talked about in this trial?

19   A.   No.

20   Q.   Did you participate in this lottery scheme?

21   A.   Even if I had, it would never have been willingly.

22   But, no.

23   Q.   Did you defraud Ms. Sandra Olson out of any of her

24   money?

25   A.   You would have seen it on me.  You would have seen it

**ATTACHMENT D**

1    in my lifestyle.  As you can see, I put that picture up

2    with money.  You would have probably seen a Mercedes or

3    Bentley.  The exchange rate in Jamaica is $117 to one of

4    your dollars.  I could buy a hospital with that type of

5    money.

6    Q.   Did you have packages and mailings that Ms. Olson

7    sent to you?

8    A.   Did I have what?

9    Q.   I will rephrase that.

10        Did you have any packages or any other mailings

11   from Ms. Olson sent to you?

12   A.   From -- I never had any packages from.

13   Q.   Did anything from Ms. Olson get sent to other people

14   at your direction?

15   A.   No, sir.

16   Q.   Did you defraud Ms. Sandra Pitcher out of any of her

17   money?

18   A.   No, sir.  Don't know these people.

19   Q.   Do you have any packages or mailings from Ms. Pitcher

20   sent to you?

21   A.   No, sir.  Don't know these people.

22   Q.   Have you ever asked other people to receive packages

23   on your behalf from Ms. Pitcher?

24   A.   No, sir.

25   Q.   From this Jamaican lottery scheme we have been

**ATTACHMENT D**

 1   talking about during this entire trial, have you received

 2   any money from this scheme?

 3   A.   No, sir.

 4   Q.   Anything at all?

 5   A.   No, sir.

 6   Q.   Has your lifestyle increased whatsoever?

 7   A.   My records would show, sir, something.  Even my mom's

 8   rent or something.

 9   Q.   Do you still live with your mother?

10   A.   Yes, sir.

11   Q.   Are you guilty of conspiracy to commit --

12   A.   No.

13   Q.   -- mail fraud?

14   A.   No, sir.

15   Q.   Are you guilty of aiding and abetting --

16   A.   No, sir.

17   Q.   -- mail fraud?

18   A.   No, sir.

19        THE COURT:  Wait until he finishes his question

20   before you answer.

21        THE WITNESS:  I am sorry.

22   Q.   (BY MR. SCABAVEA)  Are you guilty of aiding and

23   abetting mail fraud on or about October 30th, 2018?

24   A.   No, sir.

25   Q.   Are you guilty of aiding and abetting mail fraud on

ATTACHMENT D

1    or about April 16, 2018?

2    A.   No, sir.

3    Q.   Are you guilty of aiding and abetting mail fraud on

4    or about July 17, 2018?

5    A.   No, sir.

6    Q.   Are you guilty of aiding and abetting mail fraud on

7    or about September 6, 2018?

8    A.   No, sir.

9    Q.   Are you guilty of aiding and abetting mail fraud on

10   or about September 25, 2018?

11   A.   No, sir.

12   Q.   Are you guilty of aiding and abetting mail fraud on

13   or about October 22, 2018?

14   A.   No, sir.

15   Q.   Are you guilty of aiding and abetting mail fraud on

16   or about October 30, 2018?

17   A.   No, sir.

18   Q.   Mr. Luton, are you guilty of aiding and abetting mail

19   fraud on or about November 2018?

20   A.   No, sir.

21        MR. SCABAVEA:  Thank you, Your Honor.  Nothing

22   Further.

23        THE COURT:  Does the jury need to take a bathroom

24   break before we begin the cross?  Why don't we take a

25   15-minute break.  We will reconvene at about 11:10.

**ATTACHMENT D**

1           (A break is taken from 10:54 a.m. to 11:10 a.m.)

2           THE COURT:  All right.  Ms. West, would you please

3    bring in the jury.

4           All right.  You may be seated.

5           Ms. Paluch, you may proceed.

6           MS. PALUCH:  Thank you, Your Honor.

7                         **CROSS-EXAMINATION**

8    **BY MS. PALUCH:**

9    Q.   Hello, Mr. Luton.

10   A.   Good afternoon.

11   Q.   Sir, I want to better understand your business, so if

12   you can help me walk through that.

13   A.   Yes.

14   Q.   You explained that people in Jamaica cannot receive

15   Amazon deliveries; right?

16   A.   Actually, Amazon does not deliver outside of the

17   United States.

18   Q.   That was your testimony.  So you help people get

19   packages that they normally couldn't order; is that right?

20   A.   Or I order for them, yes, ma'am.

21   Q.   People in Jamaica ask you to place an order, say on

22   Amazon, is that correct, and they pay you to order

23   something for them?

24   A.   In some cases, yeah.

25   Q.   And then those packages are delivered to you?

**ATTACHMENT D**

1    A.    To various addresses, yes.

2    Q.    The items you are buying online, is that the 3- to

3    400 packages you testified that are coming to your

4    address?

5    A.    Most of them, yes.

6    Q.    Okay.  And you mentioned that it was so many packages

7    that you had to take out a mailbox; correct, because you

8    couldn't receive all of them at your apartment building?

9    A.    Uh-huh.  Yes.

10   Q.    So you had to pay for that mailbox service, didn't

11   you?

12   A.    Yes, that is right.

13   Q.    There is no record in any of your banking activity to

14   show that you pay, on a regular basis, for a mailbox; is

15   there?

16   A.    Well, it is part of your discovery that you showed

17   me, you see where it says "UPS Utility Boxes."  It is a

18   part of your display.  It is in DeShan Garricks' name.

19   Q.    It is in whose name?

20   A.    DeShan Garricks', my ex-girlfriend.  You have it in

21   discovery.  You showed me.

22   Q.    It is your business; right, sir?

23   A.    Yes, ma'am.

24   Q.    Okay.  And what is the name of your business?

25   A.    Well, I just give it the name Electro Raiders.

**ATTACHMENT D**

1   Q.   So there is no account in that name, there is no

2   business?

3   A.   It is not a legitimately registered business.  It is

4   something I started, like, 2 years.  It's like we talked

5   about.

6   Q.   Right.

7   A.   Definitely.

8   Q.   And you are familiar with Amazon packages; right?

9   They are very distinctive?

10   A.   Right.

11   Q.   They have an official label on them.

12   A.   Yes.  It has a sticker on it.  Yes, ma'am.

13   Q.   And you are saying all those Amazon packages arrived

14   at your mailbox, your U.S. Post mailbox?

15   A.   No, I did not say they all arrived there.

16   Q.   So, where did all these packages go, these 3- to --

17   A.   They are --

18       THE COURT:  You have to wait until she finishes,

19   and you need to enunciate more clearly, into microphone.

20       THE WITNESS:  Sorry.

21   Q.   (BY MS. PALUCH)  So, sir, tell us where these 3- to

22   400 packages were delivered.

23   A.   They are various addresses.  It depends on if the

24   person who was ordering has an address already.  Or, if

25   they don't -- like, say you have a family member's

**ATTACHMENT D**

1   address, and you are like, okay, well, my aunt is going to

2   receive this.  It will go to your aunt, and then I receive

3   it from your aunt and mail it to you.

4   Q.   So the people in Jamaica would give you the address

5   of where they wanted their packages --

6   A.   If they have it sent already, yes.

7   Q.   And, if they don't --

8   A.   Yes.

9   Q.   -- if they need you to find an address, you would use

10   the addresses of your friends; right?

11   A.   Yes, ma'am.

12   Q.   And you would have these packages mailed to Lincoln's

13   house; correct?

14   A.   Yeah.

15   Q.   Hosang's house; correct?

16   A.   All right.

17   Q.   Miller's house?

18   A.   Okay.

19   Q.   So, if this is your legitimate business, why are

20   these packages being mailed in false names?

21   A.   I could not determine the name that you mail those

22   packages in.  I would never tell you to mail it in a false

23   name.

24   Q.   So when the people hired you, wouldn't they give you

25   the name of what to use on the package?

ATTACHMENT D

1    A.    You see in the texts, ma'am, they gave me tracking

2    numbers.  So, I get a tracking number, and I track it.

3    You provide me with a name, and that is how I know the

4    name.

5    Q.    So, you conducted your business, that you are

6    describing for the jury, through text messages, is that

7    right, with people?

8    A.    Text messages, phone calls, stuff like that.

9    Q.    So, wouldn't these people text you and say, hey, can

10   I have a package delivery?  Can you arrange to pick up a

11   package for me?

12   A.    Or verbally, yes.

13   Q.    So why is there no evidence -- there is absolutely no

14   evidence in the text messages along those lines, of people

15   saying, I want to have a package delivered, or can you

16   pick up a package for me?

17   A.    Because the only conversations you focused on was

18   Dobson.  You never checked anybody else who I do business

19   with.

20   Q.    We have checked all of your records, sir --

21   A.    There are names --

22   Q.    -- all of your records --

23         THE COURT:  Sir, let her ask the question, then you

24   answer.  You do not talk over her.

25         And let him finish his answer before you ask

**ATTACHMENT D**

1    another question.

2        MS. PALUCH:  Certainly, Your Honor.

3    Q.   (BY MS. PALUCH)  Mr. Luton --

4    A.   Yes, ma'am.

5    Q.   -- in your text messages --

6    A.   Yes, ma'am.

7    Q.   -- there are no texts coming to you from other people

8    saying, will you please pick up a package for me?

9    A.   A question or a statement?

10   Q.   I am asking you.  I am saying, why is there no

11   information in your text messages of conversations of the

12   like that you are describing to this jury?

13   A.   Could I?

14   Q.   Yes.

15   A.   Right now, you obviously seen -- you only showed the

16   conversation with Dobson.  You have not shown me any

17   conversations with anybody else that I have had to prove

18   to me that there isn't.  And I can tell you that there is.

19        In the same display you've show with Dobson you've

20   seen an item off eBay in the picture of one of your

21   displays that you have there, off an item that I was to

22   purchase online.  It is in your discovery that you have

23   shown earlier in WhatsApp.  That is just one example.

24   But, I mean, you didn't go beyond to check.

25   Q.   You have a copy -- you have a copy.  Well, you know

**ATTACHMENT D**

1    what is on your cellphone, and you and your attorney --

2    A.   Actually --

3    Q.   -- have a copy of --

4         THE COURT:  Hold on.  Let her finish the question.

5    Q.   (BY MS. PALUCH)  You have a copy of everything --

6         THE COURT:  Wait.  Start over.  This is getting

7    really confusing.

8         MS. PALUCH:  Sorry, Your Honor.

9         THE WITNESS:  I am sorry.

10   Q.   (BY MS. PALUCH)  Mr. Luton --

11   A.   Yes, ma'am.

12   Q.   -- there are no conversations on your phone in which

13   you have a business discussion about picking up or

14   delivering packages for certain people; correct?

15   A.   Is that a question?

16   Q.   It is a question.  On your phone --

17   A.   No, it is not correct.

18   Q.   And you know what is on your phone, and your attorney

19   knows what is on your phone, because you have received a

20   download of everything on your phone.  And there are no

21   text communications along the lines of, will you pick up

22   or deliver a package for me, as part of your business;

23   correct?

24   A.   No, ma'am, that is not correct.

25   Q.   Now, this whole story that you told the jury today

**ATTACHMENT D**

1    about this business of yours, where you are accepting 300,

2    400 packages over a couple-year period, you never told the

3    agents that story in your post-arrest interview, did you?

4    A.   No, ma'am.

5    Q.   And you never talked to them at all about this is how

6    you make money, is driving around the country picking up

7    packages?

8    A.   No, ma'am.  I didn't state that.  That was not my

9    only source of income either, ma'am.

10    Q.   You told the agents that you made money as a DJ?

11    A.   That is one of my jobs.

12    Q.   It is one of your jobs, but that is the only job you

13    told the agents that you had?

14    A.   Well, I told them that I had other jobs.  And as far

15    as living in my car, also, ma'am.

16    Q.   Right.  When you were asked how often have you picked

17    up packages for Rajay Dobson, your answer was, this is the

18    first time.  Do you remember that?

19    A.   No, I don't remember that.  But, if I did, it

20    probably was the first time.

21    Q.   I can certainly pull up the videotape if you would

22    like to see that.

23    A.   No problem.

24    Q.   You recall saying, in response to the question, how

25    many times has Rajay Dobson asked you to pick up a

**ATTACHMENT D**

1    package, and you said this is the first time?

2    A.   I could not honestly say I recall.  But, as you said,

3    you can pull up a video.  No problem with me.

4    Q.   Do you recall later in your interview you said you

5    picked up packages for Dobson multiple times over the last

6    year?

7    A.   Today?  Yes.

8    Q.   No, in your post-arrest interview --

9    A.   Post-arrest interview.

10   Q.   -- later on, you said you had been picking up

11   packages for Rajay Dobson for the last year?

12   A.   Today?  I said that today?

13   Q.   Sir, after your arrest --

14   A.   Oh, no.

15   Q.   -- you were interviewed by the agents; correct?

16   A.   No.

17   Q.   Sir, you were interviewed by Kevin Hoyland and Caleb

18   Robertson --

19   A.   Once.

20   Q.   -- and that is the interview I am talking about.

21   A.   You said after the arrest, ma'am.  That is what I am

22   saying, it was only one interview I had ever.

23   Q.   Right.  After the arrest, you were interviewed once

24   by the agents?

25   A.   Yes, ma'am.

**ATTACHMENT D**

1    Q.   And they asked you how often you pick up packages for
2    Dobson; correct?
3    A.   Yes, ma'am.  I guess so, yeah.  I don't remember,
4    but, yes.
5    Q.   Why don't we pull up that clip.
6    A.   Thank you.
7         THE COURT:  Now, none of the clips that I have,
8    have been put into evidence.
9         MS. PALUCH:  Pardon me, Your Honor?
10        THE COURT:  I don't have any of the clips being
11   admitted into evidence.
12        MS. PALUCH:  Yes, Your Honor.  What I had Agent
13   Robertson do is authenticate the videotape.
14        THE COURT:  Yes.
15        MS. PALUCH:  The videotape of the defendant's
16   interview is Government's Exhibit 21.  I have audio clips
17   clipped out from that.  At this time, I could move into
18   evidence the whole tape, which is 21.
19        THE COURT:  All right.  Any objection?
20        MR. SCABAVEA:  No, Your Honor.
21        THE COURT:  Exhibit 21 is admitted.
22        (Exhibit No. 21 is admitted.)
23        THE COURT:  You may play the clips.
24        MS. PALUCH:  Thank you, Your Honor.
25             We are going to play the excerpt at 21S.  If the

**ATTACHMENT D**

1    jurors could please put on their headphones.

2            (Exhibit 21S played in open court.)

3            MS. PALUCH:  Then if you can please play 21T.

4            (Exhibit 21T played in open court.)

5    Q.  (BY MS. PALUCH)  Did you hear that, sir?

6    A.   No, I didn't hear.

7    Q.   You couldn't hear it?

8    A.   Play it again, please.

9    Q.   Certainly.

10           MS. PALUCH:  Let's start with 21S.

11           (Exhibit 21S played in open court.)

12   Q.  (BY MS. PALUCH)  So, there you said it is the first

13   time?

14   A.   First time.

15   Q.   Did you hear that, sir?

16   A.   Yes, I did.

17           MS. PALUCH:  Let's play T.

18           (Exhibit 21T played in open court.)

19   Q.  (BY MS. PALUCH)  Do you hear that?  You said you have

20   been doing this for the last year?

21   A.   I have been doing this for the last year.

22   Q.   Picking up packages for the last year?

23   A.   Yeah.  From Rajay.  He said how long I been doing

24   this, I said for the last year.

25   Q.   You said that you have been picking up packages for

**ATTACHMENT D**

1   Rajay for the last year.  But, when you were first asked,

2   you said this was the very first time --

3   A.   First time, yeah.

4   Q.   -- you had ever done that.  So, which is it, sir?

5   A.   I have been picking up packages for years, but not

6   for Rajay, in general, but anybody.

7   Q.   You weren't truthful with the agents, were you?

8   A.   Honestly, the first picture you see, I am almost fast

9   asleep.  You saw that.  I am literally sleeping.  Did you

10   notice that?  Then the second --

11        THE COURT:  Mr. Luton -- Mr. Luton, there is no

12   question before you.

13        THE WITNESS:  I am sorry.

14        THE COURT:  Just answer the questions.

15        THE WITNESS:  I am sorry, ma'am.

16   Q.  (BY MS. PALUCH)  Is your testimony today that you are

17   sleeping through this interview --

18   A.   No.

19   Q.   -- and you have no idea what you told the agents?

20   A.   No, no, no.  I am not saying that.  I am saying I

21   might have been a little bit weary.  Tired.  That is all I

22   am saying.

23   Q.   Kind of weary, like you were in October, when you

24   have no recollection to coming to Colorado?

25   A.   Yes.

**ATTACHMENT D**

1    Q.   So you were so weary that you have no idea that you

2    were in Estes Park, Colorado, in October of 2018?

3    A.   I know I was in Estes Park, because I told you that

4    we stopped.  I know we were in Loveland.

5    Q.   Okay.  So you knew you were in Colorado in October of

6    2018?

7    A.   Yes, ma'am.

8    Q.   And you told the agents, in your interview that you

9    had never been to Colorado.  Do you remember that?

10   A.   Yes, ma'am.

11   Q.   And you told them you had never been to this part of

12   the world --

13   A.   Exactly.

14   Q.   -- and that was a lie?

15   A.   You said that, ma'am.

16   Q.   No, I am asking you.  That was a lie, because your

17   testimony here --

18   A.   Yeah.

19   Q.   -- under oath was you were here in October?

20   A.   Yes, ma'am.

21   Q.   So, you lied to the agents in January when you said,

22   I have never been here before?

23   A.   I told you why I said that, about that lie.

24   Q.   You said that because you didn't want the agents to

25   know you were at Ms. Olson's house in the early morning

ATTACHMENT D

1    hours of October 3rd.  And you know, don't you, that --

2    A.   Ma'am, I told you I was there, ma'am.

3    Q.   -- you know that your girlfriend, Stacy Byfield, had

4    the same story; that she just slept the whole time and had

5    no idea what she was doing; right?

6    A.   She was drunk and high.  She told you that, too.

7    Q.   But that is now, today --

8    A.   No.

9    Q.   -- that is your story --

10   A.   No.

11   Q.   -- because you saw the phone evidence.  Let me finish

12   my question.  You heard Special Agent Hoyland detail your

13   activity from your home to Estes Park in October; correct?

14   A.   Yes, ma'am.

15   Q.   And you heard all that evidence; correct?

16   A.   Yes, ma'am.

17   Q.   And you realized there was no way getting out of the

18   fact that you were in Colorado in October.  So, today, you

19   are telling the jury, yes, I was in Colorado in October?

20   A.   Ma'am, it's clear that I was in Colorado in October,

21   ma'am.

22   Q.   Then why did you lie to the agents when you were

23   interviewed?

24   A.   Ma'am, I was arrested in Colorado, ma'am.

25   Q.   Sir, you lied to them when you said you had never

**ATTACHMENT D**

1   been to Colorado before, ever.

2   A.   I have been many places, ma'am, but if one time

3   missed me, and I cleared it up, obviously, ma'am.

4   Q.   You didn't clear it up in that interview, sir.

5   A.   But I testified under oath that I am now.

6   Q.   That is because you are facing all of this evidence

7   and you knew there was no other explanation.

8   A.   No, ma'am, I am here on trial, ma'am.  I chose to be

9   in trial now.

10  Q.   Well, let's talk about the cellphone that you had on

11  your person --

12  A.   No problem, ma'am.

13  Q.   Let me finish my question, please.

14       So, in your work of repairing cellphones, you are

15  very familiar with what an IMEI is; correct?

16  A.   Yes, ma'am.

17  Q.   You know that that is unique to your phone?

18  A.   Yes, ma'am.  Every device.

19  Q.   And you heard the testimony that the serial number

20  and the IMEI on the phone in your possession is the exact

21  match for the phone purchased by Ms. Olson?

22  A.   Yes, ma'am.

23  Q.   And your testimony is that you purchased that phone

24  out of the trunk of the car of your friend Briggs?

25  A.   Yes, ma'am.

**ATTACHMENT D**

1   Q.   And you saw the evidence in this case that that phone

2   was delivered to your address?

3   A.   Yes, ma'am.

4   Q.   And you heard the evidence in this case that your mom

5   confirmed your receipt of that package?

6   A.   My mom confirmed receipt of that package, or a

7   package of that name?

8   Q.   She confirmed receipt of the John Anderson package to

9   your address; that you took it?

10   A.   Yes, ma'am.

11   Q.   And you are aware of that?

12   A.   Yes, ma'am.

13   Q.   But you want this jury to believe that somehow Briggs

14   got ahold of that phone delivered to your address, and

15   turned around and sold it to you out of the trunk of his

16   car?

17   A.   Briggs got it out of the package, ma'am, not the car.

18   Q.   So it is just a coincidence that he got ahold of the

19   package out of your apartment building?

20   A.   It is not a coincidence, ma'am.  Maybe it is his

21   delivery, so he got the package.

22   Q.   How is it -- Briggs doesn't live with you at 1307

23   Pacific?

24   A.   No, but maybe he had ordered something through me.  I

25   don't know, probably he had somebody order something

**ATTACHMENT D**

1    through him.

2    Q.   And SO that's a terrible coincidence, isn't it?

3    A.   It is not a coincidence, ma'am.  If you order

4    something -- say he has somebody order, or Rajay ordered,

5    as you said, and it came to my address, and somebody

6    picked it up as usual.

7    Q.   Let's talk about some other statements you made to --

8    A.   No problem.

9    Q.   -- the officers.

10   A.   No problem.

11   Q.   While I am getting back to my outline, I think you

12   testified today that at the time of your arrest, you had

13   dreads; correct?

14   A.   Cornrows.

15   Q.   Cornrows.  And that you cut those while in custody;

16   is that right?

17   A.   Yes, ma'am.

18        MS. PALUCH:  Could you post his booking photo?

19   Q.   (BY MS. PALUCH)  Isn't that the photo of you taken

20   when you were arrested?

21   A.   Yes, ma'am.

22   Q.   And your testimony is you cut your dreads before you

23   were photoed?

24   A.   I have the braids right here.  You see them.  My hair

25   is braided.

**ATTACHMENT D**

1    Q.   Okay.  Let's talk about -- you said that you and

2    Stacy broke up because she didn't know that you had

3    another child; correct?

4    A.   I am thinking that is one of the instances.  I

5    haven't spoken to her, so I wouldn't know.

6    Q.   I think your testimony was that your intent was to

7    get married in Chicago?

8    A.   Yeah.

9    Q.   But you knew that Stacy was already married?

10   A.   Yeah.

11   Q.   You knew she is already married, but you are

12   telling --

13   A.   To her family.  It is a business wedding, ma'am, not

14   an official wedding.

15   Q.   So she is previously married, but your testimony is

16   the plan was to get married in Chicago?

17   A.   Yeah, she has business wedding, ma'am, to another

18   Jamaica, to help them get their paperwork, not an official

19   marriage.

20   Q.   Oh, I see, so she could still marry you?

21   A.   Well, not officially, but she is my wife.  She is my

22   girlfriend.  We are dating, and we are together.  I don't

23   get the point.

24   Q.   Let's go back to your statement that these phone

25   messages left by Rajay Dobson on your phone -- I think

**ATTACHMENT D**

1    your testimony was that you don't know that language; is

2    that right; the Caribbean Creole?

3    A.    I don't know the language?  No, I didn't say that.  I

4    say it doesn't make sense.

5    Q.    That the translation doesn't make sense?

6    A.    Yes, ma'am.

7    Q.    But you understood the language of those messages

8    that are coming in on your phone; right, the messages that

9    Dobson left for you?

10    A.    Yeah.  If I seen the entirety of it, yes.

11    Q.    So, in the first message -- and I am looking at --

12          MS. PALUCH:  If you can publish Government Exhibit

13    105.

14    Q.    (BY MS. PALUCH)  You are saying that this makes no

15    sense.  He is talking about that "he is going to max out

16    the card and close them, and order four more."  He is

17    talking about gift cards, isn't he, there?

18    A.    The "max out the card and close them"?  Why would you

19    "max out the card and close them, and order four more"?

20    What is the sense in that?

21    Q.    So, your testimony today is you have no idea what

22    your friend is leaving on your phone?

23    A.    I don't have any idea of my friend leaving that.  I

24    don't know what you are saying, Miss.

25    Q.    How about the next message, where he talks about the

**ATTACHMENT D**

1    "three bills"?  He is referring to money there, isn't he?

2    A.    "Three bills"?  "The three bills," yes.

3    Q.    And then he says, "send it to that name."  That is

4    Rajay instructing you who to send the money to; right?

5    A.    Where?

6    Q.    Sir, "the three bills.  Send it to that name."  It is

7    right in front of you on the screen.

8    A.    "Yeah.  It's the thing that you were to send back to

9    the dogs, the three bills.  Send it to that name."

10   Q.    And your testimony to the jury is you have no idea

11   what that message refers to?

12   A.    It could be many things, ma'am.  Many, many things.

13   Q.    So, you know that your jail calls were recorded;

14   right?

15   A.    Yes, ma'am.

16   Q.    And you know that they were translated into English?

17   A.    I have been told.

18   Q.    They were translated from the English Caribbean

19   Creole language; correct?

20   A.    No, ma'am, not correct.

21   Q.    And so your testimony to this jury is somehow the

22   language is wrong, and that is why you don't understand

23   any of this?

24   A.    No.  I am saying that Creole -- again, ma'am, I don't

25   speak Creole.

**ATTACHMENT D**

1   Q.   You remember during your interview, and here in your

2   testimony, you said you have no idea what these packages

3   contain; correct?

4   A.   Yes, ma'am.

5        MS. PALUCH:  If you would please display Government

6   Exhibit 2, the second page, please.

7   Q.   (BY MS. PALUCH)  You heard the testimony that this is

8   a photograph of the cash that Ms. Olson handed over in the

9   early morning of October 3rd, when you were in Estes Park?

10  A.   I heard the testimony, ma'am.

11  Q.   And that photo was taken by your phone?

12  A.   Ma'am, that is a screenshot, ma'am, and it is off a

13  display picture of the screen, and you just switched it

14  off.

15  Q.   No, sir.  This is a photograph retrieved from your

16  images on your phone.

17  A.   Could you go back to this picture before and I will

18  show it to you, ma'am.

19       MS. PALUCH:  Please display page 1.  If you could

20  blow that up.

21       THE WITNESS:  Isn't that a display picture there?

22  Q.   (BY MS. PALUCH)  It is created, sir, on October 12th;

23  that is nine days after she handed that over.

24  A.   Uh-Huh.  "Camera Model:  iPhone X."  The phone I have

25  is not an iPhone X.

**ATTACHMENT D**

1   Q.   Yes, it was.  Your phone was an iPhone X.  It was an

2   X Max that was sent by Ms. Olson.

3   A.   It was an X Max, not an iPhone X.

4   Q.   Sir, this photo was retrieved from your phone, that

5   was in your possession upon your arrest?

6   A.   Yeah.

7   Q.   Okay.  And that is the same phone you were carrying

8   when you were arrested at Ms. Olson's house, 1,800 miles

9   away, in January?

10   A.   Yes, ma'am.

11   Q.   That is quite a coincidence, isn't it?

12   A.   I am saying, Miss, it says "iPhone X."  Ma'am, that

13   is all I am saying.  My phone is a big difference.

14   Q.   So, what you are saying is that is not your phone?

15   A.   I am saying an iPhone X is a 10, a small one.  The X

16   Max is the bigger one.  It says the picture was created by

17   an iPhone X.  And the picture was retrieved off an iPhone

18   X Max.  That is what I am saying.  I am not denying that.

19   Q.   You don't dispute that that photograph was retrieved

20   from your phone?

21   A.   No, I am not disputing it, ma'am.  I have millions of

22   pictures of money on my phone.

23   Q.   So you just are saying you have no idea what this is

24   a picture off?

25   A.   No, I am disputing that.  I am correcting you that it

ATTACHMENT D

1    is a different phone, is all I am saying.  It is a

2    different phone, if you notice.

3    Q.   So, I think you talked about how packages are just

4    delivered to the apartment where you live with your mom,

5    and people -- they are on a table, and people can walk off

6    with those.

7    A.   Yes, ma'am, in the lobby.

8    Q.   And did that happen a lot?

9    A.   Every day.

10        MS. PALUCH:  Okay.  Let's display Government

11   Exhibit 46, previously admitted.  And if we can blow up

12   the bottom of that.

13   Q.   (BY MS. PALUCH)  You see your address there; correct?

14   A.   Yes, ma'am.

15   Q.   And you see there is a signature there where somebody

16   signed for that delivery?

17   A.   Yes, ma'am.  Sure enough.

18   Q.   And it shows exactly when that package was delivered?

19   A.   Yes, ma'am.

20   Q.   And so somebody didn't just walk off with that

21   package, somebody had to sign for it?

22   A.   Is that a package of the phones?

23   Q.   That is another package of the phones.

24        MS. PALUCH:  Please publish Government Exhibit 25.

25   Q.   (BY MS. PALUCH)  You see these are registered -- one

ATTACHMENT D

1    of those phones was registered just a few minutes after

2    the package was delivered?

3    A.    Actually, it was the other day.  It was the following

4    day.

5    Q.    This actually pertains to the phones that were

6    delivered to you in October --

7    A.    Okay.

8    Q.    -- right?  And you registered it in your name.  If

9    you can go to the next page.  One more page.  See your

10   name appears for that phone?

11   A.    In '17, yes, ma'am.

12   Q.    And you don't dispute that you registered that

13   iPhone?

14   A.    No, ma'am.

15   Q.    And that was the iPhone Ms. Olson sent to your

16   address?

17   A.    I wouldn't know, ma'am.

18   Q.    You just don't know how to explain that?

19   A.    No, ma'am.

20   Q.    So let's go back to your interview.

21   A.    Yes, ma'am.

22   Q.    You told the officers that Dobson asked you to come

23   to Colorado; right?

24   A.    Asked me to pick up a package in Colorado.

25   Q.    You told the agents that he said he would pay you

**ATTACHMENT D**

1    $500.  Do you recall that?

2    A.   Yes, ma'am.

3    Q.   But, today your testimony is he said he would pay you

4    a thousand dollars?

5    A.   Yes, ma'am.

6    Q.   So, which is it?

7    A.   A thousand dollars, ma'am.

8    Q.   And do you remember the agents asked you for Dobson's

9    phone numbers?

10   A.   I think so, yeah.

11   Q.   And you gave them two phone numbers?

12   A.   Yes, ma'am.

13   Q.   You didn't give the agents all of Dobson's phone

14   numbers, did you?

15   A.   The ones on the screen that they asked me whose it

16   was, I told them it is Dobson's.  They didn't ask me for

17   some more numbers.  They asked me, and I said these two

18   numbers are numbers he called me from.

19   Q.   And Dobson had a number of contacts in your phone;

20   correct?

21   A.   Yes, ma'am.

22   Q.   At least four of them, wouldn't you say?

23   A.   At least four, yes.

24   Q.   And you certainly didn't tell the agents that you set

25   up a 702 MagicJack account for Dobson, did you?

**ATTACHMENT D**

1   A.   No.   They didn't ask me about nothing to do with

2   MagicJack setting up for Dobson.

3   Q.   And you admitted today that you set that up and you

4   sent it to Dobson?

5   A.   Yes, ma'am.

6   Q.   And that is just another coincidence that that number

7   was used to defraud Sandra Olson?

8   A.   Understood.   I've seen it in discovery, ma'am.

9   Q.   Right.   So you set up the 702 number?

10  A.   Yes, ma'am.

11  Q.   That is the number Dobson uses to call Olson?

12  A.   I can't tell you that that is the number he used,

13  ma'am.

14  Q.   Then you are found outside Olson's address and

15  arrested?

16  A.   He asked me to pick up a package.

17  Q.   And that is just a coincidence?

18  A.   Ma'am, I could not tell you, but he did.

19  Q.   Dobson goes by a number of nicknames, doesn't he?

20  A.   Bird.   Mostly has to do with "Bird."

21  Q.   Bird Lime?

22  A.   Bird.

23  Q.   Budman?

24  A.   Bird.

25  Q.   Dobson goes by the name Budman?

**ATTACHMENT D**

1    A.    In Patois, Bird is Bud.

2    Q.    So Budman is also Dobson?

3    A.    Yes, ma'am.

4    Q.    Ex-Budman is Dobson?

5    A.    Yes, ma'am.

6    Q.    He also goes by Fry.  "Fry" appears for his number?

7    A.    Probably, yeah.

8    Q.    Dobson hasn't been in this country since at least

9    2017; isn't that right?

10   A.    Yeah, I think so.

11   Q.    And you were asked how you communicate with Dobson in

12   your interview; correct?  And you said that you talked on

13   the phone?

14   A.    Yes, ma'am.

15   Q.    And that was your testimony today?

16   A.    Today, right.

17   Q.    And in your interview and today, you said you rarely

18   text with him?

19   A.    Today, I said like three or four times a day.

20   Q.    You said you talk to him three or four times a day,

21   but not texting.  Let's go back to this.  Do you recall in

22   your interview the agents, they asked you, do you text

23   with Dobson, and your answer was rarely?

24   A.    I don't remember the agent interview.

25   Q.    You don't remember that?

**ATTACHMENT D**

1  A.   No.

2       MS. PALUCH:  Okay.  If you could please pull up --

3  we have that clip.  It is 21M.  If we can please have the

4  headphones on.

5       (Exhibit 21M played in open court.)

6  Q.  (BY MS. PALUCH)  You said you mostly -- texted

7  rarely, mostly calls?

8  A.   Mostly calls, yes, ma'am.

9  Q.   You heard Agent Hoyland testify that on your phone he

10 found close to a thousand text messages between you and

11 Dobson?

12 A.   Over the year, yes, ma'am.

13 Q.   That he is texting you a couple times a day, at

14 least.  That came out?

15 A.   Once or twice, yes, ma'am.

16 Q.   You just didn't want the agents looking for those

17 texts; isn't that right?

18 A.   Ma'am, I gave them my phone willingly.  I hand out my

19 phone and gave it to them.

20 Q.   Now, the agents asked you in your interview how you

21 knew to get to Ms. Olson's address.  And you remember you

22 said that Dobson texted you the address?

23 A.   Yes, ma'am.  But, the first thing, ma'am -- don't get

24 me wrong, but I have never seen the video of my interview.

25 So I am trying to remember the day that I was arrested.

**ATTACHMENT D**

1    If I don't remember something, I am not patronizing you.

2    I have never seen the video or anything.  So I don't have

3    recollection to try and -- I am not trying to create a

4    story.  I really do not remember, it is over a year ago.

5    Q.   Well, the video was certainly provided to you through

6    your counsel.  And I am happy to play you clips.  But I

7    appreciate you saying that.

8    A.   I am not patronizing you.

9    Q.   I appreciate you saying that, sir.  Thank you.

10        Now, you were asked in your interview how you knew

11   how to get to Ms. Olson's house.  Do you remember that?  I

12   can play it for you.

13   A.   Yeah.

14   Q.   You told them that Dobson texted you Ms. Olson's

15   address?

16   A.   I guess.

17   Q.   And you have seen, through this trial, the text

18   messages where he texted you that address in August and in

19   October --

20   A.   Yes, ma'am.

21   Q.   -- right?  So you had the address before January?

22   A.   Ma'am, I was in Colorado before, ma'am.  I testified

23   to that.

24   Q.   You didn't admit that to the agents, though.  So,

25   let's talk about the car you drove to Colorado.

**ATTACHMENT D**

1   A.   Yes, ma'am.

2   Q.   I believe you testified today that that was your car?

3   A.   Yes, ma'am.

4   Q.   But you told the agents that that was your friend,

5   Zavian Miller's, car?

6   A.   Yes, ma'am.

7   Q.   In fact, that car is registered to Zavian Miller?

8   A.   Yes, ma'am.

9   Q.   So it is not your car?

10  A.   Well, ma'am, it is my car.

11  Q.   How is it your car?

12  A.   Because I purchased it.  And I was making earlier

13  comments -- I didn't go in-depth, but living in New York,

14  for a driver's license for 2 years, my insurance is $375.

15  So, in order for me to pay less insurance from

16  Philadelphia, I had my friend register the car in his

17  name, so I only pay $80.  That is how it is when you live

18  in the city, ma'am.

19  Q.   I see.

20  A.   And I am 6'3", driving a 2005 Honda Civic, ma'am,

21  with several hundred thousand miles.  Come on, ma'am.

22  Q.   Now, Zavian Miller, you gave his address to Dobson,

23  didn't you, for receipt of packages?

24  A.   He already knew it, too, but --

25  Q.   Pardon me, sir?

**ATTACHMENT D**

1   A.   Yes, ma'am.

2   Q.   So, if we go back to your prior explanation on

3   Miller's car --

4   A.   Yes.

5   Q.   -- you were just scamming the insurance company that

6   way; right because --

7   A.   I'm not scamming insurance company, ma'am.

8   Q.   -- because it was cheaper for you?  Well, what you

9   described sounds like a scam.

10  A.   I had to change -- it is cheaper.

11  Q.   It was cheaper?

12  A.   So I just put it in my mom's name or your name or

13  anybody's.

14  Q.   Instead of doing it legal way --

15  A.   It wasn't illegal.

16  Q.   -- you did it that way?

17  A.   It wasn't illegal.  It is not illegal.

18  Q.   So you picked up packages from Miller's house, didn't

19  you?

20  A.   Yes, ma'am.

21  Q.   A hundred miles away; right?

22  A.   Yeah.  Yes, ma'am.

23  Q.   And packages that were addressed to fake names like

24  Paul Whither?

25  A.   Just pick the package up, ma'am.

**ATTACHMENT D**

1    Q.   So, are you saying it is just a coincidence that

2    Ms. Olson was directed to mail packages to your friend

3    Miller's house?

4    A.   I don't know if it is a coincidence, ma'am.  I never

5    instructed her to mail packages.

6    Q.   But you are outside her house, arrested, sir.  And

7    her packages are going to your friend's addresses.

8    A.   So why is there no conversation from me with this

9    person?  I don't know none of these persons, ma'am.

10   Q.   Well, you are communicating with Dobson; right?  He

11   is giving you the tracking numbers?

12   A.   Yes, ma'am.  That is exactly right.

13   Q.   Yep, he gave you --

14   A.   Yes.

15   Q.   -- the tracking numbers, then you knew where to go

16   and pick it up, and that --

17   A.   Yes, ma'am.

18   Q.   -- is what you did?

19   A.   Yeah.

20   Q.   Okay.

21   A.   That is what I told you.

22   Q.   And your testimony is that you had no idea what was

23   in any of those packages?

24   A.   Yes, ma'am.

25   Q.   But we have seen the photo on your phone of the

**ATTACHMENT D**

1  package of cash; correct?

2  A.   In the discovery, you gave me, like, five pictures of

3  packages of cash, and that is the only one you choose to

4  use, ma'am.  I have thousands.

5  Q.   We do have a lot of pictures of cash, and we --

6  A.   I have thousands in my phone, ma'am.  Thousands.

7  Q.   -- can show you those.

8       So, you said in your interview you were supposed to

9  pick up packages for Rajay and give them to his brother,

10  Greg --

11  A.   Yes.

12  Q.   -- in the Bronx?

13  A.   Yeah.

14  Q.   That is what you told the agents?

15  A.   Yes, ma'am, I see that.

16  Q.   But today your story is different, sir.  Today your

17  story is you were just in the business of picking up and

18  delivering packages for all sorts of people.

19  A.   Yeah.  It wasn't just for Rajay, ma'am.

20  Q.   It wasn't just for Greg; right?

21  A.   No.

22  Q.   So, when we looked at all of your texts between you

23  and Rajay, there are no texts in which he says, hey, can

24  you pick up a package and deliver it to my brother, Greg?

25  A.   There is no message saying that.  I know who to

**ATTACHMENT D**

1    give --

2    Q.   And you never responded to Dobson saying, hey, I just

3    delivered your package, like you asked me to?

4    A.   Why would I say that to him?  He just call me on the

5    phone.

6    Q.   Wasn't that how people usually talk and converse?

7    A.   But I stated earlier that -- in the video you showed,

8    that we mostly called.  That is what you were saying.

9    Wouldn't it be wise for him to call me?  You just said

10   that.

11   Q.   So, your texts with Dobson, it is a tracking number,

12   and "Chop"?

13   A.   Sometimes.  It varies.

14   Q.   And you are being cryptic because you don't want

15   people to know what you are talking about, aren't you?

16   A.   Ma'am, that is not cryptic, that is a slang.

17   Q.   Okay.  Well, let's talk about that slang.

18   A.   No problem.

19   Q.   Your testimony today was "chop" can mean anything.

20   It can mean all sorts of things?

21   A.   It is a slang.

22   Q.   But that is not what you told the agents, is it?

23   A.   They said that I told them that.

24        MS. PALUCH:  So, let's watch that portion.  If we

25   can play 21X.

**ATTACHMENT D**

1                (Exhibit 21X played in open court.)

2                MS. PALUCH:  Can you please play that one more time

3       so we can hear that.

4                (Exhibit 21X played in open court.)

5       Q.   (BY MS. PALUCH)  You didn't tell the agents that

6       "chop" can just mean anything, that it is slang?

7       A.   I am telling them various ways there.  I said it can

8       mean -- okay, remember all of that.  I am showing you how

9       you use the word right there, ma'am.  And I have the

10      dreads in, too.  See, I have the braids on the back of my

11      head.

12      Q.   So, sir, when you are receiving those tracking

13      numbers and you are responding "track" -- I am sorry, my

14      apologies.  You are responding "chop," the tracking

15      numbers, those aren't slang, are they?

16      A.   No, ma'am.

17      Q.   Right?  It is information; correct?

18      A.   Yes, ma'am.

19      Q.   And it is information you need to go get the

20      packages?

21      A.   Yes, ma'am.

22      Q.   Right.  And you are getting those tracking numbers

23      from Dobson?

24      A.   Yes, ma'am.

25                MS. PALUCH:  Okay.  Let's please display Government

**ATTACHMENT D**

1    Exhibit 79, which has previously been admitted.  And if

2    you can blow up the text underneath.

3    Q.   (BY MS. PALUCH)  So you admitted today that you set

4    up that 702 number; correct?

5    A.   Yes, ma'am.  Yes, ma'am.

6    Q.   You admit that you sent that phone number and the

7    account information to Dobson?

8    A.   Yes, ma'am.

9    Q.   And you registered that number.  And just minutes

10   after you did that, you texted that to Dobson?

11   A.   Yes, ma'am.

12   Q.   And that is the number used to defraud the woman,

13   Ms. Olson.  And you are arrested outside her house?

14   A.   Yes, ma'am.

15   Q.   Okay.  And you gave Dobson -- we have seen text

16   message after message, where you are giving him the

17   addresses of your friends for receipt of packages;

18   correct?

19   A.   Three addresses, yes, ma'am.

20   Q.   Right.  And those are addresses --

21        MS. PALUCH:  You can take the exhibit down.  Thank

22   you.

23   Q.   (BY MS. PALUCH)  Those are addresses where you knew

24   you would be able to access the package.  You could pick

25   it up from your friend; right?

**ATTACHMENT D**

1   A.   Those are addresses that anybody sends packages for

2   me to.  Yes, ma'am, I could go get a package.  Yes, ma'am.

3   Q.   Right.  They were going to hold that package for you

4   and wait until you come to pick it up; right?

5   A.   Yes, ma'am.

6   Q.   And you didn't want those packages to get snatched by

7   a porch pirate or something, did you?

8   A.   I presume, no.

9   Q.   You did that so they wouldn't get picked up at your

10  apartment building by someone else; right?

11  A.   I guess.  I didn't have the space in my apartment,

12  ma'am.

13  Q.   You would go to those addresses and wait, wouldn't

14  you?  You would wait on the doorstep until those packages

15  were delivered?

16  A.   Those addresses are addresses I am frequently at,

17  ma'am.

18  Q.   Did you make 500 for every package, or a thousand for

19  every package?

20  A.   No, ma'am.  It depends how far I have to go to get a

21  package.

22  Q.   Well, if you are getting a thousand or 500, it must

23  tell you that what is inside the package is worth a lot

24  more than 500 or a thousand; right?

25  A.   It is telling me the distance I have to go is

**ATTACHMENT D**

1    farther, not what is inside the package.

2    Q.   Well, you used an example of ordering a wig for

3    somebody online; if somebody wants a wig?

4    A.   Right.

5    Q.   So, a wig wouldn't be costing that much money?

6    A.   Depends.  If it is Malaysian, it is, like, 350 or 400

7    per bundle.

8    Q.   Okay.  Now, do you remember one of the addresses you

9    gave Dobson was Stacy's dad address, Elbert Byfield's

10   address?

11   A.   Yes, ma'am.

12   Q.   And that is the 433 Tompkins Avenue address?

13   A.   Yes, ma'am.

14        MS. PALUCH:  Please display Government Exhibit 96.

15   And if we can blow that up the bottom portion.

16   Q.   (BY MS. PALUCH)  And that's you texting Dobson,

17   Elbert Byfield's address; correct?

18   A.   Yes, yes.

19   Q.   You are texting Dobson under his name "Budman."  And

20   if you could look at the entry three from the bottom,

21   where you say "use this."  Okay.  Correct, sir, you see

22   that?

23   A.   Yes, ma'am.

24   Q.   All right.  You are giving Dobson that address so he

25   can use it for the delivery of packages?

**ATTACHMENT D**

```
 1    A.    Whatever package he was going to send, I guess.

 2    Q.    Okay.  Yet you were asked in your interview with the

 3    agents if you knew who lived at that address?

 4    A.    Yes, ma'am.

 5    Q.    Do you remember?

 6    A.    Yes, ma'am, I remember.

 7    Q.    Do you remember what you said?

 8    A.    I don't know that address.

 9    Q.    You said you didn't know who was at that address?

10    A.    Right.

11    Q.    It is your girlfriend's dad's house?

12    A.    Remember, you have the message where she sent me that

13    address, then I forwarded it to this.

14    Q.    So you've testified that --

15    A.    You showed that to me.

16    Q.    You testified --

17    A.    Yes, ma'am.

18    Q.    -- that you have been in a relationship with

19    Ms. Byfield for 3 years?

20    A.    Yes, ma'am.

21    Q.    She went on package pick-up trips with you?

22    A.    Yes, ma'am.

23    Q.    And she lives very close to where you live in

24    Brooklyn?

25    A.    Yes, ma'am.
```

**ATTACHMENT D**

1    Q.    And you are telling this jury that you had no idea

2    that that was her father's address?

3    A.    No, ma'am, I did not know the number of it.  I know

4    he lives on Tompkins, but she sent me the address, ma'am.

5    You showed it to me in my discovery.  If I had known, why

6    would I ask her for it?

7    Q.    If she sent you the address, you knew the address.

8    A.    Right.  That is what I am saying.  She sent it to me,

9    and I sent it to him.  You showed me that.

10   Q.    Sir, my question to you is, in your interview you

11   lied to the agents when you said --

12   A.    That I didn't know the address?

13         THE COURT:  Don't interrupt the questions.

14         THE WITNESS:  Sorry, ma'am.

15   Q.    (BY MS. PALUCH)  You lied in your interview, when

16   they said, who lives at the Tompkins Avenue address, and

17   you said that you didn't know?

18   A.    Yeah.

19   Q.    That was a lie?

20   A.    I guess, ma'am.  I don't remember.

21   Q.    There is a lot you don't remember; right?

22   A.    Yeah, ma'am.  Old age for me, ma'am.

23   Q.    You gave Dobson Lincoln Haughton's Toms River

24   address, as well?

25   A.    Yes, ma'am, definitely.

**ATTACHMENT D**

1          MS. PALUCH:  Actually, could you put that exhibit

2    up, as well.  That was Exhibit 96.  The top part of that

3    if we can blow that up.

4    Q.   (BY MS. PALUCH)  That is your friend, Carlene

5    Hosang's, address?

6    A.   Yes, ma'am.

7    Q.   You felt it important to give him that address five

8    times; right?

9    A.   Actually, the other one, too, it looks like.  Yeah.

10   Q.   Yep.  And you saw Agent Hoyland's slide that 19 -- 12

11   of the 19 slides, those were all delivered to Ms. Hosang's

12   address?

13   A.   Yes, ma'am, I saw that.

14   Q.   You paid her over $11,000 during the period of

15   conspiracy to receive those packages, didn't you?

16   A.   In the period of that year?

17   Q.   In that year.  In the year of 2018, you paid her over

18   $11,000?

19   A.   Probably more, ma'am.

20   Q.   She doesn't work for you, does she?

21   A.   Nobody works for me, ma'am.

22   Q.   Right.  So there is no other reason why you would pay

23   her $11,000?

24   A.   Yes, there are many more reasons, ma'am.  It is 10

25   and $20 out of $50 or $100.  She sends money for me.

**ATTACHMENT D**

```
 1   Q.   So, the fact --
 2   A.   She sends money for me to Jamaica for my family,
 3   ma'am.
 4   Q.   Well, we saw that.  We saw all the Western Union
 5   wires Hosang made for you.
 6        So, the fact that she is being paid right around
 7   the time she receives packages mailed by Ms. Olson is just
 8   a coincidence?
 9   A.   Is it the only time she is being paid, as you said,
10   from me?
11   Q.   We pointed out instances where she is being paid
12   right around the time that you -- that Dobson mailed
13   packages -- had packages mailed to her address.
14   A.   So wouldn't that be a coincidence separate than the
15   other $11,000?
16   Q.   I am saying, it is not a coincidence, sir, that you
17   paid her right around the time she accepted -- you paid
18   her to receive packages, didn't you?
19   A.   I gave her money to send to Jamaica, not pay her,
20   ma'am.  She doesn't work for me.
21   Q.   So, what is in it for all your friends to receive
22   your packages for you?
23   A.   What is in it for me?
24   Q.   What is in it for you?
25   A.   That is the whole point.
```

**ATTACHMENT D**

1  Q.   We will get to what is in it for you.  We have some

2  photos for that.

3  A.   Yeah.

4  Q.   Okay.  You remember the agents asked you about how

5  many times you had used Lincoln Haughton's address for

6  receipt of packages?

7  A.   I think so, ma'am.

8  Q.   And do you remember you told them twice?

9  A.   Twice.  Like two or three times.

10 Q.   And the agents confronted you with the evidence that,

11 in fact, you had six packages mailed to Lincoln's address,

12 and those were all packages from Ms. Olson?

13 A.   Right.

14 Q.   And do you remember you acted surprised about that?

15 A.   Because I was surprised.

16 Q.   You were just surprised because the agents knew about

17 it; right?

18 A.   No.  I was surprised so many -- six packages from

19 Ms. Olson came to Lincoln's address.

20 Q.   Now, back to the Byfield address.  You saw the texted

21 address in which the name Tom White is mentioned.  And the

22 agents asked you about Tom White?

23 A.   Yes, ma'am.

24 Q.   And you knew that there was no Tom White that lived

25 at that Byfield address?

**ATTACHMENT D**

1   A.   It's an apartment building, like mine, too, so --

2   Q.   So all these names in this case; Tom White, Mark

3   White --

4   A.   I cannot --

5   Q.   -- Frank White --

6   A.   I cannot --

7   Q.   -- you know nothing about?

8   A.   I cannot --

9        THE COURT:  Hold on.  Hold on.  Hold on.  Do not

10   interrupt the question.

11        THE WITNESS:  I am sorry, ma'am.

12        THE COURT:  The court reporter cannot take it down

13   if you are talking and she is talking.

14        THE WITNESS:  Sure, ma'am.  You are right.

15        MS. PALUCH:  My apologies, as well.

16        THE WITNESS:  My apologies.

17   Q.   (BY MS. PALUCH)  Sir, your testimony today is even

18   though all these names show up on your phone, you know

19   nothing about all of these fake names on your phone?

20   A.   No, ma'am.

21   Q.   Okay.  Well let's talk -- do you remember the agents

22   asked you about all those names and addresses on your

23   phone, and they asked you why is it they relate to the

24   names and addresses on Ms. Olson's spreadsheet?  And do

25   you remember what you responded?

**ATTACHMENT D**

1    A.   No, I don't.

2         MS. PALUCH:  So, if we can please pull up -- if I

3    can have one second, Your Honor.

4         THE COURT:  You may.

5         MS. PALUCH:  If we can play Exhibit 21W.

6         (Exhibit 21W played in open court.)

7    Q.   (By MS. PALUCH)  That was your response, sir.  That

8    is from Dobson telling you what to get?

9    A.   Yeah.  To pick a package up.

10   Q.   So Dobson is giving you false names and addresses --

11   go ahead.

12   A.   No, you go ahead.

13   Q.   I will move on.

14        Now, during your interview, you remember being

15   asked about all of the money you were sending to Jamaica

16   through Western Union?

17   A.   Yes, ma'am.

18   Q.   And you explained you couldn't send the money because

19   you were blocked --

20   A.   Yes, ma'am.

21   Q.   -- by Western Union.  You have to wait for me.

22   A.   Sorry.

23   Q.   And you asked a lot of other people to make these

24   wires to Western Union?

25   A.   Yes, ma'am.

**ATTACHMENT D**

1    Q.   And you explained that you had to have a lot of

2    different people make these wires so those people wouldn't

3    get blocked?

4    A.   Yes, ma'am.

5    Q.   And, specifically, with respect to your son's mother,

6    you said you didn't want her to be blocked as a scammer?

7    A.   Yes, ma'am.

8    Q.   And you brought up the term "scammer," right?

9    A.   Yes, ma'am.

10   Q.   The agents never used that word?

11   A.   No, ma'am.

12   Q.   And you are very familiar with scamming, aren't you?

13   A.   As I said, it is in on YouTube and TV all over

14   Jamaica.

15   Q.   Right.  And it is a part of the Jamaican culture,

16   isn't it?

17   A.   I don't know if it is part of the culture, but it is

18   all over the TV, yeah.

19   Q.   Well, music is part of culture, isn't it?

20   A.   Yes, ma'am.

21   Q.   And you are a DJ, and you've talked about how

22   important music is to you?

23   A.   Yes, ma'am.

24   Q.   And you don't just like, it is part of your job, how

25   you make a living, to keep up with music that is popular;

**ATTACHMENT D**

1    right?

2    A.   Yes, ma'am.

3    Q.   And you have heard of that song called "Western

4    Union," haven't you?

5    A.   "Western Union"?  Who does it?

6    Q.   The "Western Union" song in Jamaica about scamming

7    Americans.

8    A.   The "Western Union" song in Jamaica?  You are talking

9    about Vybz Kartel?

10   Q.   Your testimony is that you are not familiar with that

11   song?

12   A.   No, I am asking you to be clearer, ma'am.  A lot of

13   song have the "Western Union" name in it.

14   Q.   Okay.

15   A.   There is a commercial with it.

16   Q.   Okay.  How about the song "Reparation"?

17   A.   "Reparation" by Vybz Kartel is online from, like, 10

18   years ago, yes.

19   Q.   And these are songs by big-time Jamaican reggae

20   stars, aren't they?

21   A.   He is actually in prison, serving 30 years.

22   Q.   For scamming?

23   A.   No, for murder.

24   Q.   But your testimony is you had no idea what Dobson was

25   up to?

**ATTACHMENT D**

1    A.    Huh?

2    Q.    Let's go back to your interview.  You said you were

3    sending money to Jamaica to help build on a property that

4    you owned?

5    A.    Yeah.

6    Q.    Do you remember that?

7    A.    Yes, ma'am.

8    Q.    So you have all this money that is being wired to

9    Jamaica to build on that property?

10   A.    Ma'am, that money could buy me a quarter of the

11   island, if I had that money.

12   Q.    First of all, you testified to this jury that you

13   didn't have much money?

14   A.    Exactly.  I said if I had that money, I could have

15   bought a quarter of the island.  Do you know how much

16   money that is in Jamaica, ma'am?

17   Q.    Sir, I am asking you, how is it that are you able to

18   send so much money to Jamaica if you don't have any money?

19   A.    I work.  I send my money.  That is why I don't have

20   any, that is all I do is work.  That is why.

21   Q.    That $14,600 that was deposited into your account

22   that we were talking about --

23   A.    Yes, ma'am, by me.

24   Q.    -- that was right after Ms. Olson mailed 15,000?

25   A.    Ma'am --

**ATTACHMENT D**

1   Q.   She mailed 15,000, and on that day, you deposited

2   14,600.  Do you remember that?

3   A.   Ma'am, you showed three figures that she mailed.  She

4   mailed 15, 9, and something I saw earlier.  No, ma'am.

5   No, ma'am.

6   Q.   The same day that 14,600 hit your account, you did an

7   international wire.  And your testimony today was that was

8   to buy a Caterpillar in Jamaica?

9   A.   Yes.  Yes, a Caterpillar.

10  Q.   That was for a Caterpillar?

11  A.   That is not Ms. Olson's money, no.

12  Q.   But you paid 14,600 to buy a Caterpillar.

13  A.   In Jamaica, yes, ma'am.

14  Q.   But, you told everyone that -- you told the jury that

15  you were struggling financially?

16  A.   That is not my money, ma'am.  That wasn't for me,

17  that was for a client.  That is not my money, ma'am.  The

18  name is on there who got the money.

19  Q.   So it wasn't a Caterpillar for your property?

20  A.   No.

21  Q.   You were purchasing that for someone else?

22  A.   Yes, ma'am.  That is what I stated earlier.

23  Q.   Okay.  So, you talked about -- I think your testimony

24  was that you go paycheck to paycheck?

25  A.   DJ job to DJ job mostly, yes, ma'am.

**ATTACHMENT D**

1          MS. PALUCH:   Could you please display Exhibit 102.

2    And if you can flip through those pictures.   If we can go

3    back to that picture.

4    Q.   (BY MS. PALUCH)   You said everybody has pictures like

5    this on their phone; is that what you said?

6    A.   I guess not everybody, but a lot of people.

7    Q.   And that is your hand there; right, holding that

8    money?

9    A.   Yes, ma'am.   Definitely.

10   Q.   And I think you said that that was just payment you

11   must have received as a DJ?

12   A.   Probably.   Not at one gig but a collective.   I save.

13   Q.   The next photo.   Okay.   Is that the same thing; that

14   is just cash you must have received from some of your DJ

15   jobs?

16   A.   This?

17   Q.   Yes.

18   A.   I don't know, ma'am.

19   Q.   You have no idea about this cash photo that was

20   retrieved from your phone?

21   A.   Meaning, I don't know if that is what that is for,

22   no, I don't.

23   Q.   You don't know anything about that photo?

24   A.   Meaning, I don't know if it was from a DJ job, no, or

25   savings.

**ATTACHMENT D**

1    Q.   That is savings?

2    A.   Yeah.

3    Q.   So did you get that from the bank?

4    A.   Of course, ma'am.

5          MS. PALUCH:  Let's go to the next photo.  Is that

6    the last one?

7          If I can have one moment, Your Honor?

8          THE COURT:  You may.

9    Q.   (BY MS. PALUCH)  Sir, you have been in this country

10   since -- on your LPR status since 2015?

11   A.   LPR?

12   Q.   Legal permanent resident.

13   A.   Yes, ma'am.

14   Q.   Yes.  And is it fair to say that you have been kind

15   of job to job since 2015?

16   A.   A lot, yes, ma'am.

17         MS. PALUCH:  Could you please display Government

18   Exhibit 511?

19         THE COURT:  Hold on, hold on.  Is that admitted?

20         MS. PALUCH:  I apologize, Your Honor, it has not

21   been offered.  I would offer at this time, and move to

22   admit Government Exhibit 511.

23         THE COURT:  I don't have a 511.

24         MS. PALUCH:  It is marked for impeachment purposes,

25   Your Honor.  It is a photograph retrieved -- photographs

**ATTACHMENT D**

1    retrieved from the defendant's phone.

2         THE COURT:  Well, we can't show it if it is not

3    admitted.  So you are asking to have it admitted?

4         MS. PALUCH:  Yes, Your Honor.

5         THE COURT:  All right.  But you are using it for

6    impeachment?

7         MS. PALUCH:  I am using it for impeachment, and it

8    has been marked.

9         THE COURT:  I don't know what it is.

10        Any objection, Mr. Scabavea?

11        MR. SCABAVEA:  Your Honor, I am not sure what it

12   is, either.  I would like to see it before.

13        MS. PALUCH:  Yes.  If we could display -- actually,

14   we have hard copies.

15        THE COURT:  Let's show it on the monitor, but only

16   to the witness.

17        COURTROOM DEPUTY:  Yes, Your Honor.

18        MS. PALUCH:  These are photographs retrieved from

19   the defendant's phone, and they are taken in 2016.

20        THE COURT:  Any objections, Mr. Scabavea?

21        MR. SCABAVEA:  No, Your Honor, no objection.

22        THE COURT:  Is this a composite exhibit?

23        MS. PALUCH:  It is, Your Honor.

24        THE COURT:  All right.  Composite Exhibit 511 is

25   admitted.

**ATTACHMENT D**

1          (Exhibit No. 511 is admitted.)

2          THE COURT:  You may publish.

3          MS. PALUCH:  There is one photograph, Your Honor,

4     that we will take out of that, if you could give us a

5     moment.

6          One second, Your Honor.  Thank you.

7          THE COURT:  Why can't we show the picture you want

8     to show and skip over the one you don't want to show?  We

9     have been waiting for 3 minutes.

10         MS. PALUCH:  I apologize.

11         THE COURT:  Why don't we take our lunch recess.

12         MS. PALUCH:  It is ready now, Your Honor, but if

13    you'd rather break.

14         THE COURT:  Well, how much longer do you have?

15         MS. PALUCH:  Not much.  Actually, I probably have

16    about another 20 minutes.

17         THE COURT:  We will go ahead and take our recess

18    for lunch at this time.  Get that done and done correctly,

19    and we will come back and take it up after lunch.

20         Remember, ladies and gentlemen, do not talk to each

21    other about this case.  Do not conduct any research.

22         Court will be in recess until 12:45.

23         (Lunch is taken from 12:12 p.m. to 12:46 p.m.)

24         THE COURT:  All right.  Ms. West, would you please

25    bring in the jury.

**ATTACHMENT D**

1          All right.  You may be seated.

2          Ms. Paluch, you may proceed.

3          MS. PALUCH:  Thank you, Your Honor.

4    Q.  (BY MS. PALUCH)  Mr. Luton, when we left off, we were

5    talking about how you indicated that since you have been

6    in the United States, you were pretty much living paycheck

7    to paycheck?

8    A.   Most instances, yes.

9    Q.   And we saw some pictures that were of cash that were

10   on your phone.  And you admitted that was your hand

11   holding that cash?

12   A.   Yes, ma'am.

13         MS. PALUCH:  Could we please move to admit

14   Government Exhibit 511, which is a composite exhibit of

15   photographs taken from the defendant's phone?

16         THE COURT:  It has been admitted by stipulation.

17   You may publish.

18         MS. PALUCH:  If we can publish 511.  Please publish

19   the second page.

20   Q.  (BY MS. PALUCH)  Sir, that is a photo of cash taken

21   from your phone, and this is in 2016, while you are living

22   in the United States?

23   A.   Yes, ma'am.  That is fake.

24   Q.   That is fake money?

25   A.   Yeah.  All these pictures are fake.

**ATTACHMENT D**

1    Q.   All these pictures on your phone are fake?

2    A.   No, all these are fake, ma'am.

3    Q.   Let's go to the next photo.  Is that fake, as well?

4    A.   Yes, ma'am.

5    Q.   That is you in that picture, isn't it?

6    A.   Yeah.  It is actually a video.  You guys took a still

7    image off a video.

8    Q.   Oh, okay.  How about the next photo --

9    A.   Yeah.

10   Q.   -- is that fake money, too?

11   A.   Yes, ma'am.

12   Q.   That is fake money?

13   A.   Ma'am, we did a video set where we had a pistol and

14   some -- yeah.  You didn't show the rest of those.

15   Q.   How about that, is that fake money, too?

16   A.   Yeah.  That is Jamaican money.  That is probably,

17   like, 10,000 Jamaican, which is, like, $70 here.

18        MS. PALUCH:  Okay.  We can take those photos down.

19   Q.   (BY MS. PALUCH)  You testified -- we are talking

20   about Ms. Pitcher now.  And you testified that you never

21   knowingly received a package from Ms. Pitcher; correct?

22   A.   Yes, ma'am.

23        MS. PALUCH:  If you could please display Government

24   Exhibit 53.  If you can blow up that label.

25   Q.   (BY MS. PALUCH)  And, sir, do you see the "From"?

**ATTACHMENT D**

1    That is from Ms. Pitcher; correct?

2    A.   Yes, ma'am.

3    Q.   And that is addressed to you, at your address;

4    correct?

5    A.   Addressed to Bruce Luton, yes, ma'am.

6    Q.   Your testimony to this jury is you never received

7    that Certified Priority Express Mail package?

8    A.   Never knowingly received it, ma'am, because I would

9    have to sign for it, but not as Bruce Luton, though.

10   Q.   You would have had to sign for that.  And your

11   testimony to this jury is you never would have signed for

12   that?

13   A.   As Bruce Luton?

14   Q.   You are Bruce Luton.

15   A.   Leonard Luton.

16   Q.   Pardon me?

17   A.   Leonard Luton.

18   Q.   You go by Bruce?

19   A.   Yes, ma'am.  But, I am saying, if she knew me, she

20   would have put Leonard Luton.  You have seen my name in

21   her phone as Leonard Luton, so why Bruce?

22   Q.   Because you have told investigators in your interview

23   that you go by Bruce.

24   A.   Yeah, I know.  But what I am saying is her phone,

25   Ms. Pitcher, my name is clearly stated in the phone, so

**ATTACHMENT D**

1   why would she send me something with "Bruce Luton"?

2   Q.   Well, let's look at Exhibit 125.   That is the screen

3   shot, I believe, of her -- if you can go through the pages

4   there.   You see this is on Ms. Pitcher's phone, and it has

5   got "Bruce Luton."   So, Ms. Pitcher would know that your

6   name is Bruce Luton?

7   A.   See, that is the P.O. Box address for the account

8   that I have, too.

9   Q.   And that is your account?

10   A.   That is for the UPS account that I told you about.

11   Q.   I am sorry, sir.   Go ahead.

12   A.   The UPS account that I told you about, that is it.

13   Q.   She has your account number, and she, just for no

14   reason at all, deposited money into your bank account, and

15   you had no knowledge of it?

16   A.   Most people who I do business with, that's 90 percent

17   of who I give my banking information to.

18        MS. PALUCH:   If you could please display the first

19   page of that exhibit.

20   Q.   (BY MS. PALUCH)   And you would agree, wouldn't you,

21   that that is the 702 number you set up?

22   A.   Yes, ma'am.

23   Q.   And that's the 702 number you sent to Dobson?

24   A.   Yes, ma'am.

25   Q.   It just happens to be on Ms. Pitcher's phone?

**ATTACHMENT D**

1   A.   I couldn't prevent it.

2   Q.   Let's look at Government's Exhibit -- hold on a

3   second here.  Look at the checks that Ms. Pitcher

4   deposited.

5        MS. PALUCH:  If you can please display Government

6   Exhibit 56.  If you could go to the check.

7   Q.   (BY MS. PALUCH)  So that is the check we have been

8   talking about, sir.  And we have heard a lot of testimony

9   about that.  That went into your Bank of America account?

10  A.   Yes, ma'am.

11  Q.   But previously you had testified that when some of

12  your customers would pay you $50 here or a hundred dollars

13  there for a purchase --

14  A.   Some of my customers --

15  Q.   Sir, let me finish my question.  We were talking

16  about your business.  And you said if any of your

17  customers would pay you $50 here or a hundred dollars, you

18  wouldn't really notice that money going into your account.

19  Do you remember that testimony?

20  A.   Yes, ma'am.

21  Q.   But, we see this check, and then the next exhibit,

22  which is 57, is another check.  So we have got $19,000 --

23  I am sorry, $18,000 going into your account.  And your

24  testimony today is you wouldn't have noticed that amount

25  of money going into your account?

**ATTACHMENT D**

1   A.   I would have noticed that amount of money, ma'am.

2   Q.   You would have?

3   A.   In order to get to $9,000, of course, ma'am.

4   Q.   So, the records are clear that that money went into

5   your account --

6   A.   Yes, ma'am.

7   Q.   -- and you agree with me on that?  You agree that

8   money went into your account?

9   A.   Of course, ma'am.

10  Q.   But, your testimony on direct was you had no

11  knowledge about this money going into your account?

12  A.   Ma'am, I have no knowledge of a lot of the money

13  going in.  But, my opinion, when this money went into my

14  account, I terminated my account, because my account was

15  hacked from Bank of America.  The records are there.  I

16  reported fraud on my account, so it was locked down from

17  then.

18  Q.   Well, the jury saw you closed out that account in

19  June of 2018.  And these checks --

20  A.   For fraud.

21  Q.   Sir, let me finish.

22  A.   Sorry.

23  Q.   -- these checks were deposited around the April

24  timeframe.  So that money was in your bank account;

25  correct?

**ATTACHMENT D**

1    A.   Yes, ma'am.

2    Q.   All right.  And, remember earlier you were asked by

3    your counsel about that $14,600 deposit into your

4    account --

5    A.   Yes, ma'am.

6    Q.   -- and you said you would definitely notice that --

7    A.   Yes, ma'am.

8    Q.   -- because that is a large amount of money?

9    A.   Yes, ma'am.

10   Q.   Okay.  Let's talk about Western Union for a second.

11   A.   Yes, ma'am.

12   Q.   You said that you had to get other people to send

13   Western Union wire transfers for you because you were

14   blocked; remember?

15   A.   Yes, ma'am.

16        MS. PALUCH:  If we can please show Government

17   Exhibit 62.  And if you can please display page 4 of that

18   exhibit.

19   Q.   (BY MS. PALUCH)  So, sir, these are Western Union

20   transfers.  And you see your name.  These are all your

21   Western Union transfers for a certain period of time?

22   A.   Yes, ma'am.

23   Q.   Correct?

24   A.   Yes, ma'am.

25   Q.   So you weren't blocked from Western Union.  You were

**ATTACHMENT D**

1    able to send money; correct?

2    A.   These transactions are via credit card, not literally

3    going into a Western Union.  These are straight off my

4    credit card.

5    Q.   So, when you wanted to transfer money to Jamaica, you

6    could?

7    A.   Well, after this period, I was blocked.  Over credit

8    card, you are only allowed 300 to $400 to Jamaica.

9    Q.   Well, all of these transfers happened in the year

10   2008 [sic], during the time of this scheme; correct?

11   A.   2008?

12   Q.   2018.

13   A.   Yes.

14   Q.   I am sorry, 2018.

15   A.   I see the dates, yes, ma'am.

16   Q.   Yeah.  So, if you wanted to send small dollar

17   amounts, you could do so?

18   A.   Yeah.

19   Q.   But when you wanted to send the large dollar amounts,

20   you had Carlene Hosang do that; correct?

21   A.   Nah, I had anybody send anything over $300.

22   Q.   Sir, you just said that these are credit card

23   transfers.

24   A.   Most of them, yeah.

25   Q.   Sir, these are Western Union records.

**ATTACHMENT D**

1    A.   Right.  That is Western Union.  If you use the app,

2    it goes straight from your credit card.

3    Q.   The point I was -- I am trying to make, sir, is you

4    were not blocked from Western Union.

5    A.   I am blocked from Western Union, ma'am.

6    Q.   Okay.  So, you weren't blocked in 2018?

7    A.   I have been blocked since 2019.  So I was not, ma'am.

8    Q.   You were blocked, yet you --

9    A.   Blocked to walk into a store and go over a certain

10   amount, ma'am.

11        MS. PALUCH:  Please display Government Exhibit 92.

12   And if you could blow up that conversation.

13   Q.   (BY MS. PALUCH)  I believe your testimony on your

14   direct exam is that your response of "Xmax dat" was a

15   typo, and that what you really meant was "X marks the

16   spot"?

17   A.   No, not as you say, a typo, that is how I write it.

18   Q.   You mean "Xmax dat" is slang for --

19   A.   Like, Patois.

20   Q.   We have to talk one at a time, sir.

21        Your testimony is "Xmax dat" is slang for what?

22   A.   "Xmax dat," that is how you say it in Patois.  "Xmax

23   dat."

24   Q.   So, the fact that that tracking number right above

25   that is the tracking number for a package containing X Max

**ATTACHMENT D**

1    iPhones, for you that is just a coincidence?

2    A.   It would have been a question, ma'am.  I would have

3    asked it as a question.  I am asking.

4    Q.   Sir, you talked about what a long process it was to

5    receive your status as a legal permanent resident;

6    correct?

7    A.   Yes, ma'am.

8    Q.   And do you remember you stated that you have to go

9    through -- had to go through three or four interviews to

10   get that status?

11   A.   Many interviews.

12   Q.   And, I believe -- and I apologize if I just said

13   this, but --

14   A.   No problem.

15   Q.   -- it took 10 years?

16   A.   Yes, ma'am.

17   Q.   Took you 10 years?

18   A.   Yes, ma'am.

19   Q.   And you had to work really hard for that status?

20   A.   Yes, ma'am.

21   Q.   And do you remember filling out a lot of paperwork?

22   A.   Yes, ma'am.

23   Q.   Okay.  And do you remember back in 2005, you were

24   denied admission into the United States?

25   A.   Yes, ma'am.

**ATTACHMENT D**

1    Q.    And you were sent back on a plane; correct?

2    A.    Yes, ma'am.

3    Q.    And then do you remember filling out your

4    application, your paperwork in 2015, do you recall that?

5    A.    '15?

6    Q.    '15 is when you got your LPR status?

7    A.    Yes, ma'am.

8    Q.    Do you remember you were asked, "Have you ever been

9    refused admission to the United States at a port of

10   entry?"  Do you remember being asked that question?

11   A.    At an airport, yes, ma'am.

12   Q.    You were asked that question, and you said "No"?

13   A.    Right.

14   Q.    And that was a lie, sir?

15   A.    Ma'am, I got a written apology letter from the

16   Customs Office at the airport, ma'am.  That is what I

17   submitted to get my LPR.

18   Q.    Right.

19   A.    I acknowledge the fact that it was a mistake made,

20   ma'am.  They accused me of having --

21   Q.    The application that you signed under oath, you

22   stated that you had never been denied admission?

23   A.    Right.  Yes, ma'am.

24   Q.    And that wasn't true, though, sir?

25   A.    Pardon me?

**ATTACHMENT D**

1   Q.   That was not true, you had been denied admission?

2   A.   Yes, ma'am, but it was a mistake.

3   Q.   It was a mistake?

4   A.   And I got a letter for it, too, which I submitted to

5   the United States Embassy.

6   Q.   So, sir, you sat here for these three days, and you

7   have heard all of the evidence.  You have heard all of the

8   Government's evidence?

9   A.   Yes, ma'am.

10   Q.   And you realize that what we've proved here in court

11   was completely different from your story that you told the

12   agents after your arrest; correct?

13   A.   No, ma'am.

14   Q.   Well, you realized that you couldn't deny setting up

15   the 702 number --

16   A.   No.

17   Q.   -- correct?  And you couldn't deny picking up the

18   packages at all of those addresses, because Agent

19   Hoyland's report showed you there; correct?

20   A.   No, ma'am.

21   Q.   And you couldn't deny being in Colorado, even though

22   you denied it before --

23   A.   No, ma'am.

24   Q.   Let me finish, sir.  Even though you denied ever

25   being to Colorado before, once you sat here and saw all of

**ATTACHMENT D**

1    our evidence, you had to admit you had been in Colorado,

2    and you decided to change your story.

3    A.   No, ma'am, I didn't decide to change my story.  I was

4    arrested in Colorado.  Why would I deny being in Colorado?

5    Q.   You changed your story here in court, sir, during

6    your testimony, because you knew that your explanations

7    simply were not plausible; isn't that true?

8    A.   No, ma'am.

9         MS. PALUCH:  No further questions, Your Honor.

10        THE WITNESS:  Thank you.

11        THE COURT:  Any redirect?

12        MR. SCABAVEA:  Yes, Your Honor, just briefly.

13                   **REDIRECT EXAMINATION**

14   **BY MR. SCABAVEA:**

15   Q.   You previously testified about how you were feeling

16   during your post-arrest interview with law enforcement.

17   A.   Yes.

18   Q.   And you said you were very tired?

19   A.   Yeah, extremely.

20   Q.   You said you were scared?

21   A.   Oh, very.

22   Q.   You said you were in a situation you had never been

23   in before?

24   A.   Right.  I mean, yes, sorry.

25   Q.   And what is your economic status?

**ATTACHMENT D**

```
1    A.    You have my bank records.  Extremely --

2    Q.    Do you have a lot of money?

3    A.    Come on, man.  I've driven a 2005 Honda Civic, Bro,

4    for the past 4 or 5 years.  No.  Live in an apartment that

5    is rat infested, in the projects.  No.  For the last 5

6    years, no.

7    Q.    And you live with your mother; correct?

8    A.    Yes, I do, sir.

9    Q.    And you actually spend a lot of time in hotels with

10   your girlfriend?

11   A.    Yes.  I sleep in a lot of motels, yes.  Because it is

12   a two-bedroom apartment, and there are three of us.

13   Q.    And were those hourly hotels sometimes?

14   A.    Yeah, mostly hourly hotels.  I mean, what sense would

15   it make?

16          MR. SCABAVEA:  Thank you.  Nothing further.

17          THE WITNESS:  Thank you.

18          THE COURT:  All right.  Thank you, sir.  You may

19   step down.

20          Mr. Luton, you may step down.

21          THE WITNESS:  Thank you.  Thank you.

22          THE COURT:  All right.  Defense may call its next

23   witness.

24          MR. SCABAVEA:  Your Honor, our next witness is

25   Andre Luton, who will not be here today until 4 o'clock.
```

**ATTACHMENT D**

```
 1              THE COURT:  All right.  So, he will be here
 2    tomorrow?
 3              MR. SCABAVEA:  Yes, Your Honor.
 4              THE COURT:  All right.  Ladies and gentlemen, you
 5    are in for a treat, you get to go home early.  We don't
 6    have any more witnesses today.
 7              I believe that is going to be your last witness; is
 8    that correct?
 9              MR. SCABAVEA:  That's correct, Your Honor.
10              THE COURT:  Does the Government plan on putting on
11    any rebuttal?
12              MS. WEISS:  Very brief rebuttal, Your Honor.
13              THE COURT:  All right.  So, ladies and gentlemen, I
14    expect that tomorrow this case will be given to you to
15    begin your deliberations.  We will hear the rest of the
16    witnesses, then we will read the jury instructions, which
17    are the law, to you, then you will hear the closing
18    arguments.  And so I expect that by late morning, this
19    case will be given to you, and you will start your
20    deliberations.
21              So, you do not have to bring lunch tomorrow.  When
22    you deliberate, we provide lunch for you.  So, go home,
23    enjoy the rest of your afternoon.
24              Remember, do not discuss this case with anyone.  Do
25    not conduct any research.
```

**ATTACHMENT D**

1        Counsel, is there anything you need me for?

2        MS. PALUCH:  No, Your Honor.  Thank you.

3        MR. SCABAVEA:  No, Your Honor, nothing from the

4   defense.

5        THE COURT:  So, we will be in recess on this case

6   until 8 o'clock tomorrow morning.

7        (Outside the presence of the jury.)

8        THE COURT:  You may be seated.  I understand there

9   is an issue the Government wants to raise.

10       MS. PALUCH:  Thank you, Your Honor, for coming back

11  out on the Bench, we appreciate that.  It is our position

12  that based on the defendant's testimony today, that a

13  deliberate ignorance instruction from the Tenth Circuit

14  Pattern Instruction 1.37 should be considered and given.

15       THE COURT:  All right.  And what is the deliberate

16  ignorance instruction?

17       MS. PALUCH:  It is found at 1.37.  If I could read

18  it to the Court.  This is what we are proposing.  And,

19  Your Honor, what I will point out is the original 1.37

20  contains a last sentence that we found confusing, so we

21  are proposing to take that last sentence out.

22       The last sentence reads, "Knowledge can be inferred

23  if the defendant was aware of a high probability of the

24  existence of a fact, unless the defendant did not actually

25  believe that fact."  And we are proposing that just the

**ATTACHMENT D**

1     first portion of that instruction be given.

2          THE COURT:  So, it is, "When the word 'knowingly'

3     is used in these instructions, it means that the act was

4     done voluntarily and intentionally and not because of

5     mistake or accident.  Although knowledge on the part of

6     the defendant cannot be established merely by

7     demonstrating that the defendant was negligent, careless,

8     or foolish, knowledge can be inferred if the defendant

9     deliberately blinded himself to the existence of a fact."

10         MS. PALUCH:  That's correct, Your Honor.

11         THE COURT:  All right.  Mr. Scabavea?

12         MR. SCABAVEA:  I have no objection, Your Honor.

13         THE COURT:  All right.  So we will include this.

14    Is there a particular place you would like it inserted?

15         MS. PALUCH:  I think it should follow the "knowing"

16    instruction.

17         THE COURT:  Okay.

18         MS. PALUCH:  But wherever the Court thinks most

19    appropriate.

20         THE COURT:  All right.  We will take a look at that

21    and we will figure out where to put it.  I expect what we

22    will do is we will get the instructions finalized, send

23    them out to you before we copy them, which I would like to

24    do before tomorrow morning.  So I need you all to let me

25    know that the instructions, as we are proposing them and

**ATTACHMENT D**

1   numbering them, are appropriate, so we can go ahead and do

2   the copying tonight.

3            MS. PALUCH:  Certainly, Your Honor.

4            THE COURT:  All right.  Very good.  So we'll get

5   these sent out to you later this afternoon.

6            Anything further?

7            MS. PALUCH:  No, Your Honor, not for the

8   Government.

9            MR. SCABAVEA:  Not from the defense.

10           THE COURT:  All right.  Very good.  Thank you.

11           (Proceedings conclude at 1:09 p.m.)

12           **R E P O R T E R ' S   C E R T I F I C A T E**

13

14           I, Darlene M. Martinez, Official Certified

15   Shorthand Reporter for the United States District Court,

16   District of Colorado, do hereby certify that the foregoing

17   is a true and accurate partial transcript of the

18   proceedings had as taken stenographically by me at the

19   time and place aforementioned.

20

21           Dated this 9th day of March, 2020.

22

23           _____

24           s/Darlene M. Martinez

25           RMR, CRR

**ATTACHMENT D**