IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 19-cr-00207-RBJ

UNITED STATES OF AMERICA,

    Plaintiff,

v.

STACY A. BYFIELD,

    Defendant.

---

# PLEA AGREEMENT

---

The United States of America, by and through Jason R. Dunn, United States Attorney for the District of Colorado, and Martha A. Paluch, Assistant United States Attorney, and the defendant, Stacy A. Byfield, personally and through counsel, Jane Fisher-Byrialsen, hereby submit the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1.

## I. PLEA AGREEMENT

### A. Defendant's Obligations

The defendant agrees to waive her right to indictment by a grand jury. She also agrees to plead guilty to the one-count Information, charging a violation of 18 U.S.C. § 4, Misprison of a Felony. To the extent there is an argument about venue to the underlying felony, Wire Fraud in violation of Title 18, United States Code, Section 1343, the defendant waives any such argument. The defendant agrees to the appellate waiver, set forth fully below. The defendant agrees to pay $4,750 in restitution to Victim

**ATTACHMENT E**

COURT
EXHIBIT
1

Case 1:19-cr-00207-RBJ Document 39-5 Filed 05/20/19 USDC Colorado Page 2 of 16

S.O., which amount the parties will request be ordered joint and several with Defendant Leonard Luton, charged in Case No. 19-cr-00098-CMA, in the event Luton is found guilty. The defendant agrees to provide complete and truthful information pursuant to the terms set forth more fully below.

### B. The Government's Obligations

In exchange for the defendant's waiver of her right to indictment, plea of guilty, waiver of certain appellate rights as set forth fully below, and her agreement to cooperate, the United States Attorney's Office for the District of Colorado ("the government") agrees to not file any additional charges in the District of Colorado against the defendant based on the information presently known to the government as outlined in the statement of facts below. In addition, provided the defendant does nothing inconsistent with accepting responsibility between the date of the plea hearing and the date of sentencing, the government will recommend that the defendant receive the maximum reduction for acceptance of responsibility. The government is not bound to seek any particular sentence. The government's agreement with respect to cooperation is set forth below.

### C. The Defendant's Waiver of Appellate Rights

The defendant is aware that 18 U.S.C. § 3742 affords the right to appeal the sentence, including the manner in which that sentence is determined. Understanding this, and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence unless it meets one of the following criteria:

-2-

**ATTACHMENT E**

(1) the sentence exceeds the maximum penalty provided in the statute of conviction; (2) the sentence exceeds the advisory guideline range that applies to a total offense level of **13**; or (3) the government appeals the sentence imposed. If any of these three criteria apply, the defendant may appeal on any ground that is properly available in an appeal that follows a guilty plea.

The defendant also knowingly and voluntarily waives the right to challenge this prosecution, conviction, or sentence in any collateral attack (including, but not limited to, a motion brought under 28 U.S.C. § 2255). This waiver provision does not prevent the defendant from seeking relief otherwise available in a collateral attack on any of the following grounds: (1) the defendant should receive the benefit of an explicitly retroactive change in the sentencing guidelines or sentencing statute; (2) the defendant was deprived of the effective assistance of counsel; or (3) the defendant was prejudiced by prosecutorial misconduct.

### D. The Defendant's Cooperation Agreement

The defendant agrees to provide truthful, complete and accurate information, and agrees to cooperate fully with the government. Deliberate falsehoods or misinformation provided during her cooperation with the government would be grounds for rescission of this plea agreement as well as possible further prosecution for perjury or false statements. This cooperation will include, but is not limited to, the following:

    a. The defendant agrees to be fully debriefed, and to attend all meetings at which her presence is requested, concerning her participation in, and knowledge of, all criminal activities.

-3-

**ATTACHMENT E**

b. The defendant agrees to furnish to the government all documents and other material that may be relevant to this fraud investigation that are in the defendant's possession or control.

c. The defendant agrees to testify fully and truthfully at any proceeding in the District of Colorado or elsewhere as requested by the government. This extends to providing testimony about all information the defendant knows, not merely about the facts outlined in the statement of facts below.

d. The defendant agrees she will at all times give complete, truthful and accurate information and testimony and will fully and truthfully disclose all information with respect to the activities of herself and others concerning all matters about which the government inquires.

e. The defendant consents to postponements of her sentencing, as requested by the government and as approved by the Court. Should the defendant be required to provide testimony at a time subsequent to her sentencing in this case and should the defendant fail, at a later date, to comply with the obligation to testify, the government could seek to file charges which the government agreed not to pursue based on this Plea Agreement. The defendant specifically waives any statute of limitations defense in the event she violates the terms of this Plea Agreement so the government could pursue new charges.

It is understood that the government's determination of whether the defendant has cooperated fully and provided substantial assistance, and the government's assessment of the value, truthfulness, completeness and accuracy of the

-4-

**ATTACHMENT E**

cooperation, are within the government's sole discretion. Moreover, the defendant shall not be entitled to withdraw her plea if the government determines that she has not fully cooperated.

The defendant's full cooperation, including truthful testimony - if required, has not yet been completed. However, in light of defendant's substantial assistance to date, the United States Attorney anticipates that, pursuant to U.S.S.G. § 5K1.1, it will file a timely motion for downward departure at the time of sentencing. The Court has the sole discretion to grant such a motion. The nature and extent of the defendant's cooperation, as well as the final requested departure, will be set forth in the government's § 5K1.1 motion. The parties understand and agree that the determination of whether or not the defendant has fully cooperated in compliance with the terms of this plea agreement is entirely within the discretion of the government. The United States agrees to consider the totality of the circumstances, including but not limited to, the following factors, in determining whether, in the sole discretion of the United States Attorney, the defendant has provided substantial assistance which would merit a motion by the United States for a downward departure from the applicable Guideline:

    a.    The United States' evaluation of the significance and usefulness of the defendant's assistance;

    b.    The truthfulness, completeness, and reliability of any information or testimony provided by the defendant;

    c.    The nature and extent of the defendant's assistance;

**ATTACHMENT E**

  d. Any harm or risk of harm to the defendant or the defendant's family resulting from the defendant's assistance; and

  e. The timeliness of the Defendant's assistance.

The parties recognize that any sentence requested by the government will be a recommendation to the Court and that the defendant's ultimate sentence will rest solely within the discretion of the sentencing Court.

The defendant also acknowledges that she will not be able to withdraw her guilty plea in the event that the Court elects not to grant any downward departure pursuant to the request made by the government or rejects the amount of the departure requested by the government.

The defendant may not contest the government's ultimate determination as to whether a § 5K1.1 motion is appropriate in this case. The government has not promised a reduction or the amount of any reduction. Again, the defendant understands she will not receive any reduction if she refuses to provide complete and true information to the government and to testify truthfully in any proceeding.

## II. ELEMENTS OF THE OFFENSE

In order to be convicted of a violation of Title 18, United States Code, Section 4, Misprison of a Felony, the government would have to prove the following elements beyond a reasonable doubt:

First, a federal felony was committed;

Second, the defendant had knowledge of the commission of that felony;

Third, the defendant failed to notify an authority as soon as possible. An

**ATTACHMENT E**

"authority" includes an FBI agent; and

Fourth, the defendant did an affirmative act, as charged, to conceal the crime. *Tenth Circuit Pattern Jury Instructions (Criminal Cases)*, § 2.08 (2011 ed.).

## I. STATUTORY PENALTIES

The maximum statutory penalty for a conviction of 18 U.S.C. § 4, is as follows: not more than 3 years of imprisonment; a fine of not more than $250,000.00, or both imprisonment and a fine; not more than 1 year of supervised release; and a $100.00 special assessment fee. If probation or supervised release is imposed, a violation of any condition of probation or supervised release may result in a separate prison sentence and additional supervision.

## II. COLLATERAL CONSEQUENCES

The conviction may further cause the loss of certain civil rights, including, but not limited to, the right to possess a firearm, vote, hold elected office, and sit on a jury.

## III. STIPULATION OF FACTS

The parties agree that there is a factual basis for the guilty plea that the defendant will tender pursuant to this plea agreement. That basis is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below which are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

**ATTACHMENT E**

This stipulation of facts does not preclude either party from hereafter presenting the Court with additional facts which do not contradict facts to which the parties have stipulated and which are relevant to the Court's guideline computations, to other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

The parties agree that the date on which relevant conduct began was in February 2018. The parties agree and stipulate to the following facts:

From February of 2018 through January 22, 2019, Defendant Leonard Luton, charged in Case No. 19-cr-00098-CMA, and others known and unknown to the government, devised a scheme and artifice to defraud victim S.O. S.O. is an 80-year old Estes Park, Colorado resident. S.O. was directed to mail and wire approximately $1 million as a result of false and fraudulent pretenses, representations, and promises made to her relating to a lottery scheme.

As part of the lottery scheme, Leonard Luton and his associates contacted and caused to be contacted S.O. by mailing her a flyer indicating she won $2,800,000 from a lottery drawing in Spain. The flyer informed S.O. that she was required to remit 5% of the total amount of the winnings to a promotional company in order to receive her winnings.

Luton and his associates contacted and caused to be contacted S.O. by telephone. One of the individuals who called S.O. identified himself as Frank White. White directed S.O. to pay the fees she owed in various ways, to include mailing via private and commercial interstate carriers, such as the United Parcel Service (UPS) and Federal Express (FedEx), cashier's checks and packages containing cash. White also directed

**ATTACHMENT E**

S.O. to wire money via Western Union on two separate occasions for a total of $5,880. In addition, White directed S.O. to mail two iPhones on three separate occasions, for a total of six iPhones. White directed S.O. to mail the packages of cashier's checks, cash, and iPhones to addresses to which Leonard Luton and his associates had access.

Specifically, S.O. was directed to mail iPhones to a J.A. at Luton's home address, an address Luton shares with his mother. Luton's mother confirmed to federal agents Luton's receipt of one package addressed to J.A. and the date of the receipt of that package coincides with S.O.'s mailing of iPhones to J.A. at that address. At the time of his arrest, Luton had on his person one of the iPhones sent by S.O.

On October 2, 2018, S.O. handed over $65,000 in cash in person to two individuals who showed up at her door at approximately 11:00 p.m. These individuals stated they were sent to S.O.'s residence by Frank White and one individual showed S.O. a badge stating he was with the FBI.

White directed S.O. to send two packages of cash to a T.W. at a Tompkins Avenue address in Brooklyn. One package, mailed on November 7, 2018, contained $15,000 and the second package, mailed on November 8, 2018, contained $20,000. **BYFIELD's** father resides at this address. **BYFIELD** maintains Luton and her father are friends and she had no knowledge of these deliveries.

Soon after S.O. handed over and mailed these amounts of cash, Luton sent text messages to **BYFIELD** directing her to wire funds via Western Union to Jamaica. **BYFIELD** explained that on this and other occasions when Luton asked her to wire funds, she asked others, and paid them a small fee, to wire the money for her because she was

-9-

**ATTACHMENT E**

blocked from sending money by Western Union. She utilized multiple senders on the same day to avoid detection by Western Union and so that any one individual would not expect being paid too often for wiring the funds. **BYFIELD** received the money and the names of persons to receive the wired funds from Luton. **BYFIELD** took photos of the receipts, and texted the photos to Luton highlighting the tracking number. In addition to having others wire money for him, **BYFIELD** admits that she and others picked up money wired in her and their names via Western Union and gave the money to Luton. **BYFIELD** explained Luton did this so that he would not have to use his name for receipt of the funds.

While **BYFIELD** maintains that she did not know specifically about the lottery scheme, she admits she knew that Luton had obtained these funds through fraud, as she knew he did not earn enough money through his side jobs to be sending and receiving so much money. **BYFIELD** also knew about a scheme Luton operated whereby he would file false insurance claims related to phones shipped to him. In addition, **BYFIELD** overhead conversations between Luton and others regarding the picking up of packages. Specifically, **BYFIELD** knew that one of Luton's friends agreed to accept packages on Luton's behalf. In addition, **BYFIELD** explained that if Luton knew a package was coming, he would wait outside the building for it to arrive, including at her residence.

Evidence of the following wire transfers were recovered from **BYFIELD's** phone.[1] Specifically, **BYFIELD** admits that at Luton's direction, she directed others to wire the following amounts to individuals in Jamaica on the following dates:

---

[1] The Apple iMessage date on **BYFIELD's** iPhone only dated back to October 30, 2018.

**ATTACHMENT E**

| Date | Sender's Name | Amount | Notes |
|---|---|---|---|
| 12/1/2018 | J.S.1 | $950 (shown on receipt) | Photo of receipt sent from Byfield to Luton. Luton provided the recipient name in Jamaica |
| 12/6/2018 | J.S.2 | $950 (shown on receipt) | Photo of receipt sent from Byfield to Luton. Luton provided the recipient name in Jamaica and asked Byfield to send $950 |
| 12/6/2018 | T.R. | $950 (see notes) | Photo of receipt sent from Byfield to Luton, but amount cut-off from photo. Luton provided the recipient name in Jamaica and asked Byfield to send $950 |
| 01/18/2019 | J.S.2 | $950 (see notes) | Photo of receipt sent from Byfield to Luton, but amount cut-off from photo. Luton provided the recipient name in Jamaica and asked Byfield to send $950 |
| 01/19/2019 | J.S.2 | $950 (see notes) | Photo of receipt sent from Byfield to Luton, but amount cut-off from photo. Luton provided the recipient name in Jamaica and asked Byfield to send $950 |

The total amount of funds wired by **BYFIELD** as evidenced by her phone is $4,750.

Such wire transfers were in violation of Title 18, United States Code, Section 1343.

By the fall of 2018, S.O. had been in contact with law enforcement, knew that she was the victim of a scam, and had stopped sending money. On January 22, 2019, White told S.O. that he would be sending "agents" to her home that day to pick up the remaining $39,600 S.O. owed to receive her winnings. Estes Park Police Department (EPPD) responded to S.O.'s residence and remained with S.O. until the "agents" arrived. On January 21, 2019, **BYFIELD** agreed to accompany Luton on a road trip from Brooklyn,

**ATTACHMENT E**

New York, to Estes Park, Colorado, to pick up a package. **BYFIELD** acknowledged that she had traveled with Luton before to pick up unknown packages and had spent nights in hotels during those trips. While **BYFIELD** maintains she did not know the purpose of the trip specifically was to go to S.O.'s residence, she admits she knew the package they would pick up likely contained money. In addition, **BYFIELD** maintains that she knew nothing about the person from whom they were picking up the package. During the road trip from Brooklyn to Estes Park, **BYFIELD** overheard numerous conversations between Luton and a male individual in which the two discussed Luton and **BYFIELD**'s location relative to their arrival in Colorado. When they arrived at S.O. residence on January 22, 2019, Luton told **BYFIELD** to go to S.O.'s front door. **BYFIELD** did so and was arrested by EPPD in the driveway. Luton was ordered out of his vehicle parked in front of S.O.'s residence and was arrested as well.

After her arrest, FBI Special Agent Kevin Hoyland and Estes Park Police Detective Caleb Robertson interviewed **BYFIELD**. At the time of her interview, **BYFIELD** knew that the federal felony of wire fraud had been committed, through the Western Union wire transfers she directed others to make as directed by Luton. She had knowledge of that felony because she participated in it. She committed an affirmative act to conceal the crime by failing to notify an authority of this felony as soon as possible; that is, she failed to notify FBI Special Agent Hoyland during her post-arrest interview that she had wired fraud proceeds via Western Union to Jamaica at Luton's direction.

Over the course of the scheme, S.O. lost over $1 million.

12

**ATTACHMENT E**

## IV. SENTENCING COMPUTATION AND 3553 ADVISEMENT

The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters that are in dispute.

A. The guideline provision applicable to misprision of a felony is U.S.S.G. § 2X4.1. This provision states that the base offense level is **9 levels** lower than the offense level for the underlying offense. Here, the underlying offense is wire fraud, in violation of 18 U.S.C. § 1343. The applicable guideline provision for wire fraud is § 2B1.1(a)(1). The base offense level is therefore **7**.

B. A **14-level** increase applies pursuant to § 2B1.1(b)(1)(H) because the loss from the scheme was more than $550,000 but less than $1,500,000.

C. A **2-level** increase applies pursuant to § 2B1.1(b)(2)(A)(iii) because the offense resulted in substantial financial hardship to victim S.O.

D. A **2-level** increase applies pursuant to § 2B1.1(b)(10)(B) because a substantial part of the fraudulent scheme was committed from outside the United States. The defendant reserves the right to dispute this enhancement.

**ATTACHMENT E**

E. There are no victim-related, obstruction of justice, or role in the offense adjustments. See § 3B1.1; § 2X4.1 App. N. 2; *United States. Carlos,* No.CR 09-2806 JB, 2012 WL 1378516, at *6 (Apr. 9, 2012) (unpublished) ("an adjustment for reduced culpability is incorporated in the base offense level" for misprison).[2]

F. The adjusted offense level is therefore **25**. **Nine offense levels** lower than **25** is **16**. § 2X4.1.

G. Pursuant to §3E1.1(a) and (b), provided the defendant does nothing inconsistent with accepting responsibility between the date of the plea hearing and the date of sentencing, the defendant should receive the full three-level reduction for acceptance of responsibility. According to the government's guideline calculation, the resulting total offense level would be **13**.

H. The parties understand that the defendant's criminal history computation is tentative. The Court ultimately determines the criminal history category. The information known to the parties shows that the defendant has no prior criminal history. The defendant's criminal history category is tentatively estimated to be Category I.

I. Assuming the tentative criminal history facts above are accurate, the career offender/criminal livelihood/armed career criminal adjustments do not apply.

---

[2] While the United States believes S.O. qualifies as a vulnerable victim, the evidence does not support a finding that **BYFIELD** knew or reasonably should have known S.O.'s identity or age at the time she went to her front door.

**ATTACHMENT E**

Case 1:19-cr-00207-RBJ Document 39-5 Filed 05/20/19 USDC Colorado Page 15 of 16

J. The guideline range resulting from the government's estimated total offense level of **13**, and the tentative Criminal History Category I, is **12-18 months**. However, in order to be as accurate as possible, with the criminal history category undetermined at this time, the estimated offense level could conceivably result in a range from **12** months (bottom of Category I) to **41** months (top of Category VI).

K. Pursuant to guideline § 5E1.2, assuming the parties' estimated offense level of **13** is accurate, the fine range for this offense would be between $5,500 and $55,000, plus applicable interest and penalties.

L. Pursuant to § 5D1.2(a)(3), if the court imposes a term of supervised release, that term shall be not more than one year.

M. The parties understand that although the Court will consider the parties' estimate, the Court must make its own determination of the guideline range. In doing so, the Court is not bound by the position of any party.

N. The defendant agrees to pay restitution to the victim S.O. in the amount of $4,750 which amount represents the fraud proceeds **BYFIELD** wired to Jamaica. The parties request that this amount be ordered to be paid jointly and severally with Defendant Leonard Luton, charged in Case No. 19-cr-00098-CMA, should he be convicted.

No estimate by the parties regarding the guideline range precludes either party from asking the Court, within the overall context of the guidelines, to depart from that range at sentencing if that party believes that a departure is specifically authorized by the guidelines or that there exists an aggravating or mitigating circumstance of a kind, or to

**ATTACHMENT E**

a degree, not adequately taken into consideration by the United States Sentencing Commission in formulating the advisory guidelines. Similarly, no estimate by the parties regarding the guideline range precludes either party from asking the Court to vary entirely from the advisory guidelines and to impose a non-guideline sentence based on other 18 U.S.C. § 3553 factors.

## V. ENTIRE AGREEMENT

This document states the parties' entire agreement. There are no other promises, agreements (or "side agreements"), terms, conditions, understandings, or assurances, express or implied. In entering this agreement, neither the government nor the defendant has relied, or is relying, on any terms, promises, conditions, or assurances not expressly stated in this agreement.

Date: 5/20/19

Stacy A. Byfield
Defendant

Date: 5/20/19

Jane Fisher-Byrialsen
Attorney for Defendant

Date: 5/20/19

Martha A. Paluch
Assistant U.S. Attorney

-16-

**ATTACHMENT E**