**FILED**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

**JUL 24 2023**

JEFFREY P. COLWELL
CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

LEAONARD LUTON,
    Petitioner,

v.

UNITED STATES OF AMERICA,
    Respondent.

Case No(s). _____

_____

DECLARATION IN SUPPORT OF MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE UNDER 28 U.S.C. § 2255

DECLARATION OF LEONARD LUTON

I, Leonard Luton, declare:

1. My name is Leonard Luton. I am over 18 years of age. I am incarcerated at the Federal Correctional Institution in Berlin, New Hampshire. I am fully competent to make this Declaration and I have personal knowledge of the facts stated in this Declaration. To my knowledge, all the facts stated in this Declaration are true and correct.

2. I am the petitioner in this matter. I make this Declaration in support of the Motion to Vacate, Set Aside, or Correct Sentence Under 28 U.S.C. § 2255.

3. In July 2019, I was charged in a superseding indictment with one count of conspiracy to commit mail fraud and nine counts of aiding and abetting mail fraud, in violation of 18 U.S.C. §§ 1341, 1349, and 2. After a jury trial in the United States District Court for the District of Colorado, I was convicted on all but one count and was sentenced to 108 months on each count to run concurrently, with three years of supervised release.

1

4. Prior to my trial, I met with my counsel, Mark Edward Scabavea, Esq., three times.

5. The first meeting was early in the case, and, at that time, I told Scabavea that the cellphones at issue never came to my hands, and that I had purchased the cellphone seized from my person at the time of my arrest from a friend.

6. I also told Scabavea that I had never been to Colorado prior to January 22, 2019.

7. I admit that I lied during that meeting. I believed that my codefendant, Rajay Dobson, and I had covered our tracks well. I also believed that Scabavea would not have represented me to the fullest if I had told the truth. I also didn't know how much evidence the government had against me at the time.

8. The second meeting I had with Scabavea, he brought some of the records and receipts that the government was prepared to introduce at trial.

9. The records confirmed that the cellphone seized from my person was one of the cellphones purchased by the alleged victim, S.O.

10. The receipts proved that a package of a set cellphones mailed to my address by S.O. had been signed for by me.

11. Another receipt was from my bank, and my signature on that receipt matched my signature for the cellphones.

12. There were also cellphone records from my cellphone with multiple phone numbers for Dobson, and even messages between

Dobson and others about addresses where packages would arrive and tracking numbers associated with those mailings.

13. This evidence blew my mind. After I saw this evidence, I thought that my chance of winning were not good at all.

14. Therefore, I asked Scabavea about pleading guilty.

15. Scabavea told me that we would discuss it another time.

16. The third meeting I had with Scabavea, we discussed what would happen if I plead guilty to all the charges.

17. Scabavea told me that If I plead guilty to all the charges, I would be admitting to all the government's allegations and therefore I would be sentenced to the maximum penalty of 20 years imprisonment.

18. In none of the three meeting I had with counsel was the Sentencing Guidelines discussed.

19. In none of those three meetings did Scabavea ever discuss what possible sentences I was facing, how the possible sentence would be affected if I were to plead guilty as opposed to going to trial, or the impact of the Sentencing Guidelines.

20. Scabavea never told me that there was a possibility of a deal with the government.

21. Instead, Scabavea told me that if I didn't go to trial and deny the government's allegations, I was certain to receive 20 years.

22. Scabavea discussed why he was certain I would receive 20 years, and explained that I would receive 20 years because the government alleged that the scheme was to defraud older people, i.e., an 80 year-old and a 67 year-old; that at least one of the operators of the scheme resides in another country, i.e., Jamaica; that a good portion of the illegal proceeds was wired to Jamaica; and the use of aliases to perpetrate the scheme.

23. Scabavea never told me that I could have pled "straight up" to the indictment without a plea offer or agreement.

24. In fact, Scabavea recommended that I go to trial.

25. My decision to proceed to trial would have been different if Scabavea had properly advised me and, had had I known that with a plea I could have received way less than 20 years by pleading guilty, I would not have gone to trial.

26. The only reason I went to trial is because Scabavea told me that pleading guilty meant that I would be admitting to all the allegations made by the government, which would guarantee me a 20 year sentence.

I declare under the penalty of perjury that the foregoing Declaration is true and correct. I have executed this Declaration on Julu 18, 2023, at Berlin, New Hampshire.

_____
Leonard Luton

4

ATTACHMENT A

In July 2019, the petitioner was charged in a superseding indictment with one count of conspiracy to commit mail fraud and nine counts of aiding and abetting mail fraud, in violation of 18 U.S.C. §§ 1341, 1349, and 2. Dkt. No. 45. After a jury trial in the United States District Court for the District of Colorado, the petitioner was convicted on all but one count and was sentenced to 108 months on each count to run concurrently, with three years of supervised release. Declaration of Leonard Luton ("Luton's Decl."), attached hereto as Exhibit A, ¶ __3__.

The evidence at trial established that between February 2018 and January 22, 2019, the petitioner's co-conspirator, Rajay Dobson, calling himself "Frank White," convinced the victim, S.O. from Estes Park, Colorado, that she had won a $2.8 million dollar lottery and a Mercedes Benz. Presentence Investigation Report ("PSR"), ¶ 9. White told S.O. she need to mail cash, cashier's checks, and cellphones via UPS and FedEx to pay the "fees" required in order to receive her prizes. Id. White directed S.O. to mail these payments to the petitioner's mailing address and to the addresses of his friends and associates. Id.

In addition, White directed S.O. to mail some of the cashier's checks to a woman with the initials S.P. who lived in Grandville, Michigan. PSR, ¶ 10. White also directed S.O. to wire funds to S.P., which S.O. did. Id. In total, S.O. sent over $150,000 to S.P. at White's direction. Id. Bank and Western Union records confirm this amount. Id.

An interstate investigation by federal and local law enforcement confirmed that S.P. was used in this scheme as a

1

money mule. PSR, ¶ 11. S.P. also had been told that she had won a lottery, in her case a prize of $5 million dollars, and that in order to receive her winnings, she needed to receive money from others and send it on. Id. She received instructions from a man calling himself "David." Id. David told S.P. that once she deposited funds received from S.O., S.P. was to obtain cashier's checks made payable to the petitioner. Id. Specifically, screenshots from S.P.'s phone confirmed that she received a text from David providing her with the petitioner Leonard Luton's name, his bank account, and routing information. Id. The cashier's checks written by S.O. were cashed out by S.P. and then deposited by S.P. into the same account listed in the text message she received from David. The petitioner's bank account records confirmed that these amounts were deposited into a Bank of America account in the petitioner's name, and for which he was the only signatory. Id.

White also directed S.O. to hand over cash in person on two separate occasions. PSR, ¶ 12. The first instance occurred in October 2018, when White directed S.O. to hand over $65,000 in cash to persons who came to her home in Estes Park at approximately 1:30 a.m. on October 3. Id. At that time, a man knocked on S.O.'s door, identified himself as an FBI agent, showed S.O. what appeared to her to be a real FBI badge, and directed her to hand over the cash. Id. S.O. walked down her sidewalk to talk to a man in the car in front of her house who represented himself to be the "merchant banker" White told her would come to her home. Id. This "banker" instructed S.O. to hand over the cash to the man who had come to her door, and S.O. did so. Id.

White also directed S.O. to hand over approximately $39,000

2

in cash to persons who came to her home in Colorado on January 22, 2019. PSR, ¶ 13. Law enforcement was involved in this case by that time, and they had set up a covert operation to apprehend whoever arrived at S.O.'s home to pick up the funds. Id. When the petitioner and his girlfriend Stacy Byfield arrived at S.O.'s home, they were both arrested. Id. In his post-arrest interview, the petitioner explained to the agents that he was at S.O.'s home at the direction of his friend Rajay Dobson, who asked the petitioner to travel from the petitioner's home in Brooklyn, New York, to S.O.'s residence in Estes Park to pick up a package. Id. At that time, he denied being part of the October hand-to-hand transaction, and indeed, he denied ever having been to Colorado before. Id.

The Cellebrite extraction of the petitioner's cellphone provided multiple phone numbers for Dobson, and the petitioner confirmed two of those numbers during his post-arrest interview. PSR, ¶ 14. The petitioner, Dobson, and others communicated with each other via text messages and other messaging services about the addresses where particular packages S.O. mailed would arrive and tracking numbers associated with those mailings. Id. Call detail records of the petitioner's phone confirmed his presence at the address where a particular package was scheduled to arrive, around the time of the expected delivery. Id. The government presented, through expert testimony of Special Agent Kevin Hoyland, 19 instances where this occurred with respect to packages mailed by S.O. as directed by White. Id. Voicemail messages left by Dobson and retrieved from the petitioner's phone indicated the two discussed the distribution of funds between themselves and others. Id.

At trial, the government presented certified bank records

3

that established the withdrawals of funds from S.O.'s bank accounts, and the deposits into, and withdrawals of cash from, the petitioner's bank accounts. PSR, ¶ 15. Many of these deposits occurred at or near the dates of deliveries of cash from S.O. Id. The government also presented evidence of the petitioner directing others to wire funds to Jamaica on multiple occasions, and of him paying his friends hundreds of dollars around the times of deliveries of S.O. packages to their addresses. Id.

The government proved through the testimony of FBI Forensic Accountant Matt Morgan, that through this lottery scheme, the petitioner and Dobson defrauded S.O. out of over $700,000 as alleged in the Superseding Indictment. PSR, ¶ 16.

Relevant here, prior to trial, the petitioner met with his counsel, Mark Edward Scabavea, Esq., three times. Luton's Decl., ¶ 4 . The first meeting was early in the case, and, at that time, the petitioner told Scabavea that the cellphones at issue never came to his hands, and that he had purchased the cell phone seized from his person at the time of his arrest from a friend. Id., ¶ 5 . The petitioner also told Scabavea that he had never been to Colorado prior to January 22, 2019. Id., ¶ 6 . The petitioner admits that he lied during that meeting, that he believed that he and Dobson had covered their tracks, that he believed that Scabavea would not have represented him to the fullest if he had told the truth, and that he also didn't know how much evidence the government had against him. Id., ¶ 7 .

The second meeting the petitioner recalls having with Scabavea, at that time, Scabavea brought some of the records and receipts that the government was prepared to introduce at trial. Id., ¶ 8 . The records confirmed that the cellphone seized from

4

the petitioner was one of the cellphones purchased by S.O. Id., ¶ 9 . The receipts proved that a package of a set of cellphones mailed to the petitioner's address by S.O. had been signed for by the petitioner. Id., ¶ 10 . Another receipt was from the petitioner's bank, and the petitioner's signature on that receipt matched the petitioner's signature for the cellphones. Id., ¶ 11 .

There were also cellphone records from the petitioner's cellphone with multiple phone numbers for Dobson, and there was even messages between Dobson and others about addresses where packages would arrive and tracking numbers associated with those mailings. Id., ¶ 12 .

This evidence "blew [the petitioner's] mind." Id., ¶ 13 . Accordingly, after seeing this evidence, the petitioner thought that his chances of winning at trial were not good at all. Id., ¶ 14 . Therefore, the petitioner asked Scabavea about pleading guilty. Id., ¶ 14. Scabavea told the petitioner that they would discuss it another time. Id., ¶ 15 .

At the third meeting the petitioner had with Scabavea, he recalls discussing what would happen if he pled guilty to all the charges. Id., ¶ 16 . Scabavea told the petitioner that if he pled guilty to all the charges, he would be admitting to all the government's allegations and therefore would be sentenced to 20 years, the maximum sentence for his charges. Id. ¶ 17 .

In none of those three meetings that the petitioner had with Scabavea was the Sentencing Guidelines discussed. Id., ¶ 18 . Similarly, in none of those three meeting did Scabavea ever discuss with the petitioner what possible sentences he was

5

facing, how the possible sentence would be affected if he were to plead guilty as opposed to going to trial, or the impact of the Sentencing Guidelines. Id., ¶ 19.

Scabavea never told the petitioner that there was a possibility of a deal with the government. Id., ¶ 20. Instead, Scabavea told the petitioner that if he didn't go to trial and deny the government's allegations, he was certain to receive 20 years. Id., ¶ 21. Scabavea discussed why he was certain the petitioner would receive 20 years, and explained that the petitioner would receive 20 years because the government alleged that the scheme was to defraud older people, i.e., an 80 year-old and a 67 year-old; that at least one of the operators of the scheme resides in another country, i.e., Jamaica; that a good portion of the illegal proceeds was wired to Jamaica; and the use of aliases to perpetrate the scheme. Id. ¶ 22.

Most significantly, Scabavea never told the petitioner that he could have pled "straight up" to the indictment without a plea offer or agreement. Id. ¶ 23. And, finally, Scabavea recommended that the petitioner go to trial. Id., ¶ 24.

The petitioner asserts that his decision to proceed to trial would have been different if Scabavea had properly advised him and that, had he known that with a plea he could have received way less than 20 years by pleading guilty, he would not have gone to trial. Id., ¶ 25. The petitioner further asserts that, the only reason he went to trial is because Scabavea told him that pleading guilty meant that he would be admitting to all the government's allegations, and would guarantee him a 20 year sentence. Id., ¶ 26.

July 18, 2023

Dear Honorable Clerk:

Please find enclosed for filing Atachment A and a Declaration in support of the motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255. As noted in the letter dated July 14, 2023, which was enclosed with the § 2255 form dated and mailed on July 14, 2023, due to typographical errors Attachment A and the accompanying Declaration could not be mailed at that time.

Thank you for your time and attention to this matter.

Sincerely,

Leonard Luton



Leonard Luton # 45133-013
Federal Correctional Institution
P.O. Box 9000
Berlin, NH 03570

WHITE RIV JCT VT 050
19 JUL 2023 PM 2 L

LEGAL MAIL!!!

United States District Court
District of Colorado
Clerk of the Court
901 19th Street, 2nd Fl.
Denver, CO 80294

80294-250151